UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| AMICUS MIAMI OF OHIO, LLC<br>78 Grand Street, Unit 4<br>New York, NY 10013,<br><br>   Plaintiff,<br><br>v.<br><br>HEATHER HOELZER KACACHOS<br>3401 Lanes Mill Road<br>Oxford, OH 45056,<br><br>   and<br><br>THOMAS KACACHOS<br>3401 Lanes Mill Road<br>Oxford, OH 45056<br><br>   Defendants. | Case No. |

**PLAINTIFF AMICUS MIAMI OF OHIO, LLC'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

   Pursuant to Federal Rule of Civil Procedure 65(a) and (b), Plaintiff Amicus Miami of Ohio, LLC ("Amicus" or "Plaintiff"), respectfully moves this Court for a Temporary Restraining Order and Preliminary Injunction against Defendants Heather Hoelzer Kacachos ("Ms. Kacachos") and Thomas Kacachos ("Mr. Kacachos," and, together with Ms. Kacachos, the "Sellers" or "Defendants"), immediately enjoining them from making any attempt to market or sell the Properties that are the subject of the PSA and, in turn this litigation, as that term is defined in the Verified Complaint filed herewith. This Motion is supported by the Verified Complaint and the below Memorandum in Support. A proposed Temporary Restraining Order is attached for the Court's consideration.

        Respectfully submitted,

        */s/ Aneca E. Lasley*
        Aneca E. Lasley (0072366), Trial Attorney
        ICE MILLER, LLP
        250 West Street, Suite 700
        Columbus, Ohio 43215-7509
        (614) 462-1085
        Aneca.Lasley@icemiller.com
        Attorney for Amicus Miami of Ohio, LLC

4883-5592-8354.4

**MEMORANDUM IN SUPPORT
OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

This case involves sophisticated real estate professionals who entered into an agreement in the fall of 2021 for Plaintiff, Amicus, to purchase student housing properties (the "Properties) from Defendants for $75 million.  However, when it came time to close on the deal in 2022, Defendants decided they would rather try to get a better price for the Properties than honor their contractual obligations and began making every attempt to stall the closing and pressure Amicus to walk away from its rights under the Limited Liability Company Membership Interests Purchase and Sale Agreement ("PSA").  Defendants' conduct has gotten so out of hand that Defendants are now claiming that the PSA, which Defendant Mr. Kacachos initialed on each and every page, and which both Defendants signed, is not a "meeting of the minds" and have tried to extract more money from Amicus in excess of the agreed upon purchase price.  Upon information and belief, Defendants may be attempting to sell the Properties to potential buyers despite the binding PSA requiring the sale of the Properties to Amicus.

After months of negotiations in the summer of 2021, Amicus and Sellers entered into the PSA for the sale of properties referred to as the "Park Place Portfolio" on October 25, 2021.  The PSA was clear that the Parties must close on the Properties, at the latest, by March 24, 2022. Working towards this closing, Amicus deposited hundreds of thousands of dollars into escrow, and spent over half a million dollars retaining appraisers, attorneys, and other professionals to facilitate this sale. Despite Amicus's best efforts and good faith attempts to close pursuant to the PSA, Sellers have been unwilling to comply with their obligations under the PSA.  As a result of these delays, Amicus has been forced to keep the capital that it called for the purchase sitting on its books, in addition to the half a million it has tied up in escrow.  Meanwhile, Amicus' effective mortgage rate has increased from 4.40% to 5.25% (an increase of 0.85%), which will not only

cause Amicus to pay, annually, an additional $116,000 in loan interest but also has more than quintupled the other financing costs from $300,000 to at least $1.7 million. Furthermore, Amicus now has a reasonable belief, based on statements of Sellers, that Sellers may be actively seeking to sell the Properties to another buyer. Given Sellers' prior bad acts, and their deliberate attempts to undercut the PSA, Amicus justifiably believes that Sellers will actively seek to sell this property during the pendency of this litigation unless they are enjoined from doing so.

To prevent further irreparable harm, Amicus requests that this Court temporarily and preliminarily enjoin Sellers from selling, transferring, damaging, or otherwise encumbering the Properties in the Park Place Portfolio until this matter can be tried. Because Amicus is entitled to purchasing rights under the PSA, and Sellers have expressed that they will attempt to transfer to the property to prevent Amicus from seeking ownership and/or relief, Amicus is entitled to an order restraining Sellers from otherwise disposing of the properties to maintain the status quo during this litigation. Furthermore, the PSA expressly authorizes Amicus to "take any and all legal actions necessary to compel Seller's specific performance." (Verified Compl. ¶¶ 10 & 49).

## I. FACTS

### A. The Purchase and Sale Agreement

Amicus Miami of Ohio, LLC is a purchaser and renovator of real estate predominately for college housing and academic living. (Verified Compl.¶ 4). Currently, Amicus operates student housing throughout the eastern United States and is looking to develop its property portfolio in Ohio. (*Id.*). Throughout 2020, Amicus examined an array of potential properties in the Oxford, Ohio area, with the goal of establishing a student housing presence near Miami University of Ohio. (*Id.*). Eventually, Amicus began discussions with Defendants Heather Hoelzer Kacachos and Thomas Kacachos who own the Properties that make up the Park Place Portfolio. (*Id.*).

Starting in late July of 2021, the Parties began months of back and forth discussions—negotiating purchase price, outlining specific housing units to be sold, establishing necessary closing periods, and more. (*Id.* ¶ 5). Throughout these negotiations both Parties, each sophisticated real estate investors, leveraged retained counsel to assist with the documentation and finalization of the transaction's terms. (*Id.* ¶¶ 4-5). These negotiations eventually culminated in the Limited Liability Company Membership Interests Purchase and Sale Agreement, which was executed on October 25, 2021. (*Id.* ¶ 30). Each of the parties signed the PSA, and Mr. Kacachos and Robert Abelson, as Manager of Amicus for the Buyers initialed *each and every page* of the PSA. (*Id.* ¶¶ 30-31).

In the PSA, Amicus agreed to purchase the Properties for a purchase price of $75 million. (*Id.* ¶ 35). In exchange, Sellers agreed to "(i) organize HoldCo [an entity wholly owned by Sellers], (ii) . . . acquire full and clear record and marketable fee simple title to their respective properties, (iii) . . . convey all of the Property to HoldCo, and (iv) sell all of the HoldCo Interests to Buyer . . . for the Purchase Price[.]" (*Id.* ¶ 33). Additionally, the Parties outlined the various closing and transfer obligations that each Party would be responsible for. (*Id.* ¶ 37-39, 42-47). For example, Sellers would be responsible for covering conveyance taxes and recording charges, whereas Amicus would cover the expenses related to seeking title insurance. (*Id.*). Perhaps most importantly, the Parties carefully outlined an inspection and closing timeline, which established an initial 90-day inspection period, with a single-use 30-day extension option, with closing required within 30 days after the inspection period's end. (*Id.* ¶¶ 40-41). Additionally, the Parties, in preparing for such a moment as would necessitate the filing of this Motion, outlined their expectations and understandings of the potential damages for a breach of contract. (*Id.* ¶¶ 48-50). Accordingly, the PSA underscored that "damages at law would be an inadequate remedy" for

Amicus should the Seller breach or otherwise fail to perform any of the covenants and agreements in the PSA. PSA, § 11.1. Furthermore, the PSA is clear that a prevailing party is to receive costs, expenses, and attorneys' fees. (Verified Compl. ¶ 50).

### B. The Plaintiff's Efforts to Close on the Sale of the Properties

From the day the PSA was executed, Amicus put forward a good faith effort to timely close on the Properties while also working to ensure that both Parties complied with their obligations under the PSA. (*Id.* ¶¶ 51-61). To show its commitment to the sale, Amicus deposited $50,000 with Fidelity National Title Insurance Company ("FNTIC") on September 16, 2021 before the PSA was even signed. (*Id.* ¶ 51). Then, two days after the PSA was signed, Amicus deposited another $250,000 into the escrow account as required by the PSA. (*Id.*). Amicus also made a third deposit on January 24, 2022, in order to extend the inspection period, as contemplated and permitted under the PSA; however, even then, the delay itself was primarily attributable to Sellers' excuse-and-delay tactics. (*Id.* ¶ 52). This third deposit brought the overall escrow deposits by Amicus to a grand total of $550,000.

Beyond depositing $550,000 in escrow, Amicus also actively pursued closing on the PSA. It attempted to work with Sellers on structuring the inspection period; hired attorneys, appraisers, and other professionals; and spent well over half a million dollars to maintain personnel to transfer the property. (*Id.* ¶¶ 54-55). Amicus has made many attempts to communicate with Sellers regarding the closing obligations of both Parties, and, when needed, Amicus made every effort to accommodate Sellers even though they were not contractually obligated to do so. (*Id.* ¶¶ 7-8, 58, 61-62, 79-83).

6

### C. Sellers' Deliberate Hinderance of the PSA

Unfortunately, Sellers' have not similarly acted in good faith to carry out their obligations under the PSA. Rather, Sellers have been evasive and dilatory. Sellers would often say that they were reviewing documents and working towards closing, when hindsight has revealed that they were merely stalling. (*Id.* ¶¶ 74-76). Alternatively, when Sellers actually got around to reviewing and/or producing necessary documents for closing, those documents would come months later, and follow-up questions from Amicus were met with further silence. (*Id.* ¶¶ 75-78). Sellers also actively refused to work with Amicus to set, and more importantly keep, a closing date—changing the agreed upon date more than four times within a one-month period. (*Id.* ¶ 89). Unfortunately, all of this shifting resulted in the Parties missing both the February 22, 2022 and March 24, 2022 closing dates set forth in the PSA, even though Amicus was ready, willing, and able to close with the full support of its lender. (*Id.* ¶¶ 58, 78, 90). Weeks after final closing was meant to occur, Sellers attempted to write off their active noncompliance with the PSA as "just business" and finally shared that the true reason for the ongoing breach was that they wanted a higher price for the Properties. (*Id.* ¶¶ 96-99). Accordingly, Sellers have breached, and continue to breach, the PSA by failing to comply with due diligence requirements, by providing incomplete and/or inaccurate information, by refusing to finalize ancillary documents, by actively avoiding meeting to facilitate an efficient and effective sale, and by actively attempting to sell the Properties to other buyers. (*Id.* ¶¶ 74-99).

### D. Amicus's Ongoing Damages

As a result of Sellers' deliberate diversions outlined above, and despite Amicus's best effort to work with its lenders, Amicus's mortgage rate to finance this deal has increased by *at least* 0.85% which will result in Amicus paying, annually, an additional $116,000 in loan interest

4883-5592-8354.4

and has *more than quintupled* Amicus's fee for the interest rate cap. (*Id.* ¶¶ 57-58). Furthermore, upon information and belief, Sellers are continuing to delay closing in the hopes that, given this less favorable financing environment and Sellers' efforts to make the closing process as excruciating as possible, Amicus will forfeit its rights under the PSA so that Sellers can sell the Properties for a higher price. (*Id.* ¶ 8). Upon information and belief, Sellers may be actively communicating with other potential buyers and are likely to attempt to sell the Properties out from under Amicus and in violation of the PSA. (*Id.* ¶¶ 8, 99). The Parties have already acknowledged that "damages at law would be an inadequate remedy" to address Sellers' default and the litany of complications and burdens it has laid upon Amicus and, therefore, the PSA provides Amicus with the remedy of specific performance.

### E. Requesting Injunctive Relief

In light of Sellers' history of scheming and underhanded tactics, Amicus has legitimate cause for concern that Sellers will seek to sell, transfer, or otherwise encumber the Property before this Court has the opportunity to rule on this case. (*See generally* Verified Compl.) Given Amicus's understanding that Sellers are actively communicating with potential buyers, and the binding terms of the PSA, Amicus will be irreparably harmed if the Court does not enjoin Sellers before they resell the Properties because the Court will not be able to enforce the PSA's provision of specific performance if Sellers no longer own the Properties.[1] (*Id.*)

## II. LAW AND ARGUMENT

### A. Standard for a Temporary Restraining Order.

The purpose of a temporary restraining order ("TRO") "is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78

---

[1] In a further effort to prevent this irreparable harm, Amicus is also filing a notice of *lis pendens* with the County recorder's office to notify potential buyers of this litigation.

F.3d 219, 226 (6th Cir. 1996). At the preliminary injunction stage, "a plaintiff must show more than a mere possibility of success," but need not "prove his case in full." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).

When considering whether to grant a TRO or a preliminary injunction, a court must examine four factors: (1) whether the moving party has a strong or substantial likelihood of success on the merits of its underlying claim; (2) whether the movant will be irreparably harmed if the order is not granted; (3) whether the granting of the motion will cause substantial harm to others; and (4) whether the public interest will be served by granting the motion. *See* QFS *Transportation, LLC v. Huguely*, No. 1:21-CV-00769, 2022 WL 395756, at *3 (S.D. Ohio Feb. 9, 2022). Notably, the standard for issuing a TRO is "logically the same" as for a preliminary injunction, with the main difference being the degree of emphasis given to the irreparable harm factor. *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016). In determining whether to grant injunctive relief, no one of the four factors is dispositive. *Treesh v. Bobb-Itt*, No. 2:10-CV-211, 2010 WL 3769266, at *3 (S.D. Ohio Sept. 21, 2010). Accordingly, these factors are meant to "simply guide" the court in its decision to grant a motion for a TRO, which lies within the sound discretion of the court. *See Fries Bros., Inc. v. Baker Produce, LLC*, No. 1:14CV00067, 2014 WL 288887, at *1 (S.D. Ohio Jan. 24, 2014); *Eberle v. Wilkinson*, No. 2:03 CV 272, 2005 WL 1984435, at *2 (S.D. Ohio Aug. 17, 2005).

Federal courts are no stranger to requests for a TRO and preliminary injunction to prevent the sale of real estate that is subject to a purchase and sale agreement. *See e.g.*, *D.P. Dough Franchising, LLC v. Southworth*, No. 2:15-CV-2635, 2017 WL 4315013, at *5 (S.D. Ohio Sept. 26, 2017).

9

**B. Amicus has demonstrated a likelihood of success on the merits.**

Amicus has asserted claims for breach of contract and for breach of the duty of good faith and fair dealing.[2] To prove a breach of contract under Ohio law, a plaintiff must establish that: (1) a contract existed, (2) the plaintiff performed, (3) the defendant has breached the contract, and (4) the breach resulted in damages. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). To prove a breach of the duty of good faith and fair dealing, which is implied in every contract, Amicus must show that the covenant is implicated by "acts or omissions 'that could not have been contemplated at the time of drafting, and which therefore w[ere] not resolved explicitly by the parties'" and that Sellers otherwise acted in bad faith. *Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 477 (6th Cir. 2009) (quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 662 N.E.2d 1074, 1083 (Ohio 1996)). Amicus is likely to succeed on both of its claim because the Parties' plainly have a binding contract, Sellers breached that contract by not Closing within the required time even though Amicus was ready, able, and willing, and Sellers have breached the contract in bad faith in an effort to sell the Properties to other potential buyers at a higher price.

First, the PSA is a binding and enforceable contract. For a contract to be enforceable under Ohio law, there must have been a meeting of the minds based not on the parties' subjective intent, but based on whether "a reasonable person would find that the parties manifested a present intention to be bound to an agreement." *Champion Gym & Fitness, Inc. v. Crotty*, 2008-Ohio-5642, 900 N.E.2d 231, ¶ 12 (2d Dist.), (quoting *Zelina v. Hillyer*, 2005-Ohio-5803, 846 N.E.2d 68, ¶ 12 (9th Dist.)). Ohio courts have held that a signed written agreement is strong evidence and

---

[2] Although Amicus is also likely to succeed on its claim that Sellers have anticipatorily breached the PSA, Amicus seeks a remedy at law for that breach and therefore does not address the claim here. *See Sunesis Trucking Co. v. Thistledown Racetrack, L.L.C.*, 2014-Ohio-3333, ¶¶ 29-33, 22 N.E.3d 190, 195-96 ("If an anticipatory breach of contract is found to occur, the injured party has the option of (1) terminating the contract and suing the breaching party immediately, or (2) continuing the contract and suing the breaching party for damages after the time for performance has passed.").

10

4883-5592-8354.4

"generally demonstrates the existence of a 'meeting of the minds.'" *See Fry v. FCA US LLC*, 2017-Ohio-7005, ¶ 20, 143 N.E.3d 1108, 1115 (6th Dist.); *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, ¶ 23, 41 N.E.3d 145, 152 (2d Dist.); *Cuyahoga Cty. Hospitals v. Price*, 64 Ohio App.3d 410, 416 (8th Dist. 1989). Similarly, a signed Purchase and Sale Agreement, in addition to evidence of attempts to negotiate material terms, can establish "[an] express contract [that] connotes an exchange of promises in which the parties have communicated terms to which they agreed to be bound." *Morganstern, MacAdams & DeVito Co., L.P.A. v. Hilliard Bldg. P'ship*, 2001-Ohio-4258, 2001 WL 1612080, at *4-6 (8th Dist.).

Here, the Parties spent substantial time negotiating the Purchase and Sale Agreement. On October 25, 2021, Amicus and Sellers entered into the PSA, which was executed by way of signature and was initialed by Mr. Kacachos on *each and every page*. (Verified Compl. ¶¶ 30-31, Exhibit A). Accordingly, the intent to be bound by the terms of the PSA was clearly demonstrated by the signatures of both of Sellers, and by and through Robert Abelson as the Manager of Amicus alone. *Id.* This conclusion is further bolstered by the parties signing and executing an Amendment To Limited Liability Company Membership Interests Purchase And Sale Agreement ("Amendment") on January 24, 2022, which directly recognized the binding presence and force of the PSA and reaffirmed the Parties' obligations and responsibilities therein. (*Id.* ¶¶ 65-67).

Moreover, two days after signing the PSA and pursuant to its obligations therein, Amicus made an escrow deposit for $250,000. (*Id.* ¶ 54). Amicus later made another escrow deposit on $250,000 on January 24, 2022. (*Id.* ¶ 52). Sellers have never sought to return that money or indicated to Amicus that it was all one big misunderstanding, that there was never any real agreement to sell the Properties. (*Id.* ¶ 73).

11

4883-5592-8354.4

Finally, Sellers initially worked to meet their obligations under the PSA too. As discussed in the Complaint, Sellers worked with Amicus to begin gathering due diligence documents, initiate transfer of accounts, and negotiating the ancillary documents contemplated in the PSA. (*Id.* ¶¶ 62-72). In fact, Sellers entered into an Amendment reaffirming the binding nature of the PSA as addressed above. Sellers only began their tactics of obstruction and delay once they began to believe that a higher purchase price could be had from another buyer. This confirms that Sellers believed there to be a binding agreement. But, most importantly, all of this taken together shows that a reasonable person would conclude that the parties had a meeting of the minds and intended to be bound by the PSA. The existence of a binding contract under Ohio law is therefore clear from the Verified Complaint and supporting exhibits.

Second, Amicus was ready, willing, and able to close within the closing period. Accordingly, Amicus has had established financing for the Properties since November 15, 2021 which was set to extend through the anticipated closing date. (*Id.* ¶ 57). Furthermore, Amicus has worked diligently to execute the transfer of the property, by: hiring appraisers, attorneys, and other professionals to facilitate the necessary paperwork; promptly initiating the inspection period; actively reviewing (when produced) Sellers' due diligence documents; attempting to resolve Sellers's concerns; and generally working to effectuate an on-time close on the Properties. (*Id.* ¶¶ 51-61).

Third, Sellers breached the PSA by failing to close within the required closing period. Although Sellers initially complied with their obligations under the PSA, as the initial closing date drew near did Sellers begin to consider the potential of selling the property for a higher price, and then they began to engage in an excuse-and-delay tactic. (*Id.* ¶¶ 2, 96-99). And despite Amicus's good faith efforts to reach a closing, Sellers repeatedly failed to provide due diligence material,

refused to negotiate ancillary documents in good faith, and eventually halted all closing progress so they could attempt to force the Plaintiff to pay a higher-than-negotiated price for the Properties. (*Id.* ¶¶ 74-99). Ultimately, this resulted in the closing date being moved numerous times, from February 23 to March 1 to March 15 and, again, to March 25. (*Id.* ¶ 89). However, this active undermining of the PSA does not reach the extent of Sellers' breach. Amicus believes that Sellers have been actively communicating with other potential buyers to sell the Properties out from under Amicus. (*Id.* ¶ 2). Accordingly, it remains clear that Sellers are actively avoiding, and breaching, their obligations under the PSA in hopes that they can deny Amicus the ability to close on the Properties, thereby enabling Sellers to pursue a larger payout.

Fourth, Sellers' breach has already damaged Amicus. Be it the annual $116,000 in additional loan interest required by the 0.85% increase in the loan interest rate, the quintupled price for interest rate caps rising from $300,000 to $1.7 million, the over half a million dollars for professional retainers, or the $550,000 in tied-up escrow funds, Amicus has suffered millions of dollars in financial damages that are the direct result of Sellers' dodgy tactics and refusal to close. (*Id.* ¶¶ 53-59). Additionally, with the market and interest rates still in flux, Amicus remains acutely vulnerable to further volatility and negative financial strains. (*Id.* ¶ 60). In addition, Amicus has already been deprived of the revenue stream that it expected to acquire from the purchase of the rental properties that make up the Park Place Portfolio. Amicus will be further damaged if Sellers do not complete the sale of the Properties required by the PSA in that Amicus will be deprived of the future revenue streams in addition to any appreciation in property value.

At bottom, Sellers' ongoing efforts to avoid closing on the PSA and to sell the Properties at a higher price to another potential buyer is plainly a breach of contract. *See e.g., Fine v. U.S. Erie Islands Co.*, 2009-Ohio-1531, 2009 WL 826525 (6th Dist.); *Fairfax Homes, Inc. v. Blue Belle,*

*Inc.*, 2006-Ohio-2261, 2006 WL 1230691 (5th Dist.). The risk that such conduct could occur is precisely why the parties entered into the PSA, and why the PSA provides Amicus with the remedy of specific performance. Further, Sellers' refusal to work in good faith with Amicus to close on the Properties within the time required under the PSA demonstrates Sellers' lack of good faith and failure to deal fairly with Sellers. *See Profit Energy Co. v. Gulfport Energy Corp.*, No. 2:19-CV-3487, 2020 WL 4226508, at *6 (S.D. Ohio July 23, 2020) (refusal to provide requested documents and explanations related to a deal impacting property constituted a violation of the covenant of good faith and fair dealing); *Sona Techs., LLC v. Barber*, No. CIV.A.2:08-CV-468, 2010 WL 2025513, at *3 (S.D. Ohio May 20, 2010) ("Bad faith may consistent of inaction" or "interference with or failure to cooperate in the other party's performance."). The Verified Complaint and supporting exhibits support that Amicus has a high likelihood of success in demonstrating that Sellers have breached the PSA and acted in bad faith such that Amicus would be entitled to specific performance under the PSA.

**C. Amicus will suffer irreparable harm if the injunction is not granted.**

Without injunctive relief, Amicus will suffer irreparable injury as a result of Sellers' active efforts to sell, or otherwise transfer, the property. Amicus has tied up considerable capital and expended substantial resources in fulfilling its obligations under the PSA. Amicus did so with the promise set out in the PSA that Sellers will sell to Amicus the Properties in the Park Place Portfolio. Amicus also did so with the understanding that, if Sellers were to breach the PSA, that Amicus is explicitly entitled to specific performance of the PSA, meaning that Sellers are obligated to sell the Properties to Amicus. Indeed, Amicus has brought this action to vindicate those very rights. If Amicus is able to sell the Properties to another buyer during the pendency of this litigation, then Amicus's right to specific performance could be rendered meaningless. That is exactly why the

14

PSA, signed by all Parties, explicitly states that "damages at law would be an inadequate remedy" for Amicus in the event that Sellers default on their obligations under the PSA. PSA, § 11.1.

Generally, the Sixth Circuit has held that irreparable harm occurs when "an injury is not fully compensable" by monetary damages or where the nature of the plaintiff's injury is such that damages would be difficult to calculate." *Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc.*, 108 F. Supp. 2d 859, 865 (S.D. Ohio 2000) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). Additionally, courts have recognized that when a party is deprived of the use and possession of the "unique nature of real property" they suffer irreparable harm. *Golf Vill. N. LLC v. City of Powell*, Ohio, 333 F. Supp. 3d 769, 781 (S.D. Ohio 2018); *see also Baker v. People's Choice Home Loan, Inc.*, No. 3:10-CV-327, 2010 WL 3447614, at *4 (S.D. Ohio Aug. 27, 2010). Similarly, it has been recognized that if a plaintiff were to succeed on its claims, but the defendant has been allowed to sell the property involved in the suit, then the plaintiff would have suffered irreparable harm. *See Stooksbury v. Ross*, 528 F. App'x 547, 557-559 (6th Cir. 2013).

### D. Sellers will not be unduly harmed, and the public will not be injured if the injunction is granted.

The requested injunctive relief will not impose an undue burden on Sellers, nor will it injure the public. Inherently, injunctive relief is an exercise in attempting to "preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996); *see also Abrahamson v. Jones*, No. 1:16-CV-712, 2016 WL 3855204, at *4 (S.D. Ohio July 15, 2016); *Reid v. Hood*, No. 1:10 CV 2842, 2011 U.S. Dist. LEXIS 7631, at *2, 2011 WL 251437 (N.D. Ohio Jan. 26, 2011).

In the status quo, Amicus stands ready and able to purchase the Properties for the agreed upon purchase price. (Verified Compl. ¶ 2). In the status quo, Amicus continues, as it always had,

15

ready and able to comply with its obligations under the PSA. (*See generally* Verified Compl.). In the status quo, Sellers have already agreed to sell the Properties to Amicus. Accordingly, Sellers will not be harmed by the injunctive relief, they will continue to be able to sell the Properties to Amicus for $75 million as required by the PSA. Allowing Sellers to otherwise sell the property would not only invalidate the entirety of the PSA but would also allow for the Defendants to evade the remedy of specific performance available to Amicus under the PSA, which requires that Sellers maintain possession of the Properties to convey them to Amicus.

Issuance of a TRO an injunction would further the public policy of Ohio. Under Ohio law, there is a "general public interest in the enforcement of voluntarily assumed contract obligations." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007). The Ohio Supreme Court has explained that this public interest is rooted in the fact that persons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced. *Prosonic Corp. v. Stafford,* 539 F. Supp. 2d 999, 1008 (S.D. Ohio 2008) (quoting *Ratchford v. Proprietors' Ins. Co.*, 47 Ohio St. 3d 1, 8 (1989)). Thus, the "public's interest in preserving the legitimacy of contracts" favors the enforcement of the PSA, and otherwise would not pose any harm to the general public. *Id.*

### III. CONCLUSION

For the foregoing reasons, Amicus respectfully requests that this Court enter a Temporary Restraining Order and a Preliminary Injunction against the Defendants. A proposed Order is attached at **Exhibit A.**

        Respectfully submitted,

        */s/ Aneca E. Lasley*
        Aneca E. Lasley (0072366), Trial Attorney
        ICE MILLER, LLP

                                              250 West Street, Suite 700
                                              Columbus, Ohio 43215-7509
                                              (614) 462-1085

                                              Attorney for Amicus Miami of Ohio, LLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of the foregoing was served by electronic mail and the Court's CM/ECF System on this May 31, 2022 upon:

Heather Hoelzer Kacachos
3401 Lanes Mill Road
Oxford, OH 45056,

Thomas Kacachos
3401 Lanes Mill Road
Oxford, OH 45056

                                          */s/ Aneca E. Lasley*
                                          Aneca E. Lasley (0072366)