*Attorney-Client Privilege Draft*
*Confidential Attorney Work Product*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION
#### (Cincinnati)

| | |
|---|---|
| AMICUS MIAMI OF OHIO, LLC | |
|      Plaintiff, | |
| v. | Case No. 1:22-cv-355 |
| HEATHER HOELZER KACACHOS | Judge Michael W. McFarland |
|      And | Magistrate Judge Karen L. Litkovitz |
| THOMAS KACACHOS | |
|      Defendants. | |

## PLAINTIFF'S FIRST AMEDNED VERIFIED COMPLAINT FOR
## SPECIFIC PERFORMANCE, PERMANENT INJUNCTION, AND DAMAGES

Plaintiff Amicus Miami of Ohio, LLC ("Amicus" or "Plaintiff"), brings this First Amended Complaint against Defendants Heather Hoelzer Kacachos ("Ms. Kacachos") and Thomas Kacachos ("Mr. Kacachos" and, collectively, the "Defendants" or "Sellers") and states as follows:

### NATURE OF THE ACTION

1.     This is a straightforward action for specific performance, damages, and injunctive relief arising out of Sellers' breach of their commitment to sell a portfolio of residential properties they own in Oxford, Ohio to Amicus.

2.     The parties' fully-executed Limited Liability Company Membership Interests Purchase and Sale Agreement ("PSA") required Sellers to close by March 24, 2022. Amicus was ready to close on that date and remains ready, willing, and able to close today. Sellers refused to close on March 24 and have now told Amicus that they have no intention of closing on the parties' agreed-upon terms at all. Instead, they have abruptly demanded that Amicus pay substantially more than the $75 million purchase price in the PSA. Sellers' reason for trying to back out of the parties' deal is apparent: They believe that they can cut a better deal at a higher price with another buyer, if not Amicus. But this flagrant repudiation of the parties' contract has no basis in law or equity.

3.     Sellers' breaches, in addition to depriving Amicus the benefits of owning the Oxford properties, have already caused Amicus substantial incident economic harm and are likely to require Amicus to accept more expensive financing terms in order to consummate the sale.

4.     On both sides of this litigation are sophisticated real estate investors. Amicus is a purchaser and renovator of real estate predominately for the use of college housing and academic living experiences. Affiliates of Amicus currently own and operate student housing in college towns in the eastern United States, and are always looking for additional investment opportunities to expand its student housing properties. In 2020, Amicus discovered such an opportunity in a portfolio of properties located in Oxford, Ohio, near Miami University. Soon thereafter, in July of 2021, Amicus began discussing a possible purchase of those properties with the current owners, Ms. Kacachos and Mr. Kacachos.

5.     After almost four months of negotiations, including a site visit in August, the parties came to terms on the 31-page PSA on October 25, 2021. Its obligations are clear and unambiguous. It was signed by both sides and initialed by Sellers on every page. The very first

section of the contract required Sellers to "sell all of the [Property] Interests to [Amicus] . . . for the [$75 million] Purchase Price."  The "Closing Date" for the sale was defined as the date "thirty (30) days after the expiration of the Inspection Period," which occurred on March 24, 2022.

6.     Amicus has complied with all of its obligations under the PSA, including depositing—and to this date, maintaining—$550,000 in escrow in partial satisfaction of the purchase price.  Amicus also completed diligence, secured financing, and took all of the other steps necessary for it to complete the purchase of the properties on March 24.

7.     For nearly six months after the parties executed the PSA, Sellers' words and actions indicated that they also intended to fulfill their obligations and close on the parties' agreed-upon timeline.  But shortly before the March 24 close, Sellers abruptly reversed course and identified a variety of extracontractual reasons to delay closing.  Taking Sellers at their word, Amicus worked through Sellers' purported issues in good faith and successfully resolved them over the next several weeks.

8.     It only then became obvious to Amicus that Sellers were not themselves operating in good faith, but rather had simply been using stall tactics in the hope that Amicus would give up and agree to terminate the Agreement.  On a call on May 11, 2022, Sellers acknowledged to Amicus that there were no outstanding "issues" that stood of the way of closing.  Except one, said Mr. Kacachos:  there was no "meeting of the minds" on "price."  Amicus reacted in astonishment— after all, the $75 million purchase price was a fundamental term of the binding PSA.  But in Sellers' view, market conditions had changed, and this was an opportunity to seek a better deal.  When Amicus made clear that it would not re-negotiate the terms of the PSA, Sellers said they would not close on its terms and ended the call.  And now that Amicus was unwilling to accede to their price

increase demand, Amicus is gravely concerned that Sellers may be unlawfully marketing the Oxford properties to other potential buyers.

9.      This action follows, asserting claims for breach of contract and breach of the duty of good faith and fair dealing against Sellers.

10.     Under the plain terms of the PSA and Ohio law, Amicus is entitled to specific performance and damages for those breaches, including an order compelling Sellers to consummate the sale. Section 11.1 of the PSA expressly provides that in the event of a Seller breach, Amicus "shall have the right to . . . compel Seller's specific performance hereunder . . . and to consummate the transaction contemplated by this Agreement in accordance with the provisions of this Agreement."

11.     Amicus should also be made whole for the damages it has suffered and will continue to suffer as a result of Sellers' breaches.  These include damages incident to specific performance, such as Amicus's lost profits and the more expensive financing terms Amicus will almost certainly be forced to incur by the delayed close.

12.     Finally, to preserve the status quo while this action is pending, Amicus respectfully requests that the Court grant injunctive relief preventing Sellers from marketing the properties to any other prospective buyers.

## THE PARTIES

13.     Plaintiff Amicus Miami of Ohio, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York City, New York.

14.     The sole member of the LLC is: Amicus II Investment Holdings LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York City, New York.

15.     As stated in the PSA, Defendant Heather Hoelzer Kacachos is a citizen of Ohio who is domiciled at 3401 Lanes Mill Road, Oxford, Ohio 45056 in Butler County.

16.     As stated in the PSA, Defendant Thomas Kacachos is a citizen of Ohio who is domiciled at 3401 Lanes Mill Road, Oxford, Ohio 45056 in Butler County.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

18.     The Properties that are the subject of this action and the Parties' PSA are to be sold by Sellers to Amicus for $75,000,000.00, in excess of the statutory requirement for the amount in controversy.

19.     The sole member of Amicus Miami of Ohio, LLC is a citizen of a state other than Ohio as set out in paragraph 19 above.

20.     Both Sellers are citizens of the State of Ohio and, upon information and belief, both Sellers own properties throughout the State of Ohio. Mr. Kacachos also maintains several professional contractor's licenses (plumbing, hydronics, refrigeration, HVAC, and electrical) in Ohio in relation to his work as general contract for Park Place Real Estate Management Inc.

21.     This Court has personal jurisdiction over Sellers because, upon information and belief, Sellers are domiciled in this State and District, Sellers own the Properties located in this State and District, and Sellers engage in systematic and continuous contacts within this State and District.

22. Further, the Properties that are the subject of this action for specific performance are located in this State and District.

23. Venue is proper in this District and Division pursuant to at least 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## FACTUAL BACKGROUND

### Negotiating the Purchase and Sale Agreement

24. Throughout 2020, Amicus sought out potential investment opportunities for student housing, with a particular focus on properties located in Oxford, Ohio, near Miami University.

25. As a result of its search, Amicus found the Park Place Portfolio, and in July 2021, it began negotiations, which lasted nearly four months, seeking to purchase these properties from the current owners, Ms. Kacachos and Mr. Kacachos.

26. Even before the PSA, these negotiations culminated in the execution of a nonbinding letter-of-intent ("LOI") on September 14, 2021, which outlined the $75 million purchase price and outlined the requirements for a pre-PSA escrow deposit.

27. The first draft of a purchase and sale contract was exchanged on September 29, 2021.

28. Negotiations over the terms of the PSA ensued. Throughout the negotiations, both Parties were represented and informed by sophisticated legal counsel, a fact memorialized in Section 12.19 of the PSA. Leading up to the execution of the PSA, Sellers provided the necessary exhibits.

### The Parties Execute the Binding Purchase and Sale Agreement

29. On October 25, 2021, Amicus and Sellers entered into the PSA, which is titled Limited Liability Company Membership Interests Purchase and Sale Agreement. A true, accurate,

and complete copy of the Parties' October 25, 2021 PSA with its exhibits is attached hereto as

**Exhibit A**.

30.     The intent to be bound by the terms of the PSA is plainly demonstrated by the

signatures of Ms. Kacachos and Mr. Kacachos for Sellers, and by and through Robert Abelson as

the Manager of Amicus for Buyer.

31.     In addition to executing the PSA by way of signature on October 25, 2021, Abelson

and Mr. Kacachos initialed *each and every page* of the PSA.

32.     Pursuant to Section 4.1(c) of the PSA, Sellers represented and warranted that:

> (c) ***This Agreement has been duly authorized, executed and delivered by
> all of the Seller Parties*** and all consents required under any of the Seller
> Parties' which are legal entities' organizational documents, operating
> agreements or by laws have been obtained. All documents that are to be
> executed by any of the Seller Parties and delivered to Buyer on the Closing
> Date have been, or on the Closing Date will be, duly executed, authorized
> and delivered by the applicable Seller Parties. ***This Agreement and all such
> documents are, and on the Closing Date will be, legal, valid and binding
> obligations of the Seller Parties***, enforceable in accordance with their
> terms, and do not, and, at the time of the Closing Date will not, violate or
> conflict with any provisions of any contract, agreement, instrument,
> document, ordinance, bylaw, rule, regulation or judicial or administrative
> order to which any of the Seller Parties is a party or to which any of the
> Seller Parties or the Property (or any portion thereof) is subject or, to Seller's
> knowledge, any ordinance, bylaw, rule, regulation applicable to the Seller
> Parties or the Property.

(Emphasis added.)

**The Parties' Obligations under the Purchase and Sale Agreement**

33.     In the PSA, Sellers agreed to "(i) organize HoldCo [an entity wholly owned by

Sellers],[1] (ii) . . . acquire full and clear record and marketable fee simple title to their respective

---

[1] The PSA required HoldCo to be (i) a limited liability company, duly organized and in good standing under the
laws of the State of Delaware, (ii) qualified to do business in Ohio, and (iii) able to enter into instruments and
agreements. PSA, § 4.1(v).

properties, (iii) . . . convey all of the Property to HoldCo, and (iv) sell all of the HoldCo Interests to Buyer . . . for the Purchase Price[.]" PSA, § 1.1.

34.     The specific properties required to be conveyed to Amicus (the "Properties") were identified in Schedule 2.1(a) of the PSA.

35.     Amicus agreed to purchase the Properties through the transfer of limited liability company interests for the purchase price of $75,000,000 (the "Purchase Price"), subject to adjustments and proration as provided by the PSA. PSA, § 3.1.

36.     Of the Purchase Price, $50,000 was required to be placed in escrow by Amicus prior to the execution of the PSA, and another $250,000 within two business days after execution.

37.     Furthermore, the Parties agreed that Sellers would be responsible for covering certain expenses resulting from the transfer of the Properties, including but not limited to, paying for all delinquent taxes, all assessments on the Properties, all unpaid real estate taxes through closing, all costs associated with deed stamps and the recording charges for release and discharge documents, conveyance taxes, documentary taxes, or any other tax imposed in connection with the conveyance of the Properties to HoldCo. PSA, §§ 3.5, 3.7, 3.13.

38.     Amicus was in turn responsible for paying all the fees charged by the title company (FNTIC), charges necessary to complete a survey, charges related to obtaining a title insurance policy, and its counsel's fees and expenses. PSA, § 3.14.

39.     To facilitate an expedient and thorough due diligence review, the Parties also agreed that Sellers must provide Amicus with all records, invoices, bills, and other information and materials relating to the Properties for inspection and copying and to *cooperate fully* throughout any reconciliations and/or audits. PSA, § 4.2(g).

40.    The Parties carefully outlined an inspection and closing timeline.  The PSA set forth an initial 90-day inspection period, beginning on the execution date of the PSA, October 25, 2021, with a one-time option for a 30-day extension if Amicus deposited an additional $250,000 into escrow.  From there, the Closing Date was set to occur within thirty (30) days after the end of the inspection period.  PSA, §§ 5.1, 8.1.

41.    Even if the Inspection Period and Closing Period were taken to their outside limits, the PSA provides for the latest Closing Date occurring on February 22, 2022, or, if extended, as was the case here, on or about March 24, 2022.

42.    In connection with the Closing, Sellers were required to provide Amicus with "sufficient information to cause the Escrow Agent to prepare a draft closing statement setting forth the prorations and adjustments to the Purchase Price . . . at least five (5) days prior to the Closing." PSA, § 3.15.

43.    On the Closing Date itself, Sellers were required to deliver each of the following items to Amicus:

(a)    A duly executed and acknowledged warranty deed (the "Deed") conveying the Real Property and the Improvements to HoldCo with title as provided in Section 6.3 in the form satisfactory to the Title Company; . . .

(b)    A duly executed warranty bill of sale conveying the Personal Property to HoldCo in a form mutually agreed upon by Buyer and Seller;

(c)    A duly executed assignment and assumption agreement regarding leases, rents, deposits and escrow accounts executed by Seller and HoldCo (the "Assignment of Leases") in the form attached hereto as Schedule J;

(d)    A duly executed assignment and assumption of the Assigned Contracts and the Intangible Property executed by Seller and HoldCo in the form attached hereto as Schedule K together with original counterparts of the Assigned Contracts and any warranties and guaranties and agreements governing the Intangible Property (or if originals are not available, copies of such Assigned Contracts, warranties, guaranties and agreements);

9

(e)      A duly executed Assignment of Membership Interests (the "Assignment of Membership Interests"), conveying to Buyer the HoldCo Interests in the form attached hereto as Schedule M;

(f)      A duly executed counterpart to the Finder's Fee Agreement;

(g)      A duly executed counterpart to the Construction Management Agreement;

(h)      A duly executed counterpart to the Property Management Agreement;

(i)      A duly executed counterpart to the Profits Interest Agreement;

(j)      A duly executed counterpart to the Closing Statement;

(k)      A duly executed certificate or certificates of non-foreign status from Seller in the Title Company's standard form;

(l)      Customary affidavits sufficient for the Title Company to delete any exceptions for parties in possession (other than tenants under Leases), mechanic's or materialmen's liens from Buyer's title policy, an affidavit in the form agreed to by the Title Company sufficient to cause the Title Company to deliver a non-imputation endorsement to Buyer, a "gap indemnity" in the Title Company's standard form and such other affidavits and documents relating to such title policy as the Title Company may reasonably request, all duly executed by Seller and such other parties as the Title Company requires;

(m)      Evidence reasonably satisfactory to Buyer and the Title Company of Seller's authority to convey the Property and the HoldCo Interests pursuant to this Agreement in form and substance satisfactory to Buyer and the Title Company;

(n)      A duly executed counterpart original of the closing statement setting forth the Purchase Price, the closing adjustments and the application of the Purchase Price as adjusted;

(o)      An updated Rent Roll;

(p)      Any and all transfer tax returns, declarations of value or other documents required under applicable law or necessary for recordation of the Deed;

(q)      A certificate of good standing for each Seller entity;

(r)      Evidence that all contracts relating to the Property (other than the Assigned Contracts) have been terminated;

(s)   Such other instruments as Buyer may reasonably request to effectuate the transaction contemplated by this Agreement without additional liability or expense to Seller, executed by Seller where necessary;

(t)   All books, records, plans, specifications, contracts, agreements and other instruments or documents and/or copies thereof to the extent in the possession of Seller or its agents or representatives related to the construction, operation and maintenance of the Property;

(u)   Keys to all locks on the Property in Seller's possession or control, if any;

(v)   A duly executed certificate from Seller stating that all representations and warranties set forth in Section 4.1 hereof were true as of the date hereof and remain true, accurate and complete as of the Closing Date; and

(w)   A Non-Competition Agreement executed by Heather Hoelzer Kacachos and Thomas Kacachos (the "Principals") in the form attached hereto as Schedule 8.2(w), pursuant to which the Principals agree not to compete with the student housing business to be conducted by Buyer and its affiliates; and

(x)   Full possession of the Property, free and clear of all occupants, subject only to the Permitted Exceptions, and except such tenants as listed in the updated Rent Roll delivered at Closing and the Property shall be in substantially the same condition on the Closing Date as on the date of Buyer's execution of this Agreement, reasonable wear and tear and loss by casualty excepted.

PSA, § 8.2.

44.   For its part, on the Closing Date, Amicus was required to deliver the Purchase Price and countersigned copies of certain ancillary documents referenced in the PSA.

45.   Amicus also obtained a number of specific representations and covenants from Sellers to further protect its rights in connection with the Agreement, such as:

(r)   The Seller Parties have not entered into any other contracts for the sale of the Property or any portion thereof, or for the sale of any interests in the Property Owners. No party has any rights of first refusal or options to purchase as to the Property, any portion thereof or the Property Owners, or any other right that might prevent or limit the consummation of the transactions contemplated by this Agreement.

(v)   As of the Closing Date, HoldCo will (A) be a limited liability company, duly organized and in good standing under the laws of the State of Delaware, or such other state on which the Parties mutually agree, (B) qualified to do business in the State of Ohio, (C) have the limited liability company power to enter into the instruments and agreements necessary to

perform all duties and obligations imposed upon it thereunder, (D) will have obtained all necessary limited liability company authorizations required under applicable law in connection with taking title to the Property, and (E) will hold good and clear record and marketable fee simple title to all of the Property.

(x)    Seller shall not have previously assigned, transferred, hypothecated or otherwise conveyed or purported to agree to assign, transfer, hypothecate or otherwise convey all or any portion of its right, title or interest in the HoldCo Interests. To the Seller Parties' knowledge, there is no action, proceeding or investigation pending or threatened (nor any basis therefor) against any of the Seller Parties which questions or would question, directly or indirectly, the validity or enforceability of the acquisition of the HoldCo Interests by Buyer. Seller acknowledges and agrees that, from and after Closing, none of the Seller Parties nor any of their affiliates nor any of their respective members, stockholders, partners, officers, directors or employees shall have any legal or beneficial ownership in HoldCo or the Property whatsoever. Seller will not appoint any officers or directors of HoldCo.

PSA, § 4.1(r), (v), (x).

46.    The PSA expressly provided that "[t]he representations and warranties" provided by Sellers "shall survive the Closing for a period of twelve (12) months thereafter." PSA, § 4.1.

47.    Sellers also covenanted in Section 4.2, among other things, that:

(d)    From and after the date hereof through the Closing Date, the Seller Parties and HoldCo shall not enter into any new contracts or agreements, amend any existing contracts or agreements, including, without limitation the Property Contracts, or place any encumbrance on the Property without the prior written consent of Buyer, which may be granted or withheld in Buyer's sole discretion. Seller agrees to terminate as of the Closing Date, the Property Contracts and any other property management, leasing brokerage and service contract or agreement relating to the Property, unless Buyer requests that such contract or agreement be assigned to Buyer, by written notice to Seller delivered no later than two (2) business days after the expiration of the Inspection Period. All costs and expenses that result from such terminations shall be paid by Seller. Any Property Contracts or other service contracts or agreements relating to the Property which are designated by Buyer as contracts or agreements which should not be terminated, and which are assignable without cost or recourse to Seller (provided that Buyer may elect to pay any such cost) shall be assigned to HoldCo at Closing (the "Assigned Contracts").

(f)    During the pendency of this Agreement, Seller shall promptly notify Buyer of the occurrence of any event or circumstance known to any of the Seller

> Parties that will make any representation or warranty of any of the Seller Parties to Buyer under this Agreement materially untrue or materially misleading as of the Closing Date or any covenant of any of the Seller Parties under this Agreement incapable of being performed (provided that such notice shall not relieve Seller of its obligations hereunder related thereto, or in any way cure and default related thereto).

PSA, § 4.2(d), (f).

48.     The Parties were proactive in outlining what would happen in the event either party defaulted or otherwise breached the PSA.

49.     In particular, Sections 11.1 and 11.2 of PSA provided certain remedies in the event of default by Sellers or Amicus:

> 11.1 <u>Seller Default</u>.  In the event that Seller breaches or shall have failed to have performed any of the covenants and agreements contained in this Agreement which are to be performed by Seller, any representation or warranty of Seller herein was untrue when made, or any such representation or warranty is untrue as of the Closing Date, then Buyer shall have the right to (i) terminate this Agreement by giving Seller timely written notice of such election prior to or at Closing, in which event the Deposit shall be returned to Buyer, or (ii) take any and all legal actions necessary to compel Seller's specific performance hereunder (it being acknowledged that damages at law would be an inadequate remedy), and to consummate the transaction contemplated by this Agreement in accordance with the provisions of this Agreement, in which event the Deposit shall be refunded to Buyer while such specific performance action is pending.

> 11.2 <u>Buyer Default</u>.  In the event all of the conditions to Closing contained in Section 7.2 above have been satisfied and Buyer defaults in its obligation to close hereunder, Seller shall be entitled to receive the Deposit as liquidated damages, ***in lieu of all other remedies available to Seller at law or in equity for such default***. Seller and Buyer agree that the damages resulting to Seller as a result of such default by Buyer as of the date of this Agreement are difficult or impossible to ascertain and the liquidated damages set forth in the preceding sentence constitute Buyer's and Seller's reasonable estimate of such damages.

(Emphasis added.)

50.     Furthermore, Sections 12.9 and 12.16 expressly provide for the prevailing party in any dispute to recover all of its actual costs and expenses, including its reasonable attorneys' fees:

> 12.9 <u>Attorneys' Fees</u>. In the event it becomes necessary for either Party hereto to file suit to enforce this Agreement or any provision contained herein, the Party prevailing in such suit ***shall be entitled to recover, in***

*addition to all other remedies or damages, as provided herein, reasonable attorneys' fees and expenses* incurred in such suit.

12.16 <u>Dispute</u>. In the event any dispute between the parties to this Agreement of the issue of default and/or disposition of the Deposit shall result in litigation or other proceeding, the prevailing party shall be reimbursed by the non-prevailing party for *all actual costs and expenses, including without limitation reasonable attorneys' fees,* incurred by the prevailing party in connection with such litigation or other proceeding and any appeal thereof. Such costs, expenses, and feels shall be included in and made part of the judgment recovered by the prevailing party, if any.

PSA, § 12.9 (emphasis added), § 12.16 (emphasis added).

**<u>Amicus Performs All of Its Obligations Under the Purchase and Sale Agreement</u>**

51.     Prior to the execution of the PSA, on September 16, 2021, Amicus made its initial $50,000 escrow deposit towards the Purchase Price. On October 27, 2021, two days after signing the PSA, Amicus, pursuant to its obligations therein, made a second escrow deposit to FNTIC for $250,000, for a total initial deposit value of $300,000.

52.     Amicus later made a third escrow deposit of another $250,000 on January 24, 2022 to extend the inspection period as contemplated by the terms of the PSA, for an overall deposit total of $550,000. A true and accurate copy of the escrow receipts are attached as **<u>Exhibit B</u>**.

53.     Throughout the escrow period, Amicus has not had access to its $550,000 in earnest money deposited with the title company, FNTIC.

54.     Amicus hired appraisers, attorneys, and other professionals to facilitate the transfer of the Properties.

55.     Amicus has spent over half a million dollars on maintaining and retaining these individuals to effectuate the transfer of the Properties required by the PSA.

56.     Additionally, Amicus repeatedly worked to obtain committed financing for the Properties, and for months has been ready, willing, and able to close by March 24, 2022.

57. When Amicus initially established financing for the Properties on November 15, 2021, Amicus was able to secure a mortgage commitment at the rate of one-month LIBOR plus 415 basis points (effective rate of 4.40%) which would extend through the anticipated date of closing.

58. As a result of Sellers' actions, and despite Amicus's best efforts to work with its lenders and comply with its obligations under the PSA, Amicus's mortgage rate to finance this deal has now increased to an estimated one-month LIBOR plus 435 basis points (effective rate of approximately 5.25%). Accordingly, Amicus's new effective rate will be at least 0.85% higher than it would have been with a timely closing. Because Amicus expects to finance $58 million of the $75 million dollar purchase price, this will likely result in Amicus paying, annually, an additional $116,000 in loan interest.

59. Furthermore, the price for the interest rate cap required to be purchased as part of the financing has more than quintupled rising from $300,000 to an estimated $1,700,000 as of May 23, 2022.

60. Additionally, as the market and interest rates remain in flux, Amicus remains particularly vulnerable to any future volatility that could impact the availability of financing, the equity available for the purchase, and, as the sale lags on, the constant reappraisal of the Properties.

61. Amicus repeatedly urged Sellers to move quickly on March 2 due to these concerns, but it was ignored.

**Sellers Take Initial Steps Toward Closing**

62. In the months following execution of the PSA, Sellers began working with Amicus on structuring the inspection period and also appeared to be genuinely working towards closing on the Properties as required by the PSA.

63.     Beginning on or around December 20, 2021, Mr. Kacachos communicated with Rob, updating him on Sellers' compliance with the due diligence requirements surrounding the production of environmental reports pursuant to Section 5.3(c) of the PSA and working to schedule walkthroughs with Amicus's appraisers. **Exhibit C** (hereinafter "Mr. Kacachos Text Messages"), pg. 1.

64.     Throughout January 2022, Amicus's CFO, Yvette Wall, communicated with Sellers attempting to coordinate other due diligence materials, including security deposits and prepaid rent rolls, pursuant to Schedule F of the PSA.

65.     The Parties also executed a First Amendment To Limited Liability Company Membership Interests Purchase And Sale Agreement ("Amendment") on January 24, 2022, which slightly adjusted Section 5.4 and 6.1 of the PSA to allow for the inspection period to run until January 31, 2022.  A true and accurate copy of the Amendment is attached as **Exhibit D**.

66.     This Amendment was signed by both Sellers and Amicus and expressly recognized that the Parties had "entered into [the] Limited Liability Company Membership Interests Purchase and Sale Agreement dated October 25, 2021 . . . concerning the acquisition of membership interests of HoldCo, which will be the owner of a portfolio of student housing properties."  Furthermore, the Parties acknowledged that the PSA, as amended, remained "in full force and effect unchanged" and they "reaffirm[ed] all of the covenants, agreements, terms, conditions, and other provisions" of the PSA. *Id.*

67.     The Parties' execution of this Amendment, and its express and repetitive citation to the PSA, further underscores that Sellers, correctly, believed that they were bound by the provisions of the PSA.  Otherwise, it would have been illogical for them to comply with the requirements of Section 12.7 of the PSA, which governs amendments—not to mention signing an

"Amendment" to the binding PSA itself. Thus, Sellers' execution of the Amendment reaffirmed the reality that the sale is, as it always has been, governed by the PSA (and subsequent Amendment).

68.     On February 1, 2022, Ms. Wall emailed Mr. Kacachos to set up the transfer of accounts, such as utilities, tenant announcements, and office files, and asked about who Mr. Kacachos believed would need to be given AmEx expense cards "as the closing approaches."  A true and accurate copy of the email threads are attached in **Exhibit E**, pg. 1.

69.     Mr. Kacachos replied on February 3, 2022, answering Ms. Wall's questions.  *Id.*

70.     On February 9, 2022, Mr. Kacachos sent an email summarizing the items that needed to be wrapped up for a closing around February 22, or late February.  A true and accurate copy of the email threads are attached in **Exhibit F**, pgs. 1-2.

71.     In that email, Mr. Kacachos noted, among other issues, that Sellers were working to figure out how to wind down payroll and stated that once there was a firm date on closing, Sellers would stop mortgage payments.  *Id.*  This confirmed to Amicus that Mr. Kacachos understood that the Parties were working towards a closing and were doing so in accordance with the fully-executed, enforceable PSA.

72.     During this period, Sellers never raised concerns or suggested to Amicus that the Agreement was all a misunderstanding and Sellers did not actually intend to sell the Properties.

73.     When Amicus made three successive deposit payments, totaling $550,000 toward the Purchase Price under the terms of the PSA, Sellers did not tell Amicus that it believed the deposits were made in error.  Nor did they attempt to return the deposits or otherwise take any action to suggest that the deposits were for any purpose other than effectuating and complying with the terms of the Parties' fully-executed and enforceable PSA.

**Sellers Begin Excuses and Delays**

74.      As the original Closing Date of February 22, 2022 neared, however, Sellers began engaging in an excuse-and-delay tactic.  On many occasions, Sellers would tell Amicus that they were making progress on their contractual obligations, when in hindsight it is clear that Sellers were merely stalling the closing.

75.      For example, on January 15, 2022, Mr. Kacachos informed Amicus that he was actively "reviewing everything this weekend and working on the deposit transfer number for [Ms. Wall]."  Mr. Kacachos Text Messages, pg. 2.  When Ms. Wall reached out to Mr. Kacachos for this information again on January 18, 2022, Mr. Kacachos responded that he "should have our total deposit numbers today."  A true and accurate copy of the email threads are attached in **Exhibit G**, pgs. 1-2.  However, production of this information did not occur until *one month* later on February 16, 2022.  A true and accurate copy of the email threads are attached in **Exhibit H**.

76.      Likewise, throughout January through March of 2022, Amicus would make attempts to schedule meetings, via email and text message with Sellers, to discuss the sale and try and restore structure to the deal in compliance with the PSA.  Amicus often received no response or, when Sellers did respond they were evasive and wanted to "just text" rather than meet.

77.      These delays began to affect the closing timeline. On or about February 14, 2022, Amicus attempted to schedule a closing checklist call with Sellers' counsel to prepare for the late February closing; however, Sellers pushed this off and, two days later, requested that the Parties instead aim for a March 1, 2022 closing.  A true and accurate copy of the email threads are attached in **Exhibit I**, pgs. 1-2.

78.      As a direct result of Sellers' actions (and inactions), the February 22, 2022 Closing Date came and went, despite Amicus's best, good faith efforts.

79.     Despite Sellers' delays, Amicus remained hopeful that Sellers intended to close under the terms of the PSA, and Sellers continued to assure Amicus that they so intended. Accordingly, Amicus elected the thirty-day extension to the inspection period (and thereby the Closing Date) in an attempt to carry out the PSA, which, in turn, forced Amicus to deposit an additional $250,000 into escrow on January 24, 2022.  Amicus otherwise would have invested and therefore earned returns on this substantial sum.

80.     Meanwhile, counsel for Amicus and Sellers prepared closing documents, reviewed draft deeds, and prepared for a closing in early March 2022.

81.     On March 2, 2022, Amicus reached out to Mr. Kacachos trying to set up a call with both Sellers and attempting, yet again, to have Sellers commit to a closing date and to finalize various ancillary documents that were required to be delivered at closing.  **Exhibit J** (hereinafter "Ms. Kacachos Text Messages"), pg. 1.  While the form of these ancillary documents had already been agreed upon and some even executed at the same time as the PSA, Mr. Kacachos began to raise purported "issues" with them that he insisted needed to be resolved prior to Closing.

82.     Ms. Kacachos responded to Amicus's March 2 outreach by asking for a closing date of March 8, 2022, stating that she "personally [does] not care" about one of the ancillary documents that was giving Mr. Kacachos pause and explaining that it was mostly just a sticking point with Mr. Kacachos.

83.     Despite believing that there were no "issues" with the ancillary documents that needed to be resolved, Amicus repeatedly attempted to get Mr. Kacachos's comments to them to resolve his concerns and proceed to closing.  Amicus was often met with hollow promises from Mr. Kacachos, stating that he was looking over documents that day and would send his comments over soon.  However, this feedback rarely came and, when it did, it took days or weeks of repetitive

outreach from Amicus. Amicus repeatedly encouraged Ms. Kacachos to get on the phone to resolve the outstanding concerns and she declined. *Id.* at pg. 5.

84. With each of Sellers' delays of a closing date, which sometimes involved moving the planned closing date multiple times in one week, Amicus had to repeatedly meet with its lenders to rework deadlines and ensure that the deal could still maintain its financing. Not only was this wasting time for Amicus and the lenders alike, but it was also running up the expenses associated with the financing for Amicus's purchase of the Properties.

**Sellers Cause a Failure to Close By The Deadline**

85. Throughout this time period, Sellers continued to insist that they wanted to work through their "issues" and intended to close under the PSA. Accordingly, on March 7, 2022, and although it had no obligation to do so, Amicus sent Sellers an email outlining potential resolutions to the "issues" ahead of closing. A true and accurate copy of the email threads are attached in **Exhibit K**.

86. Unfortunately, no response was received.

87. Once it became increasingly apparent that Sellers' evasive efforts were likely intended to cause the Closing Date to pass the March 24 cutoff, Amicus twice offered to extend the Closing Period for another 60 or 90 days, first on March 7 and again on March 17.

88. Each time that Amicus offered an extension of the Closing Period to permit Sellers more time to satisfy their obligations under the PSA, Sellers failed to even respond. At that point, Amicus became increasingly concerned that Sellers were not acting in good faith and intended to breach the Parties' PSA.

89. When Amicus could get a response from Sellers, they claimed they needed more time to review documents and would request that targeted Closing Dates be pushed back.

Ultimately, Sellers moved the Closing Date from February 23 to March 1 to March 15 and again to March 25.

90.     Despite Sellers' repeated alterations to the Closing Date, Amicus remained willing and able to close, regardless of the date. Furthermore, as Sellers continued to express their intention to close on the deal, Amicus continued to work in good faith with Sellers to fully effectuate the PSA throughout the dwindling closing period.

91.     Despite Amicus doing everything possible to secure Sellers' compliance, Sellers failed to close on any of the Parties' agreed-upon Closing Dates.

92.     By failing to close on March 25, 2022, which was already beyond the latest Closing Date contemplated in the PSA (*i.e.*, March 24, 2022), and failing to take the required steps prior to closing, Sellers breached numerous provisions of the PSA.

93.     However, even after the Closing Date, at first, Sellers continued to insist that they intended to close once the purported "issues" with the ancillary documents were worked out. Amicus believed their repeated assurances and, thus, continued to spend time and funds in an effort to resolve these allegedly outstanding issues and proceed to closing in hopes of avoiding litigation.

94.     Throughout May the purported "issues" with the ancillary documents were resolved to Sellers' satisfaction. At this point, Amicus reasonably believed that there were no remaining impediments to closing.

95.     And yet, despite all of Amicus's efforts, Sellers still refused to close.

96.     On a call on May 2, 2022, where Mr. Kacachos said that despite Amicus having resolved the outstanding issues to Sellers' satisfaction, this was "just business" and so Sellers were now demanding a higher price. The only purported justification given for this demand by Mr.

Kacachos was "inflation" which, he said, had increased the value of the Properties since the signing of the PSA.

97.     Amicus was shocked.  The Purchase Price has already been negotiated and agreed to months before in the legally binding PSA.  There was certainly no provision in the PSA for Sellers to obtain an increased Purchase Price due to "inflation" or other changes to the value of the Properties between signing and Closing.  Besides, Mr. Kacachos' justification made no economic sense.  Amicus made all these points to Mr. Kacachos, and he responded that he would discuss them with Ms. Kacachos and his counsel and get back to Amicus.  Given the completely untenable nature of the price demand, Amicus still maintained hope that Sellers would close on the agreed-upon terms, as Sellers had maintained they would for months.

98.     This hope turned out to be misplaced.

99.     On a final call with Sellers on May 11, 2022, Mr. Kacachos once again asserted that, regardless of the terms of the PSA, he was demanding a price change.  It was then clear that Sellers' repudiation of their obligations under the PSA was absolute, and they, in fact, had no intention of selling the Properties to Amicus.

100.     This eventually culminated in Amicus filing its initial Complaint on May 31, 2022.

101.     Since the initial filing, Sellers' delays have continued to spurn damages for Amicus. In particular, Amicus's costs to finance this deal have substantially increased and, in order to close, Amicus will have to pay, once again, for an appraisal and engage in additional cap rate negotiations.

102.     Accordingly, as a direct result of Sellers' continued excuse-and-delay tactics, Amicus is going to face another slew of unnecessary yet foreseeable expenses.  All of which could have been avoided but for Sellers' breach.

103.    Despite these additional expenditures required as a result of Sellers' continuous and ongoing breach of the PSA, Amicus still remains ready and able to uphold its obligations under the PSA.

## COUNT I:  DEFENDANTS' BREACH OF CONTRACT

104.    The allegations in the foregoing Paragraphs are incorporated herein by reference.

105.    The PSA is a valid, binding, and enforceable contract between Amicus and Sellers.

106.    Amicus has performed all of its duties and obligations under the PSA, and remains willing, ready, and able to undertake the Closing as contemplated by the PSA.

107.    Amicus has worked tirelessly with Sellers in an effort to secure their compliance with the PSA and undertake the Closing.

108.    Yet Sellers have refused to abide by their obligations and have unilaterally breached the PSA in numerous ways.

109.    For example, § 1.1 of the PSA required Sellers to "(i) organize HoldCo [an entity wholly owned by Sellers], (ii) cause the [Property they own] to acquire good and clear record and marketable fee simple title to their respective properties, (iii) . . . convey all of the Property to HoldCo, and (iv) sell all of the HoldCo Interests" to Amicus by the Closing Date, which was March 24, 2022.  PSA, §§ 1.1, 5.1, 8.1.

110.    To date, Sellers have failed to comply with any of their obligations under the Section 1.1, including their obligations to convey the Properties to Amicus by March 24, 2022.

111.    Sellers have also breached the PSA by failing to comply with its due diligence requirements, which specifically require Sellers to provide certain documentation to Amicus.

112.     Sellers either failed to provide the necessary documents altogether, and/or failed to provide complete and accurate information in sufficient time for the Parties to satisfy the Closing Period.

113.     Sellers have also breached the PSA by failing to finalize certain ancillary agreements as contemplated by the PSA.  Sellers actively avoided meeting to negotiate these documents, made hollow promises about reviewing and returning drafts, and refused to operate in good faith to complete these ancillary agreements.

114.     Sellers have also breached other provisions of the PSA, including without limitation, the representations and warranties made in Sections 4.1(r), (x), and (v), as well as the covenants reflected in Sections 4.2(d) and (f).

115.     Sellers continue to breach and/or repudiate their obligations under the PSA, including by informing Amicus that they do not intend to close on the terms of the Parties' binding agreement.

116.     Sellers' breaches have caused significant interruption to Amicus's financing options for the Properties, resulting in an unnecessary and avoidable increase in the mortgage interest rates available to Amicus in addition to increased risk that Amicus will have a more challenging time securing funding in the future, which is causing Amicus to suffer irreparable harm and significant loss.

117.     Sellers' breaches have caused Amicus to lose access to $550,000 in cash deposited in escrow, which Amicus would otherwise have invested and earned a return upon.

118.     By not closing on the Properties within the agreed-upon timeframe, Sellers have delayed and/or deprived Amicus of all of its expected benefits of ownership of the Properties, including, but not limited to, potential renting opportunities, unreasonably extended transition

times, caused Amicus to face substantially higher costs for renovations and recruitment, and significantly interrupted Amicus's ability to launch and operate student housing in the targeted market.

119.    The Parties' PSA explicitly provides Amicus with the non-exclusive remedy which states that, "[i]n the event that Seller breaches or shall have failed to have performed any of the convents and agreements . . . then Buyer shall have the right to . . . take any and all legal actions necessary to compel Seller's specific performance."  PSA, § 11.1.  Furthermore, Amicus is to be refunded its deposits while the action is pending.  *Id.*

120.    However, the remedies provided to Amicus in the PSA are not exclusive.  While Sections 11.1 and 11.2 provided the Parties with additional rights to seek certain damages beyond their common law rights, the language of the PSA does not establish exclusivity for Amicus. Notably, while Section 11.2 provides that in the event of Buyer default "Seller shall be entitled to receive the Deposit as liquidated damages, *in lieu of all other remedies available* to Seller at law or in equity for such default[,]" this limiting language does not appear in the Sections addressing remedies for Seller's default.  PSA § 11.2 (emphasis added).  Thus, by its plain language, the rights granted to Amicus in the event of Sellers' default are *in addition* to its rights at common law, rather than Sellers' rights which are *in lieu of* those rights.

121.    The Parties further agreed that if a party had to bring an action to enforce the PSA, or otherwise engage in litigation relating to enforcement of the PSA, then the prevailing party would be entitled to all costs and expenses, including reasonable attorneys' fees.

122.    The Properties that Amicus sought to purchase, and indeed did contractually agree to purchase pursuant to the PSA, are unique and valued to be worth at least $75,000,000.

123.    Amicus cannot be made whole by any remedy at law because the Properties are unique.  The Parties expressly recognized this as the case in Section 11.1 of the PSA when they "acknowledged that damages at law would be an inadequate remedy" if Sellers defaulted.

124.    By reason of the foregoing, Amicus is entitled to a decree of specific performance pursuant to the PSA and an award of all damages incident to specific performance.

125.    In the alternative, if the Court holds that there is an adequate remedy at law, Amicus is entitled to recover the highest of the possible damages among its expectancy, reliance, or restitution damages under Ohio law in an amount to be decided at trial.

126.    For its expectancy damages, Amicus is entitled to recover the value of the bargain set forth in the PSA which it has lost as a result of Sellers' failure to perform.  These damages include, but are not limited to, the difference in value of the Properties on the promised date of sale and the original $75,000,000 price, costs associated with any changes in financing terms, and the lost profits that Amicus otherwise would have received.

127.    Alternatively, Amicus is entitled to reliance damages to recover the expenses it incurred in anticipation of the sale and through its compliance with the PSA.

128.    In the alternative, Amicus is entitled to restitution damages to restore to Amicus the benefits that Defendants have obtained from their breach of the PSA.

129.    Amicus is entitled to preliminary and permanent injunctive relief requiring Sellers to perform their obligations under the PSA.

130.    Amicus is entitled to all of its costs and expenses, including reasonable attorneys' fees, associated with enforcing the PSA.

### COUNT II:  ANTICIPATORY REPUDIATION OF THE PSA

131.    The allegations in the foregoing Paragraphs are incorporated herein by reference.

132.    The PSA is a valid, binding, and enforceable contract between Amicus and Sellers.

133.    Amicus has performed all of its duties and obligations under the PSA, and remains willing, ready, and able to undertake the Closing as contemplated by the PSA.

134.    Sellers have explicitly repudiated the PSA by contending that they are not bound to close under its terms.  Instead, Sellers have demanded a higher Purchase Price than the Parties' agreed-upon Purchase Price in the PSA without providing any legal basis for their demand.

135.    When Amicus would not agree to increase the Purchase Price, Sellers refused to participate further in the closing process for the sale of the Properties.

136.    Sellers refused to carry out their obligations under the PSA.

137.    Amicus has continued to carry out the obligations of the PSA to the extent possible without Sellers' participation.

138.    By reason of the foregoing, Amicus is entitled to a decree of specific performance pursuant to the PSA and an award of all damages incident to specific performance.

139.    In the alternative, if the Court holds that there is an adequate remedy at law, Amicus is entitled to damages in an amount to be decided at trial.

140.    Amicus is entitled to preliminary and permanent injunctive relief requiring Sellers to perform their obligations under the PSA.

141.    Amicus is entitled to all of its costs and expenses, including reasonable attorneys' fees, associated with enforcing the PSA.

## COUNT III:  DEFENDANTS' BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

142.    The allegations in the foregoing Paragraphs are incorporated herein by reference.

143.    In the alternative to its breach of contract claim, Amicus posits that Sellers violated the duty of good faith and fair dealing.

144.     The PSA requires the application of Ohio law.

145.     Under Ohio law, every contract, including the PSA, contains an implied duty for the Parties to act in good faith and to deal fairly with one another.

146.     This duty required Sellers to not only be honest with Amicus but also to act reasonably and in good faith.

147.     Through Sellers' evasive actions, empty promises, and, upon information and belief, their potential efforts to sell the Properties out from under Amicus despite the Parties' PSA, or, in the alternative, to wrongly retain the Properties for themselves, Sellers have acted with bad faith and ill will, breaching their duty of good faith and fair dealing.

148.     By virtue of the acts and omissions of Sellers, as alleged herein—including their refusal to provide necessary due diligence documentation, their unwillingness to cooperate with Amicus to resolve outstanding issues, and their reliance upon pretextual excuses to delay and ultimately avoid closing—Sellers have acted with ill will, in bad faith, and without reasonable justification thereby breaching the covenant of good faith and fair dealing.

149.     Amicus has performed and continues to perform all of its obligations under the PSA and has continuously operated in good faith in an effort to close on the Properties.

150.     As a result of Sellers' breaches of their duty of good faith and fair dealing, Amicus has suffered, and continues to suffer substantial damages and is entitled to specific performance of the PSA, together with any other relief to which Amicus may be entitled, including compensatory damages reflecting the increased financing costs, lost investment opportunities of its funds held in escrow, lost profits, expenses incurred in its attempts to close under the PSA, and interruption to its ability to launch and operate student housing associated with Sellers' failure to act in good faith and deal fairly with Amicus.

151.    Additionally, Amicus is entitled to all costs and expenses, including reasonable attorneys' fees, associated with enforcing Sellers' duty of good faith and fair dealing under the PSA.

## COUNT IV: PROMISSORY ESTOPPEL

152.    The allegations in the foregoing Paragraphs are incorporated herein by reference.

153.    Sellers promised to execute the PSA and comply with their obligations therein.

154.    Sellers promised to transfer the Properties to HoldCo, and in turn transfer the ownership interest of HoldCo to Amicus.

155.    Sellers also promised to provide documentation, complete account transfers, and negotiate an array of documents so as to facilitate the closing on the Properties.

156.    Sellers also promised to close on the Properties on or before February 22, 2022, or, if extended, on March 24, 2022 (the "Closing Period").

157.    As a result of Sellers' promises and actions, Amicus has placed $550,000 into an escrow account, where it has been held for months.

158.    Furthermore, Amicus hired an array of professionals and other entities, spending over half-a-million dollars to facilitate the transfer of the Properties.

159.    Amicus was also required to do a "capital call" in order to obtain the funding to close as required under the PSA and was ready, willing, and able to close as a result of the capital call.

160.    Despite Sellers' promises and Amicus's reliance upon them, Sellers have failed to transfer the Properties to Amicus.

161.   As a result of Sellers' actions, Amicus has been deprived of ownership of and income from the Properties, and Amicus has suffered, and will continue to suffer, irreparable harm and damages as a result.

162.   Furthermore, Sellers' extensive delays have resulted in substantially worse financing terms for Amicus's purchase of the Properties.

163.   As a result of its detrimental reliance on Sellers' promises, Amicus has suffered, and continues to suffer substantial damages, and thus it is entitled to damages in an amount to be decided at trial.

164.   Additionally, Amicus is entitled to all costs and expenses, including reasonable attorneys' fees, the increased cost of funding, and the lost investment opportunity of its funds held in escrow, associated with Sellers' failure to act in good faith and deal fairly with Amicus.

## PRAYER FOR RELIEF

WHEREFORE, Amicus respectfully requests that this Court grant:

A.   A decree of specific performance requiring Sellers to perform their obligations pursuant to the PSA and sell the Properties to Amicus;

B.   Preliminary and permanent injunctive relief requiring Sellers to cease efforts to sell the Properties to any individual or entity that is not Amicus;

C.   Award monetary damages in favor of Amicus and against Sellers in an amount to be proven at trial, including without limitation all damages incident to specific performance;

D.   Pre-judgment interest in favor of Amicus and against Sellers;

E.   All of Amicus's costs and expenses, including reasonable attorneys' fees associated with this litigation; and

F.      Such other and further relief as this Court deems just and equitable.

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, Ohio 43215-7509
(614) 462-1085
Aneca.Lasley@icemiller.com

## **VERIFICATION**

I, Robert Abelson, declare as follows:

1.      I am a Manager of Amicus Miami of Ohio, LLC.

2.      I have personal knowledge of Amicus Miami of Ohio, LLC and Defendants Heather Hoelzer Kacachos and Thomas Kacachos and their activities described in the Verified Complaint, and if called to testify I would competently testify to the matters stated herein.

3.      I swear under penalty of perjury of the laws of the United States that the factual statements set forth in this Verified Complaint are true and correct to the best of my knowledge.


_____
Robert Abelson
Manager, Amicus Miami of Ohio, LLC



_July 1, 2022_____
Date

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document was filed electronically and served through the Court's ECF System upon all counsel of record on this 1st day of July, 2022.

Respectfully submitted,

*/s/ Aneca E. Lasley*

Aneca E. Lasley (0072366)

4878-9097-8597.6