**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **AMICUS MIAMI OF OHIO, LLC** | : | **Case No. 1:22-cv-00355** |
| **Plaintiff** | : | **Judge McFarland** |
| **vs.** | | **Magistrate Litkovitz** |
| **HEATHER HOELZER KACACHOS,** *ET AL.* | : | |
| **Defendants** | | |

## DEFENDANTS THOMAS AND HEATHER KACACHOS' ANSWER AND COUNTERCLAIM TO PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT

For their Answer and Counterclaim to the First Amended Verified Complaint filed by Plaintiff Amicus Miami of Ohio, LLC ("Amicus"), Defendants Heather and Thomas Kacachos (collectively, hereinafter, "the Kacachoses") state as follows:

1.  Amicus' paragraph 1 states no claim to which the Kacachoses are obliged to respond. Nevertheless, to the extent a response is deemed required, the Kacachoses deny the allegations stated therein. As evidenced by the balance of this Answer and Counterclaim, the matter is anything but straightforward. Months of negotiations left the parties still in disagreement over key, material terms. The Purchase and Sale Agreement, Exhibit A to Amicus' First Amended Complaint (the "PSA"), was ultimately nothing more than an "agreement to agree," anticipating a more complex set of ancillary agreements to be fully integrated addressing *inter alia*, non-competition, and the prospect of Mr. Kacachos performing certain work under contract for Amicus, and other service related agreements to be performed

by Amicus. The PSA was dependent and conditioned upon finalization of the various ancillary agreements by the end of the inspection period, which never occurred. The parties disagreed over proration of rents. Allocation of value to realty versus goodwill and other assets also remained a point of contention. In short, the agreement Amicus seeks to enforce remains inchoate, missing key pieces, and as such, does not reflect a complete meeting of the minds as to all material terms.

2.  Denied as to all allegations. Notably, Amicus does not attach a proper closing statement in support of its allegations that it was "ready, willing and able to close." Among other impediments to closing on March 24, Amicus insisted on a drop down method of allocation that appeared likely to subject the Kacachoses, as sellers, to substantial liability for conveyance fees on the backside of any closing. Further, the Kacachoses are not shopping for some other buyer at a better price.

3.  Denied.

4.  Denied in part for lack of knowledge as to Amicus' experience in other venues. "Sophisticated" is a subjective term. The Kacachoses obviously built, through a family business, a substantial portfolio in Oxford, Ohio. But their holdings are primarily limited to Butler County, serving a niche market heavily directed to Miami University's Oxford campus. Admit the parties began discussing a possible purchase and sale of real estate assets on or around July 13, 2021.

5.  The Kacachoses refer to the purported PSA attached as Exhibit A to Amicus's First Amended Complaint for the terms and contents of same, and otherwise deny any allegations of Amicus's paragraph 5, or any other paragraph of its First Amended Complaint, to the extent inconsistent within the four corners of that PSA, including any ancillary documents or agreements incorporated by reference into said PSA.

2

6. Specifically denied as to Amicus having "complied with all of its obligations under the PSA." The parties at times took steps toward closing; at other key points they confronted persistent, unyielding disagreements over material terms, such as the proper approach to proration of rent for properties typically rented on a nine month leasehold period corresponding to the academic calendar, the allocation of real estate to good will and other assets in conveyancing statements, the scope, and the duration of a proposed non-competition agreement, among other matters.

7. Denied, insofar as the parties did not reach agreement on ancillary agreements and other key terms, as described in paragraphs 1 and 6, *supra*. There was no abrupt reversal of course by the Kacachoses, but rather, persistent failure to agree to key terms and, hence, failure to arrive at a full and final PSA complete with all ancillary agreements incorporated by reference therein.

8. Admit in part, that there was no meeting of the minds as to all material terms. Denied as to any allegations of "stall tactics" by the Kacachoses. Denied as to any allegations that the Kacachoses are shopping the portfolio to other potential buyers.

9. Amicus' paragraph 9 states pure legal conclusions, and therefore requires no response. To the extent a response is deemed required, the same is denied.

10. The Kacachoses refer to the PSA for terms and contents thereof, and otherwise deny the allegations of Amicus' paragraph 10. Further answering, the Kacachoses deny that a complete and enforceable agreement ever came to fruition between themselves and Amicus, and further deny that they (the Kacachoses) have breached same.

11.    Deny that Amicus is entitled to any damages, under any legal theory presented here, and specific performance is not available according to the transaction history and factual circumstances giving rise to this conflict.

12.    Deny that Amicus is entitled to injunctive relief.

13.    Denied for lack of knowledge as to the corporate status of Amicus. Through the negotiations, the principal business contacts of Amicus were Rob Abelson, Austin Brooks and Yvette Wall.

14.    Denied for lack of knowledge.

15.    Admit.

16.    Admit.

17.    Amicus' paragraph 17 states a conclusion of law, which the Kacachoses deny for lack of knowledge.

18.    Denied, insofar as the Kacachoses deny they have breached any agreement , and therefore no justiciable controversy is presented here.

19.    Denied for lack of knowledge.

20.    Admit.

21.    Admit the Kacachoses reside in Butler County, Ohio, which falls under the Western Division, Cincinnati branch, of the Southern District of Ohio, provided other jurisdictional requirements for federal courts are otherwise met. Denied as to allegations of ownership. The Kacachoses are not, in fact, title owners of record of the real properties in dispute.

22.    Admit.

23.    The Kacachoses reasonably believe this case should have been filed in and assigned to the Western Division of the Southern District of Ohio, and assigned to

4

Cincinnati, under the Local Rules of this Court, principles of *forum non conveniens*, and for the sake of compelling non-party witness testimony if it proved necessary.

24. Denied for lack of knowledge.

25. Admit in part. As stated, *supra,* on or about July 13, 2021, discussions and, thereafter, negotiations commenced between Amicus' principals and the Kacachoses. Denied as to the Kacachoses being current title owners of record. *See* ¶ 21, *supra*.

26. Admit as to existence of a non-binding letter of intent, but the same was superseded by the PSA.

27. Admit. Further answering, any preliminary draft would be superseded by the executed version of the PSA (which was itself subject to ultimately unsatisfied contingencies).

28. The Kacachoses refer to the PSA for the terms and contents thereof, denying any allegations inconsistent with the wording of that document. Further answering, the PSA does not pass judgment on the sophistication of the parties' respective legal counsel. The sellers disagree that they were the sole parties required to provide exhibits to the PSA. Further deny that the integrated ancillary agreements contemplated by the PSA were in existence at the time the PSA was executed; and such ancillary agreements were never finalized.

29. Admit that the incomplete PSA between the parties was signed on October 25, 2021, subject to finalization of other intended agreements (as scheduled) upon which the overall transaction was expressly dependent. Further answering, the Kacachoses refer to the PSA for the terms and contents thereof.

30.   The Kacachoses admit they signed the PSA, and that Rob Abelson signed for Amicus. However, the parties continued to negotiate dependent parts of the transaction, including a non-competition agreement and other ancillary agreements, the method of calculating proration of rents, and the allocation of values for real properties, goodwill and other assets for conveyancing statement and income tax purposes. As a consequence, there was not a final, enforceable agreement to transfer the portfolio of real properties, and the integrated ancillary agreements were never agreed to and finalized per the PSA.

31.   Admit that Tom Kacachos initialed some pages of the PSA, but specifically deny that *all* pages of the PSA, including then-available exhibits, were initialed, and deny all further allegations.

32.   The Kacachoses refer to the PSA for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of real properties in dispute. Specifically deny that the ancillary agreements as drafted by Amicus are compliant with the provisions of PSA section 4.1 (c).

33.   The Kacachoses refer to the PSA for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

34.     The Kacachoses refer to the PSA, including all Schedules (some of which were incomplete), for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. Schedule 2.1(a) merely sets forth current street addresses of various properties, but does not contain accurate legal descriptions and permanent parcel numbers required for instruments of conveyance.

35.     The Kacachoses refer to the PSA, including all Schedules (some of which were incomplete), for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. Adjustments and prorations include the conveyance fees associated with the sale of real properties for value.

36.     The Kacachoses refer to the PSA, including all Schedules (some of which were incomplete), for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

37.   The Kacachoses refer to the PSA, including all Schedules (some of which were incomplete), for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

38.   The Kacachoses refer to the PSA, including all Schedules (some of which were incomplete), for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

39.   The Kacachoses refer to the PSA for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. Further answering Amicus' paragraph 39, the Kacachoses state they did "cooperate fully" in providing documentation of matters needed in due diligence, or to draft a closing statement, and it was not for lack of the Kacachoses' reasonable cooperation that the contemplated transaction failed to ripen into an enforceable agreement suitable for conveyance of the real properties in this dispute.

40.   Admit that Amicus at first represented that a closing could take place as early as February 2022, and otherwise refer to the PSA for terms and contents thereof,

including specific timelines stated therein which govern the transaction sequence, reserving any defenses thereto.

41.   Admit that Amicus projected a February 2022 closing date, and otherwise refer to the PSA for closing timetable sequence, while reserving all defenses to that instrument. Further answering, the Kacachoses reject any inference that they caused delays in the negotiating process or frustrated the occurrence of the closing.

42.   The Kacachoses refer to the PSA for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. The Kacachoses did, in fact, provide Amicus with sufficient information to prepare an accurate Closing Statement, which Amicus then failed to timely provide.

43.   The Kacachoses refer to the PSA, for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

44.   The Kacachoses refer to the PSA, for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. The PSA expired of its own terms about two months before Amicus eventually

sought enforcement, notwithstanding that the ancillary agreements were never finalized.

45. The Kacachoses refer to the PSA, for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

46. The Kacachoses refer to the PSA, for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

47. The Kacachoses refer to the PSA, for terms and contents thereof, and otherwise deny any allegations inconsistent within the four corners thereof, including, without limitation, those agreements incorporated by reference into the PSA. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute.

48. The Kacachoses refer to the PSA, for terms and contents thereof, including any remedies for breach thereof, and otherwise deny any allegations inconsistent within the four corners thereof. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. Further answering, the Kacachoses deny that they are in breach of the PSA.

49. The Kacachoses refer to the PSA, for terms and contents thereof, including any remedies for breach thereof, and otherwise deny any allegations inconsistent within the four corners thereof. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. Further answering, the Kacachoses deny that they are in breach of the PSA.

50. The Kacachoses refer to the PSA, for terms and contents thereof, including any remedies for breach thereof, and otherwise deny any allegations inconsistent within the four corners thereof. Further answering, the Kacachoses deny that the PSA ever ripened into an enforceable and binding agreement to sell the portfolio of properties in dispute. Further answering, the Kacachoses deny that they are in breach of the PSA.

51. Admit, on information and belief.

52. Admit, on information and belief. Further answering, the inspection period was extended on behalf of Amicus, not as a result of any conduct (either acts or omissions) of the Kacachoses.

53. Admit that Amicus wrote the contract and voluntarily set the $550k deposit amount.

54. Admit, on information and belief, that Amicus was represented by a team of professionals, including legal counsel and at least one certified public accountant.

55. Denied for lack of knowledge, and expressly denied as to any inference that the Kacachoses caused any damages to Amicus.

56. Denied. In fact, Amicus sent sharply mixed signals about their desire to close, and the timing of any proposed closing. Amicus did not want to close from February 16

to March 1 because they disagreed over rent proration. Then they abruptly reversed course, and on March 2 proposed to close forthwith. Then on March 3 they decided they did *not* want to close, instead requesting a 90 day extension (which the Kacachoses refused). Amicus did not want to close from March 3-17. On March 17, Amicus again reversed course, first proposing a March 25 closing, and then changing the proposed date yet again to March 24, even though the integrated ancillary agreements were not finalized and Amicus had not provided an accurate closing statement per the timeline set forth in the PSA.

57.    Denied for lack of knowledge. Amicus always made it appear that the loan was in jeopardy if certain conditions were not met. They constantly stated in writing and verbally that the loan was in jeopardy of not happening, and Amicus sought concessions from the sellers, which the Kacachoses refused.

58.    Denied for lack of knowledge. The PSA does not have any "safety net" or caps on financing costs; thus, the buyer assumed the risk of shifting market conditions.

59.    Denied for lack of knowledge. The PSA does not have any "safety net" or caps on financing costs; thus, the buyer assumed the risk of shifting market conditions.

60.    Denied for lack of knowledge. The PSA does not have any "safety net" or caps on financing costs; thus, the buyer assumed the risk of shifting market conditions.

61.    Denied. Amicus sought to extend the closing date by 90 days, which the Kacachoses declined.

62.    Admit.

63.    Admit.

64.    Admit.

65.    The Kacachoses refer to the Amendment attached as Exhibit D to Amicus' First Amended Complaint for the terms and contents thereof, and otherwise deny any remaining allegations of Amicus' ¶ 65 that vary from or are inconsistent with the specific wording of that instrument. Notwithstanding the extension of the inspection period, the integrated ancillary agreements were never finalized before the closing deadline.

66.    The Kacachoses refer to the Amendment attached as Exhibit D to Amicus' First Amended Complaint for the terms and contents thereof, and otherwise deny any remaining allegations of Amicus' ¶ 66 that vary from or are inconsistent with the specific wording of that instrument. Notwithstanding the extension of the inspection period, the integrated ancillary agreements were never finalized before the closing deadline.

67.    The Kacachoses refer to the Amendment attached as Exhibit D to Amicus' First Amended Complaint for the terms and contents thereof, and otherwise deny any remaining allegations of Amicus' ¶ 67 that vary from or are inconsistent with the specific wording of that instrument. Notwithstanding the extension of the inspection period, the integrated ancillary agreements were never finalized before the closing deadline.

68.    The Kacachoses aver that the e-mail threads attached as Exhibit E to Amicus' First Amended Complaint speak for themselves. Mr. Kacachos admits sending and receiving e-mails in the e-mail string attached as Ex. E to the First Amended Complaint. Nevertheless, these were only a part of voluminous communications overlapping between and among the principals, their agents, and their respective counsel.

69. The Kacachoses aver that the e-mail threads attached as Exhibit E to Amicus' First Amended Complaint speak for themselves. Mr. Kacachos admits sending and receiving e-mails in the e-mail string attached as Ex. E to the First Amended Complaint. Nevertheless, these were only a part of voluminous communications overlapping between and among the principals, their agents, and their respective counsel.

70. The Kacachoses aver that the e-mail threads attached as Exhibit F to Amicus' First Amended Complaint speak for themselves. Mr. Kacachos admits sending and receiving e-mails in the e-mail string attached as Ex. F to the First Amended Complaint. Nevertheless, these were only a part of voluminous communications overlapping between and among the principals, their agents, and their respective counsel.

71. The Kacachoses aver that the e-mail threads attached as Exhibit F to Amicus' First Amended Complaint speak for themselves.

72. Denied. In fact, the February 9, 2022 e-mail from Thomas Kacachos raised many issues and items that had not yet been agreed to, including the Construction Management Agreement, the Profit Interest Agreement, the Non-Competition Agreement, the Closing Statement, and the costs of the brand new house built at 211 University during the 2021-22 school year. This e-mail was followed up by a phone call between Thomas Kacachos and Yvette Wall, Rob Abelson, Austin Brooks. Ms. Wall also brought up ownership of trucks, equipment, and supplies were to be acquired by Amicus. Mr. Kacachos stated that it would not since those items are part of the sellers' warehouse and contracting assets, which were not being sold to Amicus.

73. Admit, on information and belief, that the deposits were made. At the time, the Kacachoses were still hopeful the contract disagreements could be worked out and ancillary agreements could be signed. Specifically deny that the PSA was fully executed and enforceable, because the integrated ancillary agreements were not finalized by the expiration of the extended Inspection Period.

74. Denied. There was a significant discrepancy between the parties over the method of prorating rents under the leases (with a $300,000 differential), along with unresolved issues pertaining to ancillary agreements and asset allocation for conveyance forms and income tax reporting.

75. Denied. In fact, Thomas Kacachos provided very accurate budget number of $975,000 on Wednesday, January 19th. The final number and spreadsheet of $980,423 was provided on Monday, January 24th . In short, the Kacachoses responded to Yvette Wall's Tuesday, January 18th request immediately and followed up with a budget number on January 19th.

76. Denied. There was continuous communication by, between and among the parties via text messages, emails, phone calls and attorney letters. Issues could not be resolved with simple texts and phone calls and meetings. Issues didn't begin until Feb 17. Despite the flurry of communications, material issues remained unresolved, and in the end, unresolvable, because there was no meeting of the minds.

77. Admit that the parties tried to arrange a closing (subject to achieving agreement on unresolved contingencies). Despite these efforts, closing did not occur. Denied as to any allegation or inference of delay or obstruction by the Kacachoses.

78.  Denied. Rob Bolin and Peter Gelzinis, the parties' respective legal counsel, agreed the parties were not ready to close on February 22, 2022. Amicus was not ready, and the PSA remained incomplete, due to continuing disputes over material terms, such as method of rent proration and ancillary agreements which were never finalized.

79.  Denied as to the Kacachoses causing any delay, or any damages to Amicus. The parties did not achieve a meeting of the minds on material terms which remained in dispute.

80.  Denied, insofar as Amicus never provided an accurate closing statement prepared according to PSA Article 3. Balance denied for lack of knowledge as to Amicus's actions.

81.  Denied that "the form of these ancillary agreements had already been agreed upon and some even executed at the same time as the PSA". The only integrated ancillary agreement initially approved at the same time as the PSA was the Property Management Agreement. However, through due diligence, it was determined to be illegal and unenforceable under Ohio real estate brokerage law. The PSA and ancillary agreements remained a work in progress. The other ancillary agreements were *not* executed with the PSA, and remained not only in negotiation, but also subject to ultimate failure to agree.

82.  Admit that Heather Kacachos proposed a closing date of March 8, 2022, but this was in the context of continuing material disputes between the parties, and that proposed closing date never materialized, nor did the disputes resolve. Further answering, both the Kacachoses were parties to the PSA. Consequently, both had

to agree on all material terms, including the terms of the integrated ancillary agreements, some of which called for personal services by Tom Kacachos.

83. Denied. The February 9, 2022 email from Mr. Kacachos raised many issues and items that had not yet been agreed to, including: (a) the Construction Management Agreement; (b) the Profits Interest Agreement; (c) the Closing Statement; (d) the Non-Competition Agreement; and (e) the costs of the brand new house built at 211 University during the 2021-22 school year. This email was followed up by a phone call between Thomas Kacachos and Yvette Wall, CPA, Rob Abelson and Austin Brooks. Yvette also brought up ownership of trucks, equipment, and supplies should go to Amicus. Mr. Kacachos stated it would not, since those items are part of the sellers' warehouse and contracting which was not being sold to Amicus. Mr. Kacachos started to work on an excluded items list, but then on February 17 Amicus attempted to renegotiate the price with the prorated rent scheme, so everything else was put on delay. Yvette Wall did a partial reply to Tom Kacachos's email, but Rob and Austin choose not to communicate or respond to the key issues.

84. Denied. Amicus constantly changed the closing date, often on exceedingly short notice; for instance, on occasions seeking closing dates one to three days later, which was never achievable. Amicus pressured the Kacachoses to send signed deeds by express courier overnight to the escrow agent/title company in New York by March 24, assuring that everything else will fall into place, despite lack of a closing statement, ancillary agreements, or insurance on the properties. This was not acceptable business practice on any real estate closing, let alone one of the scope contemplated here.

17

85. Denied. As stated by Amicus's attorney, Amicus "had no obligation" to send the e-mail, which outlined two bad scenarios for the Kacachoses. Likewise, the Kacachoses had no obligation to accept either scenario. Nevertheless, these were only a part of voluminous communications overlapping between the principals, their agents, and their respective counsel.

86. Denied. The Kacachoses told Amicus that the parties needed to work out contract issues and that they would not lower the price.

87. Admit that a March 24 closing was not achieved because of continuing disagreements over material terms and unsatisfied contingencies, and there was no meeting of the minds to achieve agreement on matters in conflict. Denied as to any "evasive efforts" by the Kacachoses. The Kacachoses tried to rebuild trust with Amicus but didn't feel comfortable with extensions. The contract negotiations seemed too far apart on ancillary agreements and other conditions.

88. Denied. Amicus was flip-flopping on closing dates and wanted contract concessions that were outside of the PSA. Amicus was becoming increasingly difficult to work with once they felt the deal was done. For example, they were fixated on the Non-Competition Agreement having a duration of 5 years, which was not acceptable.

89. Denied as to any evasive or obstructive conduct by the Kacachoses. Both parties discussed multiple closing dates. The Kacachoses never shut down the talks, as did Amicus from February 16, 2022, until 5 PM March 1, 2022, and from March 3 to March 17, 2022. Disagreements persisted over material terms and unsatisfied contingencies.

90.    Denied. Amicus eliminated any opportunity to close due to material disagreements and unsatisfied contingencies.

91.    Admit that no closing occurred. Denied as to balance of allegations. Amicus eliminated any opportunity to close due to material disagreements and unsatisfied contingencies.

92.    Denied as to any allegation of breach by the Kacachoses. There was continuing disagreement over material terms and unsatisfied contingencies. The parties never achieved a meeting of the minds on issues left open and unresolved by the PSA.

93.    Denied as to any allegation of breach by the Kacachoses. There was continuing disagreement over material terms and unsatisfied contingencies. The parties never achieved a meeting of the minds on issues left open and unresolved by the PSA.

94.    Denied as to any allegation of breach by the Kacachoses. There was continuing disagreement over material terms and unsatisfied contingencies. The parties never achieved a meeting of the minds on issues left open and unresolved by the PSA.

95.    Denied as to any allegation of breach by the Kacachoses. There was continuing disagreement over material terms and unsatisfied contingencies. The parties never achieved a meeting of the minds on issues left open and unresolved by the PSA.

96.    Admit that Tom Kacachos had a phone call with Amicus' Rob Abelson and Austin Brooks on May 2, 2022. The phone call did not result in a meeting of the minds.

97.    Denied. The negotiated purchase price was a function of the expected contributory value of the integrated ancillary agreements, and was negotiated accordingly. The ancillary agreements were never finalized because the parties did not achieve a meeting of the minds on material terms. Without the benefit of the ancillary agreements, the purchase price was unacceptable to sellers, and this position was

made known to Amicus' principals. Notwithstanding good faith efforts on the Kacachoses' part to come to terms, the parties did not achieve a meeting of the minds. Consequently, the transaction did not close.

98. Denied.

99. Admit a phone call occurred, but denied as to remaining allegations. Amicus had already gone past the last possible closing date, without generating a closing statement suitably detailed to guide a closing agent through what would have been a fairly complex, multi-parcel closing.

100. Admit Amicus filed a Complaint, but deny it had any legal grounds for filing same. The original complaint was not filed in the correct division of the Court.

101. Denied. The Kacachoses do not know what is meant by the phrase "spurn damages," but in any event deny any allegation, inference or implication that they have caused Amicus any damages, or that they have breached any contract with Amicus, or otherwise committed any civil wrong. The Kacachoses deny for lack of knowledge the allegations concerning Amicus's expenditures, but would point out, in the lead-up to a contract of this magnitude, both parties could be expected to have substantial legal and other transactional costs. The parties here did not ultimately come to terms on an enforceable agreement to buy and sell the portfolio. That is a risk both parties bore, but does not transform the facts related here into a legally actionable or compensable claim for the frustrated buyer.

102. Admit that Seller's performance is excused, and deny any other allegation or inference of delay, obstruction or breach by the Seller.

103. Denied. There was continuing disagreement over material terms and unsatisfied contingencies. The parties never achieved a meeting of the minds on issues left

open and unresolved by the PSA. The purported contract was never sufficiently complete to close.

104. The Kacachoses incorporate by reference paragraphs 1-103 of their Answer and Counterclaims as if fully rewritten herein.

105. Denied.

106. Denied.

107. Admit in part that both sides worked hard to negotiate this transaction, but denied as to any allegation or inference that the Kacachoses breached any agreement with Amicus.

108. Denied.

109. Refer to PSA for terms and contents thereof, but deny that the PSA ever became an enforceable and complete agreement to sell the real properties in this dispute, and further deny any allegation or inference that the Kacachoses breached the PSA.

110. Denied. There was continuing disagreement over material terms and unsatisfied contingencies. The parties never achieved a meeting of the minds on issues left open and unresolved by the PSA. Hence, Seller's performance was excused.

111. Denied. The language " provide certain documentation" is unclear and ambiguous, and the Kacachoses request a more definite statement.

112. Denied. The language "necessary documents" is unclear and ambiguous, and the Kacachoses request a more definite statement.

113. Denied. Further answering, there was never a meeting of the minds on the unsigned integrated ancillary agreements.

114. Denied.

115. Denied.

116.   Denied, as to both allegations of breach by the Kacachoses, or any causation of damages to Amicus.

117.   Denied, as to both allegations of breach by the Kacachoses, or any causation of damages to Amicus.

118.   Denied. PSA section 4.2 contemplated that the Kacachoses would operate and manage the portfolio according to customary practice, including leasing and upkeep of the properties. The vast majority of the properties comprising the portfolio were leased by May 2022 for the 2022-2023 academic year, and preleased for the 2023-2024 academic year, such that the portfolio is operating soundly under seller's diligence. At Amicus's request, the 314 N. University property was *not* leased.

119.   Any breach by the Kacachoses is denied. The Kacachoses refer to the PSA for its terms and contents, reserving any defenses thereto, again deny they are in breach of said agreement, and otherwise deny any remaining allegations of Amicus' paragraph 119.

120.   The Kacachoses refer to the PSA for its terms and contents, reserving any defenses thereto, again deny they are in breach of said agreement, and otherwise deny any remaining allegations of Amicus' paragraph 120. Further answering, Amicus's paragraph 120 states in part pure conclusions of law, which require no response from the Kacachoses. To the extent a response is deemed required, those legal conclusions are denied.

121.   The Kacachoses refer to the PSA for its terms and contents, reserving any defenses thereto, again deny they are in breach of said agreement, and otherwise deny any remaining allegations of Amicus' paragraph 121.

122.  Denied that Amicus and the Kacachoses ever reached a full and enforceable agreement to sell the properties at issue in this dispute. Further answering, on information and belief, the real properties are "valued to be worth at least $75,000,000."

123.  Amicus's paragraph 123 states pure conclusions of law, which require no response from the Kacachoses. To the extent a response is deemed required, those allegations are denied.

124.  Denied.

125.  Denied.

126.  Denied.

127.  Denied.

128.  Denied.

129.  Denied.

130.  Denied.

131.  The Kacachoses incorporate by reference paragraphs 1-130 of their Answer and Counterclaims as if fully rewritten herein.

132.  Denied.

133.  Denied.

134.  Denied in part. The Kacachoses are not bound to close upon sale of the real estate portfiolio in this dispute, under the terms of the PSA. The PSA is materially incomplete and unenforceable against the Kacachoses, whether the remedy sought is specific performance or money damages, or any combination of remedies.

135.  Denied.

136.  Denied.

137. Denied.

138. Denied.

139. Denied.

140. Denied.

141. Denied.

142. The Kacachoses incorporate by reference paragraphs 1-141 of their Answer and Counterclaims as if fully rewritten herein.

143. Denied as to any breach of "the duty of good faith and fair dealing." Further answering, Ohio recognizes no standalone action for breach of the duty of good faith and fair dealing. Accordingly, this claim should be dismissed as a matter of law pursuant to Federal Rule of Civil Procedure 12(b)(6).

144. Denied as to enforceability of the PSA. Ohio is the preferred forum for this dispute because the Defendants reside therein and the entirety of the real properties comprising the portfolio are located in Ohio. Furthermore, the contemplated ancillary agreements (which were never finalized) would have been performed in Ohio. Ohio is the only convenient forum according to the circumstances of the transaction.

145. Amicus's paragraph 145 states a conclusion of law, to which the Kacachoses are not obliged to respond, and therefore deny. Subject to and without retracting said denial, they further deny any inference that they have dealt with Amicus unfairly or in bad faith.

146. Amicus's paragraph 146 states a conclusion of law, to which the Kacachoses are not obliged to respond, and therefore deny. Subject to and without retracting said

denial, they further deny any inference that they have dealt with Amicus dishonestly, unreasonably or in bad faith.

147.  Denied.

148.  Denied.

149.  Denied.

150.  Denied.

151.  Denied.

152.  The Kacachoses incorporate by reference paragraphs 1-151 of their Answer and Counterclaims as if fully rewritten herein.

153.  Denied as to any inference or allegation that the Kacachoses breached the PSA. As elsewhere noted in Amicus's Amended Complaint, the Kacachoses did execute the PSA, but that instrument did not constitute a complete and enforceable agreement to sell real properties and was expressly conditioned on finalizing and executing various ancillary agreements by a date certain, which did not occur, through no fault of the Kacachoses.

154.  Denied.

155.  Denied as to any grounds for a promissory estoppel claim based on these facts. Further answering, the Kacachoses did provide ample documentation and engaged in negotiations in good faith. Those negotiations did not in the end produce an enforceable agreement.

156.  Denied insofar as Amicus's allegations make it sound as if the Kacachoses set up impediments to closing. There were discussions of various closing dates, some in February, some in March of 2022. Amicus was not prepared to close. Integrated

ancillary agreements were not finalized because of disagreement on material terms. The method of rent proration remained in dispute.

157.　Admit, on information and belief, that Amicus has escrowed money. That the money remains in escrow and the transaction contemplated by the PSA never closed are not the result of any unreasonable or unlawful action by the Kacachoses.

158.　Denied for lack of knowledge.

159.　Denied for lack of knowledge.

160.　Denied as to any grounds for promissory estoppel on these facts. The Kacachoses did not close because the PSA with its integrated ancillary agreements was not sufficiently complete and material terms remained in dispute. There was no meeting of the minds. Conditions precedent to closing and to performance were therefore not satisfied.

161.　Denied.

162.　Denied both as to Amicus's allegations that the Kacachoses delayed negotiations, due diligence or any other matters germane to the transaction, and further denied that the Kacachoses caused Amicus to accept "substantially worse" financing terms.

163.　Denied.

164.　Denied.

<u>FIRST AFFIRMATIVE DEFENSE</u>

The First Amended Complaint fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12 (b)(6).

<u>SECOND AFFIRMATIVE DEFENSE</u>

The PSA with its integrated ancillary agreements was not sufficiently complete, and material terms remained in dispute. There was no meeting of the minds. Conditions precedent to closing and to performance were therefore not satisfied.

<u>THIRD AFFIRMATIVE DEFENSE</u>

Plaintiff's claim is barred by the Ohio Statute of Frauds, Ohio Revised Code § 1335.05 insofar as there are no agreements before this Court signed by the parties to be charged, *i.e.*, the record title owners of the real properties included in the portfolio that is the subject matter of this action. The title owners are various corporations and limited liability companies which are non-parties to the PSA, and their ownership is a matter of public record.

<u>FOURTH AFFIRMATIVE DEFENSE</u>

Plaintiff has failed to join necessary parties pursuant to Fed. R. Civ. P. 19.

<u>FIFTH AFFIRMATIVE DEFENSE</u>

The subject matter is not suited to specific performance, because the real properties are not identified by legal descriptions or permanent parcel numbers or title owners, which are required for conveyance, transfer and recordation according to Ohio law.

<u>SIXTH AFFIRMATIVE DEFENSE</u>

There is no privity of contract between Amicus and the various title owners of record.

SEVENTH AFFIRMATIVE DEFENSE

Performance by the Kacachoses is excused by Amicus's material breach of contract by failure to perform its duties within the date specific timelines set forth in the PSA.

EIGHTH AFFIRMATIVE DEFENSE

Performance by the Kacachoses is excused by Amicus's anticipatory repudiation of the contract, by insistence upon concessions having significant adverse financial repercussions to the Kacachoses, which were not contemplated by the PSA.

NINTH AFFIRMATIVE DEFENSE

Assumption of Risk: Amicus assumed the risk of market shift pertaining to terms of its intended mortgage financing, which are beyond the Kacachoses' control. The PSA is not subject to financing conditions imposed upon Amicus by its lending sources.

TENTH AFFIRMATIVE DEFENSE

Amicus waived strict performance and damages under the PSA.

ELEVENTH AFFIRMATIVE DEFENSE

Amicus's claims are barred by equitable estoppel. Amicus sought a 90-day extension of the closing date and now complains that the transaction did not close on time.

TWELFTH AFFIRMATIVE DEFENSE

Amicus's claims are barred by laches, because it waited an unreasonable amount of time to seek performance following expiration of the PSA, which imposed a date certain for closing. The delays are unreasonable according to shifting conditions affecting financial markets, including inflation, interest rate hikes, market volatility and other prevailing risks adversely impacting contract performance.

## THIRTEENTH AFFIRMATIVE DEFENSE

Amicus's claims are barred by its own unclean hands. By way of example, it tried to impose an unacceptable and self-serving method of proration of rent which was not consistent with the provisions of PSA Article 3. Amicus attempted to annualize the proration even though the leases were based on 9-month terms consistent with Miami University's academic calendar, with rents due on a semester basis. The justification submitted by Amicus in relation to its lender expectations was unreasonable and had material adverse financial consequences for the properties' owners (approximately $300,000). This disputed method of rent proration remained an unresolved conflict.

## FOURTEENTH AFFIRMATIVE DEFENSE

Two of the anticipated ancillary agreements, namely the Property Management Agreement and the Acquisition Fee Agreement, are illegal and hence unenforceable under Ohio real estate brokerage law, Ohio Rev. Code § 4735.01(A)(6)-(7), (B).

## FIFTEENTH AFFIRMATIVE DEFENSE

The proposed Profits Interest Agreement is illusory. The Kacachoses, through counsel, and through due diligence sought supporting financial information to ascertain the business viability, and Amicus failed and refused to provide such information. Consequently there was no meeting of the minds as to such ancillary agreement.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Construction Management Agreement involving Tom Kacachos never resulted in a meeting of the minds, and as such never transformed into an enforceable contract.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Under Ohio's Parol Evidence Rule, which is a matter of substantive contract law, extraneous evidence such as e-mails, text messages or oral communications, and the like, which Amicus alleges in its First Amended Complaint, are objectionable and cannot be used to contradict, modify or amend the PSA.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Any reliance by Amicus on the PSA, which was conditional and incomplete on its face, was unreasonable, because conditions precedent to closing upon which performance depended were not satisfied in a timely manner.

## NINTEENTH AFFIRMATIVE DEFENSE

Plaintiff's First Amended Complaint is barred by failure of consideration.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's First Amended Complaint is barred by fraudulent inducement of the purported agreement which Amicus sues upon.

Amicus's principals used the incentives of various ancillary agreements to negotiate the purchase price stated in the PSA, according to the inducement that those ancillary agreements contributed significant value to the Kacachoses, exceeding $5 million in the aggregate. In fact, the ancillary agreements Amicus ultimately submitted to the Kacachoses many weeks after the PSA was executed were one-sided, unfair, unreasonable, illusory, and, in some instances, illegal, in whole or in part. Consequently, the many problems associated with the ancillary agreements prevented their finalization. The absence of the ancillary agreements significantly reduces the financial benefits which Amicus led the Kacachoses to believe would be realized under the PSA.

<u>TWENTY-FIRST AFFIRMATIVE DEFENSE</u>

Enforcement of the PSA, or discrete parts thereof, is barred by illegality. The PSA, Section 1.1, addressing Purchase and Sale, contemplates transfer of real properties to a fictitious entity referred to as "Hold Co," whereby Hold Co's membership interest would transfer to seller at closing, after Hold Co received conveyances of the real properties. This method of conveyancing is now commonly known as the "drop down" method, whereby the real property conveyed to Hold Co is treated as an exempt conveyance, and transfer of the membership interest is not reported as a real estate transfer. The "drop down" method avoids disclosure of transfer of real property for value, such that the $75 million purchase price would not be recognized by the County Auditor, and Amicus would not be required to pay real property taxes accruing on real properties according to their book value, as of date of closing. Under PSA Section 3.13(i), the seller is nevertheless solely responsible for conveyance tax and bears financial risk of imposition of fees and penalties for any inaccurate reporting. Said drop down method violates Ohio statutes pertaining to conveyancing of real properties. and may be construed as fraudulent conveyancing and an illegal scheme intended to evade accurate taxation of real properties. See Ohio Rev. Code §§ 319.202; 319.54; see also § 319.21, barring fraudulent transfers. See also, e.g., *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, Slip Opinion No. 2020-Ohio-253 (2020).

The Kacachoses do not intend to participate in an illegal tax evasion scheme and, through counsel, so advised Amicus.

<u>TWENTY-SECOND AFFIRMATIVE DEFENSE</u>

Amicus's First Amended Complaint is barred by the doctrine of waiver.

<u>TWENTY-THIRD AFFIRMATIVE DEFENSE</u>

Plaintiff has failed to mitigate its alleged damages.

<u>TWENTY-FOURTH AFFIRMATIVE DEFENSE</u>

The Kacachoses reserve the right to assert additional affirmative defenses as this action progresses.

WHEREFORE, the Kacachoses demand that the First Amended Verified Complaint be dismissed, with prejudice, at Plaintiff's cost, and that Defendants be awarded their reasonable attorney's fees and costs incurred herein, and all other legal and equitable relief to which they are entitled.


## **COUNTERCLAIM**

Now come Defendants-Counterclaimants the Kacachoses, and for their Counterclaim against Counterclaim-Defendant Amicus state as follows:

1. The Kacachoses incorporate by reference all admitted facts, affirmations, averments and affirmative defenses set forth in their Answer.

2. Amicus contacted Thomas Kacachos on or around July 13, 2021, to discuss a potential student housing portfolio purchase. Originally, Amicus only expressed interest in houses.

3. Thomas "Tom" Kacachos was the principal point of contact from the Kacachos side.

4. Amicus's principals Rob Abelson and Austin Brooks visited Oxford, Ohio and viewed numerous properties on August 4, 2021.

5. On October 25, 2021, parts of an overarching contract were signed, though contrary to Amicus's narrative, that PSA and a single ancillary agreement thereto did not constitute a complete and enforceable agreement to sell the portfolio in this dispute. The PSA contemplated a hybrid transaction involving: (a) purchase and sale of real properties; (b) purchase and sale of tangible properties; (c) purchase and sale of an interest in a limited liability company (*i.e.,* "HoldCo") to be used as a conduit for conveyancing; and (d) fully integrated ancillary agreements calling for personal and business services to be performed, as well as a non-competition agreement, all of which comprise the transaction as a whole, and upon which contract duties are interdependent. On the face of the PSA, the finalization of the ancillary agreements by the end of the Inspection Period (as defined by the PSA) was a condition precedent to performance of contract duties, including closing. *See,* generally, Art. 8; *see also* Sec. 12.8 of the PSA, which language demonstrates that the PSA is incomplete and conditional in nature. Hence, the PSA is better characterized as an "agreement to work toward a further comprehensive agreement." Further, the PSA was not in itself a guarantee that the parties could ultimately reach a meeting of the minds on a comprehensive agreement, embracing not only property sales, but approaches to proration of rents, allocations on conveyancing statements with major backside property tax implications, and a proposed Non-Competition Agreement that would affect the Kacachoses' professional lives.

6. The Kacachoses were induced to enter into the PSA by Amicus based upon the added financial incentives which they reasonably expected to be derived from various integrated ancillary agreements, but these agreements were initially

conceptual and not reduced to writing (except for the Property Management Agreement) when the PSA was signed. The contributive value which Amicus placed on the integrated ancillary agreements amounted to $5,650,000. (*See,* e-mails of September 10-14, 2021, attached as **Exhibit 1**.) Following the parties' signing of the PSA on October 25, 2021, the Kacachoses provided to Amicus those records required for Amicus to conduct its due diligence. These records included the following:  leases/rent rolls, property contracts, tax bills, financials, due diligence materials, and other personnel, insurance and operating information, much of which is of a confidential and proprietary nature. The Kacachoses were diligent in performing their duties under the PSA and demonstrated good faith compliance while they awaited the various ancillary agreements upon which the PSA was also conditioned.

7. The various ancillary agreements, with the exception of the "Property Management Agreement," were not in existence as of the date of execution of the PSA, and were not provided by Amicus until many weeks following its execution. The following table lists the Ancillary Agreements, the section of the PSA referencing same, and the date Amicus first circulated the respective Ancillary Agreements:

| **Agreement** | **PSA Section Ref.** | **Circulation Date** |
| --- | --- | --- |
| Property Management – Schedule 4.4(c) | 4.4(e); 8.2(g) | with PSA |
| Non-Competition – Schedule 8.2(w)  * | 8.2(w) | 12/07/2021 |
| Construction Management – (Not scheduled/Not attached) | 4.4(d); 8.2(g) | 12/09/2021 |
| Finder's Fee – Schedule O  * | 4.4(a); 8.2(f) | 12/23/2021 |

Profits Interest –
Schedule Q  *                          4.4(f); 8.2(i)                    02/16/2022

\* The Schedules as attached to the PSA when signed, stated:
 **To be finalized prior to the expiration of the Inspection Period.**
 (emphasis original)

PSA Section 4.1(c) contains a closing covenant specifically requiring: "legal, valid, and binding obligations ....."

The respective Ancillary Agreements are attached as **Exhibits 2 through 6**.

8. When the Ancillary Agreements were eventually circulated by Amicus, the various agreements contained terms and conditions which were unsatisfactory to the Kacachoses. The disputed terms and conditions remained the subject of ongoing discourse, disagreement and negotiation. In addition, legal counsel for the Kacachoses also determined that the Property Management Agreement and the Finder's Fee Agreement were illegal and would violate the expected closing covenants of PSA Section 4.1(c).

9. As of March 17, 2022, after expiration of the Inspection Period set forth in the PSA, the ancillary agreements were still not finalized. *See,* Don Lussier e-mail and letter dated March 17, 2022, attached as **Exhibit 7.** *See also,* letter of March 23, 2022, from Jack Grove, attorney for the Kacachoses, directed to Donald Lussier and Peter Gelzinis, attorneys for Amicus, identifying several problems with the PSA terms and disputed issues underlying the various ancillary agreements, attached as **Exhibit 8.**

10. After prolonged negotiations, no meeting of the minds occurred about the unacceptable terms. In consequence, conditions precedent to closing were not satisfied.

11. The overall transaction anticipated by the PSA did not close when a definitive agreement could not be reached on the integrated ancillary agreements, as well as other disputed and divisive issues, such as the proper approach to proration of rents. Amicus now seeks to force a sale of the portfolio contrary to the parties' expressed intentions, and even though no final agreement was reached. Amicus effectively asks this Court to rewrite the PSA and to make a new deal for the parties, contrary to well-settled contract law.

12. After receipt, the various ancillary agreements were the subject of continuing negotiation, because there was not a meeting of the minds as to the previously undisclosed substantive terms.

13. There were major, unresolvable differences between the parties, as summarized in the letter dated March 23, 2022, from the Kacachoses' counsel Jack Grove. (*See* Exhibit 8.)

14. Also, disagreements arose and persisted over performance of the PSA, including, for example, Amicus's insistence on a "drop down" method of conveyancing and its insistence on prorating rents under the leases, on a 12 month basis, despite the fact the underlying actual leases were for 9 month terms. These disputes involved material financial discrepancies affecting overall consideration.

15. The PSA imposed date specific timelines during its executory phase, and performance of the parties was subject to compliance with the deadlines. For example, PSA Section 3.15 required the escrow agent to forward a closing

statement setting forth prorations and adjustments to the purchase price at least five (5) days prior to closing. At no time did the escrow agent provide a closing statement compliant with Article 3 requirements. In consequence of the prolonged disagreement over terms of the ancillary agreements, the lack of a closing statement, disagreement over method of rent proration, and disagreement over asset allocation, *inter alia,* the transaction did not close on or before the closing date set forth in the PSA.

16. Notwithstanding the Kacachoses' efforts as sellers, Amicus as buyer, and their respective representatives and agents, the parties were unable to achieve a meeting of the minds on all material terms, and in consequence thereof, conditions precedent to closing were not satisfied.

17. The contracting parties did not intend for the PSA to be "evergreen" and of indefinite duration. The overall transaction contemplated by the PSA failed to close within a reasonable time after the agreed, definitive timetable for performance to occur. This was the case, despite the parties' efforts to conclude their negotiations and come to terms on the incomplete ancillary agreements that were integrated into the PSA, and other terms in dispute, such as rent proration. Changing circumstances, including major capital expenditures, market conditions, renewed rent cycles for the 2023-2024 academic year, inflation and obligations incurred by the owners associated with continuing business operations (not contemplated by the contracting parties) have adversely impacted the expected benefit of the bargain to be derived by a timely closing. In sum, due to expiration of the PSA, the parties are excused from further performance. In other words, the PSA is now a dead deal.

**Count I: Declaratory Judgment Pursuant to 28 U.S.C. § 2201**

18. The Kacachoses incorporates by reference paragraphs 1-17 above as if fully rewritten herein.

19. An actual controversy has arisen between Amicus and the Kacachoses.

20. The nature of the controversy is whether the PSA executed by the parties constitutes a complete and enforceable agreement binding the Kacachoses to sell a real estate portfolio to Amicus.

21. The Kacachoses request judgment in their favor, pursuant to the Ohio Declaratory Judgment Act, declaring that the PSA was incomplete as to critical ancillary agreements incorporated by reference therein, and therefore failed to reflect a meeting of the minds as to all material terms contained or incorporated by reference therein.

22. Although the PSA incorporated by reference a non-competition agreement between the Kacachoses and Amicus, the parties never reached a meeting of the minds on the duration of such an agreement.

23. The Kacachoses and Amicus also diverged on the proper approach to proration of rent. Amicus insisted that the rent must be prorated on the basis of a 12 month year, while the Kacachoses pointed out that the portfolio in dispute was heavily composed of student housing, mostly rented to Miami University students on a 9 month term, tracking the University's academic year. Accordingly, proration should be based on the actual 9 month term set forth in actual leases.

24. The parties further disagreed about using "drop down" allocation methods to inform conveyancing statements on the various portfolio real properties. Amicus insisted upon allocating a grossly inflated sum for goodwill and other non-realty

assets. The Kacachoses reasonably expected the allocation to reflect the centrality of real estate holdings and fair market values thereof to the proposed transfer. The Kacachoses pointed out that Amicus's insisted approach could saddle the sellers with substantial contingent liability on the back end of any sale if transfer for value is not fairly and accurately reported. This dispute never resolved, and is part of the reason why the PSA remained an incomplete contract.

25. Amicus never forwarded to the Kacachoses a proper closing statement that accurately stated all debits, credits and disbursements, in sufficient specificity to have a closing agent arrange and conduct the actual real estate closing. For this reason alone, Amicus cannot claim it was ready, willing and able to close on purchase of the portfolio in dispute.

26. Amiucus was inconsistent as to timing of any prospective closing. At times, its principals would insist on closing on exceedingly short notice. But when Amicus learned of comparatively minor code enforcement issues raised by the City of Oxford—with respect to units which had already passed inspections—Amicus abruptly reversed course and insisted on a 90 day extension of the closing date. Both the premature efforts to set closings, based on incomplete contract documents, and the request for a lengthy extension of time to close, underscore a key point—that the PSA itself was not a standalone, enforceable agreement, but rather, depended on the parties' coming to terms on key ancillary agreements and other matters remaining in dispute.

27. The Kacachoses seek declaratory judgment in their favor, declaring that the PSA does not reflect a meeting of the minds in requisite mirror image terms as to all material terms of the parties' bargain.

28. The Kacachoses seek declaratory judgment pursuant to 28 U.S.C. § 2201, that for all the foregoing reasons, the PSA is not an enforceable contract, and the Kacachoses are not obliged thereunder to sell Amicus the real estate portfolio in this dispute.

**Count II: Amicus's Breaches of PSA**

29. The Kacachoses incorporates by reference paragraphs 1-28 above as if fully rewritten herein.

30. Pleading in the alternative, pursuant to Fed. R. Civ. P. 8, the Kacachoses further allege that after the conditional PSA was signed by the parties on October 25, 2021, the Kacachoses substantially performed all seller related duties through the end of the Inspection Period set forth in the PSA, such that Amicus, through its counsel, issued its "Notice to Proceed." A copy of the Notice issued by Amicus counsel Peter Gelzinis, dated February 9, 2022, is attached as Exhibit 9.

31. Notwithstanding the Kacachoses' faithful performance through February 9, 2022, their further performance under the PSA was excused by Amicus's material breaches of the PSA, including:

(a) Demanding an improper method of rent proration under the student rental leases (9 month terms with rents paid on a per semester basis). Through its improper method of calculating proration, Amicus tried to extract an approximately $300,000 windfall credit, which devalued the agreed consideration. The Kacachoses objected to this improper proration method. Amicus tried to justify its approach by contending that its lender would require its 12 month based rent proration method, even though lender/mortgagee

approval was *not* a condition, either express or implied, of the PSA relating to closing after issuance of the Notice to Proceed.

(b) Amicus did not circulate its draft of the Profits Interest Agreement until February 16, 2022, which was after the end of the Inspection Period and after its Notice to Proceed. According to the incomplete documentation provided, the Profits Interest Agreement was illusory. It involved a third party entity called "Amicus II Manager, LLC," which is not a party to the PSA. Furthermore, the Profits Interest Agreement documentation provided by Amicus failed to demonstrate monetary par value of shares consistent with what Amicus's principals previously represented. For their due diligence, the Kacachoses, through counsel, requested supporting business records, such as financial statements, business plan and operating *pro formas*. Amicus ignored such request. The illusory Profits Interest Agreement had a material adverse impact on the sellers' expected aggregate compensation to be derived under the PSA, because the Profits Interest Agreement was integrated into the PSA and intended to be a part thereof.

(c) A Closing Statement is specifically required by a date certain, at least five days prior to closing, under PSA § 3.15. Amicus, through its escrow agent/title company issued a draft closing statement which did not conform to the specific requirements set forth in PSA Article III. Amicus' draft closing statement is attached hereto as **Exhibit 10**. The draft closing statement includes projected mortgage pay-offs, but without per diem rate accumulation. Further, it did not make an allocation of asset values for the subject real properties, goodwill, or tangible personal property. The draft closing statement did not include rent and

tax prorations or provide for other transaction fees and costs, such as conveyance fees and recording costs. Sellers rejected the draft closing statement. *See* Jack Grove letter to Donald Lussier, dated March 23, 2022, attached as Exhibit 8**.** Neither Amicus nor its escrow agent/title company ever provided a conforming closing statement. Therefore, Amicus' financial performance was incomplete.

(d) After Amicus received notice of doubtful City of Oxford code enforcement notices involving five portfolio properties (issued *after* the properties passed inspections), Amicus sought to impose additional conditions under the PSA, such as an excessive $500,000 escrow reserve, which was not agreeable to the Kacachoses. As before, Amicus attributed this unreasonable demand to its lender, even though lender/mortgagee approval was not an express or implied condition of the PSA relating to closing after issuance of the Notice to Proceed.

(e) Amicus, through its counsel, requested a walk away clause excusing Amicus's further performance based upon lending rate structure occasioned by inflationary surges, financial market volatility and general economic conditions, all of which lay beyond the Kacachoses' control and were not the result of any breach of duty on their part. All of the aforesaid breaches are material in nature, and the PSA did not close by reason of Amicus's unilateral breaches in derogation of the PSA. *See* April 5, 2022 e-mail from Donald Lussier to Jack Grove, attached as **Exhibit 11**.

32. By reason of Amicus's breach, the Kacachoses are entitled to recoup the deposit of $550,000, escrowed under PSA section 11.2 for buyer default. In addition, the Kacacoses are entitled to recover their attorney fees under PSA section 12.9.

### Count III:  Bad Faith/Frivolous Conduct

33. The Kacachoses incorporates by reference paragraphs 1-32 above as if fully rewritten herein.

34. Amicus and its counsel demonstrated bad faith and frivolous conduct on their part as follows:

a) Amicus failed to serve a notice of breach upon the Kacachoses prior to commencement of suit, nor was their counsel, identified under PSA § 12.2, served with a copy of the Complaint either before or after its filing;

b) Amicus and its counsel commenced suit in an improper division of the U.S. District Court, Southern District of Ohio, according to Loc. R. 82.1. Amicus not only filed the Complaint, but secured what that Court later concluded was an improvidently granted *ex parte* Temporary Restraining Order. It is difficult to comprehend how the matter proceeded to an *ex parte* Temporary Restraining Order if filing in Columbus, Ohio arose from a mere clerical oversight. It is also difficult to understand why it took filing a formal Motion to Transfer at the Kacachoses' expense to get the forum corrected. Plaintiff and its counsel obviously knew the properties all were situated in Butler County, Ohio, and the Kacachoses were Butler County residents. Butler County is outside the Eastern Division of this Court pursuant to the Local Rules.

c) Amicus's counsel did not provide required notice under Fed. R. Civ. P. 65(b) regarding its Motion for Temporary Restraining Order, and also did not provide certification of the movant's notice to the defendants.

d) Amicus made verified allegations that are utterly untrue, asserting the Kacachoses believe they can derive a higher price from another buyer. There is not one scintilla of evidence that the Kacachoses are shopping the portfolio of properties to other potential buyers.

35. In consequence of such bad faith and frivolous conduct, the Kacachoses have incurred legal fees associated with the Motion to Transfer to the Western Division in Cincinnati and opposition to the improperly commenced Motion for Temporary Restraining Order.

WHEREFORE, the Kacachoses demand judgment as follows on their Counterclaim:

(A) On Count I of the Kacachoses' Counterclaims, Declaratory Judgment from this Court, declaring that the Purchase and Sale Agreement is not sufficiently complete to compel specific performance in this case, because: (1) the parties never achieved a meeting of the minds on ancillary agreements integrated into the PSA; (2) the parties never agreed on proration of rents, and Amicus's demand for proration on a 12 month basis was unsupportable in light of the actual leases on the real properties in this dispute; (3) at least one ancillary agreement violated Ohio brokerage law; and (4) Amicus insisted upon but the Kacachoses never agreed to the drop down method of allocation.

(B) On Count I, a Declaratory Judgment further declaring that Amicus is not entitled to monetary damages or any other relief from the Kacachoses.

(C) On Count II, in the alternative, if the Court found the PSA was enforceable, a judgment on the Kacachoses' Count II, finding that the Kacachoses had performed their pre-closing duties under the PSA in good faith, but that Amicus breached the PSA by: (1) failing to provide a proper closing statement; (2) demanding a walk-away clause shifting risk of financial and lending market volatility and other economic conditions to the sellers; (3) demanding an improper method of rent proration, which materially reduced sellers' consideration; and (4) presenting as part of the supposed "consideration" an illusory Profits Interest Agreement.

(D) On Count II, judgment awarding the Kacachoses the $550,000 in earnest money as liquidated damages in consequence of Amicus's material breaches of the PSA and recovery of legal fees.

(E) On Count III, an award of counsel fees incurred in addressing Amicus's bad faith and frivolous conduct in filing its original lawsuit without first serving a Notice of Breach upon Amicus and its counsel identified in the PSA, and in filing said lawsuit in a forum not convenient to the Kacachoses, and not authorized by Loc. R. 82.1.

(F) Any other and further relief this Court sees fit to grant.

Respectfully submitted,

*/s/ Edward P. Akin*
Edward P. Akin  0074357
Aronoff, Rosen & Hunt
2200 U.S. Bank Tower
425 Walnut Street
Cincinnati, OH 45202
(513) 241-0400
(513) 241-2877 (fax)
epakin@arh-law.com
*Trial Attorney for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I certify this document was filed electronically and served through the Court's ECF System on Aneca E. Lasley, aneca.lasley@icemiller.com, on July 29, 2022.

*<u>/s/ Edward P. Akin</u>*
Edward P. Akin