## JACK F. GROVE
### ATTORNEY AT LAW
1251 NILLES ROAD
SUITE 10
FAIRFIELD, OHIO  45014

TELEPHONE: (513) 829-2900

TELECOPIER: (513) 829-7538

7006 FAIRFIELD ROAD

OXFORD, OHIO  4505

March 23, 2022

Donald G. Lussier, Esq.
Peter P. Gelzinis, Esq.
100 Summer Street, 22nd Floor
Boston, MA. 02110

Re: Park Place Portfolio – Purchase and Sale Agreement

Dear Mssrs.

This correspondence follows our telephone conversation on Friday afternoon March 18, 2022.

First, I would like to address your letter dated March 17, 2022. I take issue with a slanted and one-sided portrayal. As you should be aware the violation notices received on February 28, 2022 came as a surprise because the code official indicated that the properties passed at the time of inspections on January 12, 2022. After receipt the Seller gave prompt notice.  Understandably the Buyer wanted to learn more about the development and what to expect.

The Seller promptly engaged my services for the purpose of opposing the enforcement action. Before I was in a position to share my thoughts, I conducted investigation. We initiated several public records requests, and the seller assembled records about the permitting history of the properties. I was concerned about the short timetable to commence the appeals and the priority was to study the Oxford PMC, then develop the strategy and begin document preparation. I avoid providing shoot-from-the-hip advice which the Buyer seemed to expect. Be assured that I take my professional engagements seriously.

Mr. Lussier, when explaining the sequence, you failed to make mention that you were away from the office the week of March 7, 2022. While you were away, I was hard at work on the appeals. In fact, I postponed other work in the pipeline in order to accelerate the task at hand. On Monday, March 14, 2022 I was scheduled out for a long-standing appointment with a dental surgeon.  Peter and I spoke twice the following day while I was still drafting the five Notices of Appeal.  The Seller's response was anything but indifferent. The Buyer's panicked reaction was inappropriate to the circumstances. The appeals were filed Wednesday, March 16, 2022 by hand delivery - well before the deadline. Peter acknowledged the effort and extended his appreciation.

EXHIBIT

8

tabbies®

# JACK F. GROVE ATTORNEY AT LAW

Pg. 2

All along Seller representatives have been attentive and communicative. I appreciate your clients' enthusiasm and hustle. But when problems arise, a pause is sometimes required to enable thoughtful and deliberate response.

There is more to the story. Before commencement of the enforcement action the Buyer and Seller had disagreement over rent prorations bearing upon closing-related finances. The Buyer expressed concern over lender requirements, which was repeated after the notice of the City's enforcement action. In consequence the Buyer wanted a 90-day extension or a hefty escrow, neither of which were envisioned by your contract. It is fair to say that the contracting parties were somewhat on edge when the notices of permit violations arrived.

The so called "simple" extension request is *not so simple* after all. The Buyer forewarned that the Lender may require new inspections and updated appraisals which were sure to complicate the transaction. The extension request also called for "ratification" of the contract. This, too, is complicated.

So, when I was asked for my opinion, I determined that it was necessary to review the contract and the many ancillary agreements comprising the package deal. It is my understanding that the ancillary agreements were not circulated until some time after the portfolio agreement was arranged. Even as I write I have not received the full evolution of the entire transaction history.

For present purposes the various ancillary agreements are not acceptable and require considerable work. For example, Tom Kacachos wrote on March 2, 2022 about the construction management agreement taking issue with payment upon COA. He would expect progress payments to occur upon percentage of completion, which is typical.

During our call on Friday, I spoke to about other contract deficiencies and illegalities requiring attention:

Brokerage - Both the Acquisition Fee Agreement and Property Management Agreement are faulted. They run afoul of Ohio's Real Estate Brokerage Law. I direct your attention to R.C. 4735.01 (A)(6) and (7), as well as subsection (B). The exemption for owner managed properties under subsection (H)(1)(A) does not apply; I disagree that the upstream profit participation entity qualifies as ownership or control envisioned by the brokerage law. This area will require considerable work and further negotiation.

"Residential Rental Property" Disclosure - Next, it appears that your purchase and sale agreement overlooked Ohio's Disclosure requirement for "Residential Rental Property" under R.C. Chapter 5323. The disclosure requirement is the County Auditor is tied to conveyance fee reporting and real property valuation also involving the auditor (to be discussed). Oxford PMC 310.2 requires a copy of the Auditor's requisite form to be filed with the City.

# JACK F. GROVE ATTORNEY AT LAW

Pg. 3

Profits Interest Agreement - This ancillary agreement is ambiguous and the contractual nexus to the portfolio is unclear. You referred to it as an "upstream" entity. As it now reads the agreement is illusory.

Please provide the business plan and a proforma concerning expected performance. Perhaps the problem could be cured with additional recitals and contractual covenants after we have needed information. Tom and Heather are unclear about what is intended and how they could be benefitted.

Drop Down Method - The transfer of LLC interest is sometimes intended to avoid booking up the real property values upon sale. During our call, I explained how a transfer for "value" triggers the Seller's payment of the conveyance fee based upon the sale price. The Ohio Supreme Court has provided guidance. The drop-down method is receiving scrutiny from Ohio Auditors and this multi-parcel transaction is sure to attract attention. (along with the Residential Rental Property reporting).

Under ¶ 3.13 of the contract as now written the Seller is responsible for the conveyance tax. The Seller has responsibility for transfer tax returns per ¶ 8.21 (P). When transfer occurs conveyance forms are required for the various properties identified by tax ID number. See *R.C. 319.202 and R.C. 319.54.* When the transfer is an exchange for value this will book-up the value for property tax value valuation. *R.C. 319.21* contains a prohibition against fraudulent transfer.

This topic was discussed at some length during last December's Real Estate Institute class, and I am familiar with the approach from other transactions (but not on this scale). Tom and Heather are required to make accurate reporting and intend to fulfill their responsibility. Stated differently, they do not intend participation in a scheme intended to evade tax obligation. It would not be in either the Seller's and Buyer's interest to become embroiled in a property tax scandal. Hopefully you agree that protecting image is imperative.

When reviewing the contract, I did not locate any sort of allocation for the various real properties, tangible personal property, good will, covenant not-to-compete, and other ancillary agreements. The allocation for the real properties is necessary for accurate reporting of the conveyances. The allocation is also important for income tax reporting, depreciation recapture, and so forth which I am sure you understand. For this transaction making the allocation will take some time. The closing statement will be dependent upon the determination of resulting values.

Assignment And Assumption Agreement For Leases - This side agreement is impacted by the enforcement actions. The draft is somewhat anemic. As explained during phone call the Seller expects a Buyer covenant requiring strict performance of landlord duties under Ohio's Landlord Tenant Code.

# JACK F. GROVE ATTORNEY AT LAW

Pg. 4

After becoming acquainted with the enforcement action, I explained the provisions of Oxford's PMC applicable to transfer. One section requires surrender of permits upon transfer and issuance to the new owner. PMC 310.3. Another section prohibits transfer during an enforcement action pending notice and agreement by the Buyer to be responsible. PMC 107.6.

The portfolio contract does not have a protocol governing compliance, and these matters cannot be overlooked. Understand that the agreement will be a public record so it should be a standalone document with minimal information about the connected transaction and financial matters.

I seriously question Oxford's Home Rule Authority to suspend real estate transfers governed by State Law. This I have not researched, and I defer to the title examiners. For present purposes I recommend compliance.

<u>Closing Statement</u> - While we were on the phone last Friday, I received the draft of the closing statement. It is **rejected** due to non-compliance with the contract, more specifically closing adjustments per ¶ 3.15. The document is grossly deficient. I do not foresee a working closing statement until this allocation of values first occurs. A complete, accurate reconciliation is needed.

<u>Closing</u> - The overall Portfolio contract (ancillary agreements) remains a work in progress. A closing by March 25, 2022 is not feasible considering numerous problems and omissions.

What next . . . ?

The summary is not meant to find fault or to lay blame; rather, it is meant to pinpoint deficiencies requiring our substantive attention. So long as various agreements are out of step with Ohio Law performance is not achievable. The Seller declines to extend the agreement because they cannot ratify a contract with so many holes and illegalities. At this point there is no meeting of the minds about all material aspects of the transaction.

It is necessary for me to remark about the Buyer's mixed messages involving the Lender's role along with worries about market volatility risk of market volatility runs both ways. The Seller was informed about the Lender's unwillingness to proceed, hence the extension request. But on the phone, you indicated that the Lender is now ready to go. This flip-flopping is not conducive to contract performance, considering the considerable work which remains ahead. Most Lenders usually prefer for the principals to resolve the complicating issues before closing. I encourage you to share this communication with the lender as it may bear Buyer performance and closing.

# JACK F. GROVE ATTORNEY AT LAW

Pg. 5


Be reminded that both sides have expended time, money, and resources in furtherance of prospecting the transaction. To the Seller's way of thinking, it better getting it right, than getting it fast. I have tried to be constructive in my approach as we work together. To that end I appreciate our discussions over the phone and your willingness to come to terms.


Very truly yours


Jack F. Grove


via email only

JFG/vke

encl: attachments

CC: Fidelity National Title Insurance Company, Attention: Andrew J. Knoph, Esq.
     Rob Bolin, Esq.

3. Include a statement of the violation or violations and why the notice is being issued.
4. Include a correction order allowing a reasonable time to make the repairs and improvements required to bring the dwelling unit or structure into compliance with the provisions of this code.
5. Inform the property owner of the right to appeal.
6. Include a statement of the right to file a lien in accordance with Section 106.3.

**PMC 107.3 Method of service.** Such notice shall be deemed to be properly served if a copy thereof is:
1. Delivered personally; or
2. Sent by first class mail with a Certificate of Mailing to the last known address; or
3. Posted in a conspicuous place on or about the structure or property affected by such notice and by first class mail to the last known address.

**PMC 107.4 Unauthorized tampering.** Signs, tags or seals posted or affixed by the code official shall not be mutilated, destroyed or tampered with, or removed without authorization from the code official.

**PMC 107.5 Penalties.** Penalties for noncompliance with orders and notices shall be as set forth in Section 106.4.

**PMC 107.6 Transfer of ownership.** It shall be unlawful for the owner of any dwelling unit or structure who has received a compliance order or upon whom a notice of violation has been served to sell, transfer, mortgage, lease or otherwise dispose of such dwelling unit or structure to another until the provisions of the compliance order or notice of violation have been complied with, or until such owner shall first furnish the grantee, transferee, mortgagee or lessee a true copy of any compliance order or notice of violation issued by the code official and shall furnish to the code official a signed and notarized statement from the grantee, transferee, mortgagee or lessee, acknowledging the receipt of such compliance order or notice of violation and fully accepting the responsibility without condition for making the corrections or repairs required by such compliance order or notice of violation.

## SECTION 108 UNSAFE STRUCTURES AND EQUIPMENT

**PMC 108.1 General.** When a structure or equipment is found by the code official to be unsafe, or when a structure is found unfit for human occupancy, or is found unlawful, such structure shall be condemned pursuant to the provisions of this code.

**PMC 108.1.1 Unsafe structures.** An unsafe structure is one that is found to be dangerous to the life, health, property or safety of the public or the occupants of the structure by not providing minimum safeguards to protect or warn occupants in the event of fire, or because such structure contains unsafe equipment or is so damaged, decayed, dilapidated, structurally unsafe or of such faulty construction or unstable foundation, that partial or complete collapse is possible.

**PMC 108.1.2 Unsafe equipment.** Unsafe equipment includes any boiler, heating equipment, elevator, moving stairway, electrical wiring or device, flammable liquid containers or other equipment on the premises or within the structure which is in such disrepair or condition that such equipment is a hazard to life, health, property or safety of the public or occupants of the premises or structure.

**PMC 108.1.3 Structure unfit for human occupancy.** A structure is unfit for human occupancy whenever the code official finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is insanitary, vermin or rat infested, contains filth and contamination, or lacks ventilation, illumination, sanitary or heating facilities or other essential equipment required by this code, or because the location of the structure constitutes a hazard to the occupants of the structure or to the public.

**PMC 108.1.4 Unlawful structure.** An unlawful structure is one found in whole or in part to be occupied by more persons than permitted under this code, or was erected, altered or occupied contrary to law.

that the requisite repairs and/or changes have been completed, the code official shall reinspect the property to determine if the required repairs and/or changes have been successfully completed.

**PMC 310.3. Permit issued.** A copy of any permit issued pursuant to this section shall be protected and displayed in a conspicuous place on the premises at all times and shall state the maximum occupancy permitted on the premises as well as the name of the owner and the owner's designated agent(s). Every person holding a permit pursuant to this section shall return the permit to the code official within ten (10) days after having given up the control or operation of the residential rental property or having sold, transferred, given away, or otherwise disposed of the property. Every Residential Rental Permit issued for any rooming house, lodging house, multi-family dwelling, dwelling unit or fraternity/sorority house shall expire at the end of one (1) year following the effective date of the issuance of the permit, unless sooner revoked pursuant to PMC Section 310.4, or by operation of PMC Section 110. A Residential Rental Permit may not be issued to another owner or agent without a full or plain view reinspection of the premises by the code official.

**PMC 310.4 Agent required.** Every owner of a dwelling not residing on the premises shall appoint and designate an agent to act on owner's behalf and shall notify the code official with the telephone number of the appointed agent and the notification shall contain an acceptable of such appointment signed by the designated agent. An individual may act as his or her own agent so long as he or she is a resident of Butler County or one of its surrounding counties. The agent required by this section must be a permanent resident of Butler County, Ohio, or adjoining county, or an entity operating a permanent office in Butler County, Ohio, or an adjoining county. Adjoining counties are Hamilton, Montgomery, Preble, and Warren in Ohio, and Dearborn, Franklin, and Union County in Indiana.

> **PMC 310.4.1 Agent defined.** An "agent" is defined as a responsible person or entity who, except in the case of the property owner, has been retained by and acts for, or in place of, the owner of a property with the responsibility of providing a healthy and safe environment for inhabitants by complying with all applicable rules and regulations and who has been granted authority by the owner to consent to inspections.

**PMC 310.5 Revocation of rental permits.** Whenever, upon inspection or any premises requiring a Residential Rental Permit, the code official finds that conditions or practices exist which are in violation of any provisions of the Oxford's PMC, the code official shall give notice in accordance with PMC Section 107 to the owner, or owner's agent, of the property, At the end of the time period specified in the notice, the code official shall reinspect the premises and if the code official finds that such conditions or practices have not been corrected and if no appeal has been filed in accordance with Section 111 of the PMC, the code official shall give notice in writing to the owner or owner's agent that the permit has been revoked. Upon receipt of such notice, the owner or the owner's agent shall immediately take any and all action necessary to cease operation of such rental unit or rental units and shall thereafter not permit any tenant to live, sleep, or reside in the property until another Residential Rental Permit is obtained.

**PMC 310.6 Appeal of permit revocation.** Any person who has received notice that his or her permit is being revoke unless existing conditions or practices at the rental premises are corrected may, within twenty (20) days after the date of such notice, fill an appeal and shall be granted a hearing upon the matter pursuant to PMC Section 111 (Means of Appeal").