# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **AMICUS MIAMI OF OHIO, LLC** | : | Case No. 1:22-cv- cv-00355 |
| **Plaintiff** | | Judge McFarland |
| | : | Magistrate Litkovitz |
| vs. | | |
| **HEATHER HOELZER KACACHOS, *ET AL.*** | : | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| **Defendants** | | |
| | : | |

Defendants Thomas and Heather Kacachos (collectively, hereinafter, "the Kacachoses") hereby file their Memorandum in Opposition to Plaintiff Amicus Miami of Ohio, LLC's ("Amicus's") Motion for Temporary Restraining Order. Amicus has no justification for its Motion. First and foremost, the Purchase and Sale Agreement ("PSA") Amicus now seeks to enforce never ripened into a complete and enforceable agreement. Instead, it was an "agreement to agree," and had it been a fully realized agreement, it would have included final, and executed versions of five important ancillary agreements. Those agreements never proceeded beyond draft stage, and remained in dispute to and through expiration of the Inspection Period, and the closing deadline, set by the PSA. Furthermore, the parties continued to dispute material terms of the PSA, including the proper proration of rent from student rental properties which comprised most of the portfolio in this dispute.

The parties further disagreed over allocation of values as between real estate assets and goodwill, personal property, and other non-realty assets. For reasons explained in the Kacachoses' Answer and Counterclaim (DOC 24), and explained further below, the

parties' disagreements on numerous material issues, as well as the highly important ancillary agreements, could not ultimately be resolved, and this prevented any ultimate meeting of the minds.

Amicus's own breaches of the PSA also precluded enforceability against the Kacachoses. As an important illustrative example, Amicus failed to provide anything resembling a proper closing statement, despite its contractual duty to furnish same. And material terms remained in flux, and more importantly, in unbridgeable dispute to the end. Amicus and the Kacachoses were still trying to negotiate key contract terms on May 11, 2022, nearly seven weeks after the PSA expired.

## COUNTERSTATEMENT OF FACTS

The Kacachoses are a married couple, living in Butler County, Ohio. In July 2021, Amicus approached the Kacachoses about purchasing a portfolio of real properties, primarily serving students attending Miami University at Oxford, Ohio. Thomas Kacachos was the initial point of contact. Nevertheless, both Kacachoses were parties to the contract. After several months of discussions, Amicus sent a first draft of the PSA in September 2021. Amicus principally drafted the PSA.

The Purchase and Sale Agreement, Exhibit A to Amicus's First Amended Complaint (DOC 22), was ultimately nothing more than an "agreement to further agree." Crucially, the PSA was dependent and conditioned upon finalizing the various ancillary agreements by the end of the inspection period. This never occurred. Instead, the parties continued to disagree about various ancillary agreements, to, and after, the Inspection Period, the extension of that period, and indeed, right into May 2022. The parties also disagreed over proration of rents. Allocation of value to realty versus goodwill and other assets also remained a point of contention. In short, the agreement Amicus seeks to

2

enforce remains inchoate, missing key pieces, and as such, does not reflect a complete meeting of the minds as to all material terms.

Importantly, the PSA integrated five so-called "Ancillary Agreements" listed in the table below, which also shows the date the particular agreement was first circulated, and the section of the PSA referencing each particular agreement:

| **Agreement** | **PSA Section Ref.** | **Circulation Date** |
|---|---|---|
| Property Management – Schedule 4.4(c) | 4.4(e); 8.2(g) | with PSA |
| Non-Competition – Schedule 8.2(w) * | 8.2(w) | 12/07/2021 |
| Construction Management – (Not scheduled/Not attached) | 4.4(d); 8.2(g) | 12/09/2021 |
| Finder's Fee – Schedule O * | 4.4(a); 8.2(f) | 12/23/2021 |
| Profits Interest – Schedule Q * | 4.4(f); 8.2(i) | 02/16/2022 |

Only one of the ancillary agreements, the "Property Management Agreement," was ever executed. Although initially approved, it was later determined to be illegal, violating Ohio brokerage law. (*See* Jack Grove letter to Donald Lussier, attached as Exhibit 8 to Answer and Counterclaim, DOC 24-8). The others remained in dispute, and were never finalized or signed. The term "ancillary agreements" is a misnomer, insofar as it suggests these agreements were simply an afterthought. The Non-Competition Agreement was potentially life changing for the Kacachoses, who would have been left, in the middle of their working years, unable to pursue their accustomed profession, in their home county or its environs, for a period of up to five years. In the aggregate, the ancillary agreements were supposed to furnish important additional consideration, which the parties took into account in weighing the merits of their deal. Hence, the PSA involved *both* the purchase

of a portfolio of real estate, and a complicated working agreement extending up to 10 years in the ancillary agreements identified in the table, *supra.*

The ancillary agreements were intended to be integrated into the PSA. Hence, the parties, including Amicus, bore the risk that failure to achieve a meeting of the minds on these important additional agreements could scuttle the entire transaction.

While the Kacachoses signed the PSA, Amicus's assertion that they "initialed every page" thereof is not true. The PSA included ancillary agreements, which remained in dispute, even as the PSA expired. The Kacachoses did not initial all those pages.

In sum, the PSA contemplated a hybrid transaction involving: (a) purchase and sale of real properties; (b) purchase and sale of tangible properties; (c) purchase and sale of an interest in a limited liability company (*i.e.,* "HoldCo") to be used as a conduit for conveyancing; and (d) fully integrated ancillary agreements calling for personal and business services to be performed, as well as a non-competition agreement, all of which comprise the transaction as a whole, and upon which contract duties are interdependent. On the face of the PSA, the finalization of the ancillary agreements by the end of the Inspection Period (as defined by the PSA) was a condition precedent to performance of contract duties, including closing. *See,* generally, Art. 8; *see also* Sec. 12.8 of the PSA, which language demonstrates that the PSA is incomplete and conditional in nature. Hence, the PSA is better characterized as an "agreement to work toward a further comprehensive agreement." The crucial point, which Amicus seems to have missed, was that the PSA was not in itself a guarantee that the parties could ultimately reach a meeting of the minds on a comprehensive agreement, embracing not only property sales, but approaches to proration of rents, allocations on conveyancing statements with major

backside property tax implications, and a proposed Non-Competition Agreement that would affect the Kacachoses' professional lives.

Amicus's self-serving and incomplete narrative makes it sound as if the Kacachoses delayed providing vital information needed for due diligence. The more complete e-mail, text and mailed correspondence shows the Kacachoses promptly provided quite detailed information. (*See,* e-mail string from Tom Kacachos to Yvette Wall, attached hereto as **Exhibit A**). Far from delaying or withholding information needed for Amicus's due diligence, the Kacachoses timely furnished all the information Amicus needed to make an informed decision about the real estate portfolio. Then, within 24 hours of learning, on March 17, 2022, that Amicus wanted to set a closing 7 days hence, the Kacachoses sent updated prorated rents, deposits and sales allocation on March 18, 2022, so that Amicus could generate a closing statement.

Meanwhile, Amicus itself tried to set the brakes on the whole transaction when it got unnerved by a relatively small scale local permitting matter. When the City of Oxford sent notices of alleged violations, affecting only a minute fraction of the overall properties, and the units or beds contained therein, Amicus put a hard stop on efforts to close, from March 3-17, 2022. The Kacachoses, meanwhile, had their counsel Jack Grove address the purported violations.

In the end, it was not delay, but abiding, material disagreements which killed the transaction. Disputes arose on numerous fronts. Despite good faith negotiation aimed at bridging the gaps between the parties' expectations, these disputes remained stubborn points of division, and ultimately prevented the parties from reaching a meeting of the minds on the complete range of agreements envisioned by the PSA.

5

Proration of rents also drove the parties apart. The blame lay squarely in Amicus's camp, because it insisted on a proration scheme based on 12 months, while the vast majority of the actual leases in play were 9 month leases, keyed to the academic year at Miami University. Amicus's proration scheme would have netted it a $300,000 windfall. This proved perhaps the most divisive point between the parties. Amicus tried to justify its approach by contending that its lender would require its 12 month based rent proration method, even though lender/mortgagee approval was *not* a condition, either express or implied, of the PSA relating to closing after issuance of the Notice to Proceed. (*See* Answer to Amended Complaint and Counterclaim, at ¶ 31, DOC 24). Amicus staked out an untenable position here, while the Kacachoses approach to proration was based on the actual leases.

Amicus repeatedly makes reckless statements, in both its original and Amended Verified Complaints, and in briefing its injunctive relief motion. As merely illustrative examples, Amicus contends the Kacachoses "decided they would rather try to get a better price for the Properties than honor their contractual obligations." (DOC 2, at p. 3). Amicus repeats this innuendo, and variations thereof, without any evidence, other than "information and belief," in its Motion for TRO and Preliminary Injunction. Simply repeating an untruth, without attribution or any record, does not transform it into an evidentiary foundation upon which to curtail another party's bundle of property rights.

In fact, not one shred of evidence suggests the Kacachoses are shopping the portfolio of real properties to other potential buyers. Certainly neither of them ever communicated to Amicus, or anyone else, that they would attempt to transfer the properties to frustrate Amicus's efforts to purchase the portfolio. Instead, the Kacachoses, mindful that the PSA has expired according to its own terms, have simply elected to keep

6

managing the properties. To that end, they have pre-leased them as far out as the 2023-24 academic year at Miami University. (*See* Answer to Amended Complaint and Counterclaim, at ¶ 118, DOC 24).

## LEGAL STANDARD

The legal standard here is vitally important, given that injunctive relief is an extraordinary remedy. Amicus's version does not capture the primacy of two of the factors.

The Sixth Circuit recently summarized the four factors to determine when a court should grant a preliminary injunction. These include (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest. *D.T. v. Sumner County Schools,* 942 F.3d 324, 326-27 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S.Ct. 1942, 1943-44, 201 L.Ed.2d 398 (2018) (per curiam); 11A Charles Alan Wright et al., *Federal Practice and Procedure*, §2948 (3d ed. 1995 & Supp. 2019).

Courts often present this inquiry as "a balancing test." *Id.*, citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6 Cir. 2007); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6 Cir. 1992). Amicus's statement of the legal standard fails to point out that courts, including courts of the Sixth Circuit, have accorded certain factors considerably more weight than the others. For instance, the irreparable harm requirement is a *sine qua non* for injunctive relief so vitally important that even "the strongest showing on the other three factors cannot "eliminate the irreparable harm requirement." *Id.*, citing, *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6 Cir. 1982).

If the plaintiff is not facing imminent and irreparable injury, there is no need to grant relief *now* as opposed to at the end of the lawsuit. *See id*. at 103; *see also* Wright et al., Fed. Prac. & Procedure, § 2948.1 ("Irreparable injury is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction[.]"). Accordingly, the Sixth Circuit has held that a district court abuses its discretion "when it grants a preliminary injunction without making specific findings of irreparable injury[.]" Id. at 327, citing *Friendship Materials, 679 F.2d at 105*. Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory.

At least the second most important factor (and some courts actually cite it as *the* most important factor) is the likelihood of the movant's success on the merits. *See Overstreet v. Lexington-Fayette Urban County Government,* 305 F.3d 566, 573 (6th Cir. 2002); *see also O'Toole v. Conner*, 802 F.3d 783, 792 (6th Cir. 2015).

The plaintiff/movant bears the burden of persuasion, and in contrast to Rule 56 proceedings, this burden never shifts to the non-movant. The Sixth Circuit has addressed the quantum of proof a plaintiff must show to secure injunctive relief:

> We note that the proof required for the plaintiff to obtain a preliminary injunction *is much more stringent than the proof required to survive a summary judgment motion, for example . . . See generally Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 818–19 (4th Cir.1991)* (observing that the standard for obtaining a preliminary injunction is higher than the standard for surviving summary judgment)[.] ("To obtain a preliminary injunction, [the plaintiff] not only had to demonstrate specific harm, but also carry the burden *of persuasion, showing a likelihood of success on the merits.*. On a motion for summary judgment, a plaintiff need only create a jury issue.")[.] . . . This is because the preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel,* 952 F.2d at 811 (quotation omitted) (alteration in original); *see also Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir.1978)*.

*Leary v. Daeschner*, 228 F.3d 729, 739 (6 Cir. 2000).

8

Hence, Amicus, as movant, bears the burden of proof on all elements. It must make a stronger showing than a party seeking to avoid summary judgment, because it is invoking an extraordinary remedy, that would not only tie up, but actually cripple the operation of a valuable portfolio of properties.

## LEGAL ARGUMENT

### A. Amicus Has Not Shown a High Likelihood of Success on the Merits.

Amicus has not shown the requisite likelihood of success on the merits. It has sued on the PSA, which by its own terms, remains incomplete. Furthermore, even if the PSA were more complete as to its integrated ancillary agreements, Amicus's own performance under the PSA was never complete. Amicus seeks to close, for example, without ever tendering a proper closing statement. The PSA referenced the above-tabled ancillary agreements, four of which remain unexecuted, and which were in dispute as late as May 2022.

The parties also disagreed as to the important issue of prorating rent on the properties in dispute. Amicus's approach was not supported by the applicable facts or any body of law. The Kacachoses' calculated their proposed proration based on actual leases on the subject properties, which consisted overwhelmingly of student housing leases, for 9 month terms corresponding to Miami University's academic year. Confronted with those stark facts, Amicus stubbornly insisted on a 12 month rent proration scheme. Amicus portrays itself as the voice of reason and the driving force behind hastening the transaction to a closing. But the proration dispute reveals otherwise. Amicus actually delayed any potential closing by weeks, and sowed distrust with the Kacachoses by trying to strongarm a $300,000-plus discount. The parties never agreed on the proper approach to rent proration. The amount in disagreement grew to nearly $800,000 by March 25.

9

The Kacachoses had the better argument, as the bulk of properties had 9 month leases. Nevertheless the key point is, this remained an unresolved obstacle to what Amicus contends was a fully agreed and enforceable contract. The PSA was neither, as the proration dispute persisted, and other points of material disagreement emerged.

Amicus also insisted on a "drop down" method of property transfer. This also prevented a meeting of the minds, because it remained a material, ongoing dispute between the parties. It also precludes enforcement of the PSA, insofar as the resulting method of transfer might violate Ohio law, and expose the Kacachoses to substantial legal and financial risks.

As expressed in the Kacachoses' Answer and Counterclaim, enforcement of the PSA, or discrete parts thereof, is barred by illegality. The PSA, Section 1.1, addressing Purchase and Sale, contemplates transfer of real properties to a fictitious entity referred to as "Hold Co," whereby Hold Co's membership interest would transfer to seller at closing, after Hold Co received conveyances of the real properties. This method of conveyancing is now commonly known as the "drop down" method, whereby the real property conveyed to Hold Co is treated as an exempt conveyance, and transfer of the membership interest is not reported as a real estate transfer. The "drop down" method avoids disclosure of transfer of real property for value, such that the $75 million purchase price would not be recognized by the County Auditor, and Amicus would not be required to pay real property taxes accruing on real properties according to their book value, as of date of closing. Under PSA Section 3.13(i), the seller is nevertheless solely responsible for conveyance tax and bears financial risk of imposition of fees and penalties for any inaccurate reporting. The "drop down" method violates Ohio statutes pertaining to conveyancing of real properties. It could also be construed as a fraudulent conveyancing

and an illegal scheme intended to evade accurate taxation of real properties. See Ohio Rev. Code §§ 319.202; 319.54; see also § 319.21, barring fraudulent transfers. See also, e.g., *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, Slip Opinion No. 2020-Ohio-253 (2020).

In turn, the "drop down" transfer method undermines Amicus' specific performance claims. For Amicus is not in contractual privity with any of the actual, record title owners of the real properties comprising the portfolio in dispute. As such, Amicus's claim is barred by the Ohio Statute of Frauds, Ohio Revised Code § 1335.05 insofar as there are no agreements before this Court signed *by the parties to be charged, i.e., the record title owners of the real properties included in the portfolio that is the subject matter of this action*. (*See* Answer and Counterclaim, at Affirmative Defenses, DOC 24*)*. The title owners are various corporations and limited liability companies which are non-parties to the PSA, and their ownership is a matter of public record.

Legal counsel for the Kacachoses also determined that the Property Management Agreement and the Finder's Fee Agreement were illegal and would violate the expected closing covenants of PSA Section 4.1(c). It is well-settled law that Ohio courts, and American courts, generally, will not enforce an illegal agreement. Here, as documented by the correspondence of Kacachoses' attorney Jack Grove to Amicus' counsel Donald Lussier, two of the Ancillary Agreements integrated into the PSA violated Ohio statutory law. As set forth in the Kacachoses' Answer and Counterclaim in the Affirmative Defenses (DOC 24), the Property Management Agreement and the Acquisition Fee Agreement, are illegal and hence unenforceable under Ohio real estate brokerage law, Ohio Rev. Code § 4735.01(A)(6)-(7), (B). That section states, in relevant part:

11

> A. "Real estate broker" includes any person, partnership, association, limited liability company, limited liability partnership, or corporation, foreign or domestic, who for another, whether pursuant to a power of attorney or otherwise, and who for a fee, commission, or other valuable consideration, or with the intention, or in the expectation, or upon the promise of receiving or collecting a fee, commission, or other valuable consideration does any of the following:
>
> (A)
>
> \* \* \*
>
> (6) Advertises or holds self out as engaged in the business of selling, exchanging, purchasing, renting, or leasing real estate;
>
> (7) Directs or assists in the procuring of prospects or the negotiation of any transaction, other than mortgage financing, which does or is calculated to result in the sale, exchange, *leasing, or renting* of any real estate;
>
> \* \* \*
>
> (B) *"Real estate" includes leaseholds as well as any and every interest or estate in land situated in this state*, whether corporeal or incorporeal, whether freehold or nonfreehold, and the improvements on the land, but does not include cemetery interment rights.

Ohio Rev. Code § 4735.01 (A)-(B) (emphasis added).

The Ohio Court of Appeals for the district where the properties are situated declined to enforce an agreement that violated state statutory law, in *Marchetti v. Blankenburg, M.D.,* 2011-Ohio-2212 at ¶ 11 (Ohio Ct. App. 12th Dist. 2011). *Marchetti* noted, "the existence of an enforceable contract is a prerequisite to a claim for breach of contract." *Id.* at ¶ 10. That court further held, parties cannot "enter into an enforceable contract that was in direct violation of state statutes." *Id.* at ¶ 11. A contract containing such promises posed as consideration will either have the same stricken from the

12

purported contract, "if possible," or alternatively, the illegal promises will render the entire contract void." *Id.* (citing *Extine v. Williamson Midwest, Inc.*, 176 Ohio St. 403, 405, 200 N.E. 2d 297 (1964). Here, Amicus relied upon the offending agreements to furnish some of the non-cash consideration it used in attempting to meet the Kacachoses' asking price. Especially in the context of specific performance demands, Amicus should not be inviting the Court to make determinations of what portions of an overall transaction violate state law, and carving out or retaining provisions based on that analysis.

Amicus falsely accuses the Kacachoses of delay, but neglects to mention its own dilatory conduct. As of March 17, 2022, after expiration of the Inspection Period set forth in the PSA, the ancillary agreements were still not finalized. (*See,* Don Lussier e-mail and letter dated March 17, 2022, attached as Exhibit 7 to Answer and Counterclaim, DOC 24-7; *see also,* letter of March 23, 2022, from Jack Grove, attorney for the Kacachoses, directed to Donald Lussier and Peter Gelzinis, attorneys for Amicus, identifying several problems with the PSA terms and disputed issues underlying the various ancillary agreements, DOC 24-8).

Yet another dispute emerged over allocation of value to real estate versus non-realty. Late in the ongoing negotiations between the parties, Amicus proposed assigning valuation of around $51.5 million to real estate, the remainder, about $23.5 million to non-realty assets, including goodwill, permits, personal property and the like. This number seemed difficult to defend. From the Kacachoses' informed perspective in managing these productive assets, the vast bulk of the value lies in the realty and uses associated with it. And like the dispute over the drop-down method of transfer, it seemed Amicus had staked out a position quite likely to incur challenge from taxing authorities.

13

Ohio has a hefty body of decisional law addressing allocation issues alone in the context of property tax litigation.

Heaped upon these core deficiencies, Amicus never circulated a closing statement that could have guided this fairly complex transaction to closing. Indeed, even cursory review shows the Amicus "closing statement" was woefully deficient. As the Kacachoses set forth in their Counterclaim, Amicus's failure to tender a proper closing statement was itself a breach of the PSA, which required tender of such by a date certain, at least five days prior to closing. (PSA § 3.15). Amicus, through its escrow agent/title company issued a draft closing statement which did not conform to the specific requirements set forth in PSA Article III. (*See* Answer and Counterclaim, Ex. 10, DOC 24-10). The Amicus draft closing statement included projected mortgage pay-offs, but without per diem rate accumulation. Further, it made no allocation of asset values for the subject real properties, goodwill, or tangible personal property. It omitted rent and tax prorations or provide for other transaction fees and costs, such as conveyance fees and recording costs. Understandably, the Kacachoses rejected the draft closing statement. (*See* Jack Grove letter to Donald Lussier, dated March 23, 2022, DOC 24-8). Neither Amicus nor its escrow agent/title company ever provided a conforming closing statement, despite Mr. Kacachos timely forwarding them updated information from which they could generate same, on March 18, 2022. Therefore, Amicus's performance under the PSA was materially incomplete. This in turn materially undermines its "likelihood of success" on a specific performance action.

As late as May 2 and 11, 2022, less than a month before it filed this lawsuit, Amicus was still trying to negotiate particular, material terms—after the PSA had already expired of its own terms.

14

Finally, the subject matter is not suited to specific performance, because the real properties are not identified by legal descriptions or permanent parcel numbers or title owners, which are required for conveyance, transfer and recordation according to Ohio law. And if the specific performance action is not properly in play, there can scarcely be any showing of "irreparable injury."

How could the fashion a specific performance order without rewriting the parties' PSA for them? As it stands, the PSA directs the Kacachoses to create a drop down transaction entity, "Hold Co," with all the potential legal repercussions on the backside for sellers. Furthermore, one of the ancillary agreements would violate Ohio brokerage laws. (*See* Grove letter to Lussier, DOC 24-8). Yet the PSA fully integrates and depends upon all of the ancillary agreements. And indeed, Amicus relied on the ancillary agreements to bridge the gap on consideration, in an attempt to seal the deal.

Furthermore, Amicus mischaracterizes the impediments to closing, and downplays its own delays. Far from being unswervingly focused on getting to closing, Amicus actually caused much of the delay it complains about. It wasted weeks in an unsupportable argument over the proper approach to a proration of rent. Amicus constantly changed closing dates, often on exceedingly short notice. On occasions, it sought a closing date within one to three days later. This was never achievable, in view of Amicus's own persistent failure to generate and circulate an adequate closing statement. Amicus pressured the Kacachoses to send signed deeds by express courier overnight to the escrow agent/title company in New York by March 24, assuring that everything else will fall into place, despite lack of a closing statement, ancillary agreements, or insurance on the properties. This was not acceptable business practice on any real estate closing, let alone one of the grand scale contemplated here.

15

Amicus' legal counsel acknowledged receipt of correspondence from the Kacachoses' attorney, Jack Grove, citing numerous serious problems with the PSA and several of the integrated ancillary agreements. (*See, especially,* Jack Grove to Donald Lussier, March 23, 2022, DOC 24-8). Amicus's counsel never even came close to refuting any of Mr. Grove's various targeted objections. But neither did Amicus revise or drop its insistence on any of the ancillary agreements. Instead, these remained central to the transaction. Amicus refused to budge on the non-competition agreement, even though it had never been negotiated and certainly was not executed.

Hence, the "likelihood of success" prong tilts heavily and fatally against Amicus's injunctive relief claims.

### B. Amicus Has Pled Claims for Monetary Relief, Which Cuts Against a Finding of Irreparable Harm.

Amicus' brief relies heavily on the language of the PSA, providing for specific performance in case of seller breach. As detailed above, the Kacachoses are **not** the breaching party here. Nevertheless, Amicus fails to make the vital legal link between being entitled to specific performance, and suffering the required "irreparable harm" required to support injunctive relief.

Amicus cites several factually divergent, and hence readily distinguishable cases, none of which specifically held that a specific performance claim, pled amidst other monetary relief claims, sufficiently supported the threat of "irreparable harm" without which injunctive relief cannot be awarded. For instance, *Golf Village N. LLC v. City of Powell, Ohio,* 333 F.Supp. 3d 769, 781 (S.D. Ohio 2018) involved claims against a governmental body, not a frustrated real estate contract. The movant already had a possessory interest in the realty. Moreover, the Court concluded injunctive relief was

16

unwarranted. Any statements that court made about the party being deprived of the use and possession of real property were in the context of a losing effort to enjoin local government regulation, and constituted mere dicta, not the linchpin to a holding.

*Stooksberry v. Ross* lay similarly far afield. 528 F. App'x. 547 (6th Cir. 2013). That case arose in Tennessee, and involved civil RICO claims, pled in conjunction with Tennessee state law fraud and breach of fiduciary duty claims. Not surprisingly, Amicus merely cites these cases in a string cite, without discussion. They do not stand for the proposition that a specific performance remedy, embedded in a purchase and sale agreement, suffices to establish threat of irreparable harm, and therefore provides a springboard to injunctive relief.

Amicus has pled several theories of monetary relief, in the alternative. It obviously contemplates that money damages could make it whole. Moreover, as detailed in the preceding argument section, even assuming for argument's sake that a specific performance claim could qualify as "irreparable damages," Amicus has not presented this Court with an enforceable claim for specific performance. Its contract did not include the record owners, because, apparently, it wanted to structure the transaction as a "drop down," for perceived tax advantages. If this Court fashioned a specific performance order tracking the language of the PSA—all of its terms, including integrated ancillary agreements—some of the resulting terms would violate Ohio brokerage statutes. Even if limited to specific conveyance of real property, an order tracking the PSA would create the drop down conveyance scenario faulted by Ohio courts.

### C. Amicus's Proposed TRO Order Would Hamper Business Operations

Amicus falsely claims the proposed injunctive relief will "not impose an undue burden on Sellers[.]" (Motion for TRO and Preliminary Injunction, at § II(D), p. 15).

17

Amicus's proposed Order granting injunctive relief is overly broad, even if relief were otherwise warranted. Amicus's proposed Order would prevent any new encumbrances, including, potentially, mortgages needed in connection with recapitalizing loans needed for operating expenses. While the Kacachoses maintain that neither the facts nor applicable law presented here justify injunctive relief, they also point out that no TRO or preliminary injunction should impair the ability to re-capitalize loans needed for operating capital. These are short term student rental properties, subject to frequent turnover. In the summers, Park Place Management, which manages the portfolio, devotes much time and expense to getting the properties into shape for the upcoming academic semester.

Further, while the remaining prongs of the receive less discussion from both parties, Amicus's flip summary will not suffice. There is a public interest, albeit a particularized section of the public, that relies on the Park Place managed portfolio for future housing needs, namely Miami University students returning to campus for their sophomore or later academic years. These persons have an interest in the stable operation of the Park Place managed portfolio, and would potentially be impacted by an overreaching order of the sort Amicus has set before the Court.

**D. No TRO Should Issue Until and Unless Amicus Posts a Bond.**

Furthermore, and relatedly, Amicus proposes, while resisting the very idea of a bond, to tie up a very substantial block of properties, on the strength of nothing more than the incomplete PSA, which has, by its own terms, expired.

Amicus also appears to misunderstand the plain language of Fed. R. Civ. P. 65. It appears to believe it can have injunctive relief, tying up a large portfolio of properties, valued in the scores of millions of dollars, without posting a bond. Amicus has complained

that counsel for the Kacachoses somehow neglected to mention a bond for a TRO (as opposed to a preliminary injunction) in telephonic discussions with the Court after this matter was transferred from the Columbus branch. Rule 65 speaks plainly to this point, stating:

> The court may issue a preliminary injunction or a temporary restraining order *only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.*

Fed. R. Civ. P. 65 (c) (emphasis added).

Plainly, a bond is required as a prerequisite to granting injunctive relief under the federal rules. The Kacachoses would have agreed to a simple TRO, merely as a placeholder until full hearing on the Preliminary Injunction. That the parties could not so agree lies in Amicus's court, because it refused to even consider a bond, in derogation of the plain language of the F. R. Civ. P. 65(c).

## CONCLUSION

For all the foregoing reasons, injunctive relief, including the requests TRO, is unwarranted and improper on the facts related here. Amicus should never have filed this case in the first place. Even with the improper filing pending, the Kacachoses have made no move to market the properties in dispute to any other party. They simply wish to be free from this vexatious lawsuit, and for Amicus to realize the deal simply never became sufficiently complete and agreed upon as to all material terms to compel a closing.

Furthermore, Amicus has not marshalled one scintilla of evidence that the Kacachoses have marketed the properties to any third party. Instead, the actual owners of the real estate have retained the properties, and the Kacachoses, as principals of a

19

management company, continue to act as good stewards, which is why the portfolios were attractive to Amicus in the first place and why the ancillary agreements involving the Kacahoses are so critical to the overall transaction. The utter lack of any evidence that the Kacachoses are trying to sell the properties, coupled with the formal *lis pendens* notice filed in this case, moots injunctive relief.

This Court should not issue a temporary restraining order, or preliminary injunction. The facts related here and applicable law do not warrant such relief. But if, and only if, such relief were granted, Fed. R. Civ. P. 65 makes clear no injunction, TRO or otherwise, should take effect without an appropriate bond—in this case a bond appropriate to tie up what Amicus itself portrays as $75 million worth of real property. Nor should any resultant order prevent recapitalizing loans for operational expenses.

Respectfully submitted,

*/s/ Edward P. Akin*
Edward P. Akin  0074357
Aronoff, Rosen & Hunt
2200 U.S. Bank Tower
425 Walnut Street
Cincinnati, OH 45202
(513) 241-0400
(513) 241-2877 (fax)
epakin@arh-law.com
*Trial Attorney for Defendants*

CERTIFICATE OF SERVICE

I certify this document was filed electronically and served through the Court's ECF System on Aneca E. Lasley, aneca.lasley@icemiller.com, on August 3, 2022.

*/s/ Edward P. Akin*
Edward P. Akin

20