## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION
### (Cincinnati)

AMICUS MIAMI OF OHIO, LLC

     Plaintiff,

v.

HEATHER HOELZER KACACHOS

     And

THOMAS KACACHOS

     Defendants.

Case No. 1:22-cv-355

Judge Michael W. McFarland

Magistrate Judge Karen L. Litkovitz

## PLAINTIFF'S ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANTS' COUNTERCLAIM TO PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Amicus Miami of Ohio, LLC ("Amicus"), by counsel, for its Answer and Affirmative Defenses to Defendants Thomas Kacachos and Heather Hoelzer Kacachos' (collectively, hereinafter, "the Kacachoses" or "Defendants") Counterclaim to Plaintiff's First Amended Verified Complaint ("***Counterclaim***") (Filing No. 24), hereby states as follows:

### COUNTERCLAIM

1. The Kacachoses incorporate by reference all admitted facts, affirmations, averments and affirmative defenses set forth in their Answer.

**ANSWER:** Amicus incorporates by reference all paragraphs, facts, affirmations, claims, and defenses set forth in its Amended Complaint and herein.

2. Amicus contacted Thomas Kacachos on or around July 13, 2021, to discuss a potential student housing portfolio purchase. Originally, Amicus only expressed interest in houses.

1

**ANSWER:** Amicus admits in part that it contacted Thomas Kacachos in or about July 2021, but otherwise denies the remainder of the allegations in paragraph 2.

3. Thomas "Tom" Kacachos was the principal point of contact from the Kacachos side.

**ANSWER:** Amicus admits that Tom Kacachos was one point of contact, alongside his wife, Heather Hoelzer Kacachos, and their counsel. Amicus denies that Tom Kacachos was classified as the "principal" point of contact. Additionally, Amicus states that Defendants were represented by counsel throughout the negotiation of, agreement to, and signing of the PSA.

4. Amicus's principals Rob Abelson and Austin Brooks visited Oxford, Ohio and viewed numerous properties on August 4, 2021.

**ANSWER:** Admitted.

5. On October 25, 2021, parts of an overarching contract were signed, though contrary to Amicus's narrative, that PSA and a single ancillary agreement thereto did not constitute a complete and enforceable agreement to sell the portfolio in this dispute. The PSA contemplated a hybrid transaction involving: (a) purchase and sale of real properties; (b) purchase and sale of tangible properties; (c) purchase and sale of an interest in a limited liability company (i.e., "HoldCo") to be used as a conduit for conveyancing; and (d) fully integrated ancillary agreements calling for personal and business services to be performed, as well as a non-competition agreement, all of which comprise the transaction as a whole, and upon which contract duties are interdependent. On the face of the PSA, the finalization of the ancillary agreements by the end of the Inspection Period (as defined by the PSA) was a condition precedent to performance of contract duties, including closing. See, generally, Art. 8; see also Sec. 12.8 of the PSA, which language demonstrates that the PSA is incomplete and conditional in nature. Hence, the PSA is better

2

characterized as an "agreement to work toward a further comprehensive agreement." Further, the PSA was not in itself a guarantee that the parties could ultimately reach a meeting of the minds on a comprehensive agreement, embracing not only property sales, but approaches to proration of rents, allocations on conveyancing statements with major backside property tax implications, and a proposed Non-Competition Agreement that would affect the Kacachoses' professional lives.

**ANSWER:** Amicus admits that on October 25, 2021 the Parties executed the PSA. Amicus further states that the PSA is a binding contract, which is attached as Exhibit A to Plaintiff's First Amended Verified Complaint, that speaks for itself. *See generally* Pl.'s First Am. Verified Compl., Ex. A, Dkt. 22. Amicus also states that Defendants were represented by counsel throughout the negotiation of, agreement to, and signing of the PSA.

Amicus denies that the finalization of the ancillary agreements by the end of the Inspection Period (as defined by the PSA) was a condition precedent to performance of contract duties, including closing. Amicus denies that the PSA is incomplete and conditional. Amicus denies that the PSA, pursuant to which Amicus placed hundreds of thousands of dollars in escrow, was merely an "agreement to work toward a further comprehensive agreement."

Amicus denies Defendants' remaining factual allegations in paragraph 5. To the extent that Defendants' allegations in paragraph 5 assert legal conclusions, no response is required. To the extent a response is deemed required, the allegations are denied.

6. The Kacachoses were induced to enter into the PSA by Amicus based upon the added financial incentives which they reasonably expected to be derived from various integrated ancillary agreements, but these agreements were initially conceptual and not reduced to writing (except for the Property Management Agreement) when the PSA was signed. The contributive value which Amicus placed on the integrated ancillary agreements amounted to $5,650,000. (See,

3

e-mails of September 10-14, 2021, attached as Exhibit 1.) Following the parties' signing of the PSA on October 25, 2021, the Kacachoses provided to Amicus those records required for Amicus to conduct its due diligence. These records included the following: leases/rent rolls, property contracts, tax bills, financials, due diligence materials, and other personnel, insurance and operating information, much of which is of a confidential and proprietary nature. The Kacachoses were diligent in performing their duties under the PSA and demonstrated good faith compliance while they awaited the various ancillary agreements upon which the PSA was also conditioned.

**ANSWER:** Amicus denies that it "induced" Defendants to enter into the PSA in exchange for anything other than the $75,000,000 Amicus agreed to pay in consideration for Defendants' sale of the properties. Amicus states that the PSA speaks for itself. Amicus also states that Defendants were represented by counsel throughout the negotiation of, agreement to, and signing of the PSA.

Amicus denies that it placed any "contributive value" on the alleged ancillary agreements and specifically denies that the amounts reflected in Defendants' Exhibit 1 amount to the alleged $5,650,000. Furthermore, Amicus notes that Defendants' Exhibit 1 pre-dated the PSA by well over a month and contained speculative, hypothetical estimates that were not incorporated into the PSA.

Amicus denies that Defendants were "diligent in performing their duties under the PSA" and denies that Defendants "demonstrated good faith compliance." Amicus denies that Defendants provided all of the due diligence documents in a timely manner or that the information, when provided, was provided in a full and complete format.

Amicus admits that certain of the ancillary agreements were still being negotiated at the time the PSA, which is a separate, binding contract, was signed. Of these certain ancillary

4

agreements, Defendants were concerned most with the Property Management Agreement.  While these ancillary agreements were still being negotiated, major terms and conditions were already outlined and agreed to in the PSA and/or remained consistent with the expectations set forth in the September 14, 2021 Letter of Intent (LOI) signed and accepted by Mrs. Kacachos.  *See* Exhibit A.

7.     Amicus denies Defendants' remaining factual allegations in paragraph 6.  To the extent that Defendants' allegations in paragraph 6 assert legal conclusions, no response is required. To the extent a response is deemed required, the allegations are denied. The various ancillary agreements, with the exception of the "Property Management Agreement," were not in existence as of the date of execution of the PSA, and were not provided by Amicus until many weeks following its execution. The following table lists the Ancillary Agreements, the section of the PSA referencing same, and the date Amicus first circulated the respective Ancillary Agreements:

| Agreement | PSA Section Ref. | Circulation Date |
|---|---|---|
| Property Management – Schedule 4.4(c) | 4.4(e); 8.2(g) | with PSA |
| Non-Competition – Schedule 8.2(w) * | 8.2(w) | 12/07/2021 |
| Construction Management – (Not scheduled/Not attached) | 4.4(d); 8.2(g) | 12/09/2021 |
| Finder's Fee – Schedule O * | 4.4(a); 8.2(f) | 12/23/2021 |
| Profits Interest – Schedule Q * | 4.4(f); 8.2(i) | 02/16/2022 |

* The Schedules as attached to the PSA when signed, stated: To be finalized prior to the expiration of the Inspection Period.(emphasis original).

PSA Section 4.1(c) contains a closing covenant specifically requiring: "legal, valid, and binding obligations"

The respective Ancillary Agreements are attached as Exhibits 2 through 6.

5

**ANSWER:**  Amicus admits that certain of the ancillary agreements were still being negotiated at the time the PSA, which is a separate, binding contract, was signed.  However, while these ancillary agreements were still being negotiated, major terms and conditions were already outlined and agreed to in the PSA and/or remained consistent with the expectations set forth in the LOI.  *See* Exhibit A.

Consistent with the fact that Defendants were concerned mostly with the Property Management Agreement, Amicus admits that the Property Management Schedule was in existence when the PSA was executed.  Amicus admits that it provided Defendants with a version of the documents listed on or around the dates provided.  Amicus denies any inferences from Defendants' allegations in paragraph 7 that these documents were not provided within the extended Inspection Period.

Amicus states that the PSA is a contract that speaks for itself and denies any allegations to the extent inconsistent with the PSA.  Amicus states that each ancillary agreement speaks for itself and denies any allegations to the extent inconsistent with such agreement.

8.     When the Ancillary Agreements were eventually circulated by Amicus, the various agreements contained terms and conditions which were unsatisfactory to the Kacachoses. The disputed terms and conditions remained the subject of ongoing discourse, disagreement and negotiation. In addition, legal counsel for the Kacachoses also determined that the Property Management Agreement and the Finder's Fee Agreement were illegal and would violate the expected closing covenants of PSA Section 4.1(c).

**ANSWER:**  Amicus admits that Defendants were represented by counsel throughout the negotiation of, agreement to, and signing of the PSA.  Additionally, Amicus states that Defendants' counsel outlined, reviewed, and approved of the PSA and other ancillary agreements at the time

of executing the PSA. Amicus admits that the Kacachoses objected to certain terms and conditions contained within certain ancillary agreements and that ongoing negotiations ensued, but states that Amicus ultimately agreed to many of the concessions requested by Defendants. Amicus also states that while some of the ancillary agreements were still being negotiated, major terms and conditions were already outlined and agreed to in the PSA and/or remained consistent with the expectations set forth in the LOI. *See* Exhibit A. Amicus further states that Defendants unreasonably and/or in bad faith refused to negotiate with Amicus as set out in Amicus's Amended Complaint. Amicus denies that these negotiations prevented or otherwise impacted the validity and enforceability of the PSA or that they excused Defendants' performance thereunder.

Amicus lacks sufficient information and belief to admit or deny the allegations in paragraph 8 of the Counterclaims related to conversations between the Kacachoses and their legal counsel, and therefore denies same. Amicus further states that Tom Kacachos represented to Amicus that all attorneys in Ohio know that it is permissible to structure a deal as the parties did under the PSA in order to reduce the tax burden associated with the transaction.

9. As of March 17, 2022, after expiration of the Inspection Period set forth in the PSA, the ancillary agreements were still not finalized. See, Don Lussier e-mail and letter dated March 17, 2022, attached as Exhibit 7. See also, letter of March 23, 2022, from Jack Grove, attorney for the Kacachoses, directed to Donald Lussier and Peter Gelzinis, attorneys for Amicus, identifying several problems with the PSA terms and disputed issues underlying the various ancillary agreements, attached as Exhibit 8.

**ANSWER:** Amicus denies the allegations in Paragraph 9 suggesting that none of the ancillary agreements had been finalized and states that, to the extent any ancillary agreement remained unfinalized, it was due to Defendants' refusal to negotiate such agreements reasonably

and in good faith. Amicus also states that while some of the ancillary agreements were still being negotiated, major terms and conditions were already outlined and agreed to in the PSA and/or remained consistent with the expectations set forth in the LOI. *See* Exhibit A. Additionally, Amicus notes that it was Mr. Kacachos who often wanted to delay and defer discussing the very agreements that he now seeks to use to avoid his responsibilities and obligations under the PSA. *See e.g.,* March 2, 2022 email from Mr. Kacachos, attached as Exhibit B; February 9, 2022 emails between Yvette Wall and Mr. Kacachos, set forth in Exhibit C, pg. 2. Amicus admits that of these certain ancillary agreements, Defendants were concerned most with the Property Management Agreement. Amicus further states that the communications between counsel speak for themselves to the extent provided in writing as exhibits.

10. After prolonged negotiations, no meeting of the minds occurred about the unacceptable terms. In consequence, conditions precedent to closing were not satisfied.

**ANSWER:** Amicus denies that no meeting of the minds occurred as to the PSA and states that the fact that any ancillary agreement may have remained unfinalized does not affect the validity of the PSA. Amicus further states that, to the extent any ancillary agreement remained unfinalized, it was due to Defendants' refusal to negotiate such agreements reasonably and in good faith. Amicus also states that while some of the ancillary agreements were still being negotiated, major terms and conditions were already outlined and agreed to in the PSA and/or remained consistent with the expectations set forth in the LOI. *See* Exhibit A. Amicus denies that the completion of such agreements was a condition precedent to closing on the PSA or that the completion of such agreements has any bearing on the PSA.

11. The overall transaction anticipated by the PSA did not close when a definitive agreement could not be reached on the integrated ancillary agreements, as well as other disputed

and divisive issues, such as the proper approach to proration of rents. Amicus now seeks to force a sale of the portfolio contrary to the Parties' expressed intentions, and even though no final agreement was reached. Amicus effectively asks this Court to rewrite the PSA and to make a new deal for the Parties, contrary to well-settled contract law.

**ANSWER:** Amicus denies Defendants' factual allegations contained in paragraph 11. Amicus further states that the PSA speaks for itself.

To the extent that Defendants' allegations in paragraph 11 assert legal conclusions, no response is required. To the extent a response is deemed required, the allegations are denied.

12. After receipt, the various ancillary agreements were the subject of continuing negotiation, because there was not a meeting of the minds as to the previously undisclosed substantive terms.

**ANSWER:** Amicus denies the allegations in Paragraph 12 suggesting that none of the ancillary agreements had been finalized and states that, to the extent any ancillary agreement remained unfinalized, it was due to Defendants' refusal to negotiate such agreements reasonably and in good faith. Amicus also states that while some of the ancillary agreements were still being negotiated, major terms and conditions were already outlined and agreed to in the PSA and/or remained consistent with the expectations set forth in the LOI. *See* Exhibit A. Amicus denies that the completion of such agreements has any bearing on the PSA. Amicus states that of these certain ancillary agreements, Defendants were concerned most with the Property Management Agreement.

13. There were major, unresolvable differences between the parties, as summarized in the letter dated March 23, 2022, from the Kacachoses' counsel Jack Grove. (See Exhibit 8.)

**ANSWER:**  Amicus denies the allegations in Paragraph 13 and states that, to the extent any ancillary agreement remained unfinalized, it was due to Defendants' refusal to negotiate such agreements reasonably and in good faith.  Amicus also states that while some of the ancillary agreements were still being negotiated, major terms and conditions were already outlined and agreed to in the PSA and/or remained consistent with the expectations set forth in the LOI.  *See* Exhibit A.  Amicus denies that the completion of such agreements has any bearing on the PSA.

14.    Also, disagreements arose and persisted over performance of the PSA, including, for example, Amicus's insistence on a "drop down" method of conveyancing and its insistence on prorating rents under the leases, on a 12 month basis, despite the fact the underlying actual leases were for 9 month terms. These disputes involved material financial discrepancies affecting overall consideration.

**ANSWER:**  Amicus denies the allegations in paragraph 14.

15.    The PSA imposed date specific timelines during its executory phase, and performance of the parties was subject to compliance with the deadlines. For example, PSA Section 3.15 required the escrow agent to forward a closing statement setting forth prorations and adjustments to the purchase price at least five (5) days prior to closing. At no time did the escrow agent provide a closing statement compliant with Article 3 requirements. In consequence of the prolonged disagreement over terms of the ancillary agreements, the lack of a closing statement, disagreement over method of rent proration, and disagreement over asset allocation, inter alia, the transaction did not close on or before the closing date set forth in the PSA.

**ANSWER:**  Amicus admits that the sale did not close within the required timeframe, but denies Defendants' suggestion that anything other than their refusal to deal in good faith, fairly, and reasonably under the terms of the PSA was the cause for such failure.  Amicus denies the

remaining allegations contained in paragraph 15.  Specifically, Amicus denies that it did not provide a closing statement, and in fact Defendants were provided with a draft closing statement, as admitted to by their attorney Jack Grove, and failed to respond.  *See* Exhibit D, pg. 4. Furthermore, communications between the parties underscore that, once again, Amicus was waiting on Defendants to provide the necessary information to complete the closing statement– including the sales price allocation that Defendants' real estate attorney claimed was preventing a closing statement.  *See* Exhibit C, pg. 1; March 18, 2022 emails between Yvette Wall and Mr. Kacachos, set forth in Exhibit E, pg. 1.

16.     Notwithstanding the Kacachoses' efforts as sellers, Amicus as buyer, and their respective representatives and agents, the parties were unable to achieve a meeting of the minds on all material terms, and in consequence thereof, conditions precedent to closing were not satisfied.

**ANSWER:**  Denied.  Specifically, Amicus denies that the failure to close was caused by anything other than Defendants' refusal to deal in good faith, fairly, and reasonably under the terms of the PSA.  Amicus states further that, to the extent the PSA contains conditions precedent to closing, any conditions precedent could not be met as a result of Defendants' unreasonable refusal to deal fairly and in good faith under the PSA which does not excuse Defendants' failure to perform.  *See Winter Enterprises, LLC v. W. Bend Mut. Ins. Co.*, No. 1:17-CV-360, 2021 WL 4193213, at *12 (S.D. Ohio Sept. 15, 2021) (calling upon "the well-established rule that '[o]ne cannot avoid liability by preventing the performance of a condition precedent'" (quoting *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007))).  Amicus denies the remaining allegations contained in paragraph 16.

11

17.     The contracting parties did not intend for the PSA to be "evergreen" and of indefinite duration. The overall transaction contemplated by the PSA failed to close within a reasonable time after the agreed, definitive timetable for performance to occur. This was the case, despite the parties' efforts to conclude their negotiations and come to terms on the incomplete ancillary agreements that were integrated into the PSA, and other terms in dispute, such as rent proration. Changing circumstances, including major capital expenditures, market conditions, renewed rent cycles for the 2023-2024 academic year, inflation and obligations incurred by the owners associated with continuing business operations (not contemplated by the contracting parties) have adversely impacted the expected benefit of the bargain to be derived by a timely closing. In sum, due to expiration of the PSA, the parties are excused from further performance. In other words, the PSA is now a dead deal.

**ANSWER:**  Denied.  Amicus states that Defendants refused to close as required under the PSA as the result of inflation, which Defendants claimed "adversely impacted the expected benefit of the bargain to be derived by a timely closing."  Amicus states further that Defendants assumed the risk that the value of the properties could increase during the closing period and that such inflation does not provide a valid, legal excuse for Defendants' failure to perform.

Amicus denies that the failure to close was caused by anything other than Defendants' refusal to deal in good faith, fairly, and reasonably under the terms of the PSA.  Amicus states further that, to the extent the PSA contains conditions precedent to closing, any conditions precedents could not be met as a result of Defendants' unreasonable refusal to deal fairly and in good faith under the PSA which does not excuse Defendants' failure to perform.  *See Winter Enterprises, LLC v. W. Bend Mut. Ins. Co.*, No. 1:17-CV-360, 2021 WL 4193213, at *12 (S.D. Ohio Sept. 15, 2021) (calling upon "the well-established rule that '[o]ne cannot avoid liability by

preventing the performance of a condition precedent'" (quoting *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007))).  Amicus denies the remaining allegations contained in paragraph 17.

### COUNT I: DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

18.     The Kacachoses incorporates by reference paragraphs 1-17 above as if fully rewritten herein.

**ANSWER:** Amicus incorporates by reference all paragraphs, facts, affirmations, claims, and defenses set forth in its Amended Complaint and herein.

19.     An actual controversy has arisen between Amicus and the Kacachoses.

**ANSWER:**  Admitted.

20.     The nature of the controversy is whether the PSA executed by the parties constitutes a complete and enforceable agreement binding the Kacachoses to sell a real estate portfolio to Amicus.

**ANSWER:** Denied.  Amicus states that the controversy between the parties is related to Defendants' breach of the PSA.

21.     The Kacachoses request judgment in their favor, pursuant to the Ohio Declaratory Judgment Act, declaring that the PSA was incomplete as to critical ancillary agreements incorporated by reference therein, and therefore failed to reflect a meeting of the minds as to all material terms contained or incorporated by reference therein.

**ANSWER:**  The allegations contained in paragraph 21 are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

22.     Although the PSA incorporated by reference a non-competition agreement between the Kacachoses and Amicus, the parties never reached a meeting of the minds on the duration of such an agreement.

**ANSWER:** Amicus admits that Schedule 8.2(w) to the PSA contemplated a Non-Competition Agreement. Amicus denies the remainder of the allegations in paragraph 22.

23. The Kacachoses and Amicus also diverged on the proper approach to proration of rent. Amicus insisted that the rent must be prorated on the basis of a 12 month year, while the Kacachoses pointed out that the portfolio in dispute was heavily composed of student housing, mostly rented to Miami University students on a 9 month term, tracking the University's academic year. Accordingly, proration should be based on the actual 9 month term set forth in actual leases.

**ANSWER:** Amicus denies Defendants' allegations contained in paragraph 23. Amicus states further that although it repeatedly acquiesced to Defendants' demands with respect to rent proration, and such acquiescence was communicated to Defendants, Defendants nonetheless unreasonably failed to finalize such an agreement.

24. The parties further disagreed about using "drop down" allocation methods to inform conveyancing statements on the various portfolio real properties. Amicus insisted upon allocating a grossly inflated sum for goodwill and other non-realty assets. The Kacachoses reasonably expected the allocation to reflect the centrality of real estate holdings and fair market values thereof to the proposed transfer. The Kacachoses pointed out that Amicus's insisted approach could saddle the sellers with substantial contingent liability on the back end of any sale if transfer for value is not fairly and accurately reported. This dispute never resolved, and is part of the reason why the PSA remained an incomplete contract.

**ANSWER:** Amicus admits that Defendants were represented by counsel throughout the negotiation of, agreement to, and signing of the PSA. Amicus admits that after execution of the PSA, which explicitly established that the parties were to use the so-called "drop down" allocation method, Defendants refused to comply with the terms of the PSA. *See* PSA §§ 1.1 and 3.13.

14

However, Amicus denies that this was a persistent or known disagreement until about one month before the Closing Date. In fact, before this time neither Defendants nor their real estate counsel ever raised even one modicum of concern over any issues related to the legality of the drop-down method. To the contrary, Mr. Kacachos represented to Amicus that he, as well as all attorneys in Ohio, know that the alleged "drop down" method is a permissible way to structure a deal under Ohio law. Amicus denies the remaining allegations contained in paragraph 24.

25. Amicus never forwarded to the Kacachoses a proper closing statement that accurately stated all debits, credits and disbursements, in sufficient specificity to have a closing agent arrange and conduct the actual real estate closing. For this reason alone, Amicus cannot claim it was ready, willing and able to close on purchase of the portfolio in dispute.

**ANSWER:** Denied. Specifically, Amicus denies that it did not provide a closing statement; rather, Defendants were provided with a draft closing statement, as admitted to by their attorney Jack Grove, and failed to respond. *See* Exhibit D, pg. 4. Furthermore, communications between the parties underscore that, once again, Amicus was waiting on Defendants to provide the necessary information to complete the closing statement–including the allocation information that Defendants' attorney claimed was preventing a closing statement. *See* Exhibit C, pg. 1; Exhibit E, pg. 1. Amicus states further that the PSA required the escrow agent to provide such a closing statement and that the escrow agent was unable to provide a final closing statement because Defendants unreasonably failed to deal in good faith and fairly in finalizing the closing statement and failed to provide the information requested from them. To the extent that a "proper" closing statement was a condition precedent to closing, any such conditions precedent could not be met as a result of Defendants' unreasonable refusal to provide necessary information and to deal fairly and in good faith which does not excuse Defendants' failure to perform. *See Winter Enterprises,*

*LLC v. W. Bend Mut. Ins. Co.*, No. 1:17-CV-360, 2021 WL 4193213, at *12 (S.D. Ohio Sept. 15, 2021) (calling upon "the well-established rule that '[o]ne cannot avoid liability by preventing the performance of a condition precedent'" (quoting *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007))).  Amicus denies that it was not "ready, willing and able to close on purchase of the portfolio" and the remaining allegations in paragraph 25.

26.     Amicus was inconsistent as to timing of any prospective closing. At times, its principals would insist on closing on exceedingly short notice. But when Amicus learned of comparatively minor code enforcement issues raised by the City of Oxford—with respect to units which had already passed inspections—Amicus abruptly reversed course and insisted on a 90 day extension of the closing date. Both the premature efforts to set closings, based on incomplete contract documents, and the request for a lengthy extension of time to close, underscore a key point—that the PSA itself was not a standalone, enforceable agreement, but rather, depended on the parties' coming to terms on key ancillary agreements and other matters remaining in dispute.

**ANSWER:**  Amicus denies Defendants' allegations contained in paragraph 26.  Amicus further states that the purportedly "minor" code violation issues carried and could continue to incur significant fines, threatened to result in the revocation of rental permits, and decreased the number of available bed spaces in certain units.  *See* Exhibit F, City of Oxford Certified Letters.

27.     The Kacachoses seek declaratory judgment in their favor, declaring that the PSA does not reflect a meeting of the minds in requisite mirror image terms as to all material terms of the parties' bargain.

**ANSWER:**  The allegations contained in paragraph 27 are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

28.     The Kacachoses seek declaratory judgment pursuant to 28 U.S.C. § 2201, that for all the foregoing reasons, the PSA is not an enforceable contract, and the Kacachoses are not obliged thereunder to sell Amicus the real estate portfolio in this dispute.

**ANSWER:** The allegations contained in paragraph 28 are legal conclusions to which no response is required. To the extent a response is deemed required, the allegations are denied.

### COUNT II: AMICUS'S BREACHES OF PSA

29.     The Kacachoses incorporates by reference paragraphs 1-28 above as if fully rewritten herein.

**ANSWER:** Amicus incorporates by reference all paragraphs, facts, affirmations, claims, and defenses set forth in its Amended Complaint and herein.

30.     Pleading in the alternative, pursuant to Fed. R. Civ. P. 8, the Kacachoses further allege that after the conditional PSA was signed by the parties on October 25, 2021, the Kacachoses substantially performed all seller related duties through the end of the Inspection Period set forth in the PSA, such that Amicus, through its counsel, issued its "Notice to Proceed." A copy of the Notice issued by Amicus counsel Peter Gelzinis, dated February 9, 2022, is attached as Exhibit 9.

**ANSWER:** Amicus admits that the PSA was signed by the Parties on October 25, 2021 but denies the claim that the PSA was "conditional." Amicus admits that its counsel sent Sellers its Notice to Proceed which stated that "Buyer elects to proceed to Closing" reaffirming the fact that Amicus was willing and able to close pursuant to the PSA and that it was actively seeking to close well within the time for closing provided for in the PSA. Defs.' Answer & Countercl., Ex. 9, pg. 1, Dkt. 24. Amicus specifically denies that the Kacachoses substantially performed all Seller-related duties through the end of the Inspection Period and beyond.

17

31.     Notwithstanding the Kacachoses' faithful performance through February 9, 2022, their further performance under the PSA was excused by Amicus's material breaches of the PSA, including:

a.      Demanding an improper method of rent proration under the student rental leases (9 month terms with rents paid on a per semester basis). Through its improper method of calculating proration, Amicus tried to extract an approximately $300,000 windfall credit, which devalued the agreed consideration. The Kacachoses objected to this improper proration method. Amicus tried to justify its approach by contending that its lender would require its 12 month based rent proration method, even though lender/mortgagee approval was not a condition, either express or implied, of the PSA relating to closing after issuance of the Notice to Proceed.

b.      Amicus did not circulate its draft of the Profits Interest Agreement until February 16, 2022, which was after the end of the Inspection Period and after its Notice to Proceed.  According to the incomplete documentation provided, the Profits Interest Agreement was illusory. It involved a third party entity called "Amicus II Manager, LLC," which is not a party to the PSA. Furthermore, the Profits Interest Agreement documentation provided by Amicus failed to demonstrate monetary par value of shares consistent with what Amicus's principals previously represented. For their due diligence, the Kacachoses, through counsel, requested supporting business records, such as financial statements, business plan and operating pro formas. Amicus ignored such request. The illusory Profits Interest Agreement had a material adverse impact on the sellers' expected aggregate compensation to be derived under the PSA, because the Profits Interest Agreement was integrated into the PSA and intended to be a part thereof.

c.      A Closing Statement is specifically required by a date certain, at least five days prior to closing, under PSA § 3.15. Amicus, through its escrow agent/title company issued a draft closing statement which did not conform to the specific requirements set forth in PSA Article III. Amicus' draft closing statement is attached hereto as Exhibit 10. The draft closing statement includes projected mortgage pay-offs, but without per diem rate accumulation. Further, it did not make an allocation of asset values for the subject real properties, goodwill, or tangible personal property. The draft closing statement did not include rent and tax prorations or provide for other transaction fees and costs, such as conveyance fees and recording costs. Sellers rejected the draft closing statement. See Jack Grove letter to Donald Lussier, dated March 23, 2022, attached as Exhibit 8. Neither Amicus nor its escrow agent/title company ever provided a conforming closing statement. Therefore, Amicus' financial performance was incomplete.

d.      After Amicus received notice of doubtful City of Oxford code enforcement notices involving five portfolio properties (issued after the properties passed inspections), Amicus sought to impose additional conditions under the PSA, such as an excessive $500,000 escrow reserve, which was not agreeable to the Kacachoses. As before, Amicus attributed this unreasonable demand to its lender, even though lender/mortgagee approval

was not an express or implied condition of the PSA relating to closing after issuance of the Notice to Proceed.

e.       Amicus, through its counsel, requested a walk away clause excusing Amicus's further performance based upon lending rate structure occasioned by inflationary surges, financial market volatility and general economic conditions, all of which lay beyond the Kacachoses' control and were not the result of any breach of duty on their part. All of the aforesaid breaches are material in nature, and the PSA did not close by reason of Amicus's unilateral breaches in derogation of the PSA. See April 5, 2022 e-mail from Donald Lussier to Jack Grove, attached as Exhibit 11.

**ANSWER:**  The allegations contained in paragraph 31 are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied. Specifically, Amicus denies that Defendants had "faithful performance" through February 9, 2022, and denies that that any of their performance was excused under the PSA.  Additionally, Amicus denies that it materially breached the PSA.

a.       Amicus denies Defendants' allegations contained in paragraph 31(a). Amicus states further that although its lender requested a 12-month proration method, Amicus was willing to acquiesce to Defendants' demands with respect to proration over nine months and such acquiescence was communicated to Defendants, Defendants nonetheless unreasonably failed to finalize such an agreement.

b.       Amicus admits that it circulated a copy of the Profits Interest Unit Grant Agreement on February 16, 2022.  Amicus states that the Profit Interest Unit Grant Agreement is a stock template used by Amicus that was otherwise not subject to negotiation.  The Profits Interest Unit Grant Agreement is a legal document that speaks for itself.  Amicus further states that § 4.4(f) of the PSA specifically references "Amicus II Investment Holdings LLC" in setting out obligations related to the Profits Interest Unit Agreement.  Amicus denies Defendants' remaining allegations contained in paragraph 31(b).

c.       Amicus admits that a final closing statement could not be prepared because Defendants unreasonably failed to deal in good faith and fairly in finalizing the closing statement.  Defendants' unreasonable refusal to deal fairly and in good faith does not excuse Defendants' failure to perform.  *See Winter Enterprises, LLC v. W. Bend Mut. Ins. Co.*, No. 1:17-CV-360, 2021 WL 4193213, at *12 (S.D. Ohio Sept. 15, 2021) (calling upon "the well-established rule that '[o]ne cannot avoid liability by preventing the performance of a condition precedent'" (quoting *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007))).  Additionally, Amicus denies that it did not provide a closing statement, rather Defendants were provided with a draft closing statement, as admitted to by their attorney Jack Grove, and failed to respond with the necessary information.  See Exhibit D, pg. 4;

Exhibit C, pg. 1; Exhibit E, pg. 1.  Accordingly, Amicus denies Defendants' allegations with respect to the sales price allocations, as Amicus had expressly agreed with the summaries prepared by Defendants on March 18, 2022, but Defendants, yet again, failed to formalize the documents as requested.  Exhibit C, pg. 2; Exhibit E, pg. 1.  Amicus denies the remaining allegations in paragraph 31(c) to the extent inconsistent with the foregoing.

   d.    Amicus admits that it received notice of City of Oxford code enforcement violations but denies that these were "doubtful."  *See* Exhibit F.  Amicus states further that Defendants had represented that they had not received any notices and that the current use and occupation of the Properties did not violate any ordinance, law, statute, bylaw, rule or regulation.  PSA, § 4.1(f).  In truth, there were violations and those violations carried and could continue to incur significant fines, threatened to result in the revocation of rental permits, and decreased the number of available bed spaces in certain units.  *See* Exhibit F.  Defendants concealed these violations from Amicus for nearly two weeks; another bad faith act by Defendants that seriously impaired the ability of the parties to remedy the violations within the time permitted per closing.  Therefore, Amicus denies the remaining allegations contained in paragraph 31(d) of the PSA.

   e.    Amicus admits that it requested to amend the PSA.  Amicus denies that requesting an amendment of a contract constitutes a breach as a matter of law.  Amicus remained ready, willing, and able to close and, indeed, would have closed but for Defendants' breaches.  Therefore, Amicus denies the remaining allegations contained in paragraph 31(e) of the PSA.

32.    By reason of Amicus's breach, the Kacachoses are entitled to recoup the deposit of $550,000, escrowed under PSA section 11.2 for buyer default.  In addition, the Kacachoses are entitled to recover their attorney fees under PSA section 12.9.

**ANSWER:**  The allegations contained in paragraph 32 are legal conclusions to which no response is required.  To the extent a response is deemed required, the allegations are denied.

### COUNT III: BAD FAITH/FRIVOLOUS CONDUCT

33.    The Kacachoses incorporates by reference paragraphs 1-32 above as if fully rewritten herein.

**ANSWER:** Amicus incorporates by reference all paragraphs, facts, affirmations, claims, and defenses set forth in its Amended Complaint and herein.

34. Amicus and its counsel demonstrated bad faith and frivolous conduct on their part as follows:

      a. Amicus failed to serve a notice of breach upon the Kacachoses prior to commencement of suit, nor was their counsel, identified under PSA § 12.2, served with a copy of the Complaint either before or after its filing;

      b. Amicus and its counsel commenced suit in an improper division of the U.S. District Court, Southern District of Ohio, according to Loc. R. 82.1. Amicus not only filed the Complaint, but secured what that Court later concluded was an improvidently granted ex parte Temporary Restraining Order. It is difficult to comprehend how the matter proceeded to an ex parte Temporary Restraining Order if filing in Columbus, Ohio arose from a mere clerical oversight. It is also difficult to understand why it took filing a formal Motion to Transfer at the Kacachoses' expense to get the forum corrected. Plaintiff and its counsel obviously knew the properties all were situated in Butler County, Ohio, and the Kacachoses were Butler County residents. Butler County is outside the Eastern Division of this Court pursuant to the Local Rules.

      c. Amicus's counsel did not provide required notice under Fed. R. Civ. P. 65(b) regarding its Motion for Temporary Restraining Order, and also did not provide certification of the movant's notice to the defendants.

      d. Amicus made verified allegations that are utterly untrue, asserting the Kacachoses believe they can derive a higher price from another buyer. There is not one scintilla of evidence that the Kacachoses are shopping the portfolio of properties to other potential buyers.

**ANSWER:** Amicus denies that it or its counsel demonstrated even a modicum of bad faith or frivolous conduct.

      a. Amicus denies that it was required to serve a notice of breach or the Complaint upon the Kacachoses or upon their counsel identified under PSA § 12.2. Amicus first attempted to serve Defendants in compliance with the Federal Rules of Civil Procedure on June 2, 2022; however, Defendants refused to come to the door and refused to accept the documents from the servicer. Aff. of Service for Thomas Kacachos, Dkt. 10 at p.3; Aff. of Service for Heather Hoelzer Kacachos, Dkt. 11 at p.3. Defendants justified their refusal by claiming someone had COVID, but when the process server provided a no contact alternative to service, Defendants still refused to accept service. *See* Exhibit G, June 2, 2022 emails from Encore Process Service. Nonetheless, this contagion was apparently no longer an issue sixteen (16) hours later when Mr. Kacachos altered course and accepted service. *Id.*

b.      Amicus vehemently denies that any actions related to the commencement of this suit were done in bad faith or in a frivolous manner.  Amicus admits that the Properties covered by the PSA are all situated in Butler County, Ohio and admits that the addresses provided by the Kacachoses fall within Butler County.  Amicus admits that Butler County is outside of the Eastern Division.  Amicus admits that due to a clerical error the suit was commenced in the Eastern Division rather than the Western Division on May 31, 2022.  Amicus admits that its original Verified Complaint bore in the header reference to filing in the Western Division. Pl.'s First Am. Verified Compl., pg. 1, Dkt. 22.  Amicus's counsel recognized the clerical error on the evening of May 31, 2022, and upon realizing that the case had been incorrectly filed with the Eastern Division immediately sought to notify the Court upon start of its business on June 1, 2022.  Aff. of Aneca Lasley, ¶ 8, filed contemporaneously herewith.  Accordingly, on the morning of June 1, 2022 the clerical error was communicated to the Clerk for the Court for the Southern District of Ohio.  *Id.* at ¶¶ 9-11.  The Clerk of the Court informed Amicus's counsel that the judge will automatically transfer the case if it is deemed it should be in Cincinnati and that Amicus did not need to do anything further.  *Id.* at ¶ 10.

On June 8, 2022, Defendants' counsel filed a Motion to Transfer.  Defendants' counsel failed to comply with Local Rule 7.3.  Defendants' counsel did not consult with Amicus's counsel to determine if Amicus would agree to transfer.  If Defendants' counsel had complied with this Local Rule, Defendants would have been spared the cost of the Motion to Transfer that Defendants now attribute to Amicus.  Immediately after reviewing the filing, on June 15, Amicus's counsel communicated to Defendants' counsel that "[a]s you have likely seen from our filing, we are in agreement that this case should have been assigned to a judge in Cincinnati.  We, in fact, raised this with the court from the outset."  *Id.* at ¶ 18.  Defendants' counsel merely replied "[t]hanks for clarifying."  *Id.*

The decision to move forward with and to grant the original Temporary Restraining Order were decisions made by the Court, and thus, Plaintiff lacks sufficient information or knowledge to admit or deny these allegations, and therefore denies same.

c.      Amicus denies Defendants' allegations contained in paragraph 34(c).  Amicus further states that its counsel attempted to contact Defendants by phone and that the Court attempted to contact Defendants by phone.  Defendants refused to answer these calls.  *Id.* at ¶¶ 12-13.

d.      Amicus denies Defendants' allegations contained in paragraph 34(d).  Amicus has reasonable basis for asserting that Defendants have demanded a higher price, and Defendants' behavior is belied by their own allegations here that inflation reduced the benefit to Defendants.

Paragraph 34 contains legal conclusions, which therefore require no response.  To the extent a

response is deemed required, those allegations are denied.

22

35.     In consequence of such bad faith and frivolous conduct, the Kacachoses have incurred legal fees associated with the Motion to Transfer to the Western Division in Cincinnati and opposition to the improperly commenced Motion for Temporary Restraining Order.

**ANSWER:** Amicus denies that it engaged in any bad faith or frivolous conduct.  Amicus denies that Defendants' legal fees associated with the Motion to Transfer are attributable to Amicus, including because of Defendants' counsel's intervening failure to comply with the Local Rules.  Amicus denies that the TRO was "improperly commenced."  Amicus further denies that Defendants expended legal fees in opposing the "improperly commenced" TRO as Defendants' opposition was only required after Defendants repeatedly insisted upon a "seven-figure bond" to secure the TRO despite claiming that Defendants had no intent to market or sell the Property anyway.  *See* Defs.' Mem. in Opp'n to Pl.'s Mot. for T.R.O, pgs. 18-19, Dkt. 25; Reply in Supp. of Pl.'s Mot. for T.R.O. & Prelim. Inj., pgs. 2, 6-7, Dkt. 26.

36.     WHEREFORE, the Kacachoses demand judgment as follows on their Counterclaim:

    a.      On Count I of the Kacachoses' Counterclaims, Declaratory Judgment from this Court, declaring that the Purchase and Sale Agreement is not sufficiently complete to compel specific performance in this case, because: (1) the parties never achieved a meeting of the minds on ancillary agreements integrated into the PSA; (2) the parties never agreed on proration of rents, and Amicus's demand for proration on a 12 month basis was unsupportable in light of the actual leases on the real properties in this dispute; (3) at least one ancillary agreement violated Ohio brokerage law; and (4) Amicus insisted upon but the Kacachoses never agreed to the drop down method of allocation.

    b.      On Count I, a Declaratory Judgment further declaring that Amicus is not entitled to monetary damages or any other relief from the Kacachoses.

    c.      On Count II, in the alternative, if the Court found the PSA was enforceable, a judgment on the Kacachoses' Count II, finding that the Kacachoses had performed their pre-closing duties under the PSA in good faith, but that Amicus breached the PSA by: (1) failing to provide a proper closing statement; (2) demanding a walkaway clause shifting risk of financial and lending market volatility and other economic conditions to the sellers; (3) demanding an improper method of rent proration, which materially reduced sellers'

consideration; and (4) presenting as part of the supposed "consideration" an illusory Profits Interest Agreement.

      d.     On Count II, judgment awarding the Kacachoses the $550,000 in earnest money as liquidated damages in consequence of Amicus's material breaches of the PSA and recovery of legal fees.

      e.     On Count III, an award of counsel fees incurred in addressing Amicus's bad faith and frivolous conduct in filing its original lawsuit without first serving a Notice of Breach upon Amicus and its counsel identified in the PSA, and in filing said lawsuit in a forum not convenient to the Kacachoses, and not authorized by Loc. R. 82.1.

      f.     Any other and further relief this Court sees fit to grant.

**ANSWER:** The allegations contained in paragraph 36 are legal conclusions to which no response is required. To the extent a response is deemed required, the allegations are denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Counterclaims fail to state a claim for which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrine of first breach because Defendants were/are in breach of their own obligations and duties.

### THIRD AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by Defendants' anticipatory repudiation of the contract.

### FOURTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, because Amicus was excused from performance of certain condition precedents due to Defendants' interference with Amicus's ability to perform. *See also McCruter v. Travelers Home & Marine Ins. Co.*, 2021-Ohio-472, ¶ 85, 168 N.E.3d 1, 16 (Oh. Ct. App. 11th Dist. 2021). Accordingly, Ohio courts have recognized

24

that "[w]here a party prevents the occurrence of the condition, the party . . . waives the performance of the condition[,] . . . 'the performance of [the] condition precedent is discharged or excused.'" *Skyline Prod., Inc. v. Posen Const., Inc.*, 430 F. App'x 485, 491 (6th Cir. 2011); *see also McCruter v. Travelers Home & Marine Ins. Co.*, 2021-Ohio-472, ¶ 85, 168 N.E.3d 1, 16 (Oh. Ct. App. 11th Dist. 2021); *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 2006-Ohio-1773, ¶ 31, aff'd, 2007-Ohio-5026, ¶ 31, 115 Ohio St. 3d 387, 875 N.E.2d 561 (Oh. Ct. App. 3rd Dist. 2006). Therefore, Defendants' actions preventing it from performing the alleged condition precedents, alongside Amicus's substantial performance under the PSA and its good faith efforts to perform, excused Amicus's performance obligations and thus resolved it of liability.

### FIFTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrine of laches.

### SIXTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrine of unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrine of in pari delicto.

### EIGHTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrine of waiver.

### NINTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by the doctrine of estoppel.

### TENTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, for failure to comply with the duty of good faith and fair dealing.

## ELEVENTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, by Defendants' assumption of risks attendant to Defendants' benefit of the bargain, including, but not limited to, Defendants' assumption of risks related to the impact of inflation or changes in the financial markets.

## TWELFTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, as the granting of Defendants' claims would result in unjust enrichment.

## THIRTEENTH AFFIRMATIVE DEFENSE

The Counterclaims are barred, in whole or in part, and/or should be reduced because Defendants have failed to minimize, mitigate, or avoid any damages allegedly sustained.

## FOURTEENTH AFFIRMATIVE DEFENSE

The damages recoverable by Defendants, if any, are subject to the restrictions, deductions, waivers, and offsets contained in any applicable agreements.

## FUTURE AFFIRMATIVE DEFENSES

Amicus reserves the right to plead additional affirmative defenses.

**WHEREFORE**, having answered, Plaintiff Amicus Miami of Ohio, LLC prays that the Counterclaim be dismissed with prejudice in its entirety; that judgment be entered against Thomas and Heather Kacachos and in favor of Amicus Miami of Ohio, LLC, and that Amicus Miami of Ohio, LLC be granted such other relief that the Court deems just and proper.

4882-9060-8685.9

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, Ohio 43215-7509
(614) 462-1085
Aneca.Lasley@icemiller.com

## CERTIFICATE OF SERVICE

I certify that this document was filed electronically and served through the Court's ECF System upon all counsel of record on this 19th day of August, 2022.

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366)