**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**
**(Cincinnati)**

| | |
|---|---|
| AMICUS MIAMI OF OHIO, LLC | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-355 |
| HEATHER HOELZER KACACHOS | Judge Matthew W. McFarland |
| And | Magistrate Judge Karen L. Litkovitz |
| THOMAS KACACHOS | |
| Defendants. | |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to Federal Rule of Civil Procedure 12(c), Plaintiff Amicus Miami of Ohio, LLC ("Amicus"), by counsel, respectfully requests this Court enter judgment in its favor, dismiss the Counterclaims of Defendants Heather Hoelzer Kacachos ("Mrs. Kacachos") and Thomas Kacachos ("Mr. Kacachos," collectively "Sellers" or "the Kacachoses"), and award Amicus specific performance and damages to be determined at a subsequent hearing.

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, Ohio 43215-7509
(614) 462-1085
Aneca.Lasley@icemiller.com

# TABLE OF CONTENTS

I. SYNOPSIS ......................................................................................................1

II. STATEMENT OF THE FACTS ......................................................................5

 A. The Parties Negotiated For And Are Bound By A Valid, Enforceable Contract. ...........5

 B. The Parties Set Forth Clear, Enforceable Obligations Under The PSA. ........................7

 C. Sellers Initially Complied With Their Obligations Under The PSA. .............................9

 D. Sellers Only Reversed Course Months Later When They Felt They Could Get A Better Deal, Or That Holding Onto The Properties Was More Financially Advantageous To Them. ..................................................................................................................10

 E. The Litigation To Enforce The PSA Begins.................................................................11

III. LEGAL STANDARD....................................................................................12

IV. ARGUMENT ................................................................................................13

 A. Amicus Is Entitled To Judgment As A Matter Of Law Because Amicus's Complaint Demonstrates That The PSA Was A Binding, Enforceable Contract Between The Parties.....................................................................................................................14

  i. The PSA was established upon a clear meeting of the minds....................................14
  ii. The ancillary agreements to do not detract from the validity or enforceability of the PSA. ........................................................................................................................15

 B. Amicus Is Entitled To Judgment As A Matter Of Law Because The Pleadings Establish That Sellers Breached The PSA, And Despite The Kacachoses' Repeated Failures To Comply With Their Obligations Therein Amicus Has Remained Compliant With Its Responsibilities In The PSA. ..........................................................................17

  i. The Kacachoses–by failing to provide necessary information, cooperate in the due diligence process, refusing to finalize ancillary documents, and blatantly avoiding closing on the Portfolio–clearly breached their obligations under the PSA. .............18
  ii. The Kacachoses' efforts to rely on alleged conditions precedent are thwarted by their own actions circumventing performance........................................................19

 C. Amicus Is Entitled To Judgment As A Matter Of Law Because the Kacachoses Repudiated The PSA......................................................................................................20

D.  Amicus Is Entitled To Judgment As A Matter Of Law Because The Kacachoses Breached Their Duty Of Good Faith And Fair Dealing. ................................................22

E.  Amicus Is Entitled To Judgment As A Matter Of Law Because The Pleadings Demonstrate That Amicus Relied On Sellers' Promises To Comply With The PSA To Its Financial Detriment. ................................................................................................23

F.  Amicus Is Entitled To Judgment As A Matter Of Law on The Kacachoses' Third Counterclaim Because There Has Been No Bad Faith Or Frivolous Conduct By Amicus. ...............................................................................................................24

V.  CONCLUSION...............................................................................................27

## TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Accurate Elec. Constr., Inc. v. Ohio State Univ.*,
2019-Ohio-4992, 149 N.E.3d 1080 (Ohio Ct. App. 10th 2019) ..........................................3, 22

*Altercare of Mayfield Vill., Inc. v. Berner*,
2017-Ohio-958, 86 N.E.3d 649 (Ohio Ct. App. 8th Dist. 2017) .......................................2, 15

*Atlas Noble, LLC v. Krizman Enterprises*,
692 F. App'x 256 (6th Cir. 2017) ..........................................................................21

*Baumer v. Franklin Cnty. Distilling Co.*,
135 F.2d 384 (6th Cir. 1943) ...............................................................................20

*Blake Homes, Ltd. v. FirstEnergy Corp.*,
173 Ohio App. 3d 230, 2007-Ohio-4606, 877 N.E.2d 1041 (Ohio Ct. App. 6th
Dist. 2007)....................................................................................................20

*Blount v. Smith*,
12 Ohio St. 2d 41, 231 N.E.2d 301 (1967) ...............................................................14

*Casillas v. Stinchcomb*,
2005-Ohio-4019 (Ohio Ct. App. 6th Dist. 2005)......................................................4, 23

*Cluck v. Brentlinger Enterprises, Inc.*,
No. 2:22-CV-290, 2022 WL 3223936 (S.D. Ohio Aug. 10, 2022) .........................................5

*Consolidated Jewelers, Inc. v. Standard Fin. Corp.*,
325 F.2d 31 (6th Cir. 1963) ................................................................................13

*CosmetiCredit, LLC v. World Fin. Network Natl. Bank*,
2014-Ohio-5301, 24 N.E.3d 762 (Ohio Ct. App. 10th Dist. 2014) .......................................22

*Cyber Sols. Int'l, LLC v. Pro Mktg. Sales, Inc.*,
634 F. App'x 557 (6th Cir. 2016) ..........................................................................17

*Daniel E. Terreri & Sons, Inc. v. Mahoning Cnty. Bd. of Commrs.*,
152 Ohio App. 3d 95, 2003-Ohio-1227, 786 N.E.2d 921 (Ohio Ct. App. 7th
Dist. 2003)...............................................................................................21, 22

*Ed Schory & Sons, Inc. v. Society Natl. Bank*,
75 Ohio St. 3d 433, 662 N.E.2d 1074 (1996) ..........................................................22, 24

*Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Rels.*,
61 Ohio St. 3d 366, 575 N.E.2d 134 (1991) .............................................................14

*Farmers Comm. Co. v. Burks*,
    130 Ohio App. 3d 158, 719 N.E.2d 980 (Ohio Ct. App. 3rd Dist. 1998) ..............................20

*Fritz v. Charter Twp. of Comstock*,
    592 F.3d 718 (6th Cir. 2010) ...............................................................................12

*Fry v. FCA US LLC*,
    2017-Ohio-7005, 143 N.E.3d 1108 (Ohio Ct. App. 6th Dist. 2017) ...................................2, 15

*Holmes v. Wilson*,
    No. 2:08-CV-602, 2009 WL 3673015, at *3 (S.D. Ohio Oct. 30, 2009)................................19

*In re Rose*,
    422 B.R. 896, 899 (Bankr. S.D. Ohio 2010)......................................................................4, 26

*Kenyon v. Union Home Mortg. Corp.*,
    581 F. Supp. 3d 951 (N.D. Ohio 2022)..............................................................................13

*Kostelnik v. Helper*,
    96 Ohio St. 3d 1, 2002-Ohio-2985, 770 N.E.2d 58 (2002).......................................................16

*Kozar v. Bio-Med. Applications of Ohio, Inc.*,
    2004-Ohio-4963 (Oh. Ct. App. 9th Dist. 2004).............................................................25, 26

*Larson v. Burton Constr., Inc.*,
    421 P.3d 538 (Wyo. 2018)..............................................................................................21

*New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*,
    No. 2:20-CV-2475, 2021 WL 5746356 (S.D. Ohio Sept. 14, 2021) ................................3, 17

*Normandy Place Assocs. v. Beyer*,
    2 Ohio St. 3d 102, 443 N.E.2d 161 (1982) .....................................................................16, 17

*Oglebay Norton Co. v. Armco, Inc.*,
    52 Ohio St. 3d 232, 556 N.E.2d 515 (1990) ...................................................................16

*PHH Mortg. Corp. v. Ramsey*,
    2014-Ohio-3519, 17 N.E.3d 629 (Ohio Ct. App. 10th Dist. 2014) ...................................3, 22

*PNC Bank, N.A. v. Springboro Med. Arts, Inc.*,
    2015-Ohio-3386, 41 N.E.3d 145 (Ohio Ct. App. 2nd Dist. 2015)....................................2, 15

*Quest Workforce Sols., L.L.C. v. Job1USA, Inc.*,
    2016-Ohio-8380, 75 N.E.3d 1020 (Ohio Ct. App. 6th Dist. 2016) .........................................18

*Reedy v. Cincinnati Bengals, Inc.*,
    143 Ohio App. 3d 516, 758 N.E.2d 678 (Ohio Ct. App. 1st Dist. 2001)............................2, 14

*Riston v. Butler*,
   149 Ohio App. 3d 390 ................................................................................4, 25

*Royal Indem. Co. v. Baker Protective Servs., Inc.*,
   33 Ohio App. 3d 184, 515 N.E.2d 5 (Ohio Ct. App. 2nd Dist. 1986) ....................................14

*Schmelzer v. Huntington Bancshares Fin. Corp.*,
   No. 2:16-CV-134, 2017 WL 2807469 (S.D. Ohio June 29, 2017) ........................................13

*Se. Land Dev., Ltd. v. Primrose Mgt. L.L.C.*,
   193 Ohio App. 3d 465, 2011-Ohio-2341, 952 N.E.2d 563 (Ohio Ct. App. 3rd
   Dist. 2011) ............................................................................................20

*Stewart v. Everyware Glob., Inc.*,
   68 F. Supp. 3d 759 (S.D. Ohio 2014) ...............................................................23

*Suter v. Farmers' Fertilizer Co.*,
   100 Ohio St. 403, 126 N.E. 304 (1919) ...........................................................3, 19

*Williams v. CitiMortgage, Inc.*,
   498 F. App'x 532 (6th Cir. 2012) ....................................................................13

*Winter Enterprises, LLC v. W. Bend Mut. Ins. Co.*,
   No. 1:17-CV-360, 2021 WL 4193213 (S.D. Ohio Sept. 15, 2021) .......................................19

**Statutes**

Fed. R. Civ. P. 12(c) ....................................................................................12

Ohio Revised Code § 2323.51(A)(2) ..............................................................4, 24, 25

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION

### I.    SYNOPSIS

This dispute is one that should be an open-and-shut case.  Tom and Heather Kacachos negotiated, agreed upon, and executed a Purchase and Sale Agreement ("PSA") with Plaintiff Amicus Miami of Ohio LLC ("Amicus").  The parties were represented by counsel who assisted in the negotiations which spanned nearly four months.  The parties, again with assistance of their counsel, drafted the PSA, which was then initialed by a party representative on each of thirty pages and signed by both parties at the end.  In that PSA, the Kacachoses agreed to sell a portfolio of student housing properties to Amicus, and Amicus agreed to pay $75,000,000 to the Kacachoses. Prior to both parties executing the PSA on October 25, 2021, Amicus deposited $50,000 in escrow on September 16, 2021, followed by an additional deposit of $250,000 within forty-eight hours of executing the PSA on October 27, 2021.[1]  The Parties then worked for approximately three months towards closing, which was burdensome and costly to Amicus as it required, among other items, sorting out the affairs of 173 rental units across 63 properties.

The pleadings clearly set forth that the PSA is a binding enforceable contract on each of the Parties–and that Sellers recognized the binding authority of the contract up-to-and-until they believed that they could force Amicus to pay a higher price.  This demand for a higher purchase price, which came long after the Parties executed the PSA, coupled with Sellers' repeated attempts to delay, disrupt, and avoid their responsibilities breached the terms of the PSA and has caused Amicus to suffer substantial financial harm while simultaneously depriving it of the benefits of

---

[1] Amicus made an additional deposit on January 24, 2022 of $250,000, pursuant to the PSA, to extend the inspection period following the Kacachoses slow response time for providing necessary due diligence information.  Plaintiff's Amended Verified Complaint ("Amended Complaint" or "Amended Verified Complaint"), Dkt. 22, ¶ 52; Defendants Answer and Counterclaim ("Defendants' Answer"), Dkt. 24, ¶ 52.  This means that, in total, Amicus has deposited at least $550,000 in escrow in contemplation of closing on the Portfolio.

ownership over the Portfolio. Therefore, Amicus is entitled to judgment on the pleadings in its favor on its claims against the Kacachoses.

*First*, Sellers are liable to Amicus for their breaches and repudiation of the PSA. The record clearly establishes that there was a meeting of the minds in the formation of the PSA such that there is a demonstrated offer, acceptance, and consideration, *Reedy v. Cincinnati Bengals, Inc.*, 143 Ohio App. 3d 516, 521, 758 N.E.2d 678, 682 (Ohio Ct. App. 1st Dist. 2001), and that any "reasonable person would find that the parties manifested a present intention to be bound to an agreement." *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, 41 N.E.3d 145, ¶ 18 (Ohio Ct. App. 2nd Dist. 2015) (internal citations omitted). As Ohio law has recognized, the presence of a signed, executed, and mutually acted upon PSA here is decidedly demonstrative of a meeting of the minds. *Altercare of Mayfield Vill., Inc. v. Berner*, 2017-Ohio-958, 86 N.E.3d 649, ¶ 29 (Ohio Ct. App. 8th Dist. 2017); *Fry v. FCA US LLC*, 2017-Ohio-7005, 143 N.E.3d 1108, ¶ 20 (Ohio Ct. App. 6th Dist. 2017). Furthermore, the law does not support Sellers' attempt to use the ancillary agreements to detract from the enforceability or validity of the PSA. Here, the PSA was not an agreement to agree; however, even if it was, the Parties' conduct after its execution clearly establishes sufficient intent to bind them to the terms of the PSA. For example, Amicus made repeated escrow deposits (which the Kacachoses never suggested were in error); the Parties initially worked to share an array of information related to transitioning numerous accounts and the Portfolio itself; and throughout much of the PSA's closing period each side made full indication that they were solely aiming to close pursuant to the terms established in the PSA. (Defs.' Answer, Dkt. 24, ¶¶ 51-52, 62-72; Am. Verified Compl. ¶¶ 62-72, 82, Ex. B.)

The Kacachoses' actions have constituted continued and repetitive breaches the PSA. And while Amicus has taken all efforts to remain compliant with the PSA, Sellers have breached their

obligations by failing to provide necessary information, refusing to cooperate fully with the due diligence process, denying reasonable efforts to finalize ancillary agreements, and expressly avoiding closing on the Portfolio. (Defs.' Answer ¶¶ 51-52, 54, 74-75; Am. Verified Compl. ¶¶ 51-61, 68-71, 74-75, 84-47, Ex. B, Dkt. 22-2, at 1, Ex. E, Dkt. 22-5, at 1-2; Ex. F, Dkt. 22-6, at 1-2.) Here, the Court is well within its authority to enforce the PSA against Sellers and should deny their efforts to avoid liability for their breaches by backing out of the contract simply because they think they can get a better deal. *New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, No. 2:20-CV-2475, 2021 WL 5746356, at *4 (S.D. Ohio Sept. 14, 2021).

*Second*, the Kacachoses' attempts to avoid liability by claiming there were incomplete conditions precedent also fails as a matter of law. Accordingly, Sellers cannot avoid liability under a contract "by making the performance of the condition precedent impossible, or by preventing it." *Suter v. Farmers' Fertilizer Co.*, 100 Ohio St. 403, 411, 126 N.E. 304, 306 (1919). While Amicus repeatedly made efforts to provide Sellers with a closing statement, it was, once more, waiting on the Kacachoses to provide it with the necessary payoff and allocation information to finalize the closing statement. (Pl.'s Reply To Defs.' Countercl. ¶ 15, Ex. C, Dkt. 30-3, at 1, Ex. E, Dkt. 30-5, at 1.) Similarly, Amicus was actively attempting to negotiate and resolve the ancillary agreements; however, any agreements that were left unresolved were so solely due to the Kacachoses' refusal to negotiate in good faith. (*Id.* at ¶¶ 6, 9-10.)

*Third*, the Sellers are liable to Amicus for their related breach of the duty of good faith and fair dealing. This duty is implied in every contract under Ohio law, *Accurate Elec. Constr., Inc. v. Ohio State Univ.*, 2019-Ohio-4992, 149 N.E.3d 1080, ¶ 130 (Ohio Ct. App. 10th 2019), and requires that parties act honestly and reasonably with one another. *PHH Mortg. Corp. v. Ramsey*, 2014-Ohio-3519, 17 N.E.3d 629, ¶ 33 (Ohio Ct. App. 10th Dist. 2014). Here, Sellers not only

3

concealed their purported belief that there was no binding PSA for nearly 220 days, but they also refused to negotiate or deliver information in a reasonable or timely manner so as to enable closing on the sale of the Portfolio.

*Fourth*, even if the Court determines that the PSA is not a binding contract, Sellers are still liable for their repeated promises to Amicus, which they reasonably could expect Amicus to act upon to its financial detriment. *Casillas v. Stinchcomb*, 2005-Ohio-4019, ¶ 17 (Ohio Ct. App. 6th Dist. 2005). Amicus repeatedly acted in reliance on the Kacachoses' promises, including, but not limited to: making escrow deposits, hiring an array of professionals, pulling substantial capital, and expending significant resources to effectuate closing. (Am. Verified Compl. ¶¶ 51-52, 54, 56; Defs.' Answer ¶¶ 51-52, 54.) Never did Sellers give any indication that Amicus was undertaking burdens for any reason but in relation to their promises to transfer the Portfolio. Instead, Sellers waited nearly six months to attempt to even suggest that their promises were illusory and that they had no intention of closing on the Portfolio leaving Amicus with a substantial, and foreseeable, financial loss.

Moreover, Sellers' Counterclaims are without any basis. The Counterclaims fail to assert any legally cognizable causes of action and lack any demonstrable facts to stand against Amicus's Complaint. Specifically, the Court should dismiss the Kacachoses' cause of action for bad faith or frivolous conduct as it is entirely unsubstantiated by the evidence and the law. The Kacachoses have clearly failed to meet their burden in establishing frivolous conduct under Ohio Revised Code § 2323.51(A)(2), and they are merely attempting to chill Amicus's legitimate claims. *Riston v. Butler* 149 Ohio App. 3d 390, 2002-Ohio-2308, 777 N.E.2d 857, ¶¶ 29-30 (Ohio Ct. App. 1st Dist. 2002) (internal citations omitted). Likewise, courts have already rejected similar efforts to elevate a mere clerical error (which Amicus's counsel brought to the Court's attention within 24-hours) to

that of actionable bad faith. *In re Rose*, 422 B.R. 896, 899 (Bankr. S.D. Ohio 2010); Aff. of Aneca E. Lasley, Dkt. 28, ¶¶ 8-11.  Therefore, for the reasons herein, judgment should also be entered in favor of Amicus on the Kacachoses' Counterclaims.

At bottom, this Motion asks the Court to ensure that the sanctity of contracts in Ohio is preserved, and that this straightforward breach of contract is not unnecessarily turned into a long, drawn out, costly dispute when it is plainly resolvable on the pleadings and the plain language of the PSA alone.  For all these reasons, and for those explained below, Amicus respectfully requests that the Court enter judgment on the pleadings in its favor and against the Kacachoses.

## II.     STATEMENT OF THE FACTS[2]

### A.     The Parties Negotiated For And Are Bound By A Valid, Enforceable Contract.

Amicus, and its affiliates, are purchasers and renovators of real estate properties across the eastern United States, with a predominate focus on collegiate housing.  Throughout 2020, Amicus sought out potential student housing investment opportunities, including targeting the housing market around Miami University in Oxford, Ohio.  (Am. Verified Compl. 24.)  As part of this investment survey, Amicus became aware of the Portfolio, and on or around July 13, 2021, Amicus began negotiating with Sellers to acquire the Portfolio.  (Am. Verified Compl. 25; Defs.' Answer ¶ 25.)  At all times during the negotiations, the Parties were represented and informed by their respective legal counsel.  (Am. Verified Compl. 28; Defs.' Answer 28.)  As a result of these negotiations, Amicus submitted, and Mrs. Kacachos signed onto, a Letter-of-Intent on September

---

[2] Plaintiff Amicus Miami of Ohio, LLC filed this case on May 31, 2022 against individuals Thomas "Tom" Kacachos and Heather Hoelzer Kacachos.  (*See generally* Verified Compl., Dkt. 1.)  An amended verified complaint (the "Amended Complaint" or "Am. Verified Compl.") was filed on July 1, 2022.  Both of these pleadings attached the PSA.  "In ruling on a motion for judgment on the pleadings, the Court considers the pleadings, which includes the complaint, answer, and any written instruments attached as exhibits." *Cluck v. Brentlinger Enterprises, Inc.*, No. 2:22-CV-290, 2022 WL 3223936, at *2 (S.D. Ohio Aug. 10, 2022) (quoting *Williams v. Sterling Jewelers, Inc.*, No. 1:19-CV-70, 2019 WL 5587025, at *2 (S.D. Ohio Oct. 30, 2019)).  Therefore, the Court can and should consider the PSA attached to Amicus's pleadings.

14, 2021 ("LOI"). The LOI set out that Amicus was to acquire the Portfolio from the Kacachoses for $75,000,000. (Defs.' Answer ¶ 26; *see generally* Plaintiff's Reply to Defendants' Answer, Ex. A, Dkt. 27-1.) Following six weeks of further negotiations regarding the precise language of the ultimate PSA, on October 25, 2021 the Parties executed the final form of the PSA, which was attached in full as Exhibit A to Plaintiff's Amended Verified Complaint. (*See generally* Am. Verified Compl. ¶ 29, Ex. A.) And Sellers have not only admitted that they signed the PSA, but Mr. Kacachos even initialed *each and every one* of the PSA pages prior to the signature page. (Defs.' Answer 26, 29-31), and that the PSA superseded the LOI, (Defs.' Answer 26). In fact, in Section 4.1(c) of the PSA, Sellers represented and warranted that:

> (c) ***This Agreement has been duly authorized, executed and delivered by all of the Seller Parties*** and all consents required under any of the Seller Parties' which are legal entities' organizational documents, operating agreements or by laws have been obtained. All documents that are to be executed by any of the Seller Parties and delivered to Buyer on the Closing Date have been, or on the Closing Date will be, duly executed, authorized and delivered by the applicable Seller Parties. ***This Agreement and all such documents are, and on the Closing Date will be, legal, valid and binding obligations of the Seller Parties***, enforceable in accordance with their terms, and do not, and, at the time of the Closing Date will not, violate or conflict with any provisions of any contract, agreement, instrument, document, ordinance, bylaw, rule, regulation or judicial or administrative order to which any of the Seller Parties is a party or to which any of the Seller Parties or the Property (or any portion thereof) is subject or, to Seller's knowledge, any ordinance, bylaw, rule, regulation applicable to the Seller Parties or the Property.

(PSA § 4.1(c) (emphasis added).) Mr. Kacachos initialed not even three inches below this language.

**B.     The Parties Set Forth Clear, Enforceable Obligations Under The PSA.**

In superseding the LOI, the binding PSA set forth that Sellers agreed to "(i) organize HoldCo [an entity wholly owned by Sellers], (ii) . . . acquire full and clear record and marketable fee simple title to their respective properties, (iii) . . . convey all of the Property to HoldCo, and (iv) sell all of the HoldCo Interests to Buyer . . . for the Purchase Price[.]"[3]   (PSA, § 1.1.) Mr. Kacachos initialed less than an inch below this provision.

In exchange, Amicus agreed to pay to the Kacachoses $75,000,000, accounting for certain adjustments and/or prorations set forth in the PSA.  Amicus also would deposit approximately $250,000 dollars, on top of its existing $50,000, into an escrow account as a quasi-down payment on the Portfolio within two days.  (PSA, §§ 3.1-3.2; *see also* Am. Verified Compl. ¶ 36.) Furthermore, the Parties agreed to allocations of certain expenses (such as taxes), (PSA, §§ 3.5, 3.7, 3.13-3.14); outlined that the Parties would *cooperate fully* throughout a due diligence review, (PSA, § 4.2(g)); and established an inspection and closing timeline, (PSA, §§ 5.1, 8.1).  Sellers also agreed to provide Amicus with "sufficient information to cause the Escrow Agent to prepare a draft closing statement setting forth the prorations and adjustments to the Purchase Price . . . at least five (5) days prior to the Closing,"  as well as an array of other items necessary to facilitate the transfer of the Portfolio and to close on the purchase.  (PSA, § 3.15; *see* Am. Verified Compl. ¶ 43.)

The Parties, acting with foresight and to protect their rights, also negotiated certain remedies in the event a Party breached the PSA or if any provision were rendered inoperative:

11.1 <u>Seller Default</u>.  In the event that Seller breaches or shall have failed to have performed any of the covenants and agreements contained in this Agreement which are to be performed by Seller, any representation or warranty of Seller herein was untrue when made, or any such representation or warranty is untrue as of the Closing Date, then Buyer shall have the right to (i) terminate this Agreement by giving Seller timely written notice

---

[3] The properties referenced in the PSA are those identified as the Portfolio herein.

of such election prior to or at Closing, in which event the Deposit shall be returned to Buyer, or (ii) ***take any and all legal actions necessary to compel Seller's specific performance hereunder*** (it being acknowledged that damages at law would be an inadequate remedy), and to consummate the transaction contemplated by this Agreement in accordance with the provisions of this Agreement, in which event the Deposit shall be refunded to Buyer while such specific performance action is pending.

11.2 <u>Buyer Default</u>. In the event all of the conditions to Closing contained in Section 7.2 above have been satisfied and Buyer defaults in its obligation to close hereunder, Seller shall be entitled to receive the Deposit as liquidated damages, in lieu of all other remedies available to Seller at law or in equity for such default. Seller and Buyer agree that the damages resulting to Seller as a result of such default by Buyer as of the date of this Agreement are difficult or impossible to ascertain and the liquidated damages set forth in the preceding sentence constitute Buyer's and Seller's reasonable estimate of such damages.

12.4 Partial Invalidity; Waiver. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

12.9 <u>Attorneys' Fees</u>. In the event it becomes necessary for either Party hereto to file suit to enforce this Agreement or any provision contained herein, the Party prevailing in such suit ***shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees and expenses*** incurred in such suit.

12.16 <u>Dispute</u>. In the event any dispute between the parties to this Agreement of the issue of default and/or disposition of the Deposit shall result in litigation or other proceeding, the prevailing party shall be reimbursed by the non-prevailing party for ***all actual costs and expenses, including without limitation reasonable attorneys' fees,*** incurred by the prevailing party in connection with such litigation or other proceeding and any appeal thereof. Such costs, expenses, and feels shall be included in and made part of the judgment recovered by the prevailing party, if any.

(PSA, §§ 11.1-11.2, 12.4, 12.9, 12.16 (emphasis added).)

Collectively, the PSA set forth in substantial detail the Parties' expectations as to the

obligations and responsibilities to one another as well as clearly identifying the price, property,

and other affirmative actions that each party needed to take to effectuate and close on the Portfolio

sale. (*See generally* PSA.) Indeed, the PSA is a 31-page document that memorialized in detail the months of negotiations between the Parties through their respective attorneys.

### C. Sellers Initially Complied With Their Obligations Under The PSA.

As Sellers have admitted, Amicus immediately began working to satisfy its obligations under the PSA by first depositing $50,000 into escrow on September 16, 2021 following the LOI and then $250,000 into escrow on October 27, 2021 following execution of the PSA. (Defs.' Answer ¶¶ 51-52; Am. Verified Compl. Ex. B, Dkt. 22-2) When Amicus placed that money into escrow, the Kacachoses never waved Amicus off or insisted it was all a big misunderstanding. Those funds, totaling $300,000, plus the additional $250,000 Amicus deposited to extend the inspection period, have continued to be held in escrow pursuant to Amicus's obligations in the PSA[4] and with the continued expectation that the Parties will close. (Am. Verified Compl. ¶ 53.) In addition, throughout the duration of the inspection and closing periods outlined in the PSA, Amicus sought and maintained financing for the Portfolio. (*See generally* Am. Verified Compl. ¶¶ 56-57, 61, Ex. C, E-K, Dkt. 22-3, 22-5:22-11; Pl.'s Reply to Defs.' Answer, Ex. B-C, E, Dkt. 24-2:24-3, 24-5.)

Amicus also hired a team of professionals, including legal counsel and a certified public accountant, to assist in facilitating the transfer of the Portfolio. (Defs.' Answer ¶ 55.) These professionals were required to achieve the important due diligence that needed to occur before closing. And in the months immediately following the execution of the PSA, Sellers admit that they worked with Amicus and its professionals toward closing on the Portfolio. (Defs.' Answer ¶ 62.) This included Sellers initially taking steps in December 2021 and January 2022 to work

---

[4] This improper withholding of the escrow deposit itself represents a breach by the Kacachoses, as the PSA frequently contemplates that should the deal not progress forward, or "in the event that Seller breaches or shall have failed to have performed" under the PSA, they are to return the full deposit to Amicus. *See* PSA, §§ 5.4, 6.1(c), 7.1(i), 8.2(p), and 11.1.

with Amicus to structure and execute the due diligence required under the PSA.  (Am. Verified Compl. ¶¶ 62-64; Defs.' Answer ¶¶ 62-64.)  During this nearly four-month period of cooperative efforts to close, Sellers never once indicated to Amicus that they believed that the PSA was unenforceable or not binding nor did their actions, which included formal amendments to the PSA to change timelines therein, demonstrate such a belief.  Instead, the Parties coordinated the exchange of security deposit and rent roll information as contemplated by the PSA.  *Id.*  And the Parties initially undertook other necessary steps to close on the Portfolio too, including by preparing to transfer accounts, sending announcements to residents, changing over utility information, and scheduling the phase out period for Sellers paying the mortgage.  (Am. Verified Compl. ¶¶ 68-72; Defs.' Answer ¶¶ 68-72.)

> **D.** **Sellers Only Reversed Course Months Later When They Felt They Could Get A Better Deal, Or That Holding Onto The Properties Was More Financially Advantageous To Them.**

After this substantial investment of time, human capital, and money, Sellers began to neglect their obligations under the PSA.  Starting in or around February 2022, the Kacachoses became unresponsive to communications from Amicus while also slow-walking their production of information necessary to effectuate a closing on the Portfolio.  (*See* Am. Verified Compl. ¶¶ 68-71, 74-76, Ex. C, E-K; Pl.'s Reply to Defs.' Answer, Ex. B-C, E.)  As a result, Sellers' bad faith tactics began to impact the closing timeline and inevitably caused the Parties to be unable to close within the timeline set forth in the PSA.[5]  (Am. Verified Compl. ¶¶ 77-82).  And despite Amicus's best efforts to progress the Parties towards a timely closing, Sellers' actions time and time again forced the Parties to repeatedly reschedule the Closing Date for the Portfolio.  (*See e.g.*, Am.

---

[5] Under the PSA, the Parties initially agreed to an inspection period that would run through January 24, 2022 and structured it such that the Closing Date would occur within thirty (30) days of the end of this period.  PSA, §§ 5.1, 8.1.  This period could be extended by 30-days if Amicus deposited an additional $250,000 into escrow.  *Id.*  Thus, the Closing Date was set to occur on February 22, 2022, or, if extended, on or around March 24, 2022.

Verified Compl. ¶ 87.)  On a May 2, 2022 call, it finally became clear why Sellers were refusing to cooperate fully with Amicus on closing on the Portfolio: Mr. Kacachos decided that the Kacachoses could get a higher price for the Portfolio due to "inflation."  (Am. Verified Compl. ¶¶ 96-97; Defs.' Answer ¶ 96.)  Mr. Kacachos again affirmed that this was the Kacachoses' position on a May 11, 2022 call, during which Mr. Kacachos expressly repudiated the PSA and Sellers' obligations therein when he stated that he had no intent to sell the Portfolio to Amicus. (Am. Verified Compl. ¶ 99; Defs.' Answer ¶ 99.)

> **E.    The Litigation To Enforce The PSA Begins.**

As a result of Sellers' repeated breaches of the PSA, Amicus has incurred, and will continue to suffer, substantial financial damage in addition to being deprived of its right to take ownership of the Portfolio and enjoy the benefits resulting therefrom.  (Am. Verified Compl. ¶¶ 57-60, 101-103.)  Amicus initiated this suit to vindicate its rights under the PSA and to ensure Sellers comport with their obligations therein.  To that end, Amicus brought suit against the Kacachoses for breach of contract (Count I), anticipatory repudiation (Count II), breach of the duty of good faith and fair dealing (Count III), and, in the alternative, a claim for promissory estoppel based on Sellers' actions and promises related to the PSA and the Portfolio transaction.

Due to a clerical error, the initial Complaint, filed on May 31, 2022, was incorrectly filed in the Eastern Division of the Southern District of Ohio; however, the Complaint was rightly labeled for the Western Division.  Amicus's counsel sought to immediately correct this clerical error by notifying the Clerk of the Court at the start of business on June 1, 2022.  (Aff. of Aneca E. Lasley, Dkt. 28, ¶¶ 8-11.)  In turn, the Clerk instructed Amicus's counsel that the assigned judge would transfer the case if it was determined that Cincinnati would be the appropriate venue.  (*Id.* at ¶ 10.)  Furthermore, Amicus's counsel was informed that it did not need to take any additional action at that time.  Rather than resolve the venue issue amicably, Sellers drafted a full-throated

motion to transfer venue—a motion that Amicus quite clearly would not have contested considering it had labeled its Complaint and all other supporting papers as intended for the Western Division. After receiving notice of the Motion to Transfer via ECF, Amicus's counsel communicated this information to the Kacachoses' counsel on June 15, 2022, and of course consented to the transfer. (*Id.* at ¶ 18; Mot. to Change Venue, Dkt. 13.)

The case was transferred to the Western Division in Cincinnati on June 17, 2022, where the present action continues. (Order, Dkt. 18.) Amicus since filed its Amended Verified Complaint on July 1, 2022. (*See generally* Am. Verified Compl.) The Kacachoses filed their Answer and Counterclaim to Amicus's Amended Verified Complaint on July 29, 2022. (*See generally* Defs.' Answer.) In their counterclaims, Sellers have alleged three counts. First, Sellers assert a counterclaim for a declaratory judgment regarding the applicability of the PSA that is entirely subsumed into Amicus's breach of contract claim. Sellers then assert their own breach of contract claim, which is in the alternative. Finally, Sellers assert a "bad faith/frivolous conduct" counterclaim for the clerical error made by Amicus's counsel in filing in the Eastern Division rather than the Western Division. Not only does this clerical error fail to constitute bad faith/frivolous conduct, but also the only possible damages for this final claim would be the cost of briefing the motion to transfer, which costs could have been avoided.

## III. LEGAL STANDARD

When there is a clear and enforceable contract, signed and executed by both Parties, and when Sellers' breaches are so apparent on the face of the pleadings, courts routinely grant motions for judgment on the pleadings. Judgment on the pleadings can be rendered any time after the pleadings are closed, so long as it is early enough not to delay trial. Fed. R. Civ. P. 12(c). The Sixth Circuit has held that the "standard of review for a Rule 12(c) motion is the same for a motion

under Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).

One reason courts are often able to resolve breach of contract claims on the pleadings is because a written instrument filed with the pleadings "trumps the allegations" of the Parties. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (quoting *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998)). It has been a long-standing rule in the Sixth Circuit that courts need not accept "[g]eneral averments of conclusions . . . when the pleadings are at variance and inconsistent with the clear and unambiguous language *of the contract filed as an exhibit thereto*." *Consolidated Jewelers, Inc. v. Standard Fin. Corp.*, 325 F.2d 31, 36 (6th Cir. 1963) (emphasis added). So, to the extent the Kacachoses' allegations in their pleadings contradict the executed, straightforward PSA, those allegations are trumped by the PSA. Although courts must "constru[e] the material allegations of the pleadings and all reasonable inferences in the light most favorable to the non-moving party," *Kenyon v. Union Home Mortg. Corp.*, 581 F. Supp. 3d 951, 955 (N.D. Ohio 2022), judgment on the pleadings is appropriate where pleadings, much like the Kacachoses' pleadings, are inconsistent with the clear and unambiguous language of a contract, *Schmelzer v. Huntington Bancshares Fin. Corp.*, No. 2:16-CV-134, 2017 WL 2807469, at *2 (S.D. Ohio June 29, 2017).

## IV.    ARGUMENT

Underscoring each of Amicus's claims is a clear and simple submission: the Parties, after months of negotiations, signed and executed a binding and enforceable contract. The validity of the PSA and the intent of the Parties was confirmed by months of each Party enacting their obligations therein, without any indication that the PSA was not in full force and effect. Similarly, even when Sellers began their repeated breaches of contract, they waited until nearly six months after the PSA was executed to begin suggesting that a binding contract never existed. It is upon

this illusory theory that the Kacachoses place their claims. They suggest that the PSA, a document they initialed, signed, and preliminarily operated under, was miraculously inchoate when inflation prices began to rise. (Am. Verified Compl. ¶¶ 96-97; Defs.' Answer ¶ 96.) And in the alternative, they attempt to leverage their own breaches of contract, including their failure to provide Amicus with necessary closing information or cooperate in good faith, as a pretense to avoid liability and prop up their own breach of contract claim.

For the reasons set forth herein, Sellers' Counterclaims fail to state any claim for relief cognizable as a matter of law. Furthermore, the pleadings clearly establish that Amicus is entitled to judgment as a matter of law with respect to its claims set forth in its Amended Verified Complaint. Therefore, Amicus respectfully requests that this Court enter judgment in Amicus's favor on its claims and dismiss Sellers' Counterclaims with prejudice.

### A. Amicus Is Entitled To Judgment As A Matter Of Law Because Amicus's Complaint Demonstrates That The PSA Was A Binding, Enforceable Contract Between The Parties.

Throughout the history of contract law, the importance of upholding and enforcing valid contracts has always been a critical cornerstone of the law. Indeed, it "is as fundamental to our society as the right to write and to speak without constraint." *Blount v. Smith*, 12 Ohio St. 2d 41, 47, 231 N.E.2d 301, 305 (1967). The freedom to contract and the ability to rely on the terms of those contracts is so fundamental that courts will respect and enforce contracts except in the face of overwhelming public policy to the contrary. *Royal Indem. Co. v. Baker Protective Servs., Inc.*, 33 Ohio App. 3d 184, 186, 515 N.E.2d 5, 7 (Ohio Ct. App. 2nd Dist. 1986).

#### i.    *The PSA was established upon a clear meeting of the minds.*

Under Ohio law, a contract is enforceable so long as there is a meeting of the minds. *See Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Rels.*, 61 Ohio St. 3d 366, 369, 575 N.E.2d 134, 137 (1991). A meeting of the minds can be demonstrated by either (1) an offer, acceptance,

14

and consideration, *Reedy v. Cincinnati Bengals, Inc.*, 143 Ohio App. 3d 516, 521, 758 N.E.2d 678, 682 (Ohio Ct. App. 1st Dist. 2001), or  (2) "a reasonable person would find that the parties manifested a present intention to be bound to an agreement." *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, 41 N.E.3d 145, ¶ 18 (Ohio Ct. App. 2nd Dist. 2015) (internal citations omitted).   And because Ohio puts such a great emphasis on the fundamental importance of enforcing contracts, the Ohio courts have repeatedly held that a signed, written agreement–just like the PSA here–is exceedingly strong evidence that there was a meeting of the minds.  *See Id.*; *Altercare of Mayfield Vill., Inc. v. Berner*, 2017-Ohio-958, 86 N.E.3d 649, ¶ 29 (Ohio Ct. App. 8th Dist. 2017); *Fry v. FCA US LLC*, 2017-Ohio-7005, 143 N.E.3d 1108, ¶ 20 (Ohio Ct. App. 6th Dist. 2017).

The uncontested pleadings confirm that there was an offer, acceptance, and consideration here, all of which are memorialized in the PSA.  The Parties agree that they spent months engaged in negotiations, which culminated in the material terms that were set forth in the executed PSA on October 25, 2021.  (Am. Verified Compl. ¶ 29; Defs.' Answer ¶¶ 26-27.)  The PSA itself indisputably sets forth the essential elements of the deal, including identifying (1) the Property to be sold, (PSA, Art. 2); (2) the Purchase Price of $75,000,000, (PSA, § 3.1); and (3) the parties to be bound by the agreement, (PSA, pg. 1).  And not only did each of the parties sign the PSA, but also Mr. Kacachos even initialed *each and every one* of the PSA pages preceding the signature page.  *See generally*, PSA, pg. 1-31.  This is sufficient on its own to demonstrate a meeting of the minds.  *Fry*, 143 N.E.3d at 1115.

>        ii.    *The ancillary agreements to do not detract from the validity or enforceability of the PSA.*

In large part because of the importance of upholding contracts under Ohio law, the law is clear that a "statement about creating a more formal document" does not prevent the agreement

from being enforced.  *PNC Bank, N.A.*, 41 N.E.3d at 151-153.  Indeed, by signing an agreement the court "must conclude that [a party] intended to be bound by the terms as expressed at that time, despite the agreement's statement that a more formal legal document could be prepared."  Id.  The Ohio Supreme Court has recognized that "all agreements have some degree of indefiniteness and some degree of uncertainty," and even still the societal significance of contracts demands such contracts be enforced.  *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 12 (2002).

Furthermore, the Kacachoses' assertion that the ancillary agreements prevent a meeting of the minds as to the PSA itself is directly counter to the law in Ohio.  The Ohio Supreme Court has long held that it is "not the law that an agreement to make an agreement is *per se* unenforceable" and instead the critical considerations are whether the parties manifested an intent to be bound such as by mutual actions in furtherance of the contract.  *Normandy Place Assocs. v. Beyer*, 2 Ohio St. 3d 102, 105-106, 443 N.E.2d 161, 164 (1982); *see Oglebay Norton Co. v. Armco, Inc.*, 52 Ohio St. 3d 232, 236, 556 N.E.2d 515, 519 (1990).

Here, while there were ancillary agreements to the PSA, the PSA itself was not an agreement to agree.  And even if it were, the PSA and the Sellers' conduct after its execution demonstrates such a clear manifestation on intent to be bound by the PSA that it would be of no legal relevance.  As Sellers have admitted, Amicus worked to immediately satisfy its obligations in the PSA through its repeated escrow deposits.  (Defs.' Answer ¶¶ 51-52; Am. Verified Compl. Ex. B.)  Throughout the end of 2021, and in the first two months of 2022, Sellers and Amicus also were working to close on the Portfolio pursuant to the PSA.  (Am. Verified Compl. ¶¶ 62-64; Defs.' Answer ¶¶ 62-64.)  The Parties worked closely to share information related to utilities, rent, maintenance, and mortgage payments, and exchanged financial records related to the Portfolio.

16

(Am. Verified Compl. ¶¶ 62-72; Defs.' Answer ¶¶ 62-72.) And not once during this period did Sellers ever suggest that there was not a contract between the Parties, nor did they provide any indication that their actions—which would be inexplicably bizarre if not in connection with a binding agreement to sell the Portfolio—were attributable to anything but the binding PSA. The Sellers' participation in negotiating the PSA, signing the PSA, conducting due diligence following execution of the PSA, and even the Kacachoses' own suggestions initially to close without finalized ancillary agreements all demonstrated "an intention to be bound by its terms" that were "sufficiently definite to be specifically enforced" even if certain ancillary agreements remained to be finalized. *Normandy Place Assocs.*, 2 Ohio St. 3d at 105-106 (1982); Am. Verified Compl. ¶ 82; Am. Verified Compl. Ex. B, Dkt. 27-2. Sellers cannot avoid their responsibilities under the PSA "simply because [they are] not happy with the outcome." *Cyber Sols. Int'l, LLC v. Pro Mktg. Sales, Inc.*, 634 F. App'x 557, 565 (6th Cir. 2016).

**B.      Amicus Is Entitled To Judgment As A Matter Of Law Because The Pleadings Establish That Sellers Breached The PSA, And Despite The Kacachoses' Repeated Failures To Comply With Their Obligations Therein Amicus Has Remained Compliant With Its Responsibilities In The PSA.**

The Kacachoses' refusal to close on the sale of the Portfolio, and their refusal to participate in good faith in the closing process, breaches both the PSA and the duty of good faith and fair dealing. Ohio courts regularly enforce purchase agreements against breaching parties who get cold feet and try to back out of closing on purchase contracts. *See, e.g.*, *New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, No. 2:20-CV-2475, 2021 WL 5746356, at *4 (S.D. Ohio Sept. 14, 2021) (noting that the Court will not rewrite a contract because one party has now decided it made a bad deal). As established above, the PSA has been binding on the parties since October 25, 2021 and specifically outlined an array of obligations for each of the Parties. However, the pleadings clearly demonstrate that only Amicus sought to fulfill those obligations,

while the Kacachoses actively sought to avoid and counteract theirs, causing Amicus to suffer substantial financial damages.[6]

> i.  *The Kacachoses–by failing to provide necessary information, cooperate in the due diligence process, refusing to finalize ancillary documents, and blatantly avoiding closing on the Portfolio–clearly breached their obligations under the PSA.*

Amicus was ready, willing, and able to close on the Portfolio, and in fact would have closed on the Portfolio but for Sellers' refusal to participate in the closing process and ultimately close on the sale. (Am. Verified Compl. ¶ 57.) Amicus has actively sought to meet its obligations set forth in the PSA, including by: hiring appraisers, attorneys, and other professionals to facilitate the necessary paperwork; promptly initiating the inspection period; actively reviewing, when produced, Sellers' due diligence documents; attempting to resolve Sellers's concerns; making the required escrow deposits; and actively working to maintain committed financing. (*Id.* at ¶¶ 51-61; Defs.' Answer ¶¶ 51-52, 54; Am. Verified Compl. Ex. B at 1, Ex. E at 1-2; Ex. F at 1-2.) Accordingly, Amicus worked to conduct due diligence around environmental reports, security deposits, and rent information. (Am. Verified Compl. ¶¶ 63-64.) In February of 2022, Amicus similarly began preparing for the transfer of accounts, and continued to work diligently to address issues with utilities, tenant announcements, and other closing priorities. (*Id.* at ¶¶ 68-71; Am. Verified Compl. Ex. E at 1.) However, as February progressed Sellers began their extensive excuse-and-delay tactics thereby repeatedly breaching the requirements of the PSA. (Am. Verified Compl. ¶ 74.) Sellers repeatedly breached the PSA by refusing to cooperate with due diligence reviews. Sellers often failed to produce necessary information, and even when production did occur it would often come weeks or months after Amicus submitted its request. (*Id.* at ¶¶ 74-75.)

---

[6] To establish a breach of contract, a party must establish "that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." *Quest Workforce Sols., L.L.C. v. Job1USA, Inc.*, 2016-Ohio-8380, 75 N.E.3d 1020, ¶ 40 (Ohio Ct. App. 6th Dist. 2016).

Sellers' failure to cooperate continued throughout the Closing Period by refusing to set and stick to a final closing date. (*Id.* at ¶¶ 84-87; Am. Verified Compl. Ex. I, Dkt. 22-9, pgs. 1-2; Am. Verified Compl. Ex. J, Dkt. 22-10, pg. 1.) Much like the breaching party in *Holmes v. Wilson*, the Kacachoses breached the PSA by refusing to adhere to their Closing obligations. No. 2:08-CV-602, 2009 WL 3673015, at *3 (S.D. Ohio Oct. 30, 2009).

> ii. *The Kacachoses' efforts to rely on alleged conditions precedent are thwarted by their own actions circumventing performance.*

The Kacachoses' attempt to blame Amicus for not Closing on the properties fails as a matter of law. Ohio law does not permit parties to avoid liability by simply preventing performance of a condition precedent. *Winter Enterprises, LLC v. W. Bend Mut. Ins. Co.*, No. 1:17-CV-360, 2021 WL 4193213, at *12 (S.D. Ohio Sept. 15, 2021) (quoting *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007)). The Kacachoses' inappropriate aims to stop cooperating and actively restrain Amicus's ability to close is exactly the type of behavior the Ohio courts do not tolerate. This century-long rule has continually punished such circumvention attempts by recognizing that "even where the liability depends upon a condition precedent, one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it." *Suter v. Farmers' Fertilizer Co.*, 100 Ohio St. 403, 411, 126 N.E. 304, 306 (1919).

And now, in light of their own refusal to close under the PSA, Sellers have attempted to concoct an excuse for their breaches by alleging that Amicus did not provide a closing statement. (Defs.' Countercl. ¶ 15.) Specifically, Sellers have attempted to suggest that Amicus did not provide the "prorations and adjustments" in the closing statements it provided Sellers. *Id.* However, this assertion is detached from the facts. Amicus provided Sellers with multiple draft closing statements throughout the closing period. (Pl.'s Reply To Defs.' Countercl. ¶ 15.) Amicus was waiting on the Kacachoses to provide the necessary payoff statements and sales price

19

allocations to allow for a formalized statement—information that Amicus had to rely on Sellers to provide. (Pl.'s Reply To Defs.' Countercl. Ex. C, Dkt. 30-3, at 1, Ex. E, Dkt. 30-5, at 1.) Similarly, Amicus actively sought to negotiate and finalize the various ancillary agreements that Sellers now assert prevent enforcement of the PSA; however, to the extent any agreements were incomplete it was fully attributable to Sellers' refusal to negotiate these agreements in good faith and their inconsistent production of information. (Pl.'s Reply To Defs.' Countercl. ¶¶ 6, 9-10). Sellers cannot now use their own actions, which rendered Amicus's full performance impossible (and breached both the PSA and the duty of good faith and fair dealing), as a means to avoid liability. *Baumer v. Franklin Cnty. Distilling Co.*, 135 F.2d 384, 389 (6th Cir. 1943).

### C. Amicus Is Entitled To Judgment As A Matter Of Law Because the Kacachoses Repudiated The PSA.

The Kacachoses have demonstrated, both by their actions and attempts to force Amicus to pay a higher purchase price, that they had no intention to close on the Portfolio or otherwise complete their obligations under the PSA. These blatant repudiations, under the guise of "just business," clearly absolved Amicus of its obligations to continue performing under the PSA and, although Amicus first attempted to resolve the dispute amicably, grants it the right pursue damages against the unremorseful Sellers. It is well established that when a contracting party repudiates a contract prior to performance coming due an "anticipatory repudiation" occurs, allowing the injured party to immediately cease performance and initiate a suit for damages for such a breach. *Farmers Comm. Co. v. Burks*, 130 Ohio App. 3d 158, 172, 719 N.E.2d 980, 990 (Ohio Ct. App. 3rd Dist. 1998). And this repudiation does not need to take some strict form, any refusal to continue performing under the terms of the contract, *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App. 3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 73 (Ohio Ct. App. 6th Dist. 2007), or words or acts that "evince an intention to refuse performance in the future" are enough, *Se. Land*

*Dev., Ltd. v. Primrose Mgt. L.L.C.*, 193 Ohio App. 3d 465, 2011-Ohio-2341, 952 N.E.2d 563, ¶ 7 (Ohio Ct. App. 3rd Dist. 2011).

The Kacachoses repeated efforts to abandon the PSA by refusing to close on the sale or cooperate in the process underscores their clear anticipatory repudiation of the contract. *See Atlas Noble, LLC v. Krizman Enterprises*, 692 F. App'x 256, 262 (6th Cir. 2017); *see also Larson v. Burton Constr., Inc.*, 421 P.3d 538, 548 (Wyo. 2018). Here, Sellers constantly avoided setting, and keeping, closing dates–often relying on improper, inefficient extracontractual excuses to avoid closing on the sale. (Am. Verified Compl. ¶¶ 7, 74, 77-80, 89.) And Sellers made this anticipatory breach explicit on March 23, 2022, before the PSA's Closing Date, in which they directly recognized that they would not be closing on the property by March 25, 2022. (Pl.'s Reply To Defs.' Countercl., Ex. D, Dkt. 30-4 at 4).

Sellers' actions constitute the most common type of repudiation – "when a party declares that he or she will not perform the terms of the contract unless the contract price is increased." *Daniel E. Terreri & Sons, Inc. v. Mahoning Cnty. Bd. of Commrs.*, 152 Ohio App. 3d 95, 2003-Ohio-1227, 786 N.E.2d 921, ¶ 46 (Ohio Ct. App. 7th Dist. 2003). As mentioned previously, Sellers' actions repeatedly indicated that come Spring of 2022, they had no intention to close under the PSA and this was directly articulated by Mr. Kacachos during a series of meetings in May of 2022. (Am. Verified Compl. ¶¶ 96-99; Defs.' Answer ¶¶ 96-97, 99.) During the first call, on May 2, 2022, Mr. Kacachos suddenly began demanding a higher purchase price for the Portfolio, with the only purported justification being "inflation." *Id.* When Amicus balked, Mr. Kacachos claimed it was "just business." *Id.* Then, on May 11, 2022, Mr. Kacachos made clear Sellers would not close on the Portfolio, regardless of the terms of the PSA and any ancillary agreements,

unless Amicus met their price demands. *Id.* This alone is a repudiation of the contract and therefore a breach. *Daniel E. Terreri & Sons, Inc.*, 2003-Ohio-1227 at ¶ 46.

**D.      Amicus Is Entitled To Judgment As A Matter Of Law Because The Kacachoses Breached Their Duty Of Good Faith And Fair Dealing.**

Alongside their litany of breaches of the material terms of the contract, the Kacachos have also breached the implied duty of good faith and fair dealing within the PSA.  By continually seeking to circumvent the contract, trying to force Amicus to pay a higher price, and concealing their intentions to challenge the validity of the PSA, Sellers failed to meet their obligations to deal honestly and reasonably with Amicus. *PHH Mortg. Corp. v. Ramsey*, 2014-Ohio-3519, 17 N.E.3d 629, ¶ 33 (Ohio Ct. App. 10th Dist. 2014).  The implied duty of good faith and fair dealing permeates every contract under Ohio law. *See Accurate Elec. Constr., Inc. v. Ohio State Univ.*, 2019-Ohio-4992, 149 N.E.3d 1080, ¶ 130 (Ohio Ct. App. 10th 2019); *CosmetiCredit, LLC v. World Fin. Network Natl. Bank*, 2014-Ohio-5301, 24 N.E.3d 762, ¶ 35 (Ohio Ct. App. 10th Dist. 2014).  This ever-present duty is a "compact" between the parties "not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Society Natl. Bank*, 75 Ohio St. 3d 433, 444, 662 N.E.2d 1074, 1082 (1996).  But this is exactly what Sellers have done.

If Sellers' account of events is taken as true, then Sellers concealed their belief that there was never any agreement for nearly ***six months***–fully aware that Amicus believed the parties had a contract and was expending significant resources to fulfill that contract.  (*See generally,* Am. Verified Compl.; Defs.' Answer.)  During this nearly 220-day period, Amicus continuously incurred significant financial costs while Sellers attempted to slow walk the closing process to force the Parties to miss the closing date.  (Am. Verified Compl. ¶¶ 85-99.)  The PSA is a binding

22

contract on its face. Sellers' attempt to get out of their obligations by claiming it is not binding and never was fails as a matter of law (as discussed above) and confirms Sellers' bad faith behavior.

>    **E.    Amicus Is Entitled To Judgment As A Matter Of Law Because The Pleadings Demonstrate That Amicus Relied On Sellers' Promises To Comply With The PSA To Its Financial Detriment.**

Even if the Court finds that the Kacachoses were not bound by the written provisions of the PSA, the promises they made therein and their actions following its signing straps them with liability. In knowingly concealing their intent to challenge the validity of the PSA, the Kacachoses intentionally enticed Amicus with promises of performance to its steep financial detriment and now must appropriately compensate Amicus under the doctrine of promissory estoppel. In Ohio, promissory estoppel is established when there is a promise which the promisor should reasonably expect to, and does, induce an action or forbearance resulting in an injustice that can only be avoided by enforcement of that promise. *Casillas v. Stinchcomb*, 2005-Ohio-4019, ¶ 17 (Ohio Ct. App. 6th Dist. 2005). This is particularly true when parties, like the Kacachoses, repeatedly make clear and unambiguous promises which they know will result in a detrimental reliance by the other party. *Stewart v. Everyware Glob., Inc.*, 68 F. Supp. 3d 759, 766 (S.D. Ohio 2014).

Amicus repeatedly took steps in reliance on these promises, including, but not limited to: making repeated escrow deposits, totaling over $500,000; hiring appraisers, attorneys, and other professionals to facilitate the transfer of the Portfolio; pulling over $15 million of non-returnable investor capital to secure committed financing for the transaction; and expending significant human capital and financial resources to work toward closing on the Portfolio. (Am. Verified Compl. 51-52, 54, 56; Defs.' Answer 51-52, 54.) Not once before the Closing Date, and not until nearly six months into the transaction, did Sellers ever inform, or even suggest to, Amicus that they believed that there was no binding agreement of any kind between the parties. Nor did Sellers

ever suggest that Amicus was unnecessarily depositing funds into escrow. And Sellers never indicated to Amicus that they believed that Amicus was taking all of these steps without any contractual obligation to do so. Nor did Sellers ever explain that although they (at least initially) were cooperating in the due diligence process by providing substantial documentation and confidential financial records to Amicus, they were apparently doing so for absolutely no reason and not at all in connection with the PSA both sides had initialed every page of and signed. Therefore, it was foreseeable by the Kacachoses that Amicus not only could rely on, but actively was relying on, Sellers' promises and actions when it was amassing significant financial burdens. Even if the PSA is not binding (and it is), the Kacachoses would still have to compensate Amicus for this justifiable reliance.

      F.    **Amicus Is Entitled To Judgment As A Matter Of Law on The Kacachoses' Third Counterclaim Because There Has Been No Bad Faith Or Frivolous Conduct By Amicus.**

Parties "that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their [] partners, without being mulcted for lack of 'good faith.'" *Ed Schory & Sons, Inc.*, 75 Ohio St. 3d at 443. Here, Amicus has merely tried to do just that, and receive the benefits that it is entitled to under the PSA. However, in a last-ditch effort to mitigate their own liability and bad faith in this transaction, the Kacachoses have asserted a woefully unsubstantiated claim for bad faith or frivolous conduct. Amicus has never attempted to disrupt the progress of this case, nor has it attempted to improperly harass or burden Sellers in any manner. In fact, Amicus has been nothing but transparent and cooperative with the Kacachoses, their counsel, and the Court, and it has repeatedly sought to reduce the burden placed on the Parties and the docket during this matter.

To begin, the Kacachoses have clearly failed to establish frivolous conduct under the Ohio Revised Code § 2323.51(A)(2). Nowhere in the pleadings do they establish any actions that were

meant to "harass or maliciously injure" Sellers. *Id.* Similarly, they have not identified any claims that are not supported in good faith by existing law or that completely lack evidentiary support. *Id.* Instead, it appears the Kacachoses are attempting to use this statute as a means to deflect from Amicus's legitimate claims. Courts have opined that this is an inappropriate use of this claim, noting that "[t]he statute is to be applied carefully so that legitimate claims are not chilled" nor was the statute "intended to punish mere misjudgment or tactical error." *Riston v. Butler,* 149 Ohio App. 3d 390, 2002-Ohio-2308, 777 N.E.2d 857, ¶¶ 29-30 (Ohio Ct. App. 1st Dist. 2002) (internal citations omitted).

Ohio Revised Code § 2323.51(A)(2) was promulgated to only address "egregious, overzealous, unjustifiable, and frivolous action" such that the test "is whether no reasonable lawyer would have brought the action in light of the existing law." *Id.* The Kacachoses cannot rely on mere incidental or negligent incidents to support their claims, they must identify willful intent. *Kozar v. Bio-Med. Applications of Ohio, Inc.*, 2004-Ohio-4963, ¶ 11 (Oh. Ct. App. 9th Dist. 2004). Neither set of facts pleaded by Sellers—that Amicus did not provide notice of the TRO hearing and that Amicus maliciously filed this action in the Eastern Division—can meet this standard.

First, Sellers' attempts to suggest that Amicus and the Court were uncommunicative regarding this suit and the Temporary Restraining Order fails to pass muster. It is well documented that both Amicus and the Court itself attempted to contact by email the Kacachoses, along with their former real estate counsel, and neither the Kacachoses nor their counsel responded. Aff. of Aneca E. Lasley, ¶¶ 12-13. Similarly, when Amicus attempted to enact service on the Kacachoses, they refused to come to the door, refused to answer their phones, and would not accept any of the documents from the process server. Aff. for Service of Summons for Mr. Kacachos, Dkt. 10, at pg. 3; Aff. for Service of Summons for Mrs. Kacachos, Dkt. 11, at pg. 3. Sellers attempted to

justify their refusals by alleging that someone in their home had COVID-19; however, this contagion was no longer an issue a mere sixteen (16) hours later when they decided to accept service after all. (Pl.'s Reply To Defs.' Countercl., Ex. G, Dkt. 30-7.)

Second, equally unsubstantiated is any claim that Amicus's clerical error in filing the suit in the Eastern Division was done with willful intent against Sellers. *Kozar*, 2002-Ohio-2308 at 11. Ohio courts have been clear that clerical errors, especially when paired with a parties' honest behavior and lack of evidence of an attempt to abuse the judicial system, fall far short of constituting bad faith or improper conduct. *In re Rose*, 422 B.R. 896, 899 (Bankr. S.D. Ohio 2010). Amicus has been candid with the Court and opposing counsel as to the circumstances surrounding the clerical filing error. Specifically, Amicus immediately contacted the Court as soon as possible to disclose that the error had occurred. Aff. of Aneca E. Lasley, ¶ 8. In response, the Clerk for the Court communicated to Amicus that the judge would addresses any concerns related to transfer and that there were no additional steps that Amicus needed to take at the time. *Id.* at ¶¶ 9-11. Similarly, had Sellers complied with Local Rule 7.3, and consulted Amicus prior to filing their Motion to Transfer, Amicus would have immediately stipulated to the transfer and spared any alleged unnecessary costs. This is reflected in the fact that shortly after Sellers filed the Motion to Transfer, Amicus contacted their counsel to inform him that "we are in agreement that this case should have been assigned to a judge in Cincinnati. We, in fact, raised this with the court from the outset." *Id.* at 18.

Even accepting Sellers' pleadings as true, they cannot set out a claim for bad faith conduct, which would require willful intent on the part of Amicus. Amicus filed this suit to vindicate its rights under the PSA, a straightforward and binding agreement that Sellers refuse to honor. There is nothing more to this action than what meets the eye—a breach of contract, plain and simple.

**V.      CONCLUSION**

The PSA standing on its own is enough to resolve this case.  The Kacachoses agreed to sell the Portfolio of properties to Amicus.  Amicus agreed to buy the Portfolio for $75 million.  Both sides initialed each and every page of the PSA.  Both sides signed the PSA at the end.  Both sides immediately began acting as if the PSA constituted a valid, enforceable, and binding agreement. It was not until rampant inflation took off that the Kacachoses suddenly decided they needed more money for the deal.  And it was not until Amicus refused to pay more for the Portfolio than the Parties had agreed to in the PSA that the Kacachoses decided the PSA was inchoate all along.  The facts of this case are the quintessential breach of contract for the sale of property dispute.  Amicus asks that this Court reaffirm the preeminence of binding contracts and by granting Amicus judgment in its favor, dismissing the Kacachoses' Counterclaims, and awarding Amicus specific performance and damages to be determined at a subsequent hearing.

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366)
ICE MILLER LLP
250 West Street, Suite 700
Columbus, Ohio 43215-7509
(614) 462-1085
Aneca.Lasley@icemiller.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document was filed electronically and served through the Court's ECF System upon all counsel of record on this 29th day of November, 2022.

Respectfully submitted,

*/s/ Aneca E. Lasley*
Aneca E. Lasley (0072366)