**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **AMICUS MIAMI OF OHIO, LLC** | : | **Case No. 1:22-cv-00355** |
| **Plaintiff** | | **Judge McFarland** |
| | : | **Magistrate Litkovitz** |
| **vs.** | | |
| **HEATHER HOELZER KACACHOS,** | : | **DEFENDANTS' MOTION FOR** |
| *ET AL.* | | **PARTIAL SUMMARY JUDGMENT** |
| **Defendants** | : | |

Defendants Heather and Thomas Kacachos (the "Kacachoses") move the Court to grant partial summary judgment pursuant to Federal Civil Rule 56. First, on the Kacachoses' claim for Declaratory Judgment, and second, dismissing Plaintiff Amicus Miami of Ohio, LLC's ("Amicus's") Counts I, II, III and IV with prejudice. There is no triable issue of outcome-determinative fact, and the Kacachoses are entitled to judgment as a matter of law in these claims. The parties never reached a meeting of the minds on material parts of their contemplated transaction. Further reasons for granting this Motion are set forth in the accompanying Memorandum in Support and the Affidavit of Thomas Kacachos.

Respectfully submitted,

*/s/ Edward P. Akin*
Edward P. Akin  0074357
Aronoff, Rosen & Hunt
2200 U.S. Bank Tower
425 Walnut Street
Cincinnati, OH 45202
(513) 241-0400
(513) 241-2877 (fax)
epakin@arh-law.com
*Trial Attorney for Defendants*

# TABLE OF CONTENTS

|  | Page |
|---|---|
| **MEMORANDUM IN SUPPORT** | 5 |
| **INTRODUCTION** | 5 |
| *About the Parties* | 5 |
| *About the PSA* | 6 |
| *About the Dispute* | 11 |
| **LEGAL STANDARD** | 15 |
| *Celotex Corp. v. Catrett,* 477 U.S. 317, (1986) | 15,16 |
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) | 15,16 |
| *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) | 15 |
| *Valentine-Johnson v. Roche,* 386 F.3d 800, 807 (6th Cir. 2004) | 16 |
| *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990) | 16 |
| *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51 (2000) | 16 |
| **LEGAL ARGUMENT** | 16 |
| **A. The Parties Never Reached a Meeting of the Minds on All Material Terms of the Planned Transaction.** | 17 |
| *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770, N.E.2d 58, ¶ 16 | 17 |
| *Nguyen v. Chen,* 12th Dist. Butler No. CA2013-10-191, 2014-Ohio-5188, 2014 WL 6612424, ¶ 43 | 17 |
| *Episcopal Retirement Homes, Inc. v. Ohio Dep't of Indus. Rel.* (1991), 61 Ohio St.3d, 366, 575 N.E.2d 134 | 17 |
| *Rulli v. Fan,* 79 Ohio St.3d 374, 683 N.E.2d 337 (1997) | 17 |

| | |
|---|---|
| **B. The PSA Amounted to an "Agreement to Further Agree," Upon Which Material Terms Remained Unresolved Despite Lengthy Negotiation.** | 21 |
| *Rice v. Wheeling Dollar Savings and Trust* (1951), 155 Ohio St. 391 | 21 |
| *Normandy Place Assoc. v. Beyer* (1982), 2 Ohio St.3d 102 | 21 |
| 1 Restatement of the Law 2d, Contracts (1981) 92, Section 33 | 21 |
| *Schlagel v. Howell,* 22 N.E.2d 771, 2015-Ohio-4296 at ¶ 25 (Ohio Ct. App. 2d Dist. 2015) | 22 |
| *General Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669 (1952) | 22 |
| *Upsal Street Realty Co. v. Rubin,* 326 Pa. 327, 192 A.2d 481 | 22 |
| 1 Corbin on Contracts, section 22, p. 54 | 22 |
| *IDT Corp. v. Tyco Group*, 23 NY3d 497, 502-503 (2014) | 23 |
| **C. There Can Be No "Anticipatory Repudiation" In the Absence of an Enforceable Contract.** | 24 |
| *McDonald v. Bedford Datsun*, 59 Ohio App.3d 38, 570 N.E.2d 299 (Ohio Ct. App. 1989) | 24 |
| **D. Conditions Precedent to Closing Remained Unsatisfied.** | 25 |
| *WSB Rehabilitation Serv. Inc. v. Cent. Acctg. Systems, Inc.,* 2022-Ohio-2160, at ¶ 26-27 (Ohio Ct. App. 1st Dist. 2022) | 25 |
| *Telxon Corp. v. Smart Media of Del., Inc.,* 2005-Ohio-4931, at ¶ 53 (9 Dist.) | 25 |
| **E. The Ohio Supreme Court Has Discredited the Drop-Down Method of Allocation as a Basis for Valuing a Real Estate Transfer.** | 26 |
| *PolyOne Corporation v. Westlake Vinyls, Inc.*, 937 F.3d 692, 701 (6th Cir. 2019) | 26 |
| *Associated Press v. Taft-Ingalls Corp.,* 340 F.2d 753, 759 (6th Cir. 1965) | 26 |
| *Columbus City Schools Bd. Of Edn. V. Franklin Co. Bd. Of Revision,* 159 Ohio St. 3d 283, 2020-Ohio-353, 150 N.E.3d 877 | 26-28 |
| Ohio Rev. Code § 319.21 | 27 |

| | |
|---|---|
| **F. The Kacachoses Did Not Breach Any Covenant of Good Faith and Fair Dealing By Failing to Agree to Amicus's One-Sided Terms.** | 28 |
| *Eggert Agency, Inc. v. NA Mgmt. Corp.*, No. C2-07-1011, 2008 WL 3474148, at *4 (S.D. Ohio Aug. 12, 2008). | 28 |
| *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co.,* 86 Ohio St.3d 270, 274, 714 N.E.2d 898 (1999) | 28 |
| *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-908, 2006-Ohio-638, ¶¶ 99–101, 2006 WL 328679 | 28 |
| *Gilchrist v. Saxon Mtge. Servs.*, 10th Dist. No. 12AP-556, 2013-Ohio-949, ¶ 24, 2013 WL 1091112 | 28 |
| *Lucarell v. Nationwide Mut. Ins. Co.,* 152 Ohio St.3d 453, 2018-Ohio-15, at ¶ 5 | 28 |
| Timothy Murray, *Corbin on Contracts,* V.I, Section 2.8 at 170 (Rev. Ed. 2018) | 29-30 |
| **G. Amicus Cannot Establish Reasonable Detrimental Reliance for Purposes of Promissory Estoppel.** | 30 |
| *Telxon Corp. v. Smart Media of Del., Inc.,* 2005-Ohio-4931 at ¶¶ 58-59 | 30,31 |
| *Uebelacker v. Cincom Sys., Inc.* (1988), 48 Ohio App.3d 268, 273, 549 N.E.2d 1210 | 31 |
| **CONCLUSION** | 32 |

## MEMORANDUM IN SUPPORT

The Purchase and Sale Agreement ("PSA") executed by the parties was woefully incomplete, based on the four corners of that very document. Only one of the important ancillary agreements referenced and intended to be incorporated therein was actually signed. The rest remained subject of long and unsuccessful negotiation until the time for closing expired, again, by the PSA's own internal deadlines. Furthermore, conditions precedent to closing never occurred. Finally, key parts of the overall transaction—which was far more complicated than a mere real estate purchase—proved illegal. The Kacachoses are entitled to summary judgment pursuant to Fed. R. Civ. P. 56. The Court should grant judgment in their favor on the Kacachoses' Counterclaim for Declaratory Judgment. The Court should also dismiss Counts I, II, III, and IV of Amicus's Verified Amended Complaint.

## INTRODUCTION

### *About the Parties*

Defendants Tom and Heather Kacachos, husband and wife, operate a real estate portfolio (known as the Park Place Portfolio) located in Oxford Ohio. Most of the real estate holdings are comprised of houses, apartments, and mixed-use structures, serving a niche market of off-campus student rentals for Miami University students. The properties are titled in a number of Ohio limited liability companies and closely held corporations, and are operated under the consolidated management of Park Place Real Estate Management, Inc., also owned by Tom and Heather. Most of the properties are located in close proximity to Miami University.

Leases for the student rentals are on a per semester basis (paid in advance) and coincide with the University's academic calendar.[1] During summer, the properties are vacant for repairs,

---

[1] Thomas Kacachos Aff. at ¶ 14.

cleaning and sometimes refurbishing. The Oxford student rental market is competitive. Many rentals pre-lease one or sometimes two years in advance.

In addition to the student rentals, the Kacachos' own other properties suited for future development in and around Oxford, as well as commercial properties.

Plaintiff Amicus Miami of Ohio, LLC is a Delaware limited liability company with a business address of New York, New York. Primary principals as concern this matter in dispute are Rob Abelson and Austin Brooks. These gentlemen are involved with the investment and management of student rentals held by other companies operating nearby college campuses in other cities.

The Kacachoses as sellers and Amicus as buyer entered into the PSA whereby Amicus intended to acquire multiple properties listed at Schedule 2.1(A) identified by street address only. About 90 street addresses are listed, without regard to the title owner, legal descriptions, tax parcels, classification of permitted uses, zoning district, number of dwelling units, or number of permitted residents. In Oxford, Ohio student housing is heavily regulated by zoning ordinance, property maintenance code, and some properties are restricted according to covenants favoring the city which arose in consequence of land use litigation in years past.

### About the PSA

The PSA [DOC 22-1] is a three-way agreement between Tom and Heather Kacachos as seller parties, Amicus as buyer, and third-party escrow agent Fidelity National Title Insurance Company, joined to facilitate the eventual closing. The PSA is unlike a conventional real estate purchase agreement involving conveyance of parcels from the title owner(s) (meaning owners) to the buyer. Instead, the PSA called for conveyances from the seller to a new limited liability company called HoldCo with transfer of membership interest in that entity to Amicus. In this so-

called drop-down method, the buyer's objective is to avoid booking up valuation of real properties based upon conveyance as would occur upon conventional sale. The conveyance in exchange for value affects real property taxation. The questionable drop-down method receives abundant discussion *infra*. In addition to acquiring real properties via the drop-down method, the PSA involved the purchase of tangible personal property used in conjunction with the real properties and other "items used exclusively in connection with the operation of the Land and the improvements." PSA § 2.1(b) at p. 2. Other than the general description, the personal property was not specifically scheduled or inventoried. Intangible personal property owned by the seller parties was also included. PSA § 2.1(c) at p.4.

PSA Article 3 addressed the financial arrangement including purchase price, deposits, escrow provision, and the proration of taxes, contracts, utilities, income expenses, security deposits, rents during the month of closing, delinquent rents and other reconciliation required for closing to occur. Seller was responsible for deed stamps, and conveyance tax in connection with the conveyance, PSA § 3.13, with the seller responsible for the tax return, declaration of value,[2] or other documents under applicable law for recordation of a "Deed."[3] PSA § 8.2(p). The PSA is explicit with respect to what is needed for closing. PSA § 3.15 requires the escrow agent to prepare a "draft closing statement setting forth the prorations and adjustments to the purchase price (the "Closing Statement") at least five days prior to closing." In some instances, the PSA timetables were definitive, and yet in other instances somewhat tentative and unclear. See PSA § 8.2(a)

---

[2] The seller therefore has the risk of real property tax related compliance in conjunction with conveyancing (along with the risk of significant backside liability) if the transactions are not accurately accounted for and disclosed (as with reference to the drop-down method).

[3] Actually, multiple deeds for multiple title owners for multiple properties with multiple tax identification numbers (also referred to as permanent parcel number as used by the county auditor and engineer) would be required for title transfers.

regarding seller delivery of the deed at closing with the bold face notation, "**[NTD: This may need to occur a few days prior to closing.]**" [emphasis original].

Also required for closing under PSA § 8.2 were a series of other agreements (mostly scheduled) and referred to as (p) the Finder's Fee Agreement, (g) Construction Management Agreement, (h) Property Management Agreement, (i) Profits Interest Agreement, (w) Non-Competition Agreement. Critical to the instant dispute, only one agreement was in existence and directly incorporated into the PSA upon its execution; the others were merely identified and scheduled with the bold face notation, "**To be finalized prior to the expiration of the Inspection Period.**" These missing agreements, although not yet agreed upon, were nonetheless subject to the integration clause. PSA § 12.8, "including the Schedules and Exhibits."

The "Inspection Period" is addressed in PSA Article 5 and commenced upon the execution date of the PSA and lasted for (90) days, PSA § 5.1, with the buyer's right to extend for an additional (30) days, PSA § 5.4, which Amicus exercised. The Inspection Period provided for buyer due diligence including review of leases, rent rolls, and other financial records, and inspection and appraisal of the various real properties. PSA § 5.3. Buyer performance was contingent, PSA § 5.1 (to determine whether to proceed) during the inspection period, and the buyer's financing contingency ran during the inspection period. PSA § 5.4. On February 9, 2022, Amicus provided its Notice to Proceed.[4] During the Inspection Period, Amicus eventually circulated drafts of the various integrated agreements which were missing from the preliminary PSA. The following schedule shows the dates of transmittals from Peter Gelzinis, who along with Don Lussier, served as the transaction legal counsel for Amicus:

---

[4] Thomas Kacachos Aff. at ¶ 7 and Exhibit 3 thereto.

The table below lists the Ancillary Agreements, the PSA section referencing same, and the date Amicus first circulated each agreement:[5]

| Agreement | PSA Section Ref. | Circulation Date |
|---|---|---|
| Property Management – Schedule 4.4(c) | 4.4(e); 8.2(g) | with PSA |
| Non-Compete – Schedule 8.2(w) | 8.2(w) | 12/07/2021 |
| Construction Management – (Not scheduled/Not attached) | 4.4(d); 8.2(g) | 12/09/2021 |
| Finder's Fee – Schedule O | 4.4(a); 8.2(f) | 12/23/2021 |
| Profit Interest – Schedule Q | 4.4(f); 8.2(i) | 02/16/2022 |

The agreement of both seller and buyer to the scheduled ancillary agreements was required for closing to occur. PSA § 7.1 and 7.2 along with stated contingencies under PSA § 3.15, 8.2, 8.3.

Subject to the fulfillment of contingencies, closing (in escrow) was expected to occur within (30) days after the expiration of the Inspection Period. PSA § 8.1. PSA Article 8 implemented an elaborate closing protocol.

Not all terms of the lengthy PSA deserve close study, but one clause in particular involving a closing related contingency proved troublesome. PSA Article 4.1 addresses Seller Representations and Warranties. PSA § 4.1(f) contains a representation specifically disclaiming notice that the "current use, occupation or condition" of the Property violates a local ordinance pertaining to zoning land use, legal occupancy, and deed restrictions with the seller's further warranty, "The property, and the current use and occupation hereof does not violate any such

---

[5] These respective Ancillary Agreements were attached as Exhibits 2 through 6 of the Kacachoses' Answer and Counterclaim [DOC 22] to Plaintiff's First Amended Verified Complaint.

statute, or law, or ordinance, by law rule or regulation." Under PSA § 7.2(a) the seller representations and warranties must be true and correct as of the closing date.

The City of Oxford conducts routine inspections for zoning and property maintenance code compliance. The City issued violations affecting only a few sites.[6] The Kacachoses provided prompt notice to Amicus and the unexpected occurrence provoked a flurry of emails, text messages, phone calls, and demands.[7] The sellers engaged attorney Jack F. Grove to address the notices of violations which were disputed. First, appeals were launched with the Oxford Board of Appeals under the Property Maintenance Code, followed by litigation commenced in the case styled *Hoelzer/Hoelzer et al., v City of Oxford et al.,* pending in Butler County Court of Common Pleas CV 2022 04 0587. Amicus wanted to extend the closing by 90 days or to withhold $550,000 plus repair costs from closing proceeds and attributed the demand to Amicus' lender.[8] The sellers declined the request which coincided with numerous other conflicts about the PSA, compliance with terms of the PSA, and failure to agree to objectionable terms of the ancillary agreements which resulted in a prolonged impasse.[9]

The transaction involving the PSA and the integrated agreements did not close after the parties could not agree. Following several months of continued negotiation which left the parties still at an impasse, Amicus commenced suit.

---

[6] Thomas Kacachos Aff. at ¶20.
[7] Thomas Kacachos Aff. at ¶21.
[8] Thomas Kacachos Aff. at ¶¶ 22- 23, and Exhibit 8 thereto.
[9] Thomas Kacachos Aff at ¶ 23 and Exhibit 9 thereto.

*About the Dispute*

As the time for closing approached, the parties continued to disagree about the following:

1. Rent Proration - PSA § 3.8 called for apportionment of "full value shall be adjusted and prorated as of the closing date." PSA § 3.12 further provides that proration "shall be based on the number of days of ownership of the property in the period applicable to the apportionment. . . ." Income and expenses as of the closing date are with the buyer. But Amicus repudiated the express formula and attempted to claim a credit of another $300,000.00 which was impermissible.[10]

2. Yvette Wall, CPA acting  on behalf of Amicus, claimed <u>all</u> tangible personal property despite the limitation in PSA § 2.1(b). Only that property used "exclusively in connection with the operation" was included in the sale. So, the sellers retained property used to support their other retained operations.

3. There was disagreement over asset allocation which the sellers were required to report. Amicus wanted to claim an indefensible apportionment to good will and personal property to the tune of over $20 million dollars. Asset allocation was problematic in conjunction with the drop-down method. Sellers refused to be a part of an illegal tax cheating scheme.

4. Sellers did not agree to the belated ancillary agreements eventually circulated by Amicus. The proposed 5-year term of the Non-compete Agreement was excessive.[11] Because indirect competition was prohibited, the sellers would be precluded from the promotion and development of retained properties effectively extending the Non-Compete for 2 years given the market conditions associated with the rent cycle. The

---

[10] Thomas  Kacachos Aff. at ¶ 15, and Exhibit 5 thereto.
[11] Thomas  Kacachos Aff. at ¶¶  1; 31.

proposed Finder's Fee and Property Maintenance Agreements both violated Ohio Real Estate Brokerage Law., O.R.C. § 4735.01 (A)(6)-(7). The Construction Management Agreement was unacceptable due to one-sided terms. Lastly, the Profit Interest Unit Rent Agreement involving another entity, Amicus II Manager, LLC, though intended as a financial incentive proved altogether illusory. Amicus ignored the Kacachoses' request for supporting documentation.

5. The City of Oxford enforcement action introduced an unexpected conflict. Per PSA § 7.2(a) the non-existence of the enforcement action was a condition of closing such that the buyer had the ability to waive (but did not waive) or terminate the agreement (which did not occur). PSA § 7.2(i) at p.20. The parties did not bridge the dilemma.[12]

6. Attorney Jack F. Grove addressed the multi-faceted problems in correspondence to Don Lussier Esq., dated March 23, 2022, along with follow up correspondence and emails. Despite several months negotiation between counsel and the principals from both sides, no resolution was achieved.[13] The closing date came and went, because closing contingencies were not satisfied. The Affidavit of Tom Kacachos (with supporting Exhibits) provides a detailed summary and timeline concerning the impasse.

The PSA was, in essence, an agreement to further agree, not in and of itself a complete and enforceable agreement to sell the portfolio and enter into a 10-year business agreement in this dispute. Further, the PSA was no guarantee that the parties could ultimately reach a final meeting of the minds on the entire transaction. The parties disagreed over important details, such as approaches to proration of rents, completion of closing documents, an opt-out clause for Amicus,

---

[12] Thomas Kacachos Aff. at ¶¶ 20-22, and Exhibit 7 thereto.
[13] Thomas Kacachos Aff. at ¶ 27 and Exhibit 12 thereto.

allocations on conveyancing statements with major backside property tax implications, and a proposed non-compete agreement.

Amicus claims the Kacachoses delayed closing. But the record flatly contradicts this self-serving account. In fact, Amicus delayed the closing on multiple occasions, including February 16 to March 1, when Amicus advanced a self-serving and unsupported approach to prorating rents.[14] Amicus delayed again, March 3 to March 17, after learning of the City inspection matters.[15]

Following the parties' signing of the PSA on October 25, 2021, the Kacachoses promptly provided records Amicus needed to conduct due diligence, including leases/rent rolls, property contracts, tax bills, financials, and other personnel, insurance and operating information, much of which is of a confidential and proprietary nature.[16] As a merely illustrative example, when Amicus advised on March 17, 2022, that it wanted to close on March 24th, Tom Kacachos responded within hours, furnishing a spreadsheet of rents and deposits collected.[17] The Kacachoses were aligned in performing their duties under the PSA and demonstrated good faith compliance, while they were forced to await the various ancillary agreements upon which the PSA was expressly conditioned. By contrast, where Amicus now tells the Court it prodded the matter toward closing, it was Amicus that failed to deliver. The delay Amicus complains of stemmed from its own, self-inflicted wounds.

Amicus now seeks to force a sale of the portfolio regardless of the parties' persistent and material disagreements, and even though no final agreement was reached. Amicus blew past the closing date due to their own unwillingness and inability to close. Amicus effectively asks this Court to rewrite the PSA and to make a new deal for the parties, contrary to well-settled contract law.

---

[14] *See* T. Kacachos Aff. at ¶¶ 15-17; Ex.5 thereto; *see also* Amended Verified Complaint (Doc. 22), Ex. C
[15] Thomas Kacachos Aff. at ¶¶ 21-23, and Exhibits 7-9 thereto.
[16] *See* Thomas Kacachos Aff. at ¶ 5
[17] Thomas Kacachos Aff. at ¶ 24 and Exhibit 10 thereto.

The PSA was never intended to be "evergreen." To the contrary, it imposed date specific timelines during its execution phase, and performance of the parties was subject to compliance with the deadlines. For example, PSA Section 3.15 required the escrow agent to forward a closing statement setting forth prorations and adjustments to the purchase price at least five (5) days prior to closing. At no time did the escrow agent provide a closing statement compliant with Article 3 requirements.[18] In consequence of prolonged disagreements over terms of the ancillary agreements, the lack of a closing statement, disagreement over method of rent proration, and disagreement over asset allocation, as well as Amicus getting cold feet, *inter alia,* the transaction did not close on or before the closing deadline set forth in the PSA.

Contrary to Amicus's version, this is no simple real estate transaction where the Kacachoses changed their minds in mid-stream and wanted to sell the property to some phantom higher bidder instead.[19] Several key facts shine through:  *First, this was never a mere real estate deal*. Instead, the PSA worked toward a complex 10-year strategic business relationship, based on the dependent ancillary agreements. Mostly, these remained unsigned and still in negotiation, over matters ranging from duration to legality of the proposed arrangement under Ohio law. Accordingly, the parties never achieved the complete meeting of the minds required to conclude the overall transaction.  *Second,* though quick to accuse the Kacachoses of delay, *it was Amicus which declined to close twice*, first when it sought an additional $300,000 with its unsupported rent proration scheme, then again when alerted to the City of Oxford inspection issues.[20] As noted, Amicus also requested an unreasonable 90-day extension of time to close on March 15.[21] Then Amicus abruptly reversed course, indicating it would close after all, in a March 17 e-mail. **Within**

[18] Thomas Kacachos Aff.  at ¶ 26
[19] Thomas Kacachos Aff. at  ¶¶ 33; 35.
[20] T. Kacachos Aff. at at ¶¶ 15; 17.
[21] Thomas Kacachos Aff. at at ¶ 23.

*hours,* the Kacachoses forwarded a spreadsheet containing updated rent roll and deposit information.[22] But while Yvette Wall, Amicus's consulting CPA, indicated she would "review" and update [Amicus'] spreadsheets, instead, more radio silence followed. Amicus never followed up with a closing statement, or any additional closing documents. Amicus played a game of "red light/green light," which contributed to the core conflict. Finally, *the Kacachoses never refused to close.* They did insist on proper closing protocol, consistent with both industry standards for real estate transfers and consistent with the PSA's own language.

Finally, no shred of evidence suggests the Kacachoses have ever demanded a higher price, or shopped the property for sale to some third party, as Amicus' Verified Amended Complaint alleges. While Amicus has now moved for Judgment on the Pleadings, this Court should be alert to unsubstantiated claims in the Verified Complaint and Amended Verified Complaint. The evidence placed before the Court by Affidavit, in support of this Motion, supports the Kacachoses' thoroughgoing rebuttal to Amicus' allegations. Notwithstanding the Kacachoses' best efforts, the parties never achieved a meeting of the minds on all material terms of their complex, multi-layered transaction. Consequently, conditions precedent to closing were not satisfied.

## LEGAL STANDARD

Summary judgment may be rendered when the Court finds that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In weighing whether to grant such a motion, the Court must construe all evidence in the light most favorable to the non-moving party and draw all *reasonable* factual inferences in that party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[22] Thomas Kachachos Aff. at ¶ 24 and Exhibit 10 thereto.

If the evidence fails to "present sufficient disagreement to require submission to a jury," the Court should enter summary judgment as matter of law in favor of the moving party. *Anderson,* 477 U.S. at 251-52; *Valentine-Johnson v. Roche* 386 F.3d 800, 807 (6th Cir. 2004) (affirming dismissal of hostile work environment claim).

Once the moving party has met its burden of production, the non-moving party must show specific facts that reveal a genuine issue of material fact. *Celotex,* 477 U.S. at 324. A "material" fact is outcome determinative under governing law. *Anderson,* 477 U.S. at 249. A mere "scintilla of evidence" will not suffice. Instead, "there must be evidence on which the [finder of fact] could reasonably find for the [non-movant]." *Id.* at 252. Mere conclusory allegations are insufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp., 898 F.2d* 1155, 1162 (6th Cir. 1990). Summary judgment is appropriate "if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. The Court must credit evidence "[f]avorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51 (2000). Construction of a written instrument such as a contract or purported contract presents a question of law, which is a fit subject for summary judgment.

## LEGAL ARGUMENT

The Kacachoses filed a Counterclaim (Doc. 22), seeking a Declaratory Judgment addressing rights and duties under the PSA. Based on the Pleadings, attachments thereto, including the PSA itself, and the Affidavit of Thomas Kacachos, they are entitled to a Declaratory Judgment declaring that the PSA is incomplete, on its face, and therefore unenforceable. The PSA integrated five ancillary agreements, all key components of the overall intended transaction. Four were never

finalized, agreed or signed. This rendered the PSA incomplete, and precluded any final meeting of the minds on all material terms. The resulting agreement is hence unenforceable. Further, failures of conditions precedent meant the Kacachoses were not obliged to close. Key elements of the intended transaction proved illegal. Accordingly, the Court should enter judgment in the Kacachoses' favor on its Declaratory Judgment, Count II, and should dismiss Counts I-IV of Amicus' Verified Amended Complaint.

**A. <u>The Parties Never Reached a Meeting of the Minds on All Material Terms of the Planned Transaction.</u>**

In Amicus's incomplete presentation of the facts, this matter presents straightforward breach of a simple contract. In fact, the transaction was anything but simple. The overall transaction was hybrid, complex, involving important, integrated agreements, which Amicus claimed the Kacachoses could count on to furnish a substantial part of the overall consideration. Negotiation—often contentious—continued right up until the parties reached an impasse. That Amicus hastened to file this lawsuit, styling the matter as simple real estate transaction should not blind the Court to its overall complexity or the parties' continuing, material disputes. These disputes, and the protracted negotiations themselves, both underscore a critical point: the parties simply never reached a meeting of the minds as to all material terms of a complex transaction, involving not only a sale of a significant real estate portfolio, but also contemplating a strategic decade long business relationship. That business relationship was to be bounded by several ancillary agreements that were never finalized, let alone signed, upon which the closing depended per the PSA. Accordingly, the parties never reached a final, enforceable agreement.

Under Ohio law, the essential elements of a contract include an offer, acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and of consideration. *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770, N.E.2d 58, ¶ 16. A

meeting of the minds is an essential element of any enforceable contract. "Mutual assent or 'a "meeting of the minds'" means that both parties have reached an agreement on the contract's essential terms." *Nguyen v. Chen*, 12th Dist. Butler No. CA2013-10-191, 2014-Ohio-5188, 2014 WL 6612424, ¶ 43 (citation omitted). To prove the existence of a contract, written or oral, "a plaintiff must show that both parties consented to the terms of the contract, that there was a 'meeting of the minds' of both parties, and that the terms of the contract are definite and certain." *Episcopal Retirement Homes, Inc. v. Ohio Dep't of Indus. Rel.* (1991), 61 Ohio St.3d, 366, 369, 575 N.E.2d 134.

Ohio Chief Justice Moyer summed up the importance of having a meeting of the minds, and committing the parties' agreement to full, final and inclusive expression:

> A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they had actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.
>
> \* \* \*
>
> "Courts have often said that they do not make contracts for the parties, very often in cases in which they wash their hands of a difficult problem that is thrust upon them by reason of incompleteness or indefiniteness in the expression of some term in a written instrument by which the parties clearly intended to be bound."

*Rulli v. Fan,* 79 Ohio St.3d 374, 376, 683 N.E.2d 337 (1997)*.*

Despite months of negotiation, Amicus and the Kacachoses never achieved a meeting of the minds on numerous important matters. Some matters were never agreed to, while other key agreements remained unsigned. Tellingly, the omitted agreements, including all but one of the

ancillary agreements, were never even attached to Amicus' original or Amended Verified Complaints. The most important abiding disagreements concerned: (a) the proper method of pro-rating rent; (b) the allocation of the net sales price to realty and personal property and goodwill, for conveyancing purposes; (c) the duration of a non-competition agreement; (d) the terms of the Construction Management, Non-Competition, and Profits Interest agreements; (e) the legality of both a proposed Acquisition Fee Agreement and Property Management Agreement; and (f) the lack of a closing statement and transparent closing documents. The Court should take note that neither Amicus's original Complaint and Amended Complaint, nor any of the exhibits attached thereto, reflect final, signed agreements resolving these disputes.

Proration of rents is a vital term of a contract to sell even one rent producing parcel. Here, the vast bulk of the $75 million portfolio Amicus sought to buy were rent producing properties. The actual leases were for 9 month/272 day terms, aligned with Miami University's academic year. Amicus should have been credited 28% of the lease proceeds.[23] The vast majority of the rental units served Miami University students, as reflected in Amicus's choice of a name for its LLC. Had a closing occurred March 1, 2022, 196 days of the leases in force at time of transfer should have been credited to the sellers, or 72% of the proceeds. Inexplicably, Amicus proposed a proration scheme that would have given it a $300,000 windfall at the sellers' expense.[24] While the Kacachoses stood on firm ground in calculating the correct method of rent proration, Amicus could muster no legally persuasive reasoning for their approach, which was contrary to the PSA. Amicus blamed its mortgage lender for supposedly demanding this approach to proration. This was not a minor detail. Considerable money—was at stake. Nor was it a minor point of disagreement.

---

[23] T. Kacachis Aff. at ¶ 14 and Exhibit 5 thereto.
[24] T. Kacachos Aff. ¶ 15 and Exhibit 5 thereto.

Amicus's actions smacked of a bad faith money grab; a unilateral reduction of the purchase price recited in the PSA.

But the most salient fact here is, the parties disagreed, and this dispute proved but one of many. Many of these material disputes remained unresolved as PSA deadlines expired on March 25, 2022.

The parties disagreed over both the amount of the sales price to be allocated to non-realty, mainly purported "goodwill," as well as the legitimacy and post-transfer tax consequences of using a drop-down method of transfer. The allocation issue was a material detail, and the legitimacy of the "drop down transfer" method went to the very heart of the PSA. These were major, material disputes, which remained unresolved, precluding a meeting of the minds on the overall transaction.

Amicus never provided a realty-non-realty allocation summary until May 2, 2022, further proving that numerous items were not agreed to. The parties also disagreed, and never bridged their disagreement, over allocation of the sales price to realty and personal property and goodwill, for conveyancing purposes. Amicus insisted on assigning an astonishing $21.45 million to goodwill and non-real estate assets—this in a portfolio overwhelmingly made up of rental properties—in a transparent effort to minimize its future property taxes.[25]

By contrast, the Kacachoses assigned $75 million to realty, a value much more reflective of the real estate portfolio's actual makeup.[26] This was no trivial dispute, and the Kacachoses held the legal and factual high ground. Amicus failed to provide legally or factually compelling grounds for their proposed allocation.

On March 23, the Kacachoses pointed out problems going to the very way the proposed real estate transfer was structured in the PSA. Their personal transactional counsel Jack Grove

---

[25] T. Kacachos Aff. at ¶ 31. and Exhibit 16 thereto.
[26] T. Kacachos Aff. at ¶ 31.

pointed out, in a letter to Amicus's transactional counsel Donald Lussier, that the drop-down method had drawn sharp criticism from Ohio courts, and was highly likely to create backside liability for the Kacachoses.[27] It is well-known that Ohio features a high volume of property tax challenges, often fueled by local school boards who stand to benefit from property taxes. It is beyond comprehension that the sale of a portfolio of this magnitude, with so many tax parcels, with conveyancing statements to be filed of record, would escape the scrutiny of taxing authorities and school boards, and the attorneys who represent them. Here again, this disagreement was anything but trivial, and the Kacachoses acted in good faith.

**B.**  **The PSA Amounted to an "Agreement to Further Agree," Upon Which Material Terms Remained Unresolved Despite Lengthy Negotiation.**

What should the Court conclude then, where a preliminary agreement was unquestionably signed, but just as clearly, incomplete based on the fact that critical integrated agreements were never agreed upon and finalized? The PSA, notwithstanding its title, amounts to an "agreement to further agree." As such, it obliged the parties to engage in good faith negotiation—which is a two-way street. And it is not breached or converted into an enforceable agreement providing a piecemeal legal shortcut when the parties prove unable to agree to the entirety of the agreements comprising the overall transaction.

Contractual intent of the parties and certainty as to essential terms are both prerequisites of a binding contract. *Rice v. Wheeling Dollar Savings and Trust* (1951), 155 Ohio St. 391, *Cf. Normandy Place Assoc. v. Beyer* (1982), 2 Ohio St.3d 102, 1 Restatement of the Law 2d, Contracts (1981) 92, Section 33. Where an agreement contemplates further action toward formalization or if an obligation to become binding rests on a future agreement to be reached by the parties, so that

---

[27] J. Grove to D. Lussier, letter of March 23, 2022 (attached as Ex. 8 to Kacachoses' Answer and Counterclaim to Plaintiff's First Amended Complaint (ECF Doc. 23-8).

either party may refuse to agree, *there is no contract*, *there is no binding contract*. *Schlagel v. Howell,* 22 N.E.2d 771, 780-81, 2015-Ohio-4296 at ¶ 25 (Ohio Ct. App. 2d Dist. 2015) (emphasis added). *General Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669 (1952).

In *Schlaegel*, the court determined a proposed joint venture agreement contemplated further action. And much like the instant case, for months, those parties tried to reach final agreement on terms. Because they were unsuccessful, no joint-venture contract ever arose. The *Schlaegel* court concluded, to be specifically enforced, Schlaegel and Howell must have "manifested an intention to be bound" by the terms of their agreement to agree and their intentions must be "sufficiently definite[.]" *Id.*

As the Pennsylvania Supreme Court observed in a case involving an "agreement to agree," "It is not unusual for persons to negotiate with the view of entering into contractual relations and to reach an accord *at once* as to certain major items of the proposed contract and then later find on other details they cannot agree. *In such a case no contract results.*" *Upsal Street Realty Co. v. Rubin,* 326 Pa. 327, 192 A.2d 481, 483.

A leading contracts treatise observed,

> In the process of negotiation a party may use words that standing alone would normally be understood to be words of 'contract,' at the same time limiting them in such a way as to say that a subsequent expression of assent on his part is required. In such case the expression is neither an operative offer nor an operative acceptance; it is a preliminary negotiation. Thus, a written proposal stating many terms" [such as the PSA in the instant case] may be "made 'subject to agreement on another specified matter; or it may be said: 'I reserve final determination for tomorrow.' Words such as these will in nearly all cases show that an operative assent has not satisfactorily been given.

1 Corbin on Contracts, section 22, p. 54.

The PSA ultimately amounted to such an "agreement to further agree." At most, it obliged the parties to good faith negotiation, which, at least on the Kacachoses' part, continued over many

months after the PSA was executed. Indeed, Amicus ended the negotiations by filing this lawsuit. While some courts have held that an agreement to agree requires further good faith negotiation, it is equally clear that even where, as here, the sellers negotiated in the utmost good faith, they may still hit an impasse. Good faith nowhere requires abandonment of one's own reasonable self-interest and reasonable business and financial objectives, nor does it require a seller to accede to a buyer's wishes—even a buyer's stringently expressed wishes—when doing so is highly likely to create legal repercussions and potential risk of liability for the seller.

> "Parties may enter into a binding contract under which the obligations of the parties are conditioned on the negotiation of future agreements. In such a case, the parties are obliged to negotiate in good faith. But that obligation can come to an end without a breach by either party. There is such a thing as a good faith impasse; not every good faith negotiation bears fruit."

*IDT Corp. v. Tyco Group*, 23 NY3d 497, 502-503 (2014).

With key ancillary agreements unfinalized, the parties negotiated, but disagreed about many important matters. From the Kacachoses' side, these disagreements and negotiations were conducted in good faith. Meanwhile, in stark contrast to Amicus's claims that the Kacachoses became uncooperative, or in their phrase, began "slow walking" the transaction, Amicus actually pulled back sharply from attempts to close several times. The Kacachoses timely provided due diligence materials. It was the essence of good faith on their part to alert Amicus to illegalities in the PSA and the offensive proposed brokerage agreements. Both would invite regulatory oversight and enforcement actions and all that such entails.

The sheer scope and complexity of the transaction weighs against a finding that the PSA covered everything required to close. This was not a purchase of a vacant lot or two. Instead, this transaction would have sold substantially all of the productive assets of companies in which the Kacachoses were the principals. If carried forward to the scope contemplated by the PSA itself, it

would have severely restricted the Kacachoses' ability to generate future income in the same field, in their home town. In sum, it was a large undertaking, with many moving parts. Despite months of good faith negotiation, the parties remained far apart on material terms.

In turn, some of those thorny, unresolved issues concerned not mere secondary details, but questions regarding whether the very consideration supposed to seal the bargain was real or illusory. According to the PSA, the parties anticipated the finalized ancillary agreements would furnish part of the consideration that Amicus intended to pay for the real estate portfolio. When the Kacachoses did due diligence on those agreements, they reasonably concluded that the consideration in the Profits Interest Agreement was illusory. When the Kacachoses requested a business plan, pro forma and other due diligence materials to evaluate the proposed arrangement, the request was ignored. The profit shares agreement was nothing more than a hollow inducement.

## C. There Can Be No "Anticipatory Repudiation" In the Absence of an Enforceable Contract.

Amicus' anticipatory repudiation claim, Count II of its Amended Complaint, fails in the absence of an enforceable contract. An anticipatory breach of a contract occurs where the promisor repudiates their contractual duty before the time fixed for performance has arrived. *McDonald v. Bedford Datsun*, 59 Ohio App.3d 38, 40, 570 N.E.2d 299 (Ohio Ct. App. 1989).

Amicus' claim fails, based on both the facts before the Court and the applicable law. First, no facts, buttressed by documents attached to pleadings, or other written communications between the parties indicates any factual support for Amicus' self-serving and false narrative that the Kacachoses unreasonably delayed closing, or that the Kacachoses for that matter were ever the party prone to delay here.[28] Instead, Amicus repeatedly sought delays—first asking for an extension of time to close, then recoiling sharply over routine regulatory actions affecting a scant

---

[28] *See, e.g.,* T. Kacachos' Aff at ¶¶ 5-6; 10, 14, 24; Exhibits 2; 4; 10.

number of units and beds.[29] The Kacachoses never refused to close. They did insist that conditions precedent to closing occur, and they declined to send deeds to an out of state closing agent without a proper closing statement and with other conditions precedent unmet.

Furthermore, anticipatory repudiation cannot occur without an enforceable contract. *Id.* As explained in detail, elsewhere in this briefing, the PSA remained incomplete, with glaring, material omissions. The PSA was not a final (stand-alone) contract; it remained to be "finalized." As such, it reflected no meeting of the minds, yielded no enforceable contract, and as such could not be the proper subject of an anticipatory repudiation claim. The Court should dismiss Count II of Amicus' Amended Verified Complaint.

**D. <u>Conditions Precedent to Closing Remained Unsatisfied.</u>**

Even if a meeting of the minds occurred sufficiently to create an enforceable contract, which is effectively refuted by the Rule 56 evidence presented here, failure of conditions precedent would still bar enforcement by specific performance or otherwise.

A condition precedent is "an act or event" that must take place before a party's performance obligations arise. *WSB Rehabilitation Serv. Inc. v. Cent. Acctg. Systems, Inc.,* 2022-Ohio-2160, at ¶ 26-27 (Ohio Ct. App. 1st Dist. 2022). An unsatisfied condition precedent can excuse performance under a contract and furnishes a defense to a claim for breach. *Id.* at 26, 34; *Telxon Corp. v. Smart Media of Del., Inc.,* 2005-Ohio-4931, at ¶ 53 (9 Dist.). It is significant that Amicus never tendered performance on its part.

Here, several conditions specified by the PSA for closing failed to occur. These included a "closing statement" so deficient that it was functionally non-existent---lacking calculations of rent prorations, recording costs, conveyance fees, transfer fees charged on a per parcel basis, among

---

[29] T. Kacachos Aff. at ¶ 20-22, Exhibits 7-9.

other omissions.[30] Further, the PSA expressly referenced and integrated the ancillary agreements, four of which were never accepted by the sellers. These were required to be signed for closing to occur. These failed conditions are stubborn, irrefutable facts.

While a condition precedent can be waived, no waiver occurred on the facts presented here. Waiver of a known right must be proven by clear and convincing evidence. *Id.* at ¶¶ 27-28. Here, there is no shred of evidence that the Kacachoses waived any conditions stated in the PSA.

**E. The Ohio Supreme Court Has Discredited the Drop-Down Method of Allocation as a Basis for Valuing a Real Estate Transfer.**

If enforced, the PSA itself and two Ancillary Agreements would violate Ohio law. It is a basic principle of contract law that a court 'may refuse to enforce a contract on grounds of illegality where the contract has a direct objective or purpose that violates the federal or a state Constitution, a statute, an ordinance, or the common law." *PolyOne Corporation v. Westlake Vinyls, Inc.*, 937 F.3d 692, 701 (6th Cir. 2019).

The PSA would transfer ownership of real estate through the convoluted drop-down method. This is not a minor issue. A drop-down or "drop-and-swap" transfer lies at the heart of the PSA. The Ohio Supreme Court has treated the drop-down method as a real estate tax evasion scheme. Accordingly, under the approach set forth in the Restatement, Second, of Contracts, as discussed by the Sixth Circuit Court of Appeals, the drop-down allocation method appears illegal and unenforceable. *Associated Press v. Taft-Ingalls Corp.,* 340 F.2d 753, 759 (6th Cir. 1965) (quoting Restatement Contracts § 598).

To explain, in *Columbus City Schools Bd. Of Edn. V. Franklin Co. Bd. Of Revision,* 159 Ohio St. 3d 283, 2020-Ohio-353, 150 N.E.3d 877, the Ohio Supreme Court discarded the contrived structure of a drop-down transaction, concluding the sale price paid for the transfer of the drop-

---

[30] *See* T. Kacachos Aff. at ¶ 26.

down entity's ownership constituted the tax value of real estate owned by that limited liability entity. *Id.*

*Columbus City Schools* arose from a case involving a drop-down transaction mirroring the instant case. A local school board noted large scale "no value" real estate transfers tied to significant mortgage financing instruments being recorded, with no corresponding high dollar real estate transfers being recorded. Much as Amicus proposed doing here, the seller in *Columbus City Schools* organized a limited liability company ("LLC"), transferred the real estate assets into it, then the seller sold and the purchaser bought all the membership interests in the LLC. The transfer involved a 264-unit apartment complex, previously valued at $16,000,000. The sale agreement for the drop and swap reflected a price of $35,000,000. As the reviewing court noted, "By structuring the transaction as a transfer of ownership of an L.L.C. rather than as a conveyance of real estate, the parties incurred no obligation to pay a conveyance fee or file a conveyance fee statement in connection with the transfer [internal citations omitted]." *Columbus City Schools*, 159 Ohio St.3d at 294, 2020-Ohio-353 at ¶ 43.

The BTA and the Ohio Supreme Court noted that a mortgage instrument recorded contemporaneously with the drop-down transfer evidenced a secured loan of over $25.5 million. Incidentally, the "large scale" transfer that caught the eye of Board of Education counsel in *Columbus City Schools* was *less than half the monetary value of the transaction contemplated here*. As in the instant case, the assets in dispute were rent-producing real property. "On the record before us, the real estate at issue generates rent income . . . No other income is derived from the use of the property that would relate to any business value other than the value of the real estate itself." 159 Ohio St.3d at 293, 2020-Ohio-353 at ¶ 42. The Ohio Supreme Court held the BTA reasonably concluded the "drop and swap" contract was a "contrivance or accomplishing the sale

of commercial real estate." 159 Ohio St.3d at 293, 2020-Ohio-353 at ¶ 39. One could easily envision a reviewing court concluding Amicus's proposed allocation of over $20 million to "good will" would likewise not withstand judicial scrutiny in a tax challenge.

As the Kacachoses' personal counsel Jack Grove pointed out in his letter to Amicus's attorney Donald Lussier, the drop-down method of allocation could constitute a fraudulent transfer pursuant to Ohio Rev. Code § 319.21. That section states:

> If a transfer of real estate is fraudulently or improperly obtained, or the just proportion of valuation is not transferred with the part of a lot or tract transferred, the county auditor may cancel such transfer and, if necessary, he shall return the proper valuation.

Ohio Rev. Code § 319.21.

The drop and swap method was the biggest legal problem, but not the only one. As noted in Jack Grove's letter of March 23, both the brokerage agreement and the finder's fee agreement violated Ohio statutory law, *viz,* O.R.C. § 4735.01 (A)(6)-(7). Amicus' legal counsel received but never rebutted this forthright warning.[31]

### F. The Kacachoses Did Not Breach Any Covenant of Good Faith and Fair Dealing By Failing to Agree to Amicus's One-Sided Terms.

Amicus's Count II alleges the Kacachoses breached some covenant of good faith and fair dealing, based on application of Ohio law.[32] This Court has addressed the very issue, concluding that there is no separate, standalone action for a breach of the duty of good faith: "The implied duty may give rise to a *breach of contract* claim when the term allegedly breached is the implied duty of good faith and fair dealing." *Eggert Agency, Inc. v. NA Mgmt. Corp.*, No. C2-07-1011, 2008 WL 3474148, at *4 (S.D. Ohio Aug. 12, 2008). However, "[t]here can be no implied

---

[31] *See* Jack Grove letter to Donald Lussier, of March 23,2022, attached as Ex. 12 to T. Kacachos Aff.

[32] The Kacachoses agree Ohio law should apply, but based on choice of law principles, not because the PSA was complete and its forum choice clause governs.

covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself." *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co.,* 86 Ohio St.3d 270, 274, 714 N.E.2d 898 (1999) (citing *Kachelmacher v. Laird,* 92 Ohio St 324, 110 N.E. 933 (1915), paragraph one of the syllabus). This is especially true, where, as here, the agreement Amicus sued upon has an integration clause, as set forth in §12.8 of the PSA. *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-908, 2006-Ohio-638, ¶¶ 99–101, 2006 WL 328679; *Gilchrist v. Saxon Mtge. Servs.*, 10th Dist. No. 12AP-556, 2013-Ohio-949, ¶ 24, 2013 WL 1091112.

Ultimately, a claim for breach of good faith and fair dealing arising from a purported contract cannot stand unless (a) there is a valid and enforceable contract, and (b) some term of that contract was materially breached. Finally, "a party to a contract does not breach the implied duty of good faith and fair dealing by seeking to enforce the agreement as written or by acting in accordance with its express terms, nor can there be a breach of the implied duty unless a specific obligation imposed by the contract is not met." *Lucarell v. Nationwide Mut. Ins. Co.,* 152 Ohio St.3d 453, 2018-Ohio-15, at ¶ 5. Here, as set forth above, the PSA never ripened into a fully integrated and agreed enforceable contract, because all of the agreements were never finalized.

Accordingly, Amicus's claims pled in Count III of its Amended Verified Complaint fail, in tandem with its contract claims, should be dismissed as a matter of law. Nevertheless, as an aid in addressing the contract claims, the Kacachoses examine the duty to negotiate in good faith.

As a leading contract treatise summed up the limits of good faith negotiation:

> Even courts that recognize a duty to negotiate in good faith recoil at the notion that the duty mandates a duty to enter into a final agreement on the parties' ultimate contractual objective. The obligation of good faith "does not guarantee that the final contract will be concluded if both parties comport with their obligation, because good faith differences in the negotiation of the open issues may prevent the parties from reaching a final contract. It is also possible that the parties will lose interest due to changed circumstances and will mutually abandon the negotiation.

Timothy Murray, *Corbin on Contracts,* V.I, Section 2.8 at 170 (Rev. Ed. 2018) (quoting *Burbach Broad Co. v. Elkins Radio Corp.,* 278 F.3d 401, 407 (4th Cir. 2002).

A more recent federal district court decision further noted that good faith does not require abandonment of self interest: "Nor is there anything preventing a party from acting in accordance with its own financial interests in response to legitimate market changes, as long as the party is not using those interests as a pretext for undermining the deal or exploiting the other party's sunken costs." *Id.,* quoting *Butler v. Balolia,* 2017 U.S. Dist. LEXIS 84662, 8 41-42 n.7 (D. Mass. 2017).

A failed negotiation does not point to bad faith, even where parties guard their own self-interest. Amicus defines "bad faith" as the Kacachoses not yielding to their demands. But it was not "bad faith" to decline Amicus's invitation to cut the purchase price by $300,000 through an unsupportable proration scheme. Nor was it bad faith to point out that the unsigned ancillary agreements would pose unreasonable constraints on the Kacachoses, post-closing, in the case of the proposed non-compete and construction management agreements. Still less was any bad faith reflected in pointing out that the drop-down method of conveyance had drawn sharp scrutiny from the courts and the property tax bar. And it was not bad faith for the Kacachoses to insist that allocation of the realty to non-realty assets for conveyancing purposes more accurately track what was being transferred. Amicus's bad faith claims collide fatally with the facts, along with well-settled Ohio law. The Court should dismiss Amicus' Count III, with prejudice.

### G. **Amicus Cannot Establish Reasonable Detrimental Reliance for Purposes of Promissory Estoppel.**

Amicus' Count IV pled promissory estoppel. "Promissory estoppel is a quasi-contractual concept where a court in equity seeks to prevent injustice by effectively creating a contract where none existed." *Telxon Corp. v. Smart Media of Del., Inc.,* 2005-Ohio-4931 at ¶¶ 58-59. Promissory

estoppel "aids the enforcement of promises by supplying the element of consideration when necessary to prevent injustice." *Uebelacker v. Cincom Sys., Inc.* (1988), 48 Ohio App.3d 268, 273, 549 N.E.2d 1210. Promissory estoppel is an equitable doctrine, subject to equitable defenses, including unclean hands and laches. *Telxon,* 2005-Ohio-4931, at ¶ 58.

The required elements of promissory estoppel include (1) a clear and unambiguous promise (2) *upon which it would be reasonable and foreseeable to rely*, and (3) actual reliance on the promise (4) to the detriment of the one who relied. *Id.* A court may deem certain circumstances objectively unreasonable, as when it finds that "reasonable minds could come to but one conclusion." *Id.* Reasonableness and foreseeability as well as detriment are objective factors, subject to court determination. *Id.*

Amicus obviously pled promissory estoppel in the alternative, since such a claim is predicated on the non-existence of any contract, oral or written. The fatal flaw in this theory is Amicus' lack of reasonable detrimental reliance, viewed objectively. Amicus presented, principally drafted and circulated the PSA, which envisioned a complex transaction, as noted, much more than a simple property transfer. The five ancillary agreements constituted integral parts of the overall transaction. And these proved to be problematic, and subject to continued negotiation, that ultimately failed to yield a meeting of the minds. Here, it would not be reasonable for Amicus to "detrimentally rely" on a promise to transfer property, where by the very terms of the parties' expression of their "agreement to agree," the PSA, that promise was interdependent on the ancillary agreements, all but one of which were never signed.[33] *See Telxon Corp.,* 2005-Ohio-4931, at ¶¶ 59; 61.

---

[33] Moreover, the one that *was signed* proved illegal under Ohio law.

Amicus could not reasonably separate the proposed land transfer from the other parts of the overall, decade long strategic business relationship contemplated by the PSA. Furthermore, in the parties' negotiations, as late as May 2, 2022, Amicus continued to insist on not only the noncompete agreement, but *all the ancillary agreements*.[34] But these remained in flux, and had never been "promised" so as to establish promissory estoppel. Hence, Amicus never signaled that it would accept a simple land transfer without, for instance, the non-compete agreement, which remained in dispute and subject to ultimately fruitless negotiations until the end. From an objective viewpoint, Amicus cannot be said to have detrimentally relied on any promise to transfer property when that transfer was subsumed in and dependent upon creating other agreements which were never finalized. Amicus' Count IV, accordingly, fails as a matter of law and should be dismissed.

## **CONCLUSION**

The parties' executed PSA was incomplete. The PSA unquestionably incorporated five ancillary agreements. Of these, only one was circulated and signed with the PSA. All the others sparked on-going negotiations, which failed to achieve a meeting of the minds. They were not finalized. The Kacachoses did not act in bad faith by declining to accede to these agreements as Amicus finally presented them. Two of the Ancillary Agreements (Finder's Fee and Property Management) violated Ohio brokerage law. Others involved typically contentious issues contained in a non-compete agreement, which sharply circumscribes one's future in business. Still others turned out to dangle illusory consideration, of dubious real value.

In the end, the PSA functioned as an "agreement to agree." It can scarcely be painted otherwise when it was incomplete, failing to include executed, or, for that matter, executable copies of four vital ancillary agreements when it was signed. The four corners of the PSA insisted those

---

[34] Thomas Kacachos Aff. at ¶ 31.

agreements were part of the entire transaction, to be finalized under a definitive timeline, *i.e.,* the Inspection Period, followed by closing within thirty days. Amicus would have the Court overstep judicial authority by making a contract the parties themselves proved unable to negotiate over many months.

The two brokerage agreements violated Ohio statutory law. The method of transfer at the heart of the PSA had been discredited by an Ohio Supreme Court decision, which looked past the formal structure of a drop-down transaction virtually identical to the instant case. The Kacachoses acted in utmost good faith by alerting Amicus to the legal perils of a drop-down transfer; they refused to be complicit in an illegal tax cheating scheme.

For all the foregoing reasons, the PSA was incomplete and unenforceable. Key parts violated Ohio statutory law and/or public policy. The Court should grant summary judgment, pursuant to Fed. R. Civ. P. 56, in favor of the Kacachoses, on their Declaratory Judgment claim. The Court should also dismiss with prejudice Counts I-IV of Amicus's Amended Complaint.

Respectfully submitted,

*/s/ Edward P. Akin*
Edward P. Akin  0074357
Aronoff, Rosen & Hunt
2200 U.S. Bank Tower
425 Walnut Street
Cincinnati, OH 45202
(513) 241-0400
(513) 241-2877 (fax)
epakin@arh-law.com
*Trial Attorney for Defendants*

CERTIFICATE OF SERVICE

I certify this document was filed electronically on December 9, 2022, and served through the Court's ECF System on Aneca E. Lasley, aneca.lasley@icemiller.com.

*/s/ Edward P. Akin*
Edward P. Akin