IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **AMICUS MIAMI OF OHIO, LLC** | : | Case No. 1:22-cv-00355 |
| **Plaintiff** | | Judge McFarland |
| | : | Magistrate Litkovitz |
| vs. | | |
| **HEATHER HOELZER KACACHOS, *ET AL*.** | : | |
| **Defendants** | | |

## AFFIDAVIT OF THOMAS KACACHOS

STATE OF OHIO, COUNTY OF BUTLER: ss

Now comes Thomas Kacachos, being first duly cautioned and sworn, and states:

1. I am Thomas Kacachos. I am over 21 years of age, of sound mind and aware of my duty to attest truthfully, based on my own personal knowledge. I am the Vice President of Park Place Real Estate Management, Inc. Heather Kacachos is my wife and business partner. We have each spent over 20 years building our company.

2. On October 25, 2021, I signed a partially completed PSA, which was a draft document of a ten-year business relationship and property sale. At the time of signing we were not provided with ancillary agreements (non-competition, construction management, profits interest, and finder's fee agreement). A ten-year property management agreement was signed. We did not have a clear understanding at the time we signed the PSA about what Amicus intended for the specific terms of the ancillary agreements. I had requested more information on multiple occasions. See Exhibit 1. Rob Abelson and Austin Brooks had told us that

the valuation of the ancillary agreements (including free property management for ten years) would help get us from the sales price of $75 million to $80 million (original ask) for the transaction as a whole. Rob Abelson said in a text on October 20, 2021 that the Profits interest alone could be worth $20 per share ($2 million dollars). See Exhibit 1.

3. Rob Abelson and Austin Brooks originally discussed a December 15, 2021 closing, stressing the benefits of closing before capital gains rates increase and confident they could achieve this closing date based upon their experience in the student rental industry involving other acquisitions.

4. Amicus failed to meet the December 15 anticipated closing date, as well as January 15, 2022 closing date, through no fault of ours.

5. On January 13 and 18, 2022 Yvette Wall emailed me asking for security deposit figures. I provided answers on January 19 (a draft number of $975,000) and January 24 (a final number around $980,423 which I couldn't provide on the 19th because a key employee was out sick). See Exhibit 2. Amicus falsely claimed in their complaint that I did not reply until February 16. It is an example of Amicus using an entire exhibit (Exhibit G of Amicus Amended Verified Complaint) to make statements that are not true.

6. On January 21, 2022, Amicus executed a financing extension of the inspection period, which further delayed any closing. On January 31, 2022, I received a buyer's objection letter from Amicus, further delaying any closing. See Exhibit 3.

7. On February 4, 2022, my real estate counsel, Rob Bolin, timely responded to the buyer's objection letter. On February 9, 2022 Amicus sent a notice to proceed, which I understood to mean that Amicus had completed its due diligence, financing was

confirmed, and they were now finally ready to begin the closing process. See Exhibit 3.

8. Rob Abelson and Austin Brooks did not respond to my February 9 and March 2 emails (see Exhibit 4) that raised concerns about the construction management agreement. For example, I pointed out concerns regarding Section 8 Non-Solicitation and received no reply. I had told them during a phone call around January 19 that I had reservations about providing them the level of commitment they required. They said I could put in as much time as I wanted. Their verbal comments differed significantly from the construction management draft that was provided on December 9, 2021. I had concerns about the inconsistencies and did not approve the agreement.

9. It was a challenge to get timely and detailed information from Amicus on the Profits Interest Agreement, which was not received until February 16, 2022. This was received after Amicus' attorney had sent their notice to proceed. Additional financial information requested by our attorney, Jack Grove, in March and was never received.

10. In my February 9, 2022 email (See Exhibit 4) I took the initiative to itemize 19 items of concern in an effort to ensure that a closing could happen. Amicus made no comparable effort. I brought up important, unresolved issues such as the construction management agreement, non-compete agreement, profit shares agreement, and the closing statement. Amicus failed to answer or add significant input. Rob Abelson and Austin Brooks never replied even after being prompted by Yvette Wall in her short response (Exhibit 4).

11. This email was followed up by a phone call with Rob Abelson, Austin Brooks, and Yvette Wall. Yvette Wall stated that they (Amicus) would be getting two trucks from us. I told her the trucks were not part of the deal. Yvette said the ownership of the trucks, equipment, and supplies should all go to Amicus. I explained that some items are part of our warehouse building and contracting business which were not being sold to Amicus. Amicus didn't really reply as to whether they agreed or disagreed. I began working on an excluded items list, but then on February 17 Amicus attempted to lower the price by $300,000 so everything else was put on hold as we had to deal with this new and unexpected roadblock. These items were never agreed to.

12. On February 10, 2022, Rob Bolin (our attorney) emailed Abelson, Brooks, Adam Schwartz, Amicus' attorneys, Heather, and me to advise that real estate taxes due February 28 had been paid. Bolin requested the closing statement to reflect an accurate real estate tax proration. Amicus' attorneys never replied and property tax prorations were never provided.

13. On February 16, 2022 I finally received the first draft of the profit's interest agreement, and related documents on February 18. This was not timely per the PSA.

14. On February 16, 2022, I sent Amicus the rent prorations computed accurately and according to the PSA (subject to all contingencies) based on a March 1, 2022 anticipated closing. Park Place leases, which were provided to Amicus, had a lease starting date of August 18, 2021 and a lease ending date of May 16, 2022 (see Exhibit 5) for a total duration of 272 actual days. Leases for student rentals are based upon the Miami University school year and payments are made on a semesterly basis (paid in advance). During the summer the properties are vacant for repairs, painting,

cleaning, and sometimes renovation. On the basis of a March 1st closing date we were entitled to 196 days (72%) and Amicus was entitled to 76 days (28%). Amicus was entitled to receive on a March 1st closing $1,518,146. We were anticipating a draft closing statement and documents to review from the escrow agent. The closing statement was due at least 5 days prior to closing per the PSA.

15. On February 17, 2022, to our disbelief, Yvette Wall from Amicus sent an email and a spreadsheet (see Exhibit 5) that incorrectly increased Amicus' prorated rent by nearly $300,000. Yvette wrote, "I have attached my calculation of the rent credit which varies slightly from yours. I have separated revenue cycle…and thus adjusts the percentage allocation. One item of significance to note is Amicus will also bear the full cost of Move In/Move Out for the 21-22 academic year in which you have captured the majority of income." Amicus tried to increase their proration percentage from 28% to 33.52% for a total rent of $1,817,247. Per the PSA (and common practice) rents are prorated based upon the duration of the lease and the amount of actual time each entity owns the property. It was a back door move by Amicus to lower the price by $300,000, which was unacceptable.

16. On February 18, 2022 I emailed (see Exhibit 5) Amicus "We need to use the leases to determine the pro-rated rent otherwise the analysis can become arbitrary…" Austin Brooks replied "…Unfortunately, doing this based upon the physical occupancy puts us in a bind whereby we would blow our monthly and quarterly loan covenants with our bank almost immediately after closing the deal. In your scenario, we would be held responsible for RE taxes, move-out expenses, etc. with no income…we have to…otherwise our lender will not close the deal. We are trying to be fair here and are working in good faith…we are also happy to jump on a call to discuss this more…we

5

want to get this deal done and are doing the best we can with our financing partners." I'm not sure why Austin describes getting $1.5 million in prorated rents as "no income". According to the PSA, after the notice to proceed the financing contingency was satisfied and the closing was not conditioned upon financier's control. Amicus' rent proration scheme would have given them a rent credit of $1,817,247, an increase of $300,000 in Amicus' favor. Despite this we provided them the opportunity to make up the $300,000. See Exhibit 6. Austin Brooks texted on February 20 "…One idea we were just throwing out, to guarantee the delta is a minimum earned of $300k to you and Heather [sic] on the contraction/acquisition agreements (the also helps solidify our working together long term)". Austin Brooks offered in an email free 5 year rent on my current office as part of a package. They had already promised both Heather and I "…can keep your offices as long as you want…".

17. On March 1, 2022, we declined to accept Amicus' unfair and non-compliant to the PSA approach to rent proration. On March 1, 2022, I was on a phone call with Amicus' Rob Abelson and Austin Brooks, from about 4:40 to 5 PM. I explained again there is only one way to prorate rent (confirmed by PSA) and the Amicus ideas presented between February 18 to 28 were not going to work. After that call ended, at 5:02 PM Rob Abelson texted "Tom, can you please share the updated prorated schedules ASAP. We're going to our board tonight. We're targeting the 3rd and need to get this through the board and lender." (See Amicus Amended Verified Complaint Exhibit C). Amicus already had the prorated schedules up through March 1st – they just needed to add one day of rent. It wasn't feasible to close one business day later.

18. Between February 16 to March 1, 2022, we remained in a major $300,000 disagreement about rent proration. Amicus tried to reduce the net selling price for the portfolio. Amicus could have created a closing statement and documents based on the true and accurate rent prorations provided on February 16, 2022. Amicus never admitted they were wrong or stated clearly in writing that they would agree to the accurate method of rent proration. Amicus became more difficult to work with once they realized we weren't going to give them $300,000. As a result, we hired attorney Jack Grove to assist in finalizing the PSA.

19. On March 2, 2022 at 10:28 AM Amicus sent a flurry of texts (see Amicus Amended Verified Complaint Exhibit J), to Heather trying to close one or two days later. Rob Bolin and Peter Gelzinis decided March 15 should be the closing date. Amicus Exhibit J to its Amended Complaint is all from March 2 at 10:28 AM, only, essentially one minute of time. Heather called them and by 11:30 AM and they were fine with the Bolin/Gelzinis March 15 closing date. This would all be an exercise in futility because the next day on March 3, 2022 Amicus flip flopped and was unready, unwilling, and unable to close.

20. On March 1-2, 2022 I began discussions with the City of Oxford regarding five properties they unexpectedly claimed to have alleged zoning/safety violations. The properties had already passed both an exterior and interior City of Oxford inspections (typically you only have to pass one). I called Sam Perry, Community Development Director, to discuss the alleged violations in hopes of a quick resolution. That did not happen.

21. On March 3, 2022 around 9 AM, Heather called Rob Abelson and Austin Brooks and explained the City permit situation. Rob and Austin expressed grave concern and

7

were uncertain if they could move forward with the deal as a result of the City of Oxford's actions. They said their lender would never close the deal if there were permits in question. Heather told them we retained attorney Jack Grove to address the issues with the City of Oxford and to defend our position. She encouraged Amicus to move forward with the closing. I also encouraged Austin and Rob to move forward with the March 15 closing, but they declined. We agreed to talk later to discuss ideas from the lender. Amicus made the decision on March 3 to cancel the March 15, 2022 closing. Amicus was unready, unable, and unwilling to close once again.

22. On March 7 Rob Abelson sent an email titled "Potential Solutions" to the City alleged violations as shown in Exhibit 7. Option 1 was a 60-90 day closing extension. Option 2 was a $550,000 plus costs escrow covered by us. According to Section 7 of the PSA this should have been an Amicus cost.

23. On March 15 Amicus requested a 90 day extension. See Exhibit 8. The document they circulated called for ratification even though the ancillary agreements remained unresolved. We declined on March 17. On March 17 Amicus decided that they wanted to close on March 24-25 (the expiration date of the PSA). Don Lussier (see Exhibit 9) sent a March 17, 2022 letter stating, "…the Seller informed the Buyer of these violations on March 3, 2022. As a result, the buyer was forced to put the closing process on hold…Buyer also opened up a conversation…about extended closing…for up to 90 days as the Purchase Agreement currently calls for a closing by March 25, 2022…" This evidence clearly shows that Amicus was unready, unwilling, and unable from March 3 to March 17, 2022.

8

24. On Friday March 18, 2022 less than 24 hours after Amicus informed us that they wanted to close I provided (for the 3rd time) rent prorations and deposits. I also provided asset allocations. See Exhibit 10. Amicus failed to send a closing statement or any other documents to review. Yvette Wall responded for Amicus regarding the rent prorations and security deposits for a March 24-25 closing. "…I will need to look at this over the weekend and update our spreadsheets…I will start with this, compare to what we have built so far and reach out to Renee for the detail of tenant breakdown." Despite seemingly being in a hurry to close on March 24 Amicus and Yvette Wall never followed up with this information or a closing document.

25. On Friday March 18, 2022 Rob Bolin received an email from Peter Gelzinis titled "Park Place – Ancillary Documents". Peter stated, "Please forward an updated rent proration calculation.", which we did. He also stated, "I will send you conveyance documents", which he never sent. The unsigned ancillary agreements were all included with a firm "5 years" listed for the Non-compete. See Exhibit 11.

26. March 18 to March 25, 2022. Amicus did not provide a FINAL closing statement, which was a prerequisite per the PSA to moving forward with a closing. We believe the Amicus never sent a closing statement because they intended to dispute the rent proration. Amicus lost about $500,000 of additional rent (about 20,000 dollars per diem) from March 1 to March 25. When you factor in the $300,000 they were hoping to take plus this $500,000 Amicus was now $800,000 away from what they wanted. We needed an official verification from Fidelity Title company in order to proceed because of the rent proration issues, Amicus' desire to place money in escrow, and an overall lack of transparency. We never received a closing statement.

9

Amicus never intended to provide a closing statement and final closing documents until after they had possession of the signed deeds.

27. On March 23, 2022, our legal counsel Jack Grove sent a letter to Amicus's attorney Don Lussier, pointing out legal problems with the Acquisition Fee Agreement and Property Management Agreement, and requesting the business plan and a *pro forma* for the Profits Interest Agreement. Grove's letter also discussed problems with the PSA's Drop Down method of conveyance. These were all material issues and deficiencies in the PSA and its integrated agreements. We felt it was necessary to address the illegalities in the agreements (and PSA) presented by Amicus. See Exhibit 12.

28. Effective March 25, 2022. The partially executed PSA expired.

29. On April 5, 2022, Amicus attorney Don Lussier emailed (see Exhibit 13) Jack Grove, asking for escrow money from us, a lower price, and a provision for Amicus to terminate the deal citing the threats of war (in the Ukraine) and inflation. Amicus also continued to push the 5 year non-compete. Lussier did not respond to Jack Grove's request for documentation to support the profits interest agreement and the valuation's Amicus had placed on it.

Lussier continues to negotiate new terms. "2) Impact of Violations --...lender has indicated they would be prepared to close...on the condition...that a sum of money be placed in escrow...which sum Buyer proposes be funded from the Seller's closing proceeds...The other open question is whether some level of purchase price adjustment is appropriate...does feel like a modest price adjustment/credit would be appropriate." "7) Rate Exposure - ...we are all experiencing right now tied to the War and inflation, Amicus would like to incorporate some provision allowing the deal to

be terminated and all deposit funds returned…" Jack Grove replied on April 12 (see Exhibit 14) outlining the continuing divergence between the two parties on important issues. Amicus remained unready, unwilling, and unable to close.

30. Amicus' inspections were not complete as of April 20, 2022. CBRE inspector, Jon Barry, contacted me to conduct additional inspections on April 28 and May 2. See Exhibit 15. It was our understanding that updated inspections were required for loan underwriting.

31. On May 2, 2022, from approximately 3 to 4 PM I spoke by phone with Austin Brooks and Rob Abelson. They started off the meeting by profusely apologizing for their recent behavior and especially for upsetting Heather. I stopped them after a few minutes and told them that "there was no reason to apologize since it was just business, and Heather and I were not taking anything personally". They moved on to the topic of non-competition and seemed dumbfounded that I didn't want so sign a 5 year agreement. They said they were worried we would buy Red Brick (student housing competitor) and compete against them. I told them I did not want to be locked into a long-term deal and constantly have someone looking over my shoulder or deciding they could attempt a legal action against us. They ultimately said they could do a one year agreement, but I declined to agree to anything binding during the phone call, which I clearly described to them as a discussion and brainstorm. They attempted to make several other blanket statements of agreement. I stated that any agreements would need to be in writing and Heather and Jack Grove would need to be involved. I questioned the need for the non-compete since Jack Grove and Don Lussier had discussed eliminating all of the ancillary agreements. They replied that they wanted to keep all of the ancillary agreements in place and work together. Rob

11

Abelson for the first time produced a spreadsheet (see Exhibit 16) of asset allocations per property, valuing real estate at about $51.5 million and goodwill at a massive $23.5 million. I told them I would need time to review their information which seemed to value goodwill too high. The real estate value alone was $75 million. I felt their asset allocation was indefensible. Per the PSA we had the risks associated with paying the appropriate conveyance fees to Butler County. They seemed satisfied with the call and Rob Abelson sent a friendly follow-up email to me on May 2.

32. On May 11, 2022 from approximately 5 PM to 5:25 PM I spoke by phone with Austin Brooks and Rob Abelson. The main discussion centered on the Amicus' asset allocation (first proposed by Rob Abelson on May 2) with a massive $21.5 million value being place on goodwill. The profit units were also discussed and Rob offered a price increase of $100,000 in place of the profits interest agreement. In this meeting Amicus reversed and said that the ancillary agreements could be removed. They circled back to the non-compete and they stated that we had agreed to a 1-year deal on May 2nd. I told them we had reached no verbal agreements on May 2nd. They kept trying to make bullet point statements and get my consent. They stated that we had a contract for $75 million. I could not agree to piecemeal concessions over the phone due to concern that they would be misconstrued and taken out of context. They became agitated. I explained that Heather and Jack needed to be involved and the entire contract must be complete and signed. I told them the PSA had expired on March 25th. We had not agreed on ancillary contracts, rent prorations, a closing statement, and asset allocations. At this point in Austin said "But you haven't even told us the new price! What's the price? Give us a new price. We have investors. We have to really think about them. It's not just us! They spent

$18 million. You are in breach of contract!" I never asked for a higher price and had no response. Austin stated again that we were in breach of contract and they would bring legal action against us. I ended the phone call.

33. Both parties were still negotiating terms in May. We never demanded a higher price. This is a fabrication. Our issue was with the 10-year business relationship as defined through the construction management, property management, non-competition, profits interest, and finder's fees ancillary agreements. We could not agree with Amicus on these key contract documents, especially since some of them contained illegalities. The PSA was not a final expression of our agreement because significant portions were missing when it was signed. We would not have signed the PSA if the specific forms Amicus envisioned for the ancillary agreements would have been honestly and accurately presented to us in the beginning. We were deceived by a bait and switch ploy in which they glamorized the monetary benefits and intentionally concealed their actual expectations and valuations for the agreements. The proposed 5-year term of the Non-compete agreement was excessive. Because indirect competition was prohibited, we would be precluded from the promotion and development of retained properties effectively extending the Non-compete for 2-years given the market conditions associated with the rent cycle (properties lease 2 years in advance). We also have students who live in the properties we are retaining. The proposed Finder's Fee and Property Maintenance Agreements both violated Ohio Real Estate Brokerage Law. The Construction Management Agreement was unacceptable due to one-sided terms. Lastly, the Profits Interest Agreement was confusing and we never fully understood it. It involved another entity Amicus II a Manager, LLC intended as a financial incentive which was altogether illusory. We

did not come to terms and were unable to finalize the PSA. Amicus showed their true character when they attempted to cheat us out of $300,000 on the rent proration. Ultimately Amicus was unready, unable, and unwilling to execute the closing throughout the duration of the PSA (expired on March 25).

34. We negotiated honestly and in good faith at all times. The accusations of bad faith are false. Amicus attempted to lower the net sales price twice (February 17 $300,000 rent scheme and March 7 $550,000 escrow) prior to the PSA expiring. Amicus again sought a lower price on April 5 (Don Lussier's email Exhibit 13). Amicus claims we tried to increase the price in May (after the PSA had expired) during a phone call. This is unequivocally not true. In fact, it was Rob Abelson who offered to increase the price on May 11th by $100,000.

35. We did not attempt to sell the properties in the portfolio to some other third party during the time of our negotiations with Amicus. We did not attempt to sell to some other third party after the expiration of the PSA on March 25, 2022. This lawsuit has cost us significant financial harm. For example, some properties, which were originally scheduled to be demolished and rebuilt ($750,000 capital cost per building) remain unleased and vacant since we are unsure how to proceed. We spent a great deal of effort, time, and money working on the 10-year strategic business relationship and selling property to Amicus. The PSA expired without developing into a final agreement and a closing due to the actions of Amicus.

All exhibits attached to the affidavit are true and correct copies of our business records.

Ex 1 Txts EMs re Ancill Agr
Ex 2 EMs re deposit nos.
Ex 3 Ext - Obj - Notice to Proceed
Ex 4 EMs Feb 9 and Mar 2
Ex 5 EMs Feb 16-18 re rent proration
Ex 6 Txt Feb 3 EM Feb 23 re 300K
Ex 7 EM Mar 7 re Amicus solution
Ex 8 EM Mar 15 re Amicus 90 day ext
Ex 9 Ltr Mar 17 fr Don Lussier
Ex 10 EMs Mar 18 re rent prorat and sales alloc
Ex 11 EM Mar 18 fr P Gelzinis re Ancill docs
Ex 12 Ltr Mar 23 fr Jack Grove
Ex 13 EM Apr 5 fr Don Lussier
Ex 14 Ltr Apr 14 fr Jack Grove
Ex 15 EM Apr 20 fr CBRE re Amicus prop inspect Apr28 and May2
Ex 16 EM May 2 fr R Abelson re Amicus new alloc

Further Affiant Sayeth Naught.

_____
Thomas Kacachos

Sworn to before me and subscribed in my presence this 9th day of December 2022.

CATHERINE G ROBERTS
NOTARY PUBLIC
STATE OF OHIO
Comm. Expires
10-26-2027
Recorded in
Butler County

_____
Notary Public