From: **Donald Lussier** dlussier@PierceAtwood.com
Subject: **RE: Park Place Portfolio**
Date: April 5, 2022 at 12:25 PM
To: Jack Grove jgrove1251@gmail.com
Cc: Peter Gelzinis pgelzinis@PierceAtwood.com



Hi Jack,

Following up on our call last Wednesday, I wanted to summarize where I think we ended up on the various open points so that we can confirm with our clients that we are moving each issue you've raised in a way that works for both of our clients, and can continue to make good progress. To the extent I mischaracterized anything below, please let me know – and nothing stated below is intended to indicate that you and I reached agreement on any points, all of these were intended to be reviewed and discussed with our clients. Apologies for the delay in getting this to you.
Here goes:

1) **Violation Appeals** – I understand that the hearing is scheduled for April 20th at 6 pm, which is outside of the statutorily prescribed 20 day period. You also mentioned that you and your client are considering seeking judicial relief before the hearing on the basis that the failure to schedule the hearing within the 20 day statutory period is a procedural due process violation that mandates a decision in your client's favor.

2) **Impact of Violations** – We discussed possible outcomes and how those should be addressed between our clients; you mentioned that your understanding was that in a scenario where the City prevailed on all counts, only 1 bed would be lost. Attached is my client's analysis, which resulted in a possible loss of up to 4 beds. As I mentioned, the lender has indicated they would be prepared to close despite these violations being ongoing on the condition that Rob and Austin deliver recourse guarantees making them liable to the lender in the event of any losses suffered as a result of these violations, and on the condition that a sum of money be placed in escrow pending the outcome of the case (and presumably released to lender if the violations have been upheld, though that has not been discussed in detail), which sum Buyer proposes be funded from the Seller's closing proceeds. In the event the violations are overthrown, these funds would be released to Seller. Assuming this is a workable approach, we should discuss the appropriate dollar amount so we can review that with the lender. The other open question is whether some level of purchase price adjustment is appropriate if 4 beds are lost; the loss of the beds doesn't change Buyer's desire to complete the acquisition but does feel like a modest price adjustment/credit would be appropriate.

3) **Brokerage Agreement** – The best option seems to be to convert this into a consulting agreement which covers "lead generation" and "prospecting" as services your client would provide, along with other transition related services as you and I discussed. You mentioned that any such agreement would have to include a limitation on the number of hours per week, which Amicus is fine with; please let us know what your client has in mind. The fee would be a flat periodic rate, perhaps monthly, with discretionary bonus potential tied to performance. We didn't discuss the term of the agreement; our proposal would be that the term should be for 1 year, and after that it would continue but be terminable by either party on 30 days' notice.

4) **Amicus' Management Services to Seller's Remaining Portfolio** – Amicus is open to whatever the Seller prefers.

5) **Drop Down Method** – Amicus' preference is to maintain the drop down structu



EXHIBIT 13

currently contemplated in the PSA, and to also agree on an allocation between real estate and other assets. The 2nd attachment above is the allocation between the properties your client sent over for Amicus' review; my understanding is that the proposed allocation to the real estate totals $40.3M, and the difference between that and the $75M purchase price was intended to cover goodwill and other non-RE assets. You mentioned the possibility of being able to allocate value to the permits, which we think is a very creative approach and are open to. You've expressed concern about the possibility of the drop down method being challenged; if that were to happen, Amicus is comfortable covering any costs associated with such an audit and any penalties imposed if the challenge was successful (though if the transfer tax became due, that would be your client's responsibility since Seller's customarily pay the transfer tax in Ohio).

6) **Closing Date** – As I noted, there will be adverse consequences to Amicus on the loan structuring if we don't close on or before May 27th. I was wrong in characterizing it as extra cost on the cost of the rate cap – that will likely continue to rise in this environment but Amicus is prepared to take that risk subject to #7 below – the issue is that the lender cannot keep the loan terms as is unless the loan closes by May 27th, and Amicus would have to pay a higher spread, etc. I understand that this may mean that the security deposit true up process at the properties will not be completed by then, but we can make accommodation for that in the PSA.

7) **Rate Exposure** – As discussed, the biggest risk for Amicus here is that rates continue to accelerate up and at some point the cost of the rate cap (which has already increased from $250K to over $900K based on the inability to close mid-March) could be excessive. Given the extraordinary rate environment we are all experiencing right now tied to the War and inflation, Amicus would like to incorporate some provision allowing the deal to be terminated and all deposit funds returned if rates go beyond a certain threshold. We haven't really figured out what that threshold should be.

8) **Non-Compete** – You mentioned that your client wants to revisit the 5 year period. Amicus' understanding was that this had been resolved – they've agreed to carve out the Seller's portfolio of remaining assets entirely (i.e., they will be free to lease those to student at any time), provided that your client will otherwise not agree to compete for 5 years. They feel that is very fair given the purchase price, among other things. If some of the finer points on the drafting of what it means to "compete" are of concern, we can certainly talk about them, but my client does feel the agreement on the term need to be kept in place.

9) **Assignment and Assumption of Leases** – we will include a provision whereby the Assignee covenants to perform its obligations under the Leases in compliance with all applicable landlord-tenant laws.

Thanks for your thoughts.

**Donald Lussier**
PIERCE ATWOOD LLP

100 Summer Street
22nd Floor
Boston, MA 02110

PH 617.488.8124
FAX 617.824.2020
CELL 617.981.1851

dlussier@PierceAtwood.com      BIO ›

This e-mail was sent from Pierce Atwood. It may contain information that is privileged and confidential. If you suspect that you were not intended to receive it please delete it and notify us as soon as possible.

**From:** Jack Grove <jgrove1251@gmail.com>