## JACK F. GROVE
ATTORNEY AT LAW
1251 NILLES ROAD
SUITE 10
FAIRFIELD, OHIO 45014

TELEPHONE: (513) 829-2900

TELECOPIER: (513) 829-7538

7006 FAIRFIELD ROAD

OXFORD, OHIO 45056

April 12, 2022

Donald G. Lussier, Esq.
Peter P. Gelzinis, Esq.
100 Summer Street, 22nd Floor
Boston, MA. 02110

Re: Park Place Portfolio – Park Place Portfolio Contract
Response to 4/15/2022 Summation

Dear Mssrs.

After speaking with both of you I reported to Tom and Heather. First, I shared information about the requested closing date of May 27, 2022. Then I passed along Don's email summation.

Before responding I wanted input from both Tom and Heather. My objectives are to avoid misunderstanding, provide clarification, and set direction.

Before I get into particulars, looking from the outside in, I think that the contract was missing all of his parts when it was signed, referring to omitted schedules and ancillary agreements. Although comprising parts of a whole these missing parts did not receive the close attention they deserved when composing the overall transaction.

I also want to comment on the passage of time. When contracts are in the prospecting and executory phases, time is a radical variable and changes in the circumstances, such as the parties have experienced introduce new challenges which were not foremost on their minds or perhaps envisioned as the contract documents were being prepared and assembled. Code violations, market volatility, inflation, rent prorations, and so forth are complicating the effort. My late arrival on the scene, along with added perspective and differences of opinion on some of the parts, I believe, has been eye-opening . . . so much so that it is caused re-thinking. I respect your words of reservation; no final agreement has been reached. It remains a work in progress.

In past communication I stated that there was no meeting of the minds on all material terms.



EXHIBIT 14

# JACK F. GROVE ATTORNEY AT LAW

Pg. (2)

So, to facilitate needed re-negotiation of a replacement contract I turn to your topics as listed (not necessarily in the order of relative of importance). Beyond summation you develop point of view from the Buyer's side, and I will do likewise from the Seller's side.

**1) Violation Appeals** – Our current thinking is to commence suit against the City involving a broader set of challenges involving the City Charter, non-performance of City duties, limited authority of the Board of Appeals, and so forth. In my opinion, neither the code official nor the Board of Appeals have enforcement authority concerning the twenty (20) year old settlement agreements which predate the Property Maintenance Code. The repercussions are far ranging and now is the time to move.

The City issues and the time required for research and analysis compete for time involving the portfolio, especially as I watch the calendar. Drafting the lawsuit with exhibits is a priority this week.

**2) Impact of Violations** – The potential loss of four (4) beds is only part of the equation. How we handle this dispute may determine the City's level of activity in pursuit of perceived violations for some time to come for this group of companies, as well as other landlords serving the market. The strength of this portfolio comes in no small measure from the effective handling of the City over a very long time at considerable expense. It represents part of the inside investment in making this portfolio attractive today.

But I look at the potential loss of only four (4) beds as almost immaterial compared to the entire portfolio and broader issues. Making the numbers work for the transaction is important, but making the portfolio work as a whole is more important. Tom and Heather resist a negative price adjustment or an escrow set aside according to the circumstances, especially considering their current expenditures and level of commitment in working on the problem. The contract calls for continuity of operations and they have devoted substantive effort and financial resources in faithful performance.

**3) Brokerage Agreement** – Thinking aloud I spoke about lead generation and prospecting. Now that I have circled back with Tom and Heather, they prefer to carve out this ancillary agreement. To their thinking it is better to keep it simple, and they now have serious concerns about meeting Seller expectations. They prefer less entanglement for management services.

**4) Amicus' Management Services to Seller's Remaining Portfolio** – Again, they prefer a carve out and elimination of the ancillary agreement.

## JACK F. GROVE ATTORNEY AT LAW

Pg. (3)

5) **Drop Down Method** – This is still a trouble spot also involving allocation of values. Starting with values, the spreadsheet lists all properties/parcels for the six (6) entities. Various properties are grouped. Tom explains that the information was assembled from historic accounting information and that organization would not be apparent. What is apparent? After the enumerated properties, subtotals are provided for each group. The last group involving Tres Walnut and Hoelzer/Hoelzer properties has a subtotal of 40.3 M. The total portfolio value on the last line is shown as 75 M. No allocation was made for good will or non-R.E. assets. The Buyer did not respond or react to the schedule when it was circulated in mid-February. Your discussion is the first feedback on this issue and illustrates why the transaction was not ready to close. Allocation of values is overdue for attention and is needed to prepare the closing statement.

Valuation aside, the topic is focused on the method of conducting the sale and financial reporting of the transaction. The Seller prefers to report the sale for value per my memo and strict adherence to the principle espoused by the Ohio Supreme Court.

Indemnification only goes so far, and would not cover a smeared reputation or risk of exposure to criminal liability for fraudulent reporting. The risk is simply too great.

I gave limited thought to the "special purpose property" concept and apportionment of the "permitting," But I have not had time to conduct needed research whether such is viable for properties in the student rental portfolio. Tom and Heather understand their responsibility to pay the conveyance fees associated with the real estate sale for value.

6) **Closing Date** – Heather explains that May 27, 2022 is problematic because security deposit refunds and reconciliation will still be in the works following expiration of the 2022 spring semester term. Inspections and damage computation are time intensive from a management standpoint. Under Ohio Law the landlord is required to perform within thirty (30) days. Heather proposes a date between June 15-30, 2022 after the process is completed. Preparing for closing is also time intensive as we know too well.

7) **Rate Exposure** – This is one of the time related variables. It is a buyer risk. The original contract was not conditional and if buyer needs a safety net to excuse performance, we can discuss the language and rate cap.

# JACK F. GROVE ATTORNEY AT LAW

Pg. (4)

**8) Non-Compete** – Tom and Heather agree that this particular ancillary agreement was not circulated until <u>after</u> the October signing of the contract; I do not have a specific date. The terms were never agreed upon.

This is a sticky issue. The five (5) year term is objectionable as previously explained and Heather insists upon on a one (1) year limit. The excessive term is the problem and not so much the scope of restricted activity or geographic area.

When measured from the standpoint of a working career five (5) years is a significant percentage. Realistically, unless they were to amass a large portfolio they could not be regarded as a competitive force. The entire portfolio is preleased for two (2) years. So, it is not as if Tom and Heather propose a threat in the near term. The Buyer should be able to learn the ropes within one (1) year especially considering their other holdings in this market niche.

I need to elaborate. Tom and Heather own a parking lot on West Church Street (although it was not specifically referred to as an excluded property). The renting of parking spaces to the tenants of other landlords could be perceived as indirect competition. Keep in mind that they have vacant land suitable for development which is also excluded. There is no current plan to go after the student rental market, but if market demand for a mixed-use project presents, they could be shut out for an extended term because projects under development are typically pre-leased before they are ready for occupancy. This is unfair.

**9) Assignment and Assumption of Leases** – Your stated approach is satisfactory.

**10) Construction Management** – Tom expressed his various concerns including payment upon percentage of completion. He did not receive a complete response.

**11) Adjusting Values** – In my call with Peter and the following call with Don, I spoke to adjusting values. This point is not addressed in the summation but it deserves discussion.

When the contract was originally negotiated, the ancillary agreements provided added financial incentive to Tom and Heather and offset the purchase price. If these agreements (including the profit participation agreement) are eliminated an adjustment of the aggregate purchase price is on the table. I do not have specific authority, and first we

## JACK F. GROVE ATTORNEY AT LAW

Pg. (5)

should decide what stays in and what is eliminated according to the satisfaction of both Buyer and Seller. Inflation and market forces deserve consideration along with rate exposure. After the terms are ironed out, we should be in a better place to assign final values.

The process of communicating attorney discussions with the principals is time consuming, and I am trying to be thorough. Added understanding usually facilitates meaningful negotiation. Let me know how you see the numbers on allocation.

I await your further thoughts.

Very truly yours,

Jack F. Grove

via email only

JFG/vke

C.C. Fidelity National Title Insurance Company, Attention: Andrew J. Knoph, Esq.
   Rob Bolin, Esq.