**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **AMICUS MIAMI OF OHIO, LLC** | : | **Case No. 1:22-cv-00355** |
| **Plaintiff** | : | **Judge Hopkins** |
| **vs.** | : | |
| **HEATHER HOELZER KACACHOS, *ET AL.*** | : | **Defendants' Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings** |
| **Defendants** | | |

Defendants/Counterclaimants Heather and Thomas Kacachos (collectively, hereinafter, "the Kacachoses") file their Memorandum in Opposition to Plaintiff/Counterclaim-Defendant Amicus Miami of Ohio, LLC's ("Amicus's") Motion for Judgment on the Pleadings (Doc. 39).

The Kacachoses filed far more than a short and plain answer stuffed with *pro forma* denials. Instead, their Answer and Counterclaim (Doc. 23) set forth facts demonstrating that the parties' Purchase and Sale Agreement (the "PSA") remained woefully incomplete, gauged by the required components listed in and intended to be integrated into that document. The Kacachoses also stated reasons why the PSA and its intended components were infected with antecedent illegalities and therefore, going forward, risked regulatory scrutiny, potential enforcement actions, and likely backside tax liability. Further, the Kacachoses did not simply recite affirmative defenses so as to avoid potential waiver, but also set forth factual grounds supporting those defenses.

The bad faith actions of Amicus further prevented the deal from closing, as they attempted to lower the price by $300,000 by cheating in a rent proration scheme (Answer and Counterclaim, at ¶¶ 1, 6, 30, 56, 74); refused to provide a closing statement and closing documents (*Id.* at ¶¶ 2, 56, 156); attempted to amend the PSA (*see*, Plaintiff's Answer to Counterclaim, at ¶ 31(e) (Doc.

30); and refused to negotiate fairly on the ancillary agreements (Answer and Counterclaim, at ¶¶ 1, 6, 7, 72, 87) (Doc. 23).

Amicus's First Amended Verified Complaint (Doc. 22) goes out of the way to portray the Kacachoses in a bad light, which is undeserved according to the well-documented transaction history. Amicus paints the dispute in a false light by ignoring the ancillary agreements and leaving out critical dialogue about problems with the transaction. Amicus's Motion asks the Court to take an impermissible short-cut and pre-judge the case without considering all the facts, defenses, and complicated legal issues at the core of the overall dispute.

## TABLE OF CONTENTS

| | Page |
|---|---|
| **INTRODUCTION** | 1 |
| **PROCEDURAL HISTORY** | 3 |
| **COUNTERSTATEMENT OF FACTS** | 3 |
| Ohio Rev. Code §§ 319.202; 319.54; 319.21 | 7 |
| *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, Slip Opinion, No. 2020-Ohio-253. | 7 |
| **LEGAL STANDARD** | 8 |
| *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017) | 9 |
| 5 Wright & Miller, § 1369, p. 698 | 9 |
| *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir.1997); Fed.R.Civ.P. 12(c) | 9 |
| *Haeberle v. Univ. of Lousiville,* 90 Fed. Appx. 895, 903 (6th Cir. 2004) | 9 |
| *Dist. No. 1., Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.,* 933 F.3d 751, 761 (D.C. Cir. 2019) | 9-10 |

| | |
|---|---|
| *Beal v. Mo. Pac. R.R. Corp.*, 312 U.S. 45, 51, 61 S.Ct. 418, 85 L.Ed. 577 (1941) | 10 |
| 61A Am. Jur. 2d Pleadings § 497 (2022) | 10 |
| 61A Am. Jur. 2d Pleadings § 505 (2022) | 10 |
| **LEGAL ARGUMENT** | 11 |
| **A. Applying the Standard Set Forth in Rule 12(c) Jurisprudence, Amicus's Motion Should Be Summarily Dismissed.** | 11 |
| **B. That the PSA Was Signed Does Not Excuse, But Only Underscores its Incompleteness.** | 12 |
| *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St. 2d 241, 245-46 (1978) | 12 |
| https://www.dictionary.com/browse/finalize | 13 |
| **C. The PSA Did Not Memorialize a Simple Real Estate Sale Transaction, But Instead, In Its Intended Entirety, Would Have Bound the Parties in 10-Year Relationship.** | 13 |
| **D. The PSA, Gauged By Its Own Express Terms, Was Incomplete.** | 14 |
| *Qwest Communications,* 208 F.R.D. 295 | 16 |
| **E. The Kacachoses Do Not Vary or Contradict the PSA, But Instead, Correctly Insist that Document be Assessed in Its Entirety.** | 16 |
| *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 362, 678 N.E.2d 519 | 17 |
| *Stonebridge Operating Co., LLC v. Antero Resources Corp.,* 510 F. Supp.3d 567, HN 27 and accompanying text (S.D. Ohio 2020) | 17 |
| **F. Amicus, Not the Kacachoses, Repeatedly Delayed Any Closing.** | 18 |
| **G. Amicus's 12(c) Motion Fatally Collides with the Well-Pled Defenses and Material Denials.** | 20 |
| **H. Amicus Cannot Negate the Kacachoses' Affirmative Defenses.** | 20 |
| *Qwest Communications Corp. v. City of Berkeley,* 208 F.R.D.288, 291 (N.D. Cal. 2022) | 20 |
| *PolyOne Corporation v. Westlake Vinyls, Inc.*, 937 F.3d 692, 701 (6th Cir. 2019) | 21 |

| | |
|---|---|
| **I.   The Kacachoses Never Refused to Close, or Demanded More Money, or Shopped the Portfolio to Third Parties.** | 22 |
| *Minster Farmers Cooperative Exchange Co. v. Meyer,* 117 Ohio St.3d 459, 2008-Ohio-1259 at ¶28, 884 N.E.2d 1056, 1061 | 22 |
| **J.   Amicus' Own Breaches of the PSA Bar Its Right to Specific Performance.** | 23 |
| *McKinney v. Lamalfa Party Center,* 2022-Ohio-4333 at ¶2-3; 26-27 (Ohio Ct. App. 11th Dist. 2022) | 24 |
| *Minster Farmers Cooperative Exchange Co. v. Meyer*, 117 Ohio St.3d 459, 464, 2008-Ohio-1259, 884 N.E.2d 1056 | 24 |
| **K.   Unsatisfied Contingencies and Conditions Precedent Bar Any Right to Specific Performance.** | 24 |
| *Sternberg v. Bd. Of Trustees,* 37 Ohio St.2d 115, 118, 308 N.E.2d 457 (1974) | 24 |
| *WSB Rehabilitation Serv. Inc. v. Cent. Acctg. Systems, Inc.,* 2022-Ohio-2160, at ¶ 26-27 (Ohio Ct. App. 1st Dist. 2022) | 25 |
| *Telxon Corp. v. Smart Media of Del., Inc.,* 2005-Ohio-4931, at ¶ 53 (9 Dist.) | 25 |
| **L.   There Can Be No "Anticipatory Repudiation" In the Absence of an Enforceable Contract.** | 26 |
| *McDonald v. Bedford Datsun,* 59 Ohio App.3d 38, 40, 570 N.E.2d 299 (Ohio Ct. App. 1989) | 26 |
| **M. Ohio Recognizes No Claim for Breach of Good Faith, Nor Did the Kacachoses Act in Bad Faith.** | 27 |
| *Eggert Agency, Inc. v. NA Mgmt. Corp.*, No. C2-07-1011, 2008 WL 3474148, at *4 (S.D. Ohio Aug. 12, 2008) | 27 |
| *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co.,* 86 Ohio St.3d 270, 274, 714 N.E.2d 898 (1999) | 27 |
| *Lucarell v. Nationwide Mut. Ins. Co.,* 152 Ohio St.3d 453, 2018-Ohio-15, at ¶ 5 | 27 |

| | |
|---|---|
| **N.  Amicus Cannot Demonstrate Reasonable and Detrimental Reliance on Promises Here.** | 28 |
| *Olympic Holding Co. LLC v. Ace Limited,* 122 Ohio St.3d 89, 97, 2009-Ohio-2057 at ¶ 39, 909 N.E.2d 93 | 28 |
| *Kelly v. Georgia-Pacific Corp.,* 46 Ohio St.3d 134, 140, 545 N.E.2d 1244 (1989) | 28 |
| **CONCLUSION** | 29 |

## INTRODUCTION

This case involves a contract dispute in a complex transactional setting. This was never a simple property sale, nor, contrary to Amicus's often repeated but never supported claims, is it an "open and shut case." The parties to this case intended a transaction involving not just sale of realty, but also creating a 10-year strategic business relationship. The bounds of this relationship were to be set forth in five ancillary agreements, all specifically referenced by and intended to be integrated into their sole signed document. The Kacachoses' Answer and Counterclaim (Doc. 23) adds documentation admitted by Amicus.

Amicus urges this Court to look past the glaring omissions in the PSA, and finalize the contracts and closing documents the parties could not resolve for themselves. Amicus further invites the Court to selectively cull from among the parties' various obligations stated in the PSA, harping on the realty sale, while conveniently leaving out the business contracts of the overarching agreement. Upon execution, the PSA was incomplete and four ancillary agreements were missing. Despite months of good faith negotiation on the Kacachoses' part, the parties never agreed on several key contracts of the proposed transaction, and they began to clash about unacceptable terms. The business agreements remained subject to months of negotiation which never bridged fundamental disagreements, and therefore never resulted in the required meeting of the minds to consummate the entire transaction.

The ancillary agreements (Construction Management, Property Management, Profits Interest, Non-Competition, and Finder's Fee agreements) were not mere after-thoughts. Each was material and constituted part of the consideration for the overall contemplated transaction.. In the absence of most of these integrated agreements, the PSA remained woefully incomplete. In the end, the PSA was a mere agreement to further agree, because Amicus refused to negotiate fairly

on these business agreements. The parties never reached a meeting of the minds sufficient to result in an enforceable contract sufficient to transfer $75 million in real estate and finalize the 10-year strategic business relationship.

The Kacachoses negotiated in good faith for many months with Amicus's principals. The parties remained far apart on critical issues, including proration of rents, allocation of realty to non-realty assets (including goodwill) for conveyancing purposes, details of construction management and profits interest agreements, and the scope and duration of a non-compete agreement. The Property Management and Finder's Fee agreements which Amicus claimed would furnish vital consideration proved either outright illegal or illusory, and the Profits Interest agreement proved of dubious value. Amicus's trite accusations of "slow walking" clash with documentary evidence of its own repeated delays of closing. Amicus tried to: (1) lower the price through a different rent proration scheme, (2) add an opt-out clause, and (3) withhold $550,000 in escrow. Amicus never provided a transparent closing statement and related documents required to consummate the realty transfer component of the transaction. Amicus now asks the Court to provide closing documents for them.

As the deadline of March 25, 2022, came and went for closing, the parties still disagreed on many vital matters, and never achieved the required meeting of the minds to yield an enforceable contract. Amicus's groundless lawsuit does not absolve it from its multiple breaches of the PSA, and it cannot fill the voids in the parties' incomplete agreement. The Court should not step in to make a contract the parties proved unable to finalize.

## PROCEDURAL HISTORY

Amicus originally filed this diversity lawsuit in the Eastern Division of the Southern District of Ohio, in Columbus. As docket entries from that earlier case underscore, the Kacachoses properly moved to transfer from an inconvenient and improper forum.

Counsel for the parties have yet to conduct the Rule 26(f) conference, typically initiated by plaintiff's counsel. This conference should have occurred by now. Accordingly, no preliminary disclosures have been made. This benefits Amicus, as the Kacachoses provided a wealth of due diligence materials during negotiations. Finally, no scheduling conference has been set. Judgment on the Pleadings seems premature. Nevertheless, the Kacachoses readily rebut Amicus's claims.

On December 9, 2022, the Kacachoses filed a Motion for Partial Summary Judgment (Doc. 40), supported by the pleadings and attachments thereto, and the Affidavit of Thomas Kacachos (Doc. 41). Amicus filed a Motion to Strike (Doc. 42). The Kacachoses promptly filed a Proposed Statement of Undisputed Facts (Doc. 44), and Memorandum in Opposition to Motion to Strike (Doc. 45). Meanwhile, Judge McFarland transferred this case to Judge Hopkins (Doc. 43). Amicus has yet to respond substantively to the Kacachoses' Rule 56 Motion (Doc. 40).

## COUNTERSTATEMENT OF FACTS

Amicus presents a distorted, self-serving statement of facts in its Motion (Doc. 39). In particular, it invites the Court to ignore language in the PSA which it now finds inconvenient. Amicus also asserts facts inconsistent with the well-documented history of the parties' communications. Consequently, a restatement of facts is in order.

Amicus contacted Thomas Kacachos on or around July 13, 2021, to discuss a potential student housing portfolio purchase. Originally, Amicus only expressed interest in houses.

3

Amicus's principals Rob Abelson and Austin Brooks visited Oxford, Ohio and viewed numerous properties on August 4, 2021. (Answer and Counterclaim, ¶¶ 2-4 of Counterclaim) (Doc. 23).

On October 25, 2021, parts—*but only parts*—of an overarching contract were signed. Contrary to Amicus's narrative, that PSA and a single ancillary agreement thereto did *not* constitute a complete and enforceable agreement to sell the portfolio in this dispute. The PSA contemplated a hybrid transaction involving: (a) purchase and sale of real properties; (b) purchase and sale of tangible properties; (c) purchase and sale of an interest in a limited liability company (*i.e.,* "HoldCo") to be used as a conduit for conveyancing; and (d) fully integrated ancillary agreements creating a 10-year business partnership, including a non-competition agreement—all of which comprise the transaction as a whole, and upon which contract duties are interdependent. On the face of the PSA, the finalization of the ancillary agreements by the end of the Inspection Period (as defined by the PSA) was a condition precedent to performance of contract duties, including closing. (Answer and Counterclaim, at ¶ 5 of Counterclaim) (Doc. 23). *See also,* generally, PSA, Art. 8; § 12.8 (Doc. 22-1).

Hence, the PSA was an "agreement to work toward a further comprehensive agreement." Further, the PSA did not guarantee that the parties could ultimately reach a meeting of the minds on a comprehensive agreement, embracing not only property sales, but approach to proration of rents, allocations on conveyancing statements with major backside property tax implications, and a proposed Non-Competition Agreement that would affect the Kacachoses' professional lives. (*Id.* at ¶ 5 of Counterclaim).

The Kacachoses were induced to enter into the PSA by Amicus based upon the added financial incentives, which they reasonably expected to be derived from various integrated ancillary agreements; but these agreements were initially conceptual and not available to review

(except for the Property Management Agreement) when the PSA was signed. The contributive value which Amicus placed on the integrated ancillary agreements amounted to $5,650,000. (*See* Answer and Counterclaim, at ¶ 6 of Counterclaim; *see also* Ex. 1, e-mails of September 10-14, 2021 (Doc. 23-1). After the parties signed the PSA on October 25, 2021, the Kacachoses provided to Amicus those records required for Amicus to conduct its due diligence. These records included the following: leases/rent rolls, property contracts, tax bills, financials, due diligence materials, and other personnel, insurance and operating information, much of which is of a confidential and proprietary nature. The Kacachoses were diligent in performing their duties under the PSA and demonstrated good faith while they awaited the various ancillary agreements on which the PSA was also conditioned. (*Id.*, ¶ 6 of Counterclaim).

The various ancillary agreements, with the exception of the "Property Management Agreement," did not exist when the PSA was signed, nor did Amicus provide them until months later. Months of negotiations left the parties still in disagreement over key, material terms. The PSA, Ex. A to Amicus's First Amended Complaint (Doc. 22-1), was ultimately nothing more than an "agreement to agree," anticipating a more complex set of ancillary agreements to be fully integrated addressing, *inter alia*, non-competition, and the prospect of Mr. Kacachos performing certain work under contract for Amicus, and other service related agreements to be performed by Amicus. The PSA was dependent and conditioned upon finalization of the various ancillary agreements by the end of the Inspection Period, which never occurred. The parties disagreed over proration of rents. Allocation of value to realty versus goodwill and other assets also remained in dispute until the closing deadline set forth in the PSA expired. (Answer and Counterclaim, at ¶ 1).

When Amicus finally circulated proposed Ancillary Agreements, those agreements contained terms and conditions unsatisfactory to the Kacachoses. The disputed terms and

conditions sparked ongoing discourse, disagreement and negotiation. In addition, counsel for the Kacachoses determined in March 2022 that the Property Management Agreement and the Finder's Fee Agreement were illegal and would violate the expected closing covenants of PSA Section 4.1(c) (Doc. 22-1).

As of March 17, 2022, after expiration of the Inspection Period set forth in the PSA, the ancillary agreements were still not finalized. *See,* Don Lussier e-mail and letter dated March 17, 2022, attached as Ex. 7 to Answer and Counterclaim (Doc. 23-7). *See also,* letter of March 23, 2022, from Jack Grove, attorney for the Kacachoses, directed to Donald Lussier and Peter Gelzinis, attorneys for Amicus, identifying several problems with the PSA terms and disputed issues underlying the various ancillary agreements, attached as Ex. 8 (Doc. 23-8). After prolonged negotiations, no meeting of the minds occurred about the unacceptable terms. In consequence, conditions precedent to closing were not satisfied.

The overall transaction anticipated by the PSA did not close when the parties could not reach definitive agreement on the integrated ancillary agreements, as well as other disputed and divisive issues, such as proper proration of rents. Amicus now seeks to force a sale of the portfolio contrary to the parties' expressed intentions, and even though no final agreement was reached. Amicus effectively asks this Court to rewrite the PSA and to make a new deal for the parties, contrary to well-settled contract law. (Answer and Counterclaim, ¶ 11 of Counterclaim) (Doc. 23).

There were major, unresolvable differences between the parties, as summarized in the letter dated March 23, 2022, from the Kacachoses' counsel Jack Grove. (*See* Answer and Counterclaim, Ex. 8.) As noted in the Grove letter, enforcement of the PSA, or discrete parts thereof, is barred by illegality. The PSA, Section 1.1 (Doc. 22-1), addressing Purchase and Sale, contemplates transfer of real properties to a fictitious entity referred to as "Hold Co," whereby Hold Co's membership

interest would transfer to seller at closing, after Hold Co received conveyances of the real properties. In this so-called "drop-down" method of conveyancing, the real property conveyed to Hold Co is treated as an exempt conveyance, and transfer of the membership interest is not reported as a real estate transfer. The "drop-down" method avoids disclosure of transfer of real property for value, such that the $75 million purchase price would not be recognized by the County Auditor, and Amicus would not be required to pay real property taxes accruing on real properties according to their book value, as of date of closing. Under PSA Section 3.13(i), the seller is nevertheless solely responsible for conveyance tax and bears financial risk of imposition of fees and penalties for any inaccurate reporting. Said drop-down method violates Ohio statutes pertaining to conveyancing of real properties and may be construed as fraudulent conveyancing and an illegal scheme intended to evade accurate taxation of real properties. *See* Ohio Rev. Code §§ 319.202; 319.54; *see also* § 319.21, barring fraudulent transfers. *See also, e.g., Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, Slip Opinion, No. 2020-Ohio-253.

Notwithstanding the Kacachoses' efforts as sellers, the parties were unable to achieve a meeting of the minds on all material terms, and in consequence thereof, conditions precedent to closing were not satisfied. The contracting parties did not intend for the PSA to be "evergreen" and of indefinite duration. (Answer and Counterclaim at ¶ 17 (Doc. 23). The overall transaction contemplated by the PSA failed to close within a reasonable time after the agreed, definitive timetable for performance to occur. (*Id.)* This was the case, despite the sellers' efforts to conclude the negotiations and come to terms on the incomplete ancillary agreements that were integrated into the PSA, and other terms in dispute, such as rent proration. Changing circumstances, including major capital expenditures, market conditions, renewed rent cycles for the 2023-2024 academic year, inflation, and obligations incurred by the owners associated with continuing business

7

operations—***not*** *contemplated by the contracting parties*—have adversely impacted the expected benefit of the bargain to be derived by a timely closing. In sum, due to expiration of the PSA, the parties are excused from further performance. In other words, the PSA is now a dead deal. (Answer and Counterclaim, at ¶ 17 of Counterclaim) (Doc. 23).

Amicus's version of the "Facts" fails to explain why it breached the rent proration sections 3.8 Proration of Income and 3.12 Calculation of Prorations of the PSA and fabricated its own method of rent proration in an attempt to gain $300,000. Amicus would have to explain why it breached section 3.15 Closing Statement and refused to provide a closing statement.

Amicus's agenda is clear, and frankly contrary to the spirit of the Federal Civil Rules. It wants to secure a judgment of liability based upon the pleadings, only. It would, if successful in this gambit, skip the discovery stage for liability and thereby evade depositions, which would flatly contradict and even eviscerate many of its exaggerated claims—for instance, that the Kacachoses caused delays, or that the PSA was complete according to the terms set forth in its four corners, or most importantly, that the PSA was a simple land transaction, and all the ancillary agreements mere window dressing.

## LEGAL STANDARD

In its misleading statement of the legal standard, Amicus asserts, "When there is a clear and enforceable contract, signed and executed by both Parties, and where Seller's breaches are so apparent on the face of the pleadings, courts routinely grant motions for judgment on the pleadings." (Motion for Judgment on the Pleadings, at 12, Section III) (Doc. 39). In fact, judgment on the pleadings is rarely granted, and when it is granted, almost always in favor of a defendant, who typically is not seeking affirmative relief, but rather seeks to negate one or more elements of a cause of action. One searches in vain for the supposed plethora of authority granting specific

performance or other offensive relief to plaintiffs, which Amicus alluded to, but noticeably failed to cite. The cases it did cite appear to all involve judgment on the pleadings sought by defendants, not offensive judgment on the pleadings in favor of plaintiffs. Accordingly, a restatement and corrective setting forth the applicable legal standard is required.

For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the non-movant's pleadings must be taken as true. The motion may be granted only if the moving party is nevertheless "clearly entitled to judgment." *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)).

In contrast to a Rule 12(b) motion in which a claim may be dismissed for failure to satisfy a procedural prerequisite, a Rule 12(c) motion, theoretically, is directed toward a determination of the substantive merits of the controversy. Consequently, such a motion should only be granted where it is clear that the merits of the controversy can be fairly and fully decided in this summary manner. 5 Wright & Miller, § 1369, p. 698. On a motion for judgment on the pleadings, this court may only look at the pleadings themselves and exhibits "incorporated by reference" therein. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997); Fed.R.Civ.P. 12(c).

The Sixth Circuit has commented on the daunting standard posed by Rule 12(c):

> Traditionally, courts have notably hesitated to grant motions for judgment on the pleadings. 5A Wright & Miller, *Federal Practice and Procedure: Civil 2d § 1368, at 517* n.1 (1990). For good reason, too; Rule 12(c) carries a difficult standard for moving parties to meet. 5A Wright & Miller, *Federal Practice & Procedure 2d* § 1368, at 705–06 (2003 Supp.)

*Haeberle v. Univ. of Lousiville,* 90 Fed. Appx. 895, 903 (6ᵗʰ Cir. 2004).

Federal courts have accurately noted that plaintiffs rarely invoke Rule 12(c). *See Dist. No. 1., Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 761

(D.C. Cir. 2019); *Beal v. Mo. Pac. R.R. Corp.*, 312 U.S. 45, 51, 61 S.Ct. 418, 85 L.Ed. 577 (1941); *see also* 61A Am. Jur. 2d Pleadings § 497 (2022) ("Allegations of a complaint . . . specifically denied by the answer must be eliminated from consideration in determining a plaintiff's motion for judgment on the pleadings."); 61A Am. Jur. 2d Pleadings § 505 (2022) ("[A]ll allegations of the moving party which have been denied or controverted are taken as false.").

 In summing up Rule 12(c) jurisprudence, the D.C. Circuit noted:

> Very few of our precedents discuss Rule 12(c), in part because judgment on the pleadings is rare. As Wright & Miller notes, "Federal Rule 12(c) has its historical roots in common law practice, which permitted either party, at any point in the proceeding, to demur to his opponent's pleading and secure a dismissal or final judgment on the basis of the pleadings." 5C Wright & Miller § 1367, at 205; ; * * *  5C Wright & Miller § 1369, at 265 (*noting "the Rule 12(c) motion is little more than a relic of the common law and code eras"*)

*District No. 1, Pacific Coast Dist*, 933 F.3d at 760.

 Furthermore, Aneca Lasley's Affidavit (Doc. 28), though referenced in Amicus's Motion (Doc. 39), can play no role in adjudicating said Motion.

 Applying well-settled law to the facts here, Amicus's Rule 12(c) Motion is dead on arrival. While the parties may disagree about the reasons for applying Ohio law, Ohio law should govern this dispute. The Kacachoses reside in Ohio. The real estate portfolio is situated in Ohio. The vitally important ancillary agreements would have been performed in Ohio. Furthermore, Ohio statutes, common law, and administrative decisions play a decisive part in (1) conveyancing real property, and (2) gauging the illegality of some of the ancillary agreements. Accordingly, Ohio law should apply here.

## LEGAL ARGUMENT

### A. Applying the Standard Set Forth in Rule 12(c) Jurisprudence, Amicus's Motion Should Be Summarily Dismissed.

The simplest approach to this case, and the procedurally proper one, is to set Amicus's allegations, as recited in its Motion (Doc. 39), against the Kacachoses' Answer and Counterclaim (Doc. 23), including the documents attached thereto and the affirmative defenses stated therein. Doing so easily demonstrates Amicus is not entitled to judgment on the pleadings.

A defendant seeking judgment on the pleadings need only negate one of the required elements of a plaintiff's cause of action in order to secure dismissal—in itself, still a daunting task when confronted with a well-pled complaint. But by contrast, a plaintiff seeking Rule 12(c) judgment must not only establish that they prevail on all the elements of their claim, but must also negate the defendant's affirmative defenses.

Amicus falls far short of this mark. Amicus's First Amended Verified Complaint (Doc. 22) made its formal allegations of breach of contract, anticipatory repudiation, breach of duty of good faith and fair dealing and promissory estoppel, at ¶¶ 104-164. In the corresponding paragraphs of their Answer and Counterclaim (Doc. 23), in response to every allegation or inference of breach of contract, or any other legal duty, the Kacachoses pled a corresponding denial with supporting Exhibits. The Kacachoses also denied every single allegation of breach laced into Amicus's slanted portrayal of facts.

Furthermore, the Kacachoses not only asserted, but also supported with factual allegations, numerous affirmative defenses. These included, among others, illegality of two ancillary agreements, as well as the drop-down method at the heart of the real estate sale component of the PSA; various instances of Amicus's non-preformance of its contractual duty; and failure of

11

conditions precedent to closing as specified by the PSA. (Answer and Counterclaim, at ¶¶ 2, 6, 7, 52, 56, 57, 88) (Doc. 23).

**B.  That the PSA Was Signed Does Not Excuse, But Only Underscores its Incompleteness.**

Amicus harps on the fact that the PSA was signed and initialed on some of the 85 pages which circulated. But this does not end the inquiry into the completeness, or lack thereof of that document. As the Kacachoses asserted in their Answer and Counterclaim, the PSA referenced and integrated five ancillary agreements. (Answer and Counterclaim at ¶¶ 1; 28-30 of Answer (Doc. 23); *see also,* ¶ 7 of Counterclaim, and Amicus's Answer and Affirmative Defenses to Counterclaim, at ¶ 7) (Doc. 30).

Amicus mistakenly believes the signature and initialization of 33 of 85 pages makes this an "open and shut" case, inviting the Court to overlook the glaring omissions from the final, intended agreement and what complete documentation was required for a closing to occur. In fact, execution of the PSA and initialization of 33 of 85 extant pages as of October 25, 2021 only underscores both parties' legal right and intention to insist upon a final agreement, consisting of fully negotiated and signed ancillary agreements.

The PSA stated that the ancillary agreements were to be finalized by the end of the Inspection Period. (*See generally,* Art. 8 of PSA; *see also* § 12.8 of PSA) (Doc. 22-1). This did not occur.

Under well-settled principles of contract interpretation, words in a written instrument are assigned their plain and ordinary meaning, unless manifest absurdity results or it is plain some other meaning was intended. *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St. 2d 241, 245-46 (1978). Neither exception applies here. The PSA did not itself define "finalized" some other way. Nor does any absurdity result from using the plain meaning. A widely circulated dictionary

definition defines "finalize," using the specific context of an agreement, as "to *complete an agreement; conclude negotiations*." (https://www.dictionary.com/browse/finalize (emphasis added)). The PSA's own language, then, reflected that in the absence of "finalized", signed ancillary agreements, these were presumed to be still in negotiation, as indeed they were. Further, the PSA set firm deadlines for concluding those negotiations. The ancillary agreements were never finalized. (*See* Answer and Counterclaim, ¶¶ 9-10 of Answer) (Doc. 23).

### C. The PSA Did Not Memorialize a Simple Real Estate Sale Transaction, But Instead, In Its Intended Entirety, Would Have Bound the Parties in 10-Year Relationship.

Amicus paints the PSA as a standalone document, memorializiong a simple land sale. But it was never simple, nor confined simply to buying and selling real properties. At Amicus's own, and consistently reiterated insistence, it was intended to create a 10-year strategic alliance. Amicus was never content to simply pay for and receive land. Instead, it wanted to bind the Kacachoses to a strategic, decade-long business relationship. As the Kacachoses summed up the matter in their Answer and Counterclaim:

> On October 25, 2021, parts of an overarching contract were signed, though contrary to Amicus's narrative, that PSA and a single ancillary agreement thereto did not constitute a complete and enforceable agreement to sell the portfolio in this dispute. ***The PSA contemplated a hybrid transaction involving: (a) purchase and sale of real properties; (b) purchase and sale of tangible properties; (c) purchase and sale of an interest in a limited liability company (i.e., "HoldCo") to be used as a conduit for conveyancing; and (d) fully integrated ancillary agreements calling for personal and business services to be performed, as well as a non-competition agreement, all of which comprise the transaction as a whole, and upon which contract duties are interdependent***. On the face of the PSA, the finalization of the ancillary agreements by the end of the Inspection Period (as defined by the PSA) was a condition precedent to performance of contract duties, including closing. *See,* generally, Art. 8; *see also* Sec. 12.8 of the PSA, which language demonstrates that the PSA is incomplete and conditional in nature. Hence, the PSA is better characterized as an "agreement to work toward a further comprehensive agreement." Further, the PSA was not in itself a guarantee that the parties could ultimately reach a meeting of the minds on a comprehensive agreement[.].

(Answer and Counterclaim, at ¶ 5 (emphasis added)). The PSA was incomplete on its face and the missing documents were not satisfactorily negotiated, hence no meeting of the minds. Thus, Amicus never contracted to simply pay the Kacachoses consideration and receive a real property portfolio. It insisted they enter into a non-compete agreement, which was *not* mentioned in the Letter of Intent and *not* attached to the PSA at the time that document was circulated, and was never finalized or signed. (*See, e.g.,* Answer and Counterclaim at ¶ 88, noting that Amicus was "fixated on the Non-Competition Agreement having a duration of 5 years, which was not acceptable."). Amicus appeared to care more about the execution of the 5-year Non-Compete Agreement than the execution of the entire deal. Amicus further contemplated binding the Kacachoses to a Property Management agreement and other ancillary agreements. It remained an unresolved sticking point.

Furthermore, as explained further below, Amicus insisted on buying the real property portfolio in a particular manner, designed, from Amicus's point of view, to minimize its post-closing real estate tax liability. This drop-down method lay at the heart of the land sale component of the PSA, and could not be severed therefrom without effectively re-making the parties' contract.

**D. The PSA, Gauged By Its Own Express Terms, Was Incomplete.**

The deficiencies of the PSA went beyond mere "indefiniteness" or "uncertainty" endemic to most written instruments. The PSA was incomplete, gauged by the contents referenced in and intended to be integrated into its final form. At the time it was signed, it lacked all but one of the six ancillary agreements. Amicus so admitted. (Amicus Answer and Affirmative Defenses to Counterclaim, at ¶ 7) (Doc. 30).

In response to paragraphs 1-6 of Amicus's First Amended Verified Complaint, the Kacachoses pled as follows:

> Months of negotiations left the parties still in disagreement over key, material terms. The Purchase and Sale Agreement, Exhibit A to Amicus's First Amended Complaint, was ultimately nothing more than an "agreement to agree," anticipating a more complex set of ancillary agreements to be fully integrated addressing, *inter alia*, non-competition and the prospect of Mr. Kacachos performing certain work under contract for Amicus. *The PSA was dependent and conditioned upon finalization of the various ancillary agreements by the end of the inspection period, which never occurred.* The parties disagreed over proration of rents. Allocation of value to realty versus goodwill and other assets also remained a point of contention. In short, the agreement Amicus seeks to enforce remains inchoate, missing key pieces, and as such, does not reflect a complete meeting of the minds as to all material terms.

(Answer and Counterclaim, at ¶ 1 of Answer (emphasis added)) (Doc. 23).

Further answering, in response to Amicus's ¶ 81, the Kacachoses flatly and firmly:

> Denied that "the form of these ancillary agreement had already been agreed to and some even executed at the same time as the PSA." The only integrated ancillary agreement initially approved at the same time as the PSA ws the Property Management Agreement. However, through due diligence, it was determined to be illegal and unenforceable under Ohio real estate brokerage law. The PSA and ancillary agreements remained a work in progress. The other ancillary agreements [excepting the Property Management Agreement} were *not* executed with the PSA and remained not only in negotiation, but also subject to ultimate failure to agree.

(Answer and Counterclaim, at ¶ 81 (emphasis original)). Hence, the Kacachoses forcefully and effectively denied that the ancillary agreements were complete or agreed upon. Accordingly, Amicus's contentions in the Complaint and First Amended Verified Complaint regarding the ostensible substantial completion of these ancillary agreements cannot be credited as accurate. Furthermore, the Kacachoses are not merely standing on procedural burden shifting here, but their averments accord with the facts, while Amicus's self-styled "Verified" Complaint and Amended Complaint play fast and loose with the parties' lengthy history of spirited and ongoing, even contentious negotiations. The Kacachoses pled that the ancillary agreements were almost all missing and all subject to further negotiation, because that is what happened here.

15

Under the well-settled Rule 12(c) standard, the Court should not consider allegations of a complaint that are specifically denied by the answer in deciding a plaintiff's motion for judgment on the pleadings. *See, e.g., Qwest Communications,* 208 F.R.D. 295 (noting that factual averments disputed by the non-movant cannot be accepted as true in support of the movant's 12(c) motion). Furthermore, these denials were not mere procedural sophistry. The Kacachoses pled definitive, well documented facts. In short, the Kacachoses did more than strictly required under notice pleading standards. As one court noted in addressing the movant and non-movant's respective burdens under Rule 12(c):

> Because this motion was framed as one for judgment on the pleadings, *the Court is required to assume that [non-movant] will be able to produce facts to support its [asserted defenses]*.

*Qwest*, 288 F.R.D. at 296. As noted, here as elsewhere, the Kacachoses layered in considerable factual detail in support of their Answer, Counterclaim and Affirmative Defenses. This more than meets the non-movant's burden under Rule 12(c). The Court should overrule Amicus's ill-supported motion.

**E. The Kacachoses Do Not Vary or Contradict the PSA, But Instead, Correctly Insist that Document be Assessed in Its Entirety.**

Amicus falsely claims the Kacachoses' Answer and Counterclaim clashes with and is trumped by the PSA. In fact, much of Amicus's shrill and tiresome repetition on this point may be fueled by a desire to divert the parties and this Court from what the PSA really says, as to things like what agreements are included, what manner of relationship is contemplated, what deadlines are set forth, and what conditions precedent must be satisfied to compel closing. It would be fair and accurate to say, the Kacachoses simply insist the PSA be read and construed in its entirety, not selectively and self-servingly culled in the manner Amicus invites.

Furthermore, the Kacachoses' denials align with well-settled Ohio law, expressing strong preference that written agreements be enforced in their entirety, that is, with all terms of a purported written contract to be enforced. Both Ohio courts and federal courts applying Ohio law to written instruments have consistently held that "In interpreting, [courts] are required, if possible, to give effect every provision of the contract." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 362, 678 N.E.2d 519, quoting *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus. *See also, Stonebridge Operating Co., LLC v. Antero Resources Corp.,* 510 F. Supp.3d 567, HN 27 and accompanying text (S.D. Ohio 2020). In *Stonebridge,* a buyer and seller of oil and gas leases battled over the amount of acreage to be included in mineral leases between the parties. Seller argued that it had identified approximately 26,000 acres of leases to buyer, obliging him to lease same. Buyer countered that any election of additional acreage beyond the amount specified in the agreement's recitals lay at its sole discretion, pointing to particular provisins of those parties' PSA.. The court concurred, and drove home the point:

> The unambiguous terms of the PSA prohibit Plaintiff's interpretation, which violates the fundamental tenet of contract construction that all terms of a contract must be given effect in accordance with the express intent of the parties.

*Id.* at 582.

To do otherwise, inviting a reviewing court or the parties themselves to selectively cull some but not all of an agreement's terms is to effectively remake the parties' bargain. Here, Amicus invites the Court to remake the parties compex and multi-layered transaction, which forecasted a decade-long strategic business relationship, as a simple land sale, and moreover, a land sale that was "evergreen," requiring the Kacachoses to close long after deadlines set forth within the PSA itself expired.

Moreover, Amicus insisted on the ancillary agreements. It insisted on the non-compete agreement, and became inflexible in demanding a five-year term (effectively a seven year term, as leases on these student rentals in the Oxford market are typically entered into as much as two years in advance of occupancy thereunder). (Answer and Counterclaim, at ¶ 88 of Answer; Ex. 11 – Email from Don Lussier) (Doc. 23).

**F.  Amicus, Not the Kacachoses, Repeatedly Delayed Any Closing.**

Incredibly, Amicus repeats its disingenuous claims that the Kacachoses delayed, or in their trite and repeated phrasing, "slow walked" the negotiations and due diligence materials. The Kacachoses thoroughly refuted these claims, with fact-rich denials, which not only must be taken as true for purposes of rebutting a Rule 12(c) motion, but which, in fact, are true.

For instance, the Kacachoses' paragraph 75 denies and refutes Amicus's claims that the Kacachoses delayed production of deposit transfer information for over a month. (Amicus Amended Verified Complaint at ¶ 75; c.f. Kacachos Answer and Counterclaims at ¶ 75). In response, the Kacachoses answered, emphatically and in detail:

> 75. Denied. In fact, Thomas Kacachos provided very accurate budget number of $975,000 was provided on Wednesday, January 19th. The final number and spreadsheet of $980,423 was provided on Monday January 24th. In short, the Kacachoses responded to Yvette Wall's Tuesday January 18th request immediately and followed up with a budget number on January 19th.

(Answer and Counterclaim, at ¶ 75 of Answer) (Doc. 23).

Here, as elsewhere in their Answer and Counterclaim, the Kacachoses did not simply deny allegations, but buttressed their denial with countervailing facts. Moreover, these facts are consistent with the overall chain of correspondence between the parties, and must be credited in the Kacachoses' favor for Rule 12(c) purposes.

As to Amicus's claims that it was "ready and willing to close," and that the Kacachoses pushed off closing dates, the Kacachoses denied this with specificity:

> 56. Denied. In fact, Amicus sent sharply mixed signals about their desire to close, and the timing of any proposed closing. *Amicus did not want to close from February 16 to March 1 because they disagreed over rent proration.* Then they abruptly reversed course, and on March 2 proposed to close forthwith. *Then on March 3 they decided they did not want to close, instead requesting a 90 day extension (which the Kacachoses refused). Amicus did not want to close from March 3-17.* On March 17, Amicus again reversed course, first proposing a March 25 closing, and then changing the proposed date yet again to March 24, even though the integrated ancillary agreements were not finalized and Amicus had not provided an accurate closing statement per the timeline set forth in the PSA.

(Answer and Counterclaim, at ¶ 56 of Answer) (Doc. 23). Again, the Court should credit this denial in favor of the Kacachoses, because it is procedurally proper under Rule 12(c), but also because it squares with the actual, detailed history of the parties' months long negotiations. Significantly, Amicus does <u>not</u> allege tender of performance. This omission speaks volumes.

Amicus, not the Kacachoses, repeatedly put off closing. (*See, e.g.,* Answer and Counterclaim at ¶ 84, noting "Amicus constantly changed the closing date, often on exceedingly short notice"). As noted in the Kacachoses' Answer and Counterclaim, Amicus blew hot and cold on closing, and never presented the unswerving, hectoring urgent-to-close force it falsely portrays in its nominally "Verified" Complaint or Amended Complaint. Amicus never sent the sharpest, most universally recognized signal of readiness and willingness to close forthwith—*the complete and accurate closing statement and final closing documents, circulated between buyer and seller, and affirmed as to all material details by both.* (Answer and Counterclaim at ¶¶ 2; 80; 83; 99; *see also* Fifth Affirmative Defense) (Doc. 23).

**G. Amicus's 12(c) Motion Fatally Collides with the Well-Pled Defenses and Material Denials.**

Amicus presents no legal authority, and certainly none binding on this Court, where a plaintiff has prevailed on a Rule 12(c) motion, on the basis that the defendant's denials and affirmative defenses were overborne by some written instrument. While Amicus cites several cases for the proposition that written instruments can trump a party's pleadings, if the two conflict, all of those cases involved *defendants'* Rule 12 motions, not a plaintiff's efforts to secure a judgment on liability.

As noted by Circuit level authority, as well as leading legal treatises, a plaintiff shoulders a daunting burden to secure affirmative relief under Rule 12(c).

**H. Amicus Cannot Negate the Kacachoses' Affirmative Defenses.**

A plaintiff is not entitled to judgment on the pleadings where the defendant's answer raises *affirmative defenses* which, if proved, would defeat plaintiff's recovery. *Qwest Communications Corp. v. City of Berkeley,* 208 F.R.D.288, 291 (N.D. Cal. 2022) (emphasis added) (discussing standard at headnote 6 and accompanying text). "A [plaintiff's] motion for judgment on the pleadings may only be granted if *all of the defenses raised in the answer are legally insufficient.*" *Id.* The Kacachoses pled and supported numerous affirmative defenses, including, *inter alia,* illegality of significant components of the proposed contract. (Answer and Counterclaim, Fourteenth Affirmative Defense) (Doc. 23). As noted in that Affirmative Defense:

> Two of the anticipated ancillary agreements, namely the Property Management Agreement and the Acquisition Fee Agreement, are illegal and hence unenforceable under Ohio real estate brokerage law, Ohio Rev. Code 4735.01(A)(6)-(7) and (B).

Accordingly, two integrated ancillary agreements—including the only one actually signed with the PSA—would violate statutory law. Amicus cannot overbear statutory law, on a motion for judgment on the pleadings, or any other manner of dispositive motion.

Well-settled contract law holds that a court "may refuse to enforce a contract on grounds of illegality where the contract has a direct objective or purpose that violates the federal or a state Constitution, a statute, an ordinance, or the common law." *PolyOne Corporation v. Westlake Vinyls, Inc.*, 937 F.3d 692, 701 (6th Cir. 2019).

Furthermore, as discussed at greater length in the Kacachoses' previously filed Motion for Partial Summary Judgment (Doc. 40), the drop-down method of property transfer at the heart of the land sale component of the PSA has drawn sharp criticism as a property tax evasion scheme, from both the Board of Tax Appeals ("BTA") and the Ohio Supreme Court. Both those tribunals rejected the formal structure of a drop-down transaction in a recent, reported case, and assigned a significantly higher value for tax purposes.

The Kacachoses also set forth a separate affirmative defense that Amicus failed to perform its own duties within the PSA's timelines. (*See* Answer and Counterclaim, at Seventh Affirmative Defense) (Doc. 23). The PSA set forth specific deadlines for: conducting inspections, finalizing the integrated ancillary agreements, producing a closing statement, and closing on the land sale component. Amicus blew past all these deadlines. Consequently Amicus's non-performance and untimely performance excused the Kacachoses from their performance, which was co-dependent. Briefing space prohibits discussion of each and every one of the Kacachoses' Affirmative Defenses here. Nevertheless, Amicus fails to carry its burden as movant to negate these Affirmative defenses. Accordingly, the Court should overrule Amicus's Motion for Judgment on the Pleadings (Doc. 39).

21

I. **The Kacachoses Never Refused to Close, or Demanded More Money, or Shopped the Portfolio to Third Parties.**

Amicus seems to believe that if blatantly false statements are parroted often enough in briefing, they become truth through some surreal legal alchemy. Correctives are in order here. First, the Kacachoses never shut down the negotiations. They simply pointed out, accurately, that Amicus had framed the overall transaction not just as a land sale, but as a long-term strategic partnership, framed by the still-unagreed, and in all but one case, unsigned, ancillary agreements. The ancillary agreements formed parts of the package deal Amicus presented and continued to insist on as negotiations proceeded into 2022.

As to Amicus's accusations of refusal to close, the Kacachoses' answered, in full detail, refuting these various allegations. As to Amicus's claims that the Kacachoses somehow acted unreasonably in declining to extend closing dates, the Kacachoses responded:

> Admit that a March 24 closing was not achieved because of continuing disagreements over material terms and unsatisfied contingencies, and there was no meeting of the minds to achieve agreement on matters in conflict. *Denied as to any "evasive efforts" by the Kacachoses. The Kacachoses tried to rebuild trust with Amicus but didn't feel comfortable with extensions. The contract negotiations seemed too far apart on ancillary agreements and other conditions.*

(Answer and Counterclaim, at ¶ 87 (emphasis added)) (Doc. 23).

Moreover, as the Kacachoses' Answer and Counterclaim pointed out, Amicus was seeking "contract concessions that were outside of the PSA." (Answer and Counterclaim, at ¶ 88.) This denial taken alone should negate any allegations of bad faith on refusal to accept extra-contractual terms, such as unbargained-for extensions. Furthermore, the denial squares with well-settled Ohio law holding that extra-contractual terms do not become part of any purported written agreement. *Minster Farmers Cooperative Exchange Co. v. Meyer,* 117 Ohio St.3d 459, 2008-Ohio-1259 at ¶28, 884 N.E.2d 1056, 1061 (holding that one party to a purported agreement may not unilaterally

impose later added terms). It was not bad faith nor any breach of contract for the Kacachoses to decline requested extensions, especially where the parties were continuing to negotiate, and the other party was demonstrating sharp elbows and trying to wrest unreasonable and unwarranted concessions, such as an untenable approach to rent proration.

Amicus has falsely insisted that the Kacachoses "believe they can cut a better deal, at a higher price with another buyer." (First Amended Verified Complaint at ¶ 2) (Doc. 22). But the Kacachoses emphatically and consistently denied this claim. Stating they "are not shopping for some other buyer at a better price." (Answer and Counterclaim, at ¶ 2) (Doc. 23). Here again, this is not mere procedural ledgerdemain, but the truth to be resolved in favor of the Kacachoses at this procedural juncture. Amicus has not and cannot point to one scintilla of evidence of some phantom buyer or stalking horse used to drive the price up.

Instead, the real answer to why the closing has not occurred, is that closing is a two-way street. Amicus continued to insist upon one-sided ancillary agreements with terms unacceptable to the Kacachoses, only one of which was signed with the PSA (and which document proved, under further examination, illegal under Ohio brokerage law).

**J. Amicus' Own Breaches of the PSA Bar Its Right to Specific Performance.**

Amicus itself breached the PSA, by refusing to follow the PSA's formula for rent proration, and by trying to cram down later added terms. The PSA set forth a formula for proration, based firmly on the tenure of the leases which stood to be transferred upon closing. Amicus ignored the language of the PSA, and broached its own self-serving formula, without any legal justification. This sparked the first serious disagreement between the parties, and also delayed closing.

Recent Ohio authority reaffirms that an attempt to impose later added terms—such as an extra-contractual approach to rent proration in this instance—can amount to a material breach.

23

*McKinney v. Lamalfa Party Center,* 2022-Ohio-4333 at ¶2-3; 26-27 (Ohio Ct. App. 11th Dist. 2022) (holding that a wedding facility host's later-added COVID restrictions amounted to a material breach of contract). *See also Minster Farmers Cooperative Exchange Co. v. Meyer*, 117 Ohio St.3d 459, 464, 2008-Ohio-1259, 884 N.E.2d 1056 (holding that notations on invoices and account statements whereby one party unilaterally sought to set forth an interest rate did not constitute part of the parties' written agreement). Yet Amicus insisted on its proration approach, despite lack of legal justification.

### K. Unsatisfied Contingencies and Conditions Precedent Bar Any Right to Specific Performance.

The Ohio Supreme Court usefully summed up the equitable roots of specific performance:

> Specific performance of a contract is a distinctively equitable remedy. *Commrs. of Muskingum County* v. *State* (1908), 78 Ohio St. 287, 305. In *Huntington* v. *Rogers* (1859), 9 Ohio St. 511, 516, the court said: "* * * specific performance * * * rests in the sound legal discretion of the court, in view of all the circumstances of the case. It is not a matter of right, but of grace; and the defendant will succeed in procuring the dismissal of the * * * [action] if he can convince the court that the exercise of their jurisdiction will be inequitable under the circumstances."

*Sternberg v. Bd. Of Trustees,* 37 Ohio St.2d 115, 118, 308 N.E.2d 457 (1974). In short, the party which invokes equity must come before the Court with clean hands. Here, Amicus makes numerous unsupported claims of delay against the Kacachoses, and has never abandoned its equally unsupported conspiratorial claims that the Kachachoses are shopping the portfolio to some phantom buyer or stalking horse, or alternatively seeking a higher price. So far, absent formal discovery, it has gotten away with these scandalous accusations. Nevertheless, they are a manifestation of bad faith. Furthermore, some of the very delay Amicus complains of stemmed from its efforts to cram down an unacceptable and self-serving rent proration scheme totally inconsistent with the provisions of PSA, Article 3. Furthermore, specific performance in the

transaction which their personal legal counsel pointed out has been criticized as a scheme to evade real estate conveyancing fees and taxes, by several Ohio tribunals, including its Supreme Court. Amicus effectively seeks the Federal Court to order the performance of illegal contracts.

Furthermore, as noted, Amicus never complied with all its obligations under the PSA. (Answer and Counterclaim, at ¶ 6 of Answer) (Doc. 23). Instead, because of the structure and wording of the PSA, the out of state Title Company Amicus selected to shepherd the transaction through closing provided a non-compliant and untimely closing statement. (Answer and Counterclaim, at ¶ 83 of Answer; ¶ 15 of Counterclaim). Finalization of the Ancillary Agreements, along with tender of a proper closing statement were conditions precedent to closing. Even if a meeting of the minds occurred sufficiently to create an enforceable contract, which is effectively refuted by the Rule 56 evidence presented here, failure of conditions precedent would still bar enforcement by specific performance or otherwise.

A condition precedent is "an act or event" that must take place before a party's performance obligations arise. *WSB Rehabilitation Serv. Inc. v. Cent. Acctg. Systems, Inc.,* 2022-Ohio-2160, at ¶ 26-27 (Ohio Ct. App. 1st Dist. 2022). An unsatisfied condition precedent can excuse performance under a contract and furnishes a defense to a claim for breach. *Id.* at 26, 34; *Telxon Corp. v. Smart Media of Del., Inc.,* 2005-Ohio-4931, at ¶ 53 (9 Dist.). It is significant that Amicus never tendered performance on its part.

Here, several conditions specified by the PSA for closing failed to occur. These included a "closing statement" so deficient that it was functionally non-existent—lacking calculations of rent prorations, recording costs, conveyance fees, transfer fees charged on a per parcel basis, among other omissions.[1] Further, the PSA expressly referenced and integrated the ancillary agreements,

---

[1] *See* T. Kacachos Aff. at ¶ 26. (Doc. 41).

four of which were never accepted by the sellers. These were required to be signed for closing to occur. These failed conditions are stubborn, irrefutable facts. Waiver of a condition precedent must be proven by clear and convincing evidence. *Id.* at ¶¶ 27-28. Here, there is no shred of evidence, in the pleadings or elsewhere, that the Kacachoses waived any conditions stated in the PSA.

**L. There Can Be No "Anticipatory Repudiation" Without an Enforceable Contract.**

Amicus's anticipatory repudiation claim, Count II, Verified Amended Complaint, fails in the absence of an enforceable contract. An anticipatory breach of a contract occurs where the promisor repudiates their contractual duty before the time fixed for performance has arrived. *McDonald v. Bedford Datsun*, 59 Ohio App.3d 38, 40, 570 N.E.2d 299 (Ohio Ct. App. 1989). Here, the Kacachoses have firmly and consistently denied that the PSA ever ripened into an enforceable contract.

Amicus's claim fails, based on facts before the Court and applicable law. First, no facts, buttressed by documents attached to pleadings, or other written communications between the parties, indicates any factual support for Amicus's self-serving and false narrative that the Kacachoses unreasonably delayed closing, or that the Kacachoses for that matter were ever the party prone to delay here.[2] Instead, Amicus repeatedly sought delays—first asking for an extension of time to close, then recoiling sharply over routine regulatory actions affecting a scant number of units and beds.[3] The Kacachoses never refused to close. They did insist that conditions precedent to closing occur, and they declined to send deeds to an out of state closing agent without a proper closing statement and with other conditions precedent unmet.

Anticipatory repudiation cannot occur without an enforceable contract. *Id.* As explained in detail, elsewhere in this briefing, the PSA remained incomplete, with glaring, material omissions.

---

[2] *See, e.g.,* T. Kacachos Aff. at ¶¶ 5-6, 10, 14, 24; Exhibits 2, 4, 10. (Doc. 41).
[3] T. Kacachos Aff. at ¶ 20-22; Exhibits 7-9 (Doc. 41).

The PSA was not a final (stand-alone) contract; it remained to be "finalized." As such, it reflected no meeting of the minds, yielded no enforceable contract, and as such could not be the proper subject of an anticipatory repudiation claim. The Court should overrule Amicus's Motion for Judgment on the Pleadings as to Count II of Amicus's Amended Verified Complaint.

## M. Ohio Recognizes No Claim for Breach of Good Faith, Nor Did the Kacachoses Act in Bad Faith.

Amicus' Count II fails, under Rule 12(c) or otherwise, because Ohio recognizes no stand-alone claim for breach of duty of good faith. "The implied duty may give rise to a *breach of contract* claim when the term allegedly breached is the implied duty of good faith and fair dealing." *Eggert Agency, Inc. v. NA Mgmt. Corp.*, No. C2-07-1011, 2008 WL 3474148, at *4 (S.D. Ohio Aug. 12, 2008). However, "[t]here can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself." *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co.,* 86 Ohio St.3d 270, 274, 714 N.E.2d 898 (1999).

Ultimately, a claim for breach of good faith and fair dealing arising from a purported contract cannot stand unless (a) there is a valid and enforceable contract, and (b) some term of that contract was materially breached. Finally, "a party to a contract does not breach the implied duty of good faith and fair dealing by seeking to enforce the agreement as written or by acting in accordance with its express terms, nor can there be a breach of the implied duty unless a specific obligation imposed by the contract is not met." *Lucarell v. Nationwide Mut. Ins. Co.,* 152 Ohio St.3d 453, 2018-Ohio-15, at ¶ 5. Here, as set forth above, the PSA never ripened into a fully integrated and agreed enforceable contract, because all of the agreements were never finalized. Amicus cannot secure judgment on the pleadings on a non-existent cause of action.

**N.  Amicus Cannot Demonstrate Reasonable and Detrimental Reliance on Promises Here.**

Amicus hedges its bets on the incomplete PSA by pleading promissory estoppel. Its alternative pleading reflects a rare moment of candor about the incomplete PSA. But Amicus cannot establish required elements of this quasi-contractual claim, and it most decidedly cannot do so in the context of a Rule 12 motion.

The Ohio Supreme Court has held that the elements of promissory estoppel include: (1) a clear and unambiguous promise; (2) detrimental reliance on such promise; and (3) reasonableness of the promisee's supposed reliance. *Olympic Holding Co. LLC v. Ace Limited,* 122 Ohio St.3d 89, 97, 2009-Ohio-2057 at ¶ 39, 909 N.E.2d 93. Reasonableness of reliance presents a question of fact, not subject to resolution on a motion for judgment on the pleadings. *Kelly v. Georgia-Pacific Corp.,* 46 Ohio St.3d 134, 140, 545 N.E.2d 1244 (1989). This is especially true where the Kacachoses firmly and fairly denied all allegations pled in support of Amicus's promissory estoppel claim. (*See* Answer and Counterclaim, at ¶¶ 153-164) (Doc. 23).

Amicus should not be permitted to use promissory estoppel to selectively enforce conditional promises set forth in an incomplete written agreement. The PSA, in its intended entirety, <u>did</u> set forth the parties' intended, though never achieved bargain. But because no meeting of the minds occurred on integral parts of that bargain, no promise enforceable in either contract or quasi-contract theories ever arose. The "promises" Amicus speaks of were embedded in the incomplete PSA. The Court should not indulge an end-run based on quasi contract, aimed at bypassing conditions precedent and deadlines set forth in the PSA. Nortshould it re-write the PSA to read those conditions and details out of it. The Court should overrule Amicus's Rule 12(c) motion as to all claims, including promissory estoppel.

**CONCLUSION**

The Court should overrule Amicus's Rule 12(c) Motion (Doc. 39). Amicus falls well short of the exceedingly daunting burden for plaintiffs seeking affirmative relief under Rule 12(c). The Kacachoses Answer and Counterclaim (Doc. 23) did not rely on stock, general denials. Though entitled to notice pleading, they rebutted Amicus's self-serving narrative, point by point, often referencing specific exhibits. Far from the Kacachoses making averments that clash with the PSA, it is actually Amicus that shows itself prone to making unsupported statements contradicted by documents attached to the pleadings. The Kacachoses also supported their affirmative defenses with supporting facts. Amicus utterly fails to negate those affirmative defenses. As a merely illustrative, though crucial example, the entire real estate transfer portion of the PSA is built around a drop-down transfer, which both the Ohio Board of Tax Appeals and Ohio Supreme Court have treated as a tax dodge, because the conveyance of real properties for valuable consideration is disguised as a transfer of membership interest of an LLC. Amicus's spin is that the conveyance for value would go undetected. But the Kacachoses would face the likely adverse tax consequences, and they refuse to be complicit to a fraudulent scheme of misreporting.

The Kacachoses never dragged their feet on closing obligations. Instead, Amicus recoiled from closing, demonstrably and unquestionably, on several occasions. Most centrally, though, the PSA was never limited to the simple real estate sale that Amicus now presents to the Court. Instead, at Amicus's own insistence, the PSA always aimed toward a decade-long strategic relationship, intended to be bounded by the ancillary agreements. Just as clearly, only one ancillary agreement was tendered at execution of the PSA, and it proved illegal. Amicus's motion is contrary to procedure and governing law.

Respectfully submitted,


**/s/ Edward P. Akin**
Edward P. Akin  0074357
Aronoff, Rosen & Hunt
2200 U.S. Bank Tower
425 Walnut Street
Cincinnati, OH 45202
(513) 241-0400
(513) 241-2877 (fax)
epakin@arh-law.com
*Trial Attorney for Defendants*


## CERTIFICATE OF SERVICE

I certify this document was filed electronically and served through the Court's ECF System on Aneca E. Lasley, aneca.lasley@icemiller.com, on January 6, 2023.


**/s/ Edward P. Akin**
Edward P. Akin