## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| AMICUS MIAMI OF OHIO, LLC, | : | |
| | : | |
| *Plaintiff,* | : | Case No. 1:22-cv-00355 |
| | : | |
| v. | : | Judge Jeffery P. Hopkins |
| | : | |
| HEATHER HOELZER KACACHOS, *et al.*, | : | |
| | : | |
| *Defendants.* | : | |

## OPINION & ORDER

It is often better to walk away from a bad deal rather than to accept it. For Defendants Heather Hoelzer Kacachos and Thomas Kacachos ("Defendants," "Kacachoses", or "Sellers"), they realized they had made a bad deal only *after* they had already agreed to one with Plaintiff Amicus Miami of Ohio, LLC ("Plaintiff," "Amicus," or "Buyer"). But the law does not permit the Kacachoses to renege on their contractual obligations simply because they could have gotten a better deal. Neither will the Court undo the essential terms of a valid, binding contract to sell properties to which the Parties assented and began performance under solely because a few side agreements that were ancillary and severable from the main contract were not signed or completed. Unfortunately for the Kacachoses, what they now perceive as a bad deal is nevertheless a binding one.

The following motions are pending now before the Court: Plaintiff's Motion for Judgment on the Pleadings (Doc. 39), Defendants' Motion for Partial Summary Judgment,

which the Court construes as a Motion for Judgment on the Pleadings (Doc. 40),[1] and Plaintiff's Motion to Strike Defendants' Motion for Partial Summary Judgment (Doc. 42). For the reasons set forth below, the Court **GRANTS IN PART, DENIES IN PART** Plaintiff's Motion for Judgment on the Pleadings; **DENIES** Defendants' Motion for Partial Summary Judgment/Judgment on the Pleadings; and **DENIES AS MOOT** Plaintiff's Motion to Strike Defendants' Motion for Partial Summary Judgment.

---

[1] The Court finds itself in an awkward procedural posture. On November 23, 2022, the Parties jointly moved "for leave to file their respective Memorandum in Support of a Motion for Judgment on the Pleadings, and any responsive briefings, in excess of the Court's page limitations." Doc. 38, PageID 1239. Judge Matthew W. McFarland, who was previously assigned to the case before it was transferred to the Undersigned, granted the motion by notation order, stating that "[a]ny motions directed to the pleadings SHALL NOT exceed thirty (30) pages." While Plaintiff filed a Motion for Judgment on the Pleadings (Doc. 39), Defendants filed a Motion for Summary Judgment (Doc. 40).

But motions for summary judgment are not motions directed towards the pleadings. *See, e.g., Pardue v. Wal-Mart Stores, Inc.*, No. C-3-06-081, 2007 WL 2902938, at *1 (S.D. Ohio Oct. 1, 2007) ("On June 1, 2007, the deadline for filing motions not directed to the pleadings, [the defendant] filed a [m]otion for [s]ummary [j]udgment."); *Smith v. Montgomery Cnty. Sheriff's Off.*, No. 3:10-cv-448, 2012 WL 4051924, at *3 (S.D. Ohio Sept. 13, 2012) ("as the deadline for motions not directed to the pleadings[,] which includes motions for summary judgment"); *Woody v. Sears, Roebuck & Co.*, No. C-3-05-368, 2006 WL 8442539, at *1 (S.D. Ohio May 2, 2006) ("the cut-off date for filing motions not directed to the pleadings, including motions for summary judgement, is October 2, 2006").

Defendants readily admit "[their] oversight and resulting non-compliance with [Judge McFarland's] standing order." Doc. 45, PageID 1441. In attempting to resolve this procedural morass, the Court has scoured caselaw in this Circuit for any instance where a court converted a motion for summary judgment into a motion for judgment on the pleadings. The Court has found no such decision, and its research indicates that courts almost exclusively go the other way. *See, e.g., Ent. Prods., Inc. v. Shelby Cnty., Tennessee*, No. 08-2047, 2009 WL 10699869, at *3 (W.D. Tenn. Sept. 29, 2009) (converting a motion for judgment on the pleadings into a motion for summary judgment); *Collver v. Bay Reg'l Med. Ctr.*, No. 16-cv-12968, 2017 WL 264485, at *1 (E.D. Mich. Jan. 20, 2017) (same); *Stephenson v. Fam. Sols. of Ohio, Inc.*, No. 1:18-cv-2017, 2020 WL 6685301, at *1 (N.D. Ohio Nov. 12, 2020) (same).

Notwithstanding the dearth of caselaw on this issue, the Court **CONVERTS** Defendants' Motion for Partial Summary Judgment under Rule 56 into a Motion for Judgment on the Pleadings under Rule 12(c) and considers the arguments therein as such. Doc. 40. While the Court appears to tread on new ground given the unique circumstances of this case, the Court is nevertheless guided by important considerations such as whether there is any "prejudice or surprise to any party" in converting Defendants' Motion. *Ent. Prods., Inc.*, 2009 WL 10699869, at *3. Here, Defendants' Motion for Partial Summary Judgment (Doc. 40) by and large recites the same assertions, allegations, and arguments that Defendants make in their Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings (Doc. 47), to which Plaintiff has filed a thorough Reply (Doc. 49). Because Plaintiff has had the opportunity to respond to the substantive issues raised in Defendants' Opposition, which itself re-raises issues in Defendants' Motion for Partial Summary Judgment, the Court finds that there will be no prejudice or surprise to either party in converting Defendants' non-compliant Motion for Partial Summary Judgment into a Motion for Judgment on the Pleadings and in construing it as such.

Within **twenty-one (21) days** of the entry date of this Opinion and Order, the Parties are hereby **ORDERED** to file a joint status report regarding the May 5, 2023 Rule 26(f) Report. Doc. 50. The joint status report must indicate whether the Parties intend to abide by the deadlines as set forth in the Rule 26(f) Report and whether the Parties have engaged in meaningful attempts at settlement now that the instant Motions have been resolved. The Court will determine at a later date if a hearing on damages is necessary.

I.    **BACKGROUND**

A. **Factual Background**

1.  **The Parties**

Thomas Kacachos and Heather Hoelzer Kacachos are a husband-and-wife business duo who operate an extensive real estate portfolio located in Oxford, Ohio (the "Park Place Portfolio" or "Portfolio"). Doc. 40, PageID 1284. Most of the real estate holdings in the Park Place Portfolio are comprised of houses, apartments, and mixed-use structures that serve a bustling market for off-campus student rentals for Miami University students. *Id*. The Portfolio properties are titled under a number of different Ohio limited liability companies and closely held corporations. *Id.* The Portfolio properties are operated under the consolidated management of Park Place Real Estate Management, Inc., which is owned by the Kacachoses. *Id*.

Plaintiff Amicus Miami of Ohio, LLC is a Delaware limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York. Am. Verified Compl., ¶ 13. Amicus and its affiliates purchase and renovate real estate properties across the eastern United States, predominantly focusing on collegiate housing. Doc. 39, PageID 1256. In 2020, Amicus sought out potential student housing

investment opportunities around Miami University in Oxford, Ohio. *Id.* While conducting an investment survey, Amicus came across the Portfolio, and on or around July 13, 2021, Amicus began negotiating with the Kacachoses to acquire the Portfolio. *Id.* On September 14, 2021, the Parties executed a nonbinding letter-of-intent that outlined the $75 million purchase price ("Purchase Price") for the Portfolio properties. Am. Verified Compl., ¶ 26. The letter-of-intent also articulated the requirements for a pre-purchase and sale agreement escrow deposit that Amicus would need to make in order for the deal to go through. *Id.*

### 2. The Purchase and Sale Agreement

The Parties exchanged the first draft of the Limited Liability Company Membership Interests Purchase and Sale Agreement (the "PSA") on September 29, 2021. *Id.* ¶ 27. Extensive negotiations over the terms of the PSA ensued. *Id.* ¶ 28. Throughout the course of these negotiations, the Parties were well represented and advised by sophisticated legal counsel. *Id.* Finally, on October 25, 2021, Robert Abelson on behalf of Amicus as the Buyer, the Kacachoses as the Sellers, and Fidelity National Title Insurance Company ("Fidelity" or "Escrow Agent") as the third-party escrow agent all entered into and executed the PSA. *Id.* ¶ 29.

The PSA is a complex tri-partite agreement setting forth multiple obligations and conditions between the Parties. The Parties agreed to the purchase and sale of the Portfolio properties by an agreed upon Closing Date. PSA, Art. 1. The Parties further agreed to exchange multiple duly executed counterparts to additional agreements, including a Finder's Fee Agreement, a Construction Management Agreement, a Property Management Agreement, a Profits Interest Agreement, and a Non-Competition Agreement (collectively, the "Ancillary Agreements"). Am. Verified Compl., ¶ 43. The Property Management

Agreement would have memorialized a 10-year strategic employment/business relationship between Amicus and the Kacachoses. Doc. 47, PageID 1457; *see also* PSA, Doc. 22-1.

In contemplation of the sale of the Portfolio properties, the Sellers agreed to "(i) organize HoldCo [an entity wholly owned by Sellers], (ii) … acquire full and clear record and marketable fee simple title to their respective properties, (iii) … convey all of the Property to HoldCo, and (iv) sell all of the HoldCo Interests to Buyer … for the Purchase Price[.]" Doc. 39, PageID 1258. In exchange, the Buyer agreed to pay to the Sellers $75,000,000, accounting for certain adjustments and prorations that were yet to be determined. *Id.* The Parties also negotiated the allocations of expenses (such as delinquent taxes, conveyance taxes, and documentary taxes), outlined a schedule for a due diligence review, and established an inspection and closing timeline. *Id.* The timeline set out an initial 90-day inspection period, beginning on the execution date of the PSA, October 25, 2021, and also included a one-time option for a 30-day extension if Amicus escrowed an additional $250,000.[2] Am. Verified Compl., ¶ 40.

The closing timeline also set forth a number of respective obligations in order to consummate the intended real estate transaction. During the Closing Period, the Sellers were to provide the Buyer with "sufficient information to cause the Escrow Agent to prepare a draft closing statement setting forth the prorations and adjustments to the Purchase Price … at least five (5) days prior to the Closing," as well as other items necessary to facilitate and close on the transfer of the Portfolio. Doc. 39, PageID 1258; *see also* Doc. 40, PageID 1286. In turn,

---

[2] The PSA also provided for the latest Closing Date to occur on February 22, 2022, or, if extended, as was the case here, on or about March 24, 2022. Am. Verified Compl., ¶ 41.

the Buyer was responsible for paying the fees charged by the title company and expenses related to obtaining a title insurance policy. Am. Verified Compl., ¶ 38.

By the Closing Date, the Sellers were required to deliver to the Buyer multiple executed documents, including deeds, bills of sale, certificates, tax returns, records, plans, contracts, rent rolls, and information relating to construction, operation, and maintenance of the Portfolio properties. *Id.* ¶ 43. The Sellers needed also to have exchanged duly executed counterparts to the Ancillary Agreements. *Id.* For its part, and by the Closing Date, Amicus was "to deliver the Purchase Price" to the Kacachoses and countersigned and duly executed copies of the Ancillary Agreements. *Id.* ¶ 44. Critical to the instant dispute, only one agreement—the Property Management Agreement—was in existence and directly incorporated into the PSA upon its execution. Doc. 47, PageID 1457. The other Ancillary Agreements appear never to have been drafted or incorporated into the PSA. *Id.*

In addition to executing the PSA by way of signature on October 25, 2021, Mr. Abelson and Mr. Kacachos initialed each page of the PSA. Am. Verified Compl., ¶ 31. Under § 4.1(c) of the PSA, the Sellers expressly agreed that:

> (c) ***This Agreement has been duly authorized, executed and delivered by all of the Seller Parties*** and all consents required under any of the Seller Parties' which are legal entities' organizational documents, operating agreements or by laws have been obtained. All documents that are to be executed by any of the Seller Parties and delivered to Buyer on the Closing Date have been, or on the Closing Date will be, duly executed, authorized and delivered by the applicable Seller Parties. ***This Agreement and all such documents are, and on the Closing Date will be, legal, valid and binding obligations of the Seller Parties***, enforceable in accordance with their terms, and do not, and, at the time of the Closing Date will not, violate or conflict with any provisions of any contract, agreement, instrument, document, ordinance, bylaw, rule, regulation or judicial or administrative order to which any of the Seller Parties is a party or to which any of the Seller Parties or the Property (or any portion thereof) is subject or, to Seller's knowledge, any ordinance, bylaw, rule, regulation applicable to the Seller Parties or the Property.

(emphasis added).

### 3.  Initial Steps Toward Closing

On September 16, 2021, Amicus made its initial $50,000 escrow deposit towards the Purchase Price contemplated by the PSA. Am. Verified Compl., ¶ 51. On October 27, 2021, two days after the PSA was executed, Amicus made a second escrow deposit for $250,000, for a subsequent deposit value of $300,000. *Id*. Amicus made a third escrow deposit of another $250,000 on January 24, 2022, extending the inspection period as outlined by the terms of the PSA, for an overall deposit total of $550,000. *Id*. ¶ 52; *see* Doc. 22-2. In the lead up time to the closing, Amicus hired a team of professionals, including legal counsel and a certified public accountant, to facilitate the effectuation of the PSA and to assist in the transfer of the Portfolio properties. Doc. 39, PageID 1260.

After the Parties signed the PSA on October 25, 2021, the Kacachoses began providing Amicus with certain documents to conduct its due diligence. Doc. 47, PageID 1461. Those documents included leases and rent rolls, property contracts, tax bills, financial and environmental reports, and confidential and proprietary insurance and operating information. *Id*. The Parties continued to exchange additional due diligence materials throughout December 2021 and January 2022 and executed a First Amendment to the PSA on January 24, 2022 (the "Amendment"), extending the inspection period until January 31, 2022. Am. Verified Compl., ¶¶ 63–65; *see also* Pl.'s Ex. D, Doc. 22-4, PageID 738–39.

On February 9, 2022, Mr. Kacachos sent an email summarizing certain action items that needed to be addressed before the Closing Date in late February 2022. *Id*. ¶ 70. Those action items included, among others, the Construction Management Agreement, the Profit Interest Agreement, the Non-Competition Agreement, the Closing Statement, the pricings of

various properties, and a finalization of the Closing Date. Defs.' Answer, ¶ 72; *see also* Pl.'s Ex. F, Doc. 22-6, PageID 745–46.

### 4. Problems Arise

The events that occurred over the next few months are a matter of intense dispute. Amicus maintains that in February 2022, the Kacachoses became unresponsive to communications and began slow-walking their production of due diligence materials necessary to achieve its closing deliveries. Doc. 39, PageID 1261. This delay allegedly thwarted the closing timeline and forced the Parties to repeatedly reschedule the Closing Date. *Id*. On or about February 14, 2022, Amicus attempted to schedule a closing checklist call with the Kacachoses' counsel to prepare for late February. Am. Verified Compl., ¶ 77. However, the Kacachoses instead requested that the Parties aim for a Closing Date in March 2022. *Id*.

Amicus avers that on March 2, 2022, it reached out to the Kacachoses to have them commit to a date and to finalize the Ancillary Agreements and other information required for closing. *Id*. ¶ 81. But Mr. Kacachos purportedly began to raise "issues" with the Ancillary Agreements, which he insisted needed to be resolved prior to the Closing Date. *Id*; *see also* Pl.'s Ex. J, Doc. 22-10, PageID 759. On or about March 7, 2022, Amicus sent the Kacachoses an email outlining a potential resolution of the alleged "issues" ahead of the closing. Am. Verified Compl., ¶ 85. No response was received. *Id*. ¶ 86. Amicus proceeded to offer an extension of the Closing Period for another 60 to 90 days, first on March 7 and again on March 17, 2022. *Id*. ¶ 87. Again, no response was received. *Id*. ¶ 88. Over the course of the next few months, Amicus asserts that it resolved the "issues" to the Sellers' satisfaction and reasonably believed there were no remaining impediments to consummating the closing. *Id*. ¶ 94. But during a call on May 2, 2022, Mr. Kacachos apparently demanded a higher price,

citing economic concerns and "inflation." *Id.* ¶ 96. The following week, on May 11, Mr. Kacachos indicated that the Kacachoses no longer had any intention of selling the Portfolio properties to Amicus. *Id.* ¶ 99.

The Sellers' version of the story is markedly different. The Kacachoses aver that their negotiations with Amicus did not relate solely to a sale of realty but more broadly encompassed discussions to commence a 10-year strategic business partnership. Doc. 47, PageID 1457. The Kacachoses maintain that they negotiated in good faith for many months with Amicus, (*id.* at PageID 1458), and admit to having executed the PSA. Defs.' Answer, ¶ 30. But the Kacachoses assert that the Parties needed to delay the Closing Date because they were far apart on several critical elements, including finalizing the Ancillary Agreements, determining the method of calculating proration of rents and the allocation of values for real properties, and measuring goodwill and other assets for tax purposes. *Id.* Consequently, the Kacachoses aver that there was never a final, enforceable agreement to transfer the Portfolio properties, nor were the integrated Ancillary Agreements ever finalized as mandated by the terms of the PSA. *Id.* According to the Kacachoses, the PSA was nothing more than a non-binding "agreement to agree." Doc. 47, PageID 1461.

When Amicus did finally circulate the proposed Ancillary Agreements, the Kacachoses objected because the agreements contained terms and conditions that were "unsatisfactory" to the Sellers. *Id.* Counsel for the Kacachoses had also determined that the Property Management Agreement and the Finder's Fee Arrangement were allegedly illegal and would likely violate the closing covenants of the PSA. *Id.* at PageID 1462. Furthermore, the Kacachoses allege that it was Amicus that tried to stifle the consummation of the real estate transaction by (1) lowering the price through a different rent proration scheme, (2)

adding an opt-out clause, (3) withholding $550,000 in escrow, and (4) refusing to provide a closing statement. *Id.* at PageID 1458, 1464. When the Inspection Period expired on March 17, 2022, the last-minute proposed additions and the Ancillary Agreements were still not finalized nor agreed upon. *Id.* at PageID 1462. According to the Kacachoses, despite their best efforts to conclude the negotiations, changing circumstances, such as unexpected capital expenditures, market conditions, renewed rent cycles, inflation, and obligations they incurred associated with continuing business operations (including addressing zoning violations), adversely impacted the expected benefit of the bargain to be derived from a timely closing. *Id.* at PageID 1463–64.

### 5. The Parties' Allegations

Amicus initiated the instant suit in May 2022. In its Amended Verified Complaint, Amicus asserts four counts. *See* Am. Verified Compl., Doc. 22. *First*, under Count One, Amicus argues that Defendants are liable for their breaches of the PSA. Am. Verified Compl., ¶¶ 106, 108; Doc. 39, PageID 1253. Amicus contends there was mutual assent in the formation of the PSA by virtue of a valid offer, acceptance, and consideration but that Defendants refused to abide by their obligations. *Id. Second*, under Count Two, Amicus alleges that Defendants repudiated the PSA by contending that they were not bound to close under its terms and by demanding a higher Purchase Price. Am. Verified Compl., ¶ 134. *Third*, under Count Three, and in the alternative to its breach of contract claim, Amicus maintains that Defendants are liable for their breach of the duty of good faith and fair dealing. *Id.* ¶ 143; Doc. 39, PageID 1254. Specifically, Amicus avers that Defendants engaged in evasive actions, conveyed empty promises, refused to provide necessary due diligence documentation, and relied upon pretextual excuses to delay and ultimately avoid closing. Am. Verified Compl.,

¶¶ 147–48. *Fourth*, under Count Four, Amicus alternatively pleads a promissory estoppel claim for Defendants' alleged breaches of their promises to provide necessary documentation, to complete account transfers, to negotiate on an array of documents so as to facilitate the closing on the Portfolio properties, and to close on the properties on or before February 22, 2022, or, if extended, on March 24, 2022. *Id*. ¶¶ 155–56.

The Kacachoses generally deny these allegations and strenuously dispute the characterization of the PSA as a binding and enforceable contract. *See generally* Defs.' Answer, Doc. 24. Moreover, the Kacachoses have lodged two counterclaims against Amicus. *First*, the Kacachoses request judgment in their favor, pursuant to the Ohio Declaratory Judgment Act, Ohio Rev. Code § 2721, *et seq*., and 28 U.S.C. § 2201, declaring that the PSA was incomplete as to the Ancillary Agreements, and therefore, that it failed to reflect a meeting of the minds as to the material terms. Defs.' Answer, ¶ 21. *Second*, the Kacachoses plead an alternative count that, notwithstanding the Sellers' faithful performance throughout the course of negotiations and the execution of the PSA, their performance was excused by Amicus' material breaches. *Id*. ¶ 31. Specifically, the Kacachoses aver that Amicus impermissibly demanded an improper method of rent proration, refused to circulate its draft of certain Ancillary Agreements, failed to provide a compliant Closing Statement, imposed an additional escrow reserve condition, and requested an opt-out clause. *Id*. ¶ 31(a)–(e).

### B. Procedural History

Inadvertently, it appears, Amicus filed the initial Complaint in this action against the Kacachoses in the Eastern Division of the Southern District of Ohio on May 31, 2022. Doc. 1. Defendants subsequently moved to transfer venue to the Western Division of the Southern District of Ohio. Doc. 13. On June 17, 2022, Judge Michael H. Watson of the Eastern

Division of the Southern District of Ohio transferred the case to the Western Division in Cincinnati, where the case was first assigned to Judge Matthew W. McFarland. Doc. 18.

Amicus filed its Amended Verified Complaint on July 6, 2022. Doc. 22. Shortly thereafter, Judge McFarland entered an agreed order for a preliminary injunction preventing Defendants from "market[ing] for sale, sell[ing] or otherwise transfer[ing] the [Portfolio] properties to a third party." Doc. 36, PageID 1235. Amicus filed its Motion for Judgment on the Pleadings on November 29, 2022. Doc. 39. Defendants filed their Motion for Summary Judgment on December 9, 2022 (Doc. 40), to which Plaintiff filed its Motion to Strike Defendants' Motion for Summary Judgment ten days later for non-compliance with Judge McFarland's Standing Order (Doc. 42). Shortly thereafter, the case was transferred to the Undersigned. Doc. 43. Oral argument was held on the pending Motions, and this decision follows.

## II.     LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(c)

The standard of review for a "Rule 12(c) motion [for judgment on the pleadings] is the same for a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). To state a claim upon which relief may be granted, "movants must satisfy the pleading requirements set forth in Rule 8(a)." *Stonebridge Operating Co., LLC v. Antero Res. Corp.*, 510 F. Supp. 3d 567, 570 (S.D. Ohio 2020). While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (clarifying the plausibility standard articulated in *Twombly*). "Although for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it] [is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. at 677–79 (quoting *Twombly*, 550 U.S. at 556 (internal quotations omitted)).

Stated differently, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citations and quotation marks omitted). Even so, "the court will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations, and it will consider as true only those factual allegations which meet a threshold test for plausibility." *Milner v. Biggs*, No. 2:10-cv-904, 2012 WL 1188274, at *11 (S.D. Ohio Apr. 6, 2012), *aff'd,* 522 F. App'x 287 (6th Cir. 2013) (citing *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998)).

In the breach of contract context, courts may resolve such claims on the pleadings because a written instrument filed with the pleadings "trumps the allegations" of the parties. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (*N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 454 (7th Cir. 1998)). Courts need not accept "[g]eneral averments of conclusions . . . when the pleadings are at variance and inconsistent with the clear and unambiguous language of the contract filed as an exhibit thereto." *Consolidated Jewelers, Inc. v. Standard Fin. Corp.*, 325 F.2d 31, 36 (6th Cir. 1963).

### B. Matters Considered

Because the Court herein considers motions under Rule 12(c) of the Federal Rules of Civil Procedure, the facts set forth below are taken from the pleadings, and from the exhibits attached thereto, which are appropriately considered part of the pleadings. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997). "[I]n ruling on a Rule 12 dispositive motion, a district court 'may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [a party]'s motion … so long as they are referred to in the Complaint and are central to the claims contained therein.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

## III.   LAW AND ANALYSIS

### A. Choice of Law

Because this case is before the Court on diversity jurisdiction, Ohio law applies to the interpretation of the PSA. *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 240 (6th Cir. 2011) ("A federal court sitting in diversity must apply the law of the highest state court if that court has ruled on the matter in dispute; otherwise, the court may rely on case law from lower state courts."). Likewise, the "Choice of Law" provision contained in the PSA provides that "[t]his Agreement shall be construed under and in accordance with the laws of the State of Ohio." PSA § 12.11. The Parties do not dispute this provision's applicability.

In Ohio, "a contract is generally defined as a promise, or a set of promises, actionable upon breach." *Kostelnik v. Helper*, 2002-Ohio-2985, ¶ 16. A meeting of the minds, or mutual assent, "as to the essential terms of the contract is a requirement to enforcing the contract." *Id*. (citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991)) (stating that to "prove the existence of a contract, the plaintiff must show the

elements of mutual assent (generally, offer and acceptance) and consideration."). "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik* at ¶ 16 (citing *Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D. Ohio 1976). The parties must also have expressed a "distinct and common intention" that is communicated by each party to the other. *Altercare of Mayfield Vill., Inc. v. Berner*, 2017-Ohio-958, ¶ 28 (citation omitted).

The interpretation of a written contract's terms "is a matter of law for initial determination by the court." *Shanesville Investments LLC v. Eclipse Resources I, LP*, 358 F. Supp. 3d 665, 670 (S.D. Ohio 2018) (citing *Phillips Exploration, Inc. v. Reitz*, 2012 WL 6594915, at *3 (S.D. Ohio, Dec. 18, 2012) and *Absalom v. Hess Corp.*, 2014 WL 12746847, at *3 (S.D. Ohio Jan. 2, 2014)). A court gives effect to the intent of the parties when confronting an issue of contract interpretation. *Shanesville Investments LLC*, 358 F. Supp. 3d at 670 (citing *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999)). The court presumes the intent of the parties will "reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313 (1996). "Where the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 2011-Ohio-2720, ¶ 37. A court may infer mutual assent where a reasonable person would agree "that the parties manifested a present intention to be bound to an agreement." *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, ¶¶ 22, 23 (internal citations and quotation marks omitted).

### B.  Plaintiff's Claims

### 1.  Count One: Defendants' Breach of Contract

Amicus argues that the PSA was a clear, definite, and binding contract and that Defendants refused to abide by their obligations to which they agreed. Amicus maintains that the Sellers' participation in negotiating, signing, and conducting due diligence following the execution of the PSA, and even the Kacachoses' own admissions initially to close without the finalized Ancillary Agreements, all demonstrate "an intention to be bound by its terms." Doc. 39, PageID 1268. Amicus assert that the terms of the PSA are "sufficiently definite to be specifically enforced," even if certain of the Ancillary Agreements remained to be finalized. *Id*. (quoting *Normandy Place Assocs. v. Beyer*, 2 Ohio St. 3d 102, 105–06 (1982)). Thus, Amicus contends that by failing to abide by the terms of the PSA and by refusing to close, the Sellers breached the contract.

The Kacachoses counter with several arguments. *First*, Defendants dispute the characterization of the PSA as a binding and enforceable contract. Defendants aver that there was never mutual assent on the essential terms of the contract because the PSA was nothing more than an "agreement to agree." Doc. 40, PageID 1311. *Second*, the Ancillary Agreements, which set forth many of the PSA's allegedly essential terms, remained "subject to months of negotiation which never bridged fundamental disagreements." Doc. 47, PageID 1457. According to the Kacachoses, because the Ancillary Agreements were never finalized, and because the deadlines of the PSA have now elapsed, both Parties are excused from performance under the terms of the PSA. *Id*. at PageID 1464. *Third*, Defendants invoke the defense of illegality. Specifically, the Kacachoses assert that the closing method elected under the PSA—dubbed the "drop-down" method for conveyancing the Portfolio properties—

16

"violates Ohio statutes pertaining to conveyancing of real properties and may be construed as fraudulent conveyancing and an illegal scheme intended to evade accurate taxation of real properties." Doc. 47, PageID 1463 (citing Ohio Rev. Code §§ 319.202; 319.54; § 319.21).

### a. *Existence of a Contract*

In order to determine whether Defendants were in breach, the Court must first assess whether there the PSA qualifies as a valid and enforceable contract. The Court answers this question in the affirmative.

Under Ohio law, a contract is enforceable where both parties consent to its terms, where there is a meeting of the minds, and where the contract by its own terms is definite and certain. *See Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Rels.*, 61 Ohio St. 3d 366, 369 (1991). "Whether there has been a manifestation of mutual assent and/or a meeting of the minds is a question of fact to be determined from all the relevant facts and circumstances." *Matusoff & Assocs. v. Kuhlman*, 2000 WL 192449, at *3 (10th Dist. 1999). Performance towards contractual obligations and the signing of a clear and definite agreement "generally demonstrate[] the existence of a 'meeting of the minds.'" *Fry v. FCA US LLC*, 2017-Ohio-7005, ¶ 20 (cleaned up); *see also Adv. Sign Group, LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) ("The manifestation of mutual assent requires that each party make a promise or begin to render performance.") (cleaned up). Moreover, mutual assent must occur "on the essential terms of the contract." *McGee v. Tobin*, 2005-Ohio-2119, ¶ 24 (7th Dist.) (citing *Alligood v. Procter & Gamble Co.*, 72 Ohio App.3d 309, 311 (1st Dist. 1991)). Courts have identified the essential terms of a contract to include "the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *Id.*

The record and the pleadings before this Court clearly demonstrate that there was a meeting of the minds on the essential terms of the PSA. The Parties' mutual performance in furtherance of the contemplated real estate transaction reflected a shared intent to be bound by their contractual obligations. And while the Ancillary Agreements were not finalized by the Closing Date, the essential terms of PSA withstand the nonfulfillment of this condition, which was otherwise waived as a result of the Parties' partial performance towards the ultimate objective of the PSA: the conveyance of the Portfolio properties.

To begin, the PSA is sufficiently definite on its essential terms. The "essential terms of a contract generally include the subject matter, identity of the parties bound, consideration, price, and quantity." *N. Side Bank & Tr. Co. v. Trinity Aviation, LLC*, 2020-Ohio-1470, ¶ 15 (1st Dist.). "Whether a meeting of the minds has occurred as to the essential terms of a contract is a question of fact to be determined from all the relevant facts and circumstances." *McFadden v. Charter Commc'ns, Inc.*, 2024-Ohio-4564, ¶ 12 (9th Dist.) (citing *Aber v. Vilamoura, Inc.*, 2009-Ohio-3364, ¶ 10 (9th Dist.)). Based on the relevant facts and circumstances as expressed in the Parties' pleadings, this Court finds that the PSA contained definite and essential terms to which the Parties assented.

The most essential obligations under the PSA require the Parties to:

> (i) organize HoldCo, (ii) cause the Ground Lessees to acquire good and clear record and marketable fee simple title to their respective properties, (iii) cause the Property Owners to convey all of the Property to HoldCo, and (iv) sell all of the HoldCo Interests to Buyer, and Buyer, or its nominee, agrees to buy all of the HoldCo Interests from Seller, for [$75,000,000].

PSA §§ 1.1, 3.1. The addresses of the respective properties are identified in Schedule 2.1(A) to the PSA (which are also initialed by Messrs. Kacachos and Adelson, the Amicus representative). In exchange, Amicus agreed to pay the Kacachoses $75,000,000, accounting

for certain adjustments and prorations set forth in the PSA, which appeared never to vary more than $300,000, and that Amicus would make a deposit into the escrow account within two days of the execution of the PSA. Doc. 39, PageID 1258; Doc. 40, PageID 1298.

Moreover, the recitals to the PSA plainly state: (1) the property to be conveyed, (2) the intention of the Buyer and Sellers in entering into the PSA, and (3) the consideration to be exchanged, the receipt and sufficiency of which was duly acknowledged by the Parties.

RECITALS

WHEREAS, Seller indirectly holds one hundred percent (100%) of the ownership interests in the entities which are the fee simple owners or the ground lessees, as applicable (collectively, the "Property Owners"; together with Seller, collectively, the "Seller Parties"; any references below to "Seller" shall be deemed to instead refer to "Seller Parties" if the context so requires), of certain student housing properties located in Oxford, Ohio and related assets, all collectively defined in Section 2.1 as the Property; and

WHEREAS, Seller intends to (i) cause any Property Owners that hold leasehold interests in the portions of the Property they own ("Ground Lessees") to acquire fee simple title thereto, and (ii) cause all of the Property Owners to convey fee simple title in the entire Property to one or more newly created limited liability companies (as Buyer may elect) that will be formed and wholly owned by Seller (such entities are collectively referred to herein as "HoldCo"); and

WHEREAS, following the Property Owners' conveyance of the Property to HoldCo, Buyer desires to purchase from Seller all of Seller's membership and equity interests in HoldCo ("HoldCo Interests"), all in accordance with the terms and conditions hereinafter set forth.

In consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows ….

Doc. 22-1, PageID 632.

These obligations constitute the clear and essential terms of the property and sale agreement, and the recitals elucidate the intent of the contracting Parties. The definite terms "include the identity of the parties to be bound, the subject matter of the contract, the

consideration to be exchanged, and the price to be paid." *Smith-Knabb v. Vesper*, 2023-Ohio-259, ¶ 17 (12th Dist.) (citing *Turner v. Langenbrunner*, 2004-Ohio-2814, ¶ 13 (12th Dist.). And while it is true that a plaintiff generally "cannot base a breach of contract claim on [a defendant's] failure to live up to the aspirational language of the recitals," *Shelbyville Hosp. Corp. v. Mosley*, 69 F. Supp. 3d 718, 724 (E.D. Tenn. 2014), the recitals nevertheless inform this Court's understanding of the intent of the Parties in entering into the PSA. *See* Doc. 22-1, PageID 632 ("Seller *intends*….") (emphasis added). It is particularly notable, therefore, that the recitals do not make even a glancing reference to the contemplated "complex 10-year strategic business relationship" between the Parties that Defendants contend was the ultimate objective of the PSA. Doc. 40, PageID 1293.

Defendants urge this Court to find the PSA deficient because, at the time it was executed, it lacked several executed Ancillary Agreements. Doc. 47, PageID 1470. Defendants further argue that the finalization of the Ancillary Agreements was itself an essential "condition[] precedent to closing" that was never "satisfied." *Id.* at PageID 1462. And where "an obligation to become binding rests on a future agreement to be reached by the parties … there is no binding contract." Doc. 40, PageID 1300–01 (citing *Schlagel v. Howell*, 2015-Ohio-4296, ¶ 25 (2d Dist.)).

Those arguments are unconvincing. *First*, by admitting that the executed PSA did not contain all finalized Ancillary Agreements, Defendants appear to concede that the Ancillary Agreements were not essential to the contract. *Second*, and more to the point, while the finalization of the Ancillary Agreements may have been a condition precedent to closing, this condition was waived because the Parties mutually began performance towards their respective obligations. Their performance demonstrates the Parties' shared intent to

20

consummate the essential component of the contemplated transaction: the conveyance of the Portfolio properties.

In Ohio, a condition precedent is an event that must occur before an obligation in the contract becomes effective. *Moody v. Ohio Rehab. Servs. Comm.*, 2002-Ohio-6965, ¶ 9 (10th Dist.). The "nonoccurrence of a condition precedent excuses performance under the contract and is a defense to a breach-of-contract claim." *Eagle Realty Invs., Inc. v. Dumon*, 2022-Ohio-4106, ¶ 11 (1st Dist.) (cleaned up). However, Ohio law generally "disfavors conditions precedent." *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 2011-Ohio-4979, ¶ 15 (10th Dist.). Courts tend to avoid construing contractual provisions as conditions precedent "unless the intent of the agreement is plainly to the contrary." *Hiatt v. Giles*, 2005-Ohio-6536, ¶ 23 (2d Dist.) (internal quotation marks and citations omitted). Consequently, "absent an explicit intent to establish a condition precedent, courts will not interpret a contractual provision in that manner." *Evans* at ¶ 15. A court "ascertains that intent from the language of the particular provision, the language of the entire agreement, and the subject matter of the agreement." *Id.* ¶ 14. Importantly, "[i]n Ohio, the general rule is that performance of a condition precedent *may be waived* by the party *to whom the benefit of the condition runs*; the waiver may arise expressly or by implication, and the key to its application in a particular case *is a showing of some performance pursuant to the terms of the contract*.'" *Corey v. Big Run Indus. Park, L.L.C.*, 2009–Ohio–5129, at ¶ 18 (10th Dist.) (cleaned up) (emphasis added); *see also Stonebridge Operating Co., LLC v. Antero Res. Corp.*, 510 F. Supp. 3d 567, 577 (S.D. Ohio 2020) ("Partial performance evidences an intent to be bound.").

Here, PSA § 7 sets forth the "[c]onditions to Seller's and Buyer's [p]erformance." One of the conditions "to consummate the transaction contemplated by [the] Agreement" is for

the Parties to "hav[e] performed all covenants and obligations required by this Agreement …
on or prior to the Closing Date." *Id*. §§ 7.1(a), 7.2(c). The covenants require the Parties, among
their other obligations, to "enter into" the Ancillary Agreements. *Id*. § 4.4(a)–(f).

As a preliminary matter, the Court notes that the PSA contains a few sections
specifying a party's rights "[i]n the event the foregoing conditions [*i.e.*, the finalization of the
Ancillary Agreements] have not been satisfied." *Id*. § 7. The PSA contemplates only that the
"*Buyer* shall have the right to waive such conditions precedent and proceed to consummate
the transactions contemplated in this Agreement, or terminate this Agreement…." PSA §
7.2(i) (emphasis added); *see also* PSA § 11.1 ("In the event that Seller breaches or shall have
failed to have performed any of the covenants and agreements contained in this Agreement
… , then Buyer shall have the right to (i) terminate this Agreement … , or (ii) take any and all
legal actions necessary to compel Seller's specific performance … and to consummate the
transaction contemplated by this Agreement…."). The Kacachoses were represented by
experienced and sophisticated counsel during the drafting and negotiation of the PSA. Doc.
49, PageID 1516. Despite this, there is no corresponding clause articulating the *Sellers*' right
to terminate the PSA if any of the conditions to performance were not satisfied. As it is the
"role of courts … to ascertain the intent of the parties," *City of St. Marys v. Auglaize Cty. Bd. of
Commrs.*, 2007-Ohio-5026, ¶ 18, and as the "intent of the parties is presumed to reside in the
language they choose to use in their agreement," *Graham v. Drydock Coal Co*., 76 Ohio St. 3d
311, 313 (1996), the absence of such language suggests to the Court an intent on the part of
the Sellers to relinquish the right to terminate the Agreement in the event of the non-
fulfillment of certain conditions. In other words, if the Sellers intended to preserve their right
to terminate the PSA if the Ancillary Agreements were not finalized—which is essentially the

22

case at bar—then "they should have included such language in the negotiated Agreement." *David Eng'g Co. v. Morbern Inc.*, No. 11-12615, 2012 WL 3109919, at *6 (E.D. Mich. July 31, 2012). But alas, "[t]hey did not." *Id.*

This, of course, does not dispose of whether the non-completion of the Ancillary Agreements nullifies the entirety of the PSA. The Court still finds the PSA to be binding because the Kacachoses' conduct *after* the execution of the PSA expressed a manifest intention to be bound to its essential and binding terms. Indeed, the Kacachoses' counsel referred to the PSA as a "contract" nearly five months after agents for the respective Parties signed every page of the agreement. Defs.' Ex. 8, Doc. 24-8, PageID 960. And the Kacachoses' performance towards the conveyance of the Portfolio properties demonstrates a waiver of the condition that the Ancillary Agreements needed to have been finalized before the consummation of the contemplated real estate transaction.

"By its very nature, a condition precedent is only operative *prior* to performance." *Corey v. Big Run Indus. Park, L.L.C.*, 2009–Ohio–5129, at ¶ 24 (10th Dist.) (emphasis added). The language of the PSA provides that the conditions may "be waived in whole or in party by [the Parties] at [their] discretion." PSA, §§ 7.1, 7.2. Under Ohio law, a "party may waive a condition precedent by the act of performance … despite the non-fulfillment of the condition." *Corey* at ¶ 19; *see also St. Marys v. Auglaize Cty. Bd. of Commrs.*, 2006-Ohio-1773, ¶ 31 (3d Dist.) ("A condition precedent may be waived by the conduct and performance of the party asserting the condition."). Ohio courts have applied this concept "to find waiver by a party who proceeds to perform a contract despite the non-fulfillment by the other party of a condition precedent." *Corey* at ¶ 23 (collecting cases). So, too, does this Court find that Amicus, to whom the benefit of the Ancillary Agreements would run, waived these

conditions. Further, the steps undertaken by the Kacachoses to convey the Portfolio properties also constitute a waiver of the condition that the Ancillary Agreements needed to have been finalized before the real estate transfer could be completed. Further still, as is discussed *infra*, the Kacachoses cannot rely on the non-fulfillment of the conditions precedent to defeat a finding of a valid contract where the Sellers' own actions circumvented the Buyer's performance and obligations.

Here, it is undisputed that the Ancillary Agreements were not finalized before the end of the Closing Period. Doc. 47, PageID 1469. But the Parties undoubtedly took concrete steps towards closing on the critical component of the PSA: the purchase and sale of the Portfolio properties. This partial performance evinces "an intention to be bound" to the essential terms of the PSA. *Normandy Place Assocs. v. Beyer*, 2 Ohio St. 3d 102, 105 (1982). The Kacachoses admit that Amicus made repeated deposits into escrow, totaling at least $550,000. *See* Defs.' Answer ¶ 51. The Kacachoses concur that the Parties were actively working through due diligence—including negotiating and drafting the Ancillary Agreements—for months following the execution of the PSA in October 2021. *Id*. ¶¶ 62–64. The Kacachoses agree that the Parties adhered to all necessary procedural processes for amending the PSA. *Id*. ¶ 65. The Kacachoses acknowledge that Amicus "circulated [the] proposed Ancillary Agreements," albeit on terms that were "unsatisfactory" to them. Doc. 47, PageID 1461. And the Kacachoses concede to have attempted to arrange a closing even without the finalized Ancillary Agreements. Defs.' Answer ¶ 82; *see also* Doc. 22-6, PageID 744 (containing an email from Mr. Kacachos suggesting that the Parties "should finalize [the Construction Management Agreement] after the closing."). Taken together, these admissions by the Kacachoses strongly suggest that both Parties performed in furtherance of their obligations

pursuant to the PSA. In fact, the Kacachoses themselves even declare that they "*substantially performed* all [S]eller related duties through the end of the Inspection Period set forth in the PSA." Defs.' Answer, ¶ 30 (emphasis added). Because the Parties took definite—admittedly substantial—steps towards the conveyance of the Portfolio properties, their partial performance constitutes a waiver of the condition that the Parties needed to have finalized the Ancillary Agreements before completing the essential component of the contemplated transaction: the purchase and sale of the Portfolio properties.

Even so, Amicus has adequately demonstrated that the Parties mutually assented to the essential terms of the contract. A reasonable person analyzing the present record "would find that the [P]arties manifested a present intention to be bound to an agreement.'" *Champion Gym & Fitness, Inc. v. Crotty*, 2008-Ohio-5642, ¶ 12 (2d Dist.) (quoting *Zelina v. Hillyer*, 2005-Ohio-5803, ¶ 12 (9th Dist.)). There is no dispute that the Parties spent months engaged in negotiations, which culminated in the material terms that were in the executed PSA on October 25, 2021. Am. Verified Compl., ¶ 29; Defs.' Answer, ¶¶ 26–27. The PSA characterizes itself as an "Agreement to Purchase and Sell" real estate and acknowledges "the liabilities, *duties*, debts, *obligations* and *responsibilities* of the Seller Parties." PSA, Art. 1 (emphasis added). Not only did the Parties sign the PSA, but the Parties' respective representatives initialed each one of the PSA pages preceding the signature page. This is sufficient on its own to demonstrate a meeting of the minds because "parties to contracts are presumed to have read and understood them and … a signatory is bound by a contract that he or she willingly signed." *Preferred Capital, Inc. v. Power Engineering Group, Inc.*, 2007-Ohio-257, ¶ 10; *see also NetJets, Inc. v. Binning*, 2005-Ohio-3934, ¶ 8 ("Thus, the signing of an

25

agreement and acquiescence in its effect generally demonstrates the existence of a 'meeting of the minds.") (cleaned up).

Turning now to the Parties' performance after the execution of the PSA. Throughout the end of 2021 and the beginning of 2022, the Parties worked together to close on the conveyance of the Portfolio properties. Amicus sought to immediately satisfy its obligations in the PSA by making repeated escrow deposits, totaling $550,000. Doc. 39, PageID 1267. The Parties closely shared due diligence information related to utilities, rent, maintenance, and mortgage payments, and exchanged financial records related to the Portfolio properties. Am. Verified Compl., ¶¶ 62–72; Defs.' Answer ¶¶ 62–72. These facts indicate "that each party made promises in the PSA *and* rendered performance pursuant to the promises made in the PSA." *Stonebridge Operating Co., LLC v. Antero Res. Corp.*, 510 F. Supp. 3d 567, 577 (S.D. Ohio 2020).

Defendants, however, assert that the Parties "never reached a meeting of the minds" and reduce the PSA as a mere "agreement to agree." Doc. 47, PageID 1458, 1461. But Defendants' own admission of their "substantial[] perform[ance]," (Defs.' Answer, ¶ 30), "belies [these] contention[s]." *Stonebridge*, 510 F. Supp. 3d at 577. For one, partial performance is evidence of the existence of a contract and an intent to be bound to the terms thereof. *See Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*, No. 2:09-cv-781, 2010 WL 3069758, at *5 (S.D. Ohio Aug. 5, 2010). Here, Amicus made repeated escrow deposits, which the Kacachoses never suggested were in error. Defs.' Answer, ¶ 147. Further, the Parties coordinated with each other for several months to share an array of sensitive, detailed information relating to the transition of numerous accounts and the conveyance of the Portfolio properties. Am. Verified Compl., ¶¶ 62–72. And in the case of

Mr. Kacachos, he personally communicated with representatives of Amicus, updating them on the Sellers' compliance with due diligence requirements concerning the production of environmental reports pursuant to Section 5.3(c) of the PSA, and worked to schedule walkthroughs with Amicus's appraisers. Am. Verified Compl., ¶ 63; Defs.' Answer, ¶ 63. Throughout the Closing Period, the Parties made overt indications that they were aiming to close pursuant to the terms established in the PSA. *See* Am. Verified Compl., ¶¶ 68–71. Moreover, the January 24, 2022 Amendment expressly recognized that the Parties had "entered into [the] Limited Liability Company Membership Interests Purchase and Sale Agreement dated October 25, 2021 … concerning the acquisition of membership interests of HoldCo, which will be the owner of a portfolio of student housing properties." Am. Verified Compl., ¶¶ 65–66. The Parties' partial performance towards their obligations, their mutual indications to close on the PSA, and the execution of the Amendment, which itself was governed by the requirements of PSA § 12.7, underscore each Party's intention to be bound to the terms of the contract.

Given all these facts, the Court is unconvinced by Defendants' contention that the PSA was nothing more than an "agreement to agree." The "enforceability of [an agreement to agree] depends ... on whether the parties have manifested an intention to be bound by its terms and whether these intentions are sufficiently definite to be specifically enforced.'" *M.J. DiCorpo, Inc. v. Sweeney*, 69 Ohio St.3d 497, 503 (1994) (quoting *Normandy Place Assoc. v. Beyer*, 2 Ohio St.3d 102, 105–106 (1982) (superseded on other grounds)). "[W]hether the parties intended a contract is a factual [question], not a legal one," "must be based upon an evaluation of the circumstances surrounding the parties' discussions," and "except in the clearest cases, the question is for the finder of fact to resolve." *Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*,

541 F.2d 584, 588 (6th Cir. 1976) (citations omitted). The case at bar is among those "clearest [of] cases."[3] *Id.*

It is a well-established principle of contract law that the "intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996) (citing *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987)). Here, the language of the PSA contradicts Defendants' averments that the PSA is a non-actionable "agreement to agree." Rather, the PSA defines itself to contain the "legal, valid, and *binding* obligations of the Seller Parties." PSA § 4(c) (emphasis added). It "embodies the entire agreement between Seller and Buyer with respect to the transactions contemplated in this Agreement, and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter." PSA § 12.8. Multiple clauses in the PSA allow for certain provisions, rights, obligations, or liabilities to "expressly survive[] termination" of the PSA. *Id.* §§ 5.4, 6.1(c), 7.1, 13. These express terms indicate to this Court that the Parties *intended* "to be bound by … [the] terms" of the PSA. *Normandy Place Assocs.*, 2 Ohio St. 3d at 105–06. Indeed, in their Response to Plaintiff's Motion for Judgment on the Pleadings, Defendants seemingly concede that the "PSA … in its intended entirety, would have *bound* the Parties…." Doc. 47, PageID 1469 (emphasis added).

At bottom, Defendants have not demonstrated to the Court that, as a matter of law, simply because the Ancillary Agreements were not finalized, the Parties should therefore be *entirely* excused from their obligations under any of the other, essential terms of the PSA. Recall that the inquiry here is whether "the pleadings before the Court reflect a meeting of the

---

[3] While the Court may not resolve factual disputes on Rule 12(c) motions for judgment on the pleadings, "it does not follow that determination of whether there was a meeting of the minds is never appropriate for decision on the pleadings." *Stonebridge Operating Co., LLC v. Antero Res. Corp.*, 510 F. Supp. 3d 567, 575 (S.D. Ohio 2020).

minds" on the PSA's essential terms. *Stonebridge Operating Co., LLC v. Antero Res. Corp.*, 510 F. Supp. 3d 567, 577 (S.D. Ohio 2020). Defendants assert that because the "PSA was incomplete on its face[,] and the missing documents were not satisfactorily negotiated," there was "no meeting of the minds." Doc. 47, PageID 1470. But still, the actions of the Parties "show conclusively that they … intended to conclude a binding agreement, even though one or more terms [were] missing or [were] left to be agreed upon." *Oglebay Norton Co. v. Armco*, 52 Ohio St.3d 232, 236 (1990) (citation omitted). The Parties' performance establishes that they "manifested a sufficiently definite intention to be bound" to the essential and "specifically enforceable" element of the PSA—the conveyance of the Portfolio properties. *Borkey v. J.F. Glaze Cleveland L.L.C.*, 2014-Ohio-3727, ¶ 7 (8th Dist.). The non-fulfillment of the Ancillary Agreements is an issue that appears to be just that—ancillary, which is defined as "[s]upplementary" and "subordinate." *See* Black's Law Dictionary 105 (10th ed. 2014); *see also* Merriam-Webster's Collegiate Dictionary 43 (10th ed. 1998). Defendants have alerted this Court to no authority that unequivocally states that the non-fulfillment of the Ancillary Agreements, as a matter of law, vitiates the Parties' agreed-upon obligations under the other, essential terms of the PSA.

*Third*, Defendants' affirmative defense of illegality fails. The Kacachoses allege that the PSA does not constitute a valid contract because the method of conveyance "would violate Ohio law."[4] Doc. 40, PageID 1305. Defendants contend that the PSA's "drop-down"

---

[4] Defendants also claim that two of the proposed Ancillary Agreements would violate Ohio law—the Brokerage Agreement and the Finder's Fee Agreement. Doc. 40, PageID 1305, 1307. The Court declines to weigh in on these matters but notes that the PSA contains a severability provision that would enable the conveyance of the Portfolio properties to proceed even without the fulfillment of allegedly illegal agreements. *See* PSA § 12.4 ("If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.").

method of real estate ownership transfer—where the Sellers would organize HoldCo, acquire title to their respective properties, convey the Portfolio properties to HoldCo, and sell all of the HoldCo interests to Amicus—is a fraudulent "real estate tax evasion scheme." Doc. 40, PageID 1305. The authorities Defendants invoke to support this contention of illegality are *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 759 (6th Cir. 1965) and *Columbus City Sch. Bd. of Educ. v. Franklin Cnty. Bd. of Revision*, 2020-Ohio-353.

Off the bat, those cases are inapposite. *Associated Press* concerned a news service's breach of contract claim against a newspaper, alleging that the newspaper was required to pay assessments for services for two years following the discontinuance of publication. 340 F.2d at 755. That case does not implicate a real estate conveyance at all. The only portion of the decision that appears relevant to Defendants' claim is the following statement: "A party to an illegal bargain cannot 'recover damages for breach thereof.'" *Id*. at 759 (quoting Restatement, Contracts, § 598). The Court would agree with that declaration of law, but without a demonstration of the illegality of the PSA, that statement is simply without teeth.

*Columbus City* fares only slightly better. There, the Ohio Supreme Court reviewed an appeal of a purchase and sale agreement that purportedly utilized the drop-down method of real estate conveyance. *Columbus City* at ¶ 1. But nowhere in that opinion does the Ohio Supreme Court expressly hold that the drop-down method of conveyance is illegal as a matter of law. Rather, the Court held that the purchase and sale agreement "reflected the parties' intent to sell and purchase income-producing real estate" and found "that the parties' transfer of corporate ownership constituted a contrivance for accomplishing the sale of commercial real estate." *Id*. at ¶ 39. Ultimately, the Supreme Court *affirmed* the lower court's decision

establishing the validity of the transaction. *Id*. at ¶ 49. There is no indication that the Court declared—let alone even considered—the drop-down method as illegal.

Thus, based on the pleadings and the record as provided by the Parties, the Court finds that the PSA was a binding agreement. "To assert a claim that a contract existed, a plaintiff must allege facts showing an offer and an acceptance and a meeting of the minds, which is supported by consideration." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 16. This is exactly what Amicus has done.

b. *Breach of the Contract*

Turning now to breach. In Count One of the Amended Verified Complaint, Amicus argues that the Kacachoses breached the PSA by "refus[ing] to close on the sale of the Portfolio" and failing "to cooperate with due diligence reviews." Doc. 39, PageID 1268–69; *see also* Am. Verified Compl., ¶¶ 104–130. Amicus avers that it sought to fulfill its obligations pursuant to the terms of the PSA but that the Kacachoses "actively sought to avoid and counteract theirs," thereby "causing Amicus to suffer substantial financial damages." Doc. 39, PageID 1268–69. The Kacachoses strenuously dispute these allegations, arguing there can be no breach where a contract does not exist and maintaining that they conducted negotiations in good faith. Doc. 40, PageID 1301–02. Instead, the Kacachoses allege that it was *Amicus* that breached the PSA by "repeatedly put[ting] off closing." Doc. 47, PageID 1475.

Under Ohio law, a claimant "must satisfy four elements to make out a breach of contract claim: 1) the existence of a binding contract; 2) the non-breaching party performed its contractual obligations; 3) a breach in contractual obligations by the other party; and 4) the non-breaching party suffered damages as a result of the breach." *Holmes v. Wilson*, No.

31

2:08-cv-602, 2009 WL 3673015, at *3 (S.D. Ohio Oct. 30, 2009); *see also Kline v. Mortg. Elec. Registration Sys., Inc.*, No. 16-3932, 2017 WL 3263745, at *8 (6th Cir. Aug. 1, 2017). The claimant must prove these elements "by a preponderance of the evidence." *Savedoff v. Access Group. Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Jarupan v. Hanna*, 2007-Ohio-5081, ¶ 18 (10th Dist.)).

Having found the PSA constitutes a binding contract, the Court must now assess whether Amicus has sufficiently pled the remaining elements. The record reflects that Amicus "performed its contractual obligations" in accordance with the terms of the PSA. *Holmes*, 2009 WL 3673015, at *3. Pursuant to Article 5 of the PSA, Amicus hired appraisers, attorneys, and other professionals to facilitate the necessary paperwork, promptly initiated the inspection period, actively reviewed—to the extent that it could—the Sellers' due diligence documents, made the required escrow deposits, and worked to maintain financing. Doc. 39, PageID 1269; Am. Verified Compl., ¶¶ 51–61; Defs.' Answer ¶¶ 51–54. Pursuant to § 5.3(c) and Schedule F of the PSA, Amicus conducted due diligence regarding environmental reports, security deposits, and rent information. Am. Verified Compl. ¶¶ 62–64; Defs.' Answer ¶¶ 62–64. Amicus began preparing for the transfer of accounts and continued to work diligently to address issues with utilities, tenant announcements, and other priorities. Am. Verified Compl. ¶¶ 68–71; Defs.' Answer ¶¶ 68–71. These are uncontested facts underscoring that Amicus performed its contractual obligations as outlined in the PSA.

Turning now to the Kacachoses' actions. Amicus maintains that Defendants "repeatedly breached the PSA by refusing to cooperate with due diligence reviews," by "fail[ing] to produce necessary information," and by "refusing to set and stick to a final closing date." Doc. 39, PageID 1269–1270. Moreover, Amicus alleges a material breach of the

essential terms of the PSA. Specifically, the Sellers were required to—but critically did not—(i) organize HoldCo, (ii) acquire good and clear record and marketable fee simple title to their respective properties, (iii) convey properties to HoldCo, and (iv) sell all of the HoldCo Interests to Amicus by the Closing Date on March 24, 2022. Am. Compl., ¶ 109; *see also* PSA §§ 1.1, 5.1, 8.1.

The Court finds that the Kacachoses' actions constitute material breaches of the PSA. A "material breach" of a contract is a party's failure to perform an element of that contract which is "so fundamental to the contract" that the single failure to perform "defeats the essential purpose of the contract or makes it impossible for the other party to perform." *O'Brien v. Ohio State Univ.*, 2007-Ohio-4833, ¶ 56 (10th Dist.) (citing 23 Williston on Contracts, Section 63:3). Here, the Kacachoses' refusal to cooperate with diligence reviews and failure to comply with the essential terms the PSA rendered "it impossible for" Amicus to fulfill its covenants and categorically "defeat[ed] the essential purpose" of the Parties' contemplated agreement. *O'Brien* at ¶ 56.

The Kacachoses attempt to excuse their breaches by alleging that Plaintiff's claims are themselves "barred by [Amicus'] own unclean hands." Defs.' Answer, PageID 898. Defendants insist that they "never refused to close." Doc. 47, PageID 1478, 1482. Rather, they explain that Amicus breached the PSA by "tr[ying] to impose an unacceptable and self-serving method of proration of rent[,]" thereby causing the Kacachoses to suffer "material adverse financial consequences." Doc. 24, PageID 898. The Kacachoses aver that Amicus "fail[ed] to perform its duties within the date specific timelines" and certain conditions precedent "set forth in the PSA." *Id.* at PageID 897. And the Kacachoses claim that "Amicus

never provided a transparent closing statement and related documents," in violation of PSA § 3.15. Doc. 47, PageID 1458, 1464.

At best, these arguments are unavailing, and, at worst, they are belied by the record. In alleging that Amicus breached the PSA by refusing to provide a closing statement, Defendants fail to account for how their own actions prevented the Buyer's fulfillment of this condition. For example, Amicus argues that it "provided [the] Sellers with multiple draft closing statements throughout the closing period." Doc. 39, PageID 1270. Indeed, on March 2, 2022, Ms. Kacachos sent a message to a representative from Amicus requesting that Amicus "send [the Kacachoses] a closing statement based on the March 8th [*sic*]." Pl.'s Ex. J, Doc. 22-10, PageID 759. The representative for Amicus responded that they would oblige "[a]s soon as Tom [Kacachos] sends the prorations based March 8 [*sic*]." *Id.* Later that month, counsel for the Kacachoses indicated that he "received the draft of the closing statement." Doc. 30-4, PageID 1134; *see also* Defs.' Ex. 10, Doc. 24-10, PageID 968. But the Kacachoses claimed that the latest draft "document [was] grossly deficient." Doc. 30-4, PageID 1134. Thereafter, Amicus sought additional information from the Kacachoses to provide the necessary payoff statements and sales price allocations in order to finalize and deliver the closing statement. Doc. 39, PageID 1271; *see also* Doc. 30-5, PageID 1139. In the March 18, 2022 email correspondence with Tom Kacachos, Yvette Wall specifically indicated that Amicus "reviewed the [price] allocations" provided by the Sellers, agreed "with the summary," and asked the Sellers to "formalize the document and include the delta of the sales price vs. [*sic*] asset total" in order to finalize the closing statement. *Id.* The Kacachoses, however, appear to have never complied with that March 18, 2022 follow-up request. Doc. 39, PageID 1270–71. The Sellers' refusal to comply violates their obligations as outlined in

34

the PSA to "provide [the] Buyer with sufficient information … to prepare a draft closing statement setting forth the prorations and adjustments of the Purchase Price …." PSA § 3.15. Thus, Defendants' argument of Plaintiff's non-compliance fails because it runs counter to the well-established rule that "[o]ne cannot avoid liability by preventing the performance of a condition precedent." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 879 (6th Cir. 2007).

Furthermore, Defendants claim that they were "excused from further performance" because the PSA "expir[ed]" without a "timely closing." Doc. 47, PageID 1464. Yet again is this Court unpersuaded by an excuse not grounded in law or in fact. Under Ohio law, "time is generally not of the essence in contractual relationships." *AMP V, LP v. Long Point Energy, LLC*, 2025-Ohio-201, ¶ 35 (7th Dist.) (citations omitted). For time to be of the essence means "that performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable one party to require performance from the other party." *Coldwell v. Moore*, 2017-Ohio-526, ¶ 21 (7th Dist.) (quoting *Lake Ridge Acad. v. Carney*, 66 Ohio St.3d 376, 378 (1993)). "The inclusion of a specific closing date in a contract does not automatically mean that time is of the essence." *AMP V, LP*, at ¶ 35 (citation omitted). While some courts have implied time is of the essence "from the circumstances surrounding the negotiations and the contract," other courts have found "that time is not of the essence unless specifically expressed in the agreement." *Id*. Here, while the PSA required the closing to occur "thirty (30) days after the expiration of the Inspection Period," (PSA § 8.1), the fact that the Parties corresponded several times to extend the Closing Period, including by executing the Amendment on January 24, 2022 pursuant to the terms of the PSA, suggests consummation of the transaction was not essential by a given date. *See* Doc. 24-7; Am. Verified Compl., ¶¶ 64, 65. Even Tom Kacachos himself recommended that the

Parties postpone the Closing Date by two weeks in a February 16, 2022 email written to several Amicus associates. *See* Doc. 22-8. Thus, the Court finds that the exact timing of the closing was not a serious concern for the Parties, or to put in legalese, was not of the essence here, and the failure to close by the deadline—several times extended—did not nullify the Parties' obligations pursuant to the PSA.

As it relates to damages, Amicus maintains that it incurred financial costs by "making repeated escrow deposits, totaling over $500,000; hiring appraisers, attorneys, and other professionals to facilitate the transfer of the Portfolio; pulling over $15 million of non-returnable investor capital to secure committed financing for the transaction; and expending significant human capital and financial resources to work toward closing on the Portfolio." Doc. 39, PageID 1274; *see also* Am. Verified Compl. ¶¶ 51–52, 54, 56; Defs.' Answer, ¶¶ 51–52, 54. These are assertions consistent with a pleading of damages.

"As none of these factual issues is actually in dispute based on the plain language of the [PSA], judgment on the pleadings is appropriate." *City of Lancaster v. Flagstar Bank, FSB*, 789 F. Supp. 2d 873, 882 (S.D. Ohio 2011). Therefore, the Court **GRANTS** Plaintiff's Motion as it relates to Count One.

## 2. Count Two: Anticipatory Repudiation of the PSA[5]

In Count Two of the Amended Verified Complaint, Amicus argues that the Kacachoses "explicitly repudiated the PSA" by illegally "demand[ing] a higher Purchase

---

[5] The Court clarifies here that the factual allegations underpinning the breach of contract claim under Count One are different than the factual allegations underpinning the anticipatory repudiation claim under Count Two. In other words, Plaintiff asserts two different theories of breach of contract. The first breach of contract claim concerns allegations that the Kacachoses violated their contractual obligations to disclose information and to close on the Portfolio properties pursuant to the PSA. The anticipatory repudiation claim concerns allegations that the Kacachoses repudiated the PSA by demanding a higher Purchase Price and then by withdrawing from the contract. Neither party has briefed whether Count Two is subsumed into Count One.

Price." Am. Verified Compl., ¶ 134. Defendants counter that "[a]nticipatory repudiation cannot occur without an enforceable contract." Doc. 47, PageID 1482. Defendants maintain that, because the PSA "reflected no meeting of the minds [and] yielded no enforceable contract," Amicus has no basis for "an anticipatory repudiation claim." *Id.*

The Court first begins with the law. "[W]hen a contracting party repudiates the contract prior to the time that such party's performance is due, an 'anticipatory breach' or, more precisely, an 'anticipatory repudiation' occurs, and the injured party has an immediate action for damages for total breach." *Farmers Comm. Co. v. Burks*, 130 Ohio App.3d 158, 172 (3d Dist. 1998) (citing Farnsworth, Contracts (1982) 627–628, Section 8.20). A claim for anticipatory repudiation may arise "when a party declares that he or she will not perform the terms of the contract unless the contract price is increased." *Daniel E. Terreri & Sons, Inc. v. Mahoning Cnty. Bd. of Commrs.*, 2003-Ohio-1227, ¶ 46 (7th Dist.). The repudiation does not rescind the contract but constitutes a breach of that contract. *See Am. Bronze Corp. v. Streamway Products*, 8 Ohio App.3d 223, 228 (8th Dist. 1982).

"To prevail on a claim of anticipatory breach of contract, a plaintiff must establish that there was a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance, causing damage to the plaintiff." *Metz v. Am. Elec. Power Co.*, 2007-Ohio-3520, ¶ 35 (10th Dist.) (citation omitted). But an anticipatory breach of contract "must be expressed in clear and unequivocal terms." *Sentinel Consumer Prods., Inc. v. Mills, Hall, Walborn & Assocs., Inc.*, 110 Ohio App.3d 211, 215 (11th Dist. 1996). "'A mere

---

However, courts in Ohio nevertheless appear to be able to entertain causes of action where a plaintiff alleges both theories—breach of contract and anticipatory repudiation—as separate counts based on different facts. *See, e.g.*, *Edgar Spring, Inc. v. Tuscarawas Cnty. Bd. of Comm'rs*, 1995 WL 156317, at *1 (Ohio Ct. App. Jan. 31, 1995); *Burke v. Athens*, 123 Ohio App. 3d 98, 104 (9th Dist. 1997); *Mike Castrucci Ford Sales, Inc. v. Hoover*, 2009-Ohio-4823, ¶ 3 (12th Dist.).

request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation.'" *McDonald v. Bedford Datsun*, 59 Ohio App. 3d 38, 40 (8th Dist. 1989) (quoting 4 Corbin, Contracts (1951) 905–906, Section 973). Likewise, "a mere expression of doubt as to willingness or ability to perform is insufficient to constitute repudiation of a contract." *Farmers Comm. Co. v. Burks*, 130 Ohio App.3d 158, 172 (3d Dist. 1998). Whether an anticipatory repudiation occurred is a question of law. *Sunesis Trucking Co. v. Thistledown Racetrack, L.L.C.*, 2014-Ohio-3333, ¶ 34 (8th Dist.) (citations omitted).

With this understanding, the Court turns next to the facts of the case at bar. As has been established, an anticipatory repudiation occurs where one party to a (1) binding contract, (2) unequivocally refuses to perform under the terms of that contract, and (3) thereby causes damages to the other party. *Blake Homes, Ltd. v. FirstEnergy Corp.*, 2007-Ohio-4606, ¶ 73 (6th Dist.). Here, the record indicates that an enforceable contract exists between the Parties. A meeting of the minds occurred on the sufficiently definite, essential terms of the PSA. The PSA identifies (1) the Property to be sold, (PSA Art. 2); (2) the Purchase Price of $75,000,000, (PSA § 3.1); (3) the Parties to be bound by the agreement, (PSA, pg. 2); and (4) the method of conveyance, (PSA, pg. 2). Doc. 39, PageID 1266. The Parties performed by "expend[ing] time, money, and resources in furtherance" of consummating the contemplated transaction. Doc. 30-4, PageID 1135. Thus, the Court rejects Defendants' assertion that Amicus' claim fails as a matter of law because there was no binding contract. To the contrary, the PSA contained an offer, reflected an acceptance, and was accepted in exchange for performance and payment of valuable consideration.

Next, the Court considers whether Defendants' actions constitute an unequivocal refusal to perform under the express terms of the PSA. Amicus claims that the Kacachoses

"repeated[ly]" attempted "to abandon the PSA by refusing to close on the sale or [to] cooperate in the [closing] process." Doc. 39, PageID 1272. Amicus posits that the Kacachoses "constantly avoided setting, and keeping, closing dates—often relying on improper, inefficient extracontractual excuses to avoid closing on the sale." *Id*. But the Court is not convinced that the Kacachoses' *delays* of the closing in the beginning months of 2022 necessarily constituted an unequivocal *refusal* to close (*i.e.*, an anticipatory repudiation) on the contemplated transaction.

However, the Court *does* find that the Kacachoses' refusal to accept the Purchase Price on May 2, 2022—which had previously been agreed upon more than six months prior—is an anticipatory repudiation of the PSA. *See* Am. Verified Compl., ¶ 96. Amicus alleges that, during a call on May 2, 2022, Mr. Kacachos "demand[ed] a higher price … despite Amicus having resolved the outstanding issues to [the] Sellers' satisfaction." *Id*. In their Answer, Defendants "[a]dmit that Tom Kacachos had a phone call … [that] did not result in a meeting of the minds." Defs.' Answer, ¶ 96. Notably, here, the Kacachoses do not deny Plaintiff's pleading in paragraph 96 specifying that the Sellers "demand[ed] a higher price." *See id*.; *see also* Fed. R. Civ. P. 8(b)(6) ("Effect of Failing to Deny. An allegation … is admitted if a responsive pleading is required and the allegation is not denied.").

During a second meeting the following week, Mr. Kacachos "made clear [the] Sellers would not close on the Portfolio, regardless of the terms of the PSA and any [A]ncillary [A]greements, unless Amicus met their price demands." Doc. 39, PageID 1272–73. Defendants dispute this allegation (Defs.' Answer, ¶ 97) and aver that "no shred of evidence suggests the Kacachoses ever demanded a higher price." Doc. 40, PageID 1294. Nonetheless, Defendants admit in their Answer that "[w]ithout the benefit of the [A]ncillary [A]greements,

the [P]urchase [P]rice was *unacceptable* to [the] [S]ellers, and this position was made known to Amicus' principals" during the May 2, 2022 phone call. Defs.' Answer, ¶ 97 (emphasis added). Consequently, "the transaction did not close." *Id*. That the "negotiated" Purchase Price suddenly became "unacceptable" to the Sellers more than six months after the Parties executed the PSA renders it quite plausible that Defendants demanded additional payment and refused to follow through on their contractual obligations until the higher demand was met. *See Nuco Plastics, Inc. v. Universal Plastics, Inc*., 76 Ohio App. 3d 137, 141, (11th Dist. 1991).

In support of its proposition that their unilateral demand for a higher Purchase Price establishes the Kacachoses' anticipatory repudiation, Amicus cites to *Daniel E. Terreri & Sons, Inc. v. Mahoning Cnty. Bd. of Commrs*., 2003-Ohio-1227 (7th Dist.). In that case, the appeals court noted that an anticipatory repudiation arises "when a party declares that he or she will not perform the terms of the contract unless the contract price is increased." *Id*. at ¶ 46. The plaintiffs in that case were awarded joint contracts by county commissioners for the demolition and renovation of a building. *Id*. at ¶ 2. The plaintiffs filed bid guarantees and performance bonds in the amount of the proposed contracts, which were executed more than a year later and which permitted plaintiffs to begin work only after receiving a "notice to commence." *Id*. at ¶¶ 3–4, 6. Due to the delay, the plaintiffs sent a letter requesting a "notice to proceed" and an increase of 15% in the contract price. *Id*. at ¶ 5. A few weeks later, the plaintiffs sent another letter "declaring that if [the county commissioners] issued a notice to proceed … [they] were also agreeing to an 'equitable increase' in the contract price." *Id*. at ¶ 6. Plaintiffs then sent a third letter informing the defendants that they were withdrawing from the contracts. *Id*. at ¶ 7. Shortly thereafter, the commissioners abandoned the project, and the

plaintiffs sued the commissioners for breach of contract. *Id.* at ¶¶ 10, 12–13. On appeal, the court held that the plaintiffs unequivocally abandoned the contract by conditioning performance on the increase of the purchase price—(1) first by asserting that the contracts were still in the bidding stage (and therefore, that no contract existed); (2) then by demanding a higher contract price; and (3) lastly by unilaterally revoking their obligations by withdrawing the bids. *Id.* at ¶¶ 56, 62–63.

*Terreri* is informative to the case at bar. *First*, Amicus has provided evidence—and Defendants maintain throughout their filings—that the Kacachoses disputed the validity of the PSA as a binding and enforceable contract. However, there is clearly an offer, acceptance, and bargained-for consideration. PSA § 3.1 states that "the total [P]urchase [P]rice for the HoldCo Interests shall be a sum of *seventy-five million dollars*," a provision under which Mr. Kacachos added his initials. Doc. 22-1, PageID 634 (emphasis added). *Second*, the Kacachoses state—in no uncertain terms—that the "[P]urchase [P]rice was unacceptable to [the] [S]ellers, and this position was made known to Amicus' principals" in May 2022. Defs.' Answer, ¶ 97. It is worth noting that, although Defendants do not specifically admit they ever demanded a higher contract price, it would still strain credulity for this Court to believe that the Purchase Price suddenly became "unacceptable" to them because the price the Parties agreed upon six months earlier was too *high* or that the Sellers' expected profit was too great. Indeed, given the Defendants' own admission that they "[had] told Amicus … that they would not lower the price," the only reasonable inference to be drawn regarding the "unacceptab[ility]" of the Purchase Price, under the circumstances, was that it was too low. *Third*, Defendants admit that, following this failure to "achieve a meeting of the minds," the Sellers' "performance [was] excused." Defs.' Answer, ¶¶ 97, 102. In other words, it is clear from the pleadings that

Defendants "repudiate[d] the contract prior to the time that [their] performance [became] due." *Farmers Comm. Co. v. Burks*, 130 Ohio App.3d 158, 172 (3d Dist. 1998).

Thus, Amicus has established to the Court's satisfaction that Defendants anticipatorily repudiated the PSA. Accordingly, the Court **GRANTS** Plaintiff's Motion as to Count Two.

### 3. Count Three: Defendants' Breach of the Duty of Good Faith and Fair Dealing

In Count Three of the Amended Verified Complaint and "in the alternative to its breach of contract claim, Amicus posits that [the] Sellers violated the duty of good faith and fair dealing." Am. Verified Compl., ¶ 143. Amicus avers that the Sellers breached this duty through "their refusal to provide necessary due diligence documentation, their unwillingness to cooperate with Amicus to resolve outstanding issues, and their reliance upon pretextual excuses to delay and ultimately avoid closing." [6] *Id.* ¶ 148.

As "an allegation of a breach of the implied covenant of good faith cannot stand alone as a separate cause of action from a breach of contract claim," *Interstate Gas Supply, Inc. v. Calex Corp.*, 2006-Ohio-638, ¶ 98 (10th Dist.), Plaintiff's pleading of Count Three "[i]n the alternative to its breach of contract claim" is essentially a pleading for an independent cause of action. Am. Verified Compl., ¶ 143. But Ohio law makes "clear 'that there is no independent cause of action for breach of implied duty of good faith and fair dealing apart from a breach of the underlying contract.'" *Life Changing Events, LLC v. Heitkoetter*, No. 5:19-cv-02057, 2020 WL 7769721, at *5 (N.D. Ohio Dec. 30, 2020) (quoting *Lucarell v. Nationwide*

---

[6] The Court further finds Amicus' allegations under Count Three (breach of the duty of good faith and fair dealing) to be duplicative of Amicus' breach of contract claim under Count One. *See* Am. Verified Compl., ¶¶ 111–113 ("[The] Sellers … breached the PSA by failing to comply with its due diligence requirements…. [The] Sellers either failed to provide the necessary documents altogether, and/or failed to provide complete and accurate information in sufficient time for the Parties to satisfy the Closing Period. … [The] Sellers have also breached the PSA by failing to finalize certain ancillary agreements … actively avoid[ing] meeting to negotiate these documents, [and] ma[king] hollow promises about reviewing and returning drafts….").

*Mut. Ins. Co.*, 2018-Ohio-15, ¶ 42); *see also Krukrubo v. Fifth Third Bank*, No. 07AP-270, 2007 WL 4532689 *5 (Ohio Ct. App. Dec. 27, 2007) (unpublished) ("[A] claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing.").

Moreover, the allegations concerning Defendants' alleged breach of the duty of good faith and fair dealing (Count Three) derive from the same nucleus of operative facts as for Plaintiff's breach of contract claim (Count One). As such, the "breach of contract claim subsumes [the] claim for breach of good faith and fair dealing, [and] Count [Three] of the [Plaintiff's] Complaint is dismissed." *Eggert Agency, Inc. v. NA Mgmt. Corp.*, No. C2-07-1011, 2008 WL 3474148, at *5 (S.D. Ohio Aug. 12, 2008) (applying Ohio law); *see also Macula v. Laws. Title Ins. Corp.*, No. 1:07-cv-1545, 2008 WL 3874686, at *5 (N.D. Ohio Aug. 14, 2008) (dismissing as an independent claim the allegation of a breach of the duty of good faith and fair dealing but subsuming the allegation into a claim for a breach of contract); *Orange Barrel Media, LLC v. KR Sunset Weho, LLC*, No. 2:21-CV-4988, 2022 WL 2482766, at *4 (S.D. Ohio July 6, 2022) ("To the extent there is a separate claim [of a breach of good faith and fair dealing] outside the breach of contract claim, it is subsumed in the breach of contract claim and the separate claim is dismissed."). Thus, Amicus is not entitled to judgment on the pleadings as to Count Three. To the extent Plaintiff alleges Defendants' breach of the implied duty of good faith and fair dealing, these allegations are subsumed into Count One, and Plaintiff's Motion as to Count Three is hereby **DENIED**, and Count Three is **DISMISSED**.

### 4. Count Four: Promissory Estoppel

In Count Four of the Amended Verified Complaint, Amicus asserts a claim for promissory estoppel. Am. Verified Compl, ¶¶ 152–164. But this claim does not appear to be

pleaded in the alternative. Rather, Amicus maintains the same allegations in support of its promissory estoppel claim (Count Four) as it does for its breach of contract claim (Count One). *Compare* Am. Verified Compl., ¶ 154 ("[The] Sellers promised to transfer the Properties to HoldCo, and in turn transfer the ownership interest of HoldCo to Amicus."); ¶ 155 ("[The] Sellers … promised to provide documentation, complete account transfers, and negotiate an array of documents so as to facilitate the closing on the Properties."); ¶ 156 ("Sellers also promised to close on the Properties on or before February 22, 2022, or, if extended, on March 24, 2022 …."); ¶ 157 ("As a result of [the] Sellers' promises and actions, Amicus has placed $550,000 into an escrow account, where it has been held for months."); *with* ¶ 110 ("[The] Sellers have failed to comply with … their obligations to convey the Properties to Amicus by March 24, 2022."); ¶ 112 ("[The] Sellers either failed to provide the necessary documents altogether, and/or failed to provide complete and accurate information in sufficient time for the Parties to satisfy the Closing Period."); ¶ 117 ("[The] Sellers' breaches have caused Amicus to lose access to $550,000 in cash deposited in escrow ….").

"'Promissory estoppel is an equitable doctrine that comes into play when the requisites of contract are not met, yet a promise should be enforced to avoid injustice.'" *Prime Invs., LLC v. Altimate Care, LLC*, 2022-Ohio-1181, ¶ 35 (10th Dist.) (quoting *APCO Indus. v. Braun Constr. Group., Inc.*, 2020-Ohio-4762, ¶ 60 (10th Dist.)). It follows that promissory estoppel is "*inconsistent with the existence of an express written contract*." Warren v. *Trotwood-Madison School Dist. Bd. of Edn.*, 1999 WL 148233, *8 (2d Dist. Mar. 19, 1999) (emphasis added). "'Thus, the existence of an enforceable express contract between the parties bars recovery under a promissory estoppel claim.'" *12100 Buckeye Ltd. v. Council for Econ. Opportunities in Greater Cleveland*, 2021-Ohio-4517, ¶ 29 (8th Dist.) (quoting *Americana Invest. Co. v. Natl. Contr. &*

*Fixturing, L.L.C.*, 2016-Ohio-7067, ¶ 13 (10th Dist.)); *see also Pagano v. Case W. Res. Univ.*, 2021-Ohio-59, ¶ 78 (8th Dist.) ("The existence of an express contract precludes a claim of ... promissory estoppel."); *APCO Indus.* at ¶ 60 ("[A] plaintiff cannot recover for promissory estoppel where the promise forming the basis of [that claim] is contained within an express written contract.").

Here, the Court has found that the executed PSA constitutes an express, binding contract between the Parties. As it "is well-established in Ohio that where a contract exists, the parties to the contract may not seek damages under quasi-contractual theories of recovery," *Davis & Tatera, Inc. v. Gray-Syracuse, Inc.*, 796 F. Supp. 1078, 1085 (S.D. Ohio 1992), including for promissory estoppel claims, *see O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007), Amicus cannot recover pursuant to Count Four. Plaintiff's Motion is **DENIED** as it relates to Count Four, which is hereby **DISMISSED**.

### C. Defendants' Counterclaims

Defendants press two counterclaims against Amicus. Under Counterclaim One, Defendants seek declaratory judgment pursuant to the Ohio Declaratory Judgment Act, Ohio Rev. Code § 2721, *et seq.*, and 28 U.S.C. § 2201 that "the PSA is not an enforceable contract, and the Kacachoses are not obliged thereunder to sell Amicus the real estate portfolio in this dispute." Defs.' Answer, ¶ 28. Pleading Counterclaim Two in the alternative to Counterclaim One, the Kacachoses contend that Amicus "material[ly] breache[d] … the PSA" by "demanding an improper method of rent proration[,]" "not circulat[ing] its draft of the Profits Interest Agreement until … after the end of the Inspection Period[,]" not "provid[ing] a conforming closing statement," and demanding "additional conditions under the PSA." *Id.* ¶

31(a)–(d). Plaintiff has moved to dismiss Defendants' counterclaims for "fail[ure] to state any claim for relief cognizable as a matter of law." Doc. 39, PageID 1265.

### 1.  Counterclaim One: Declaratory Judgment

The Kacachoses request judgment in their favor "declaring that the PSA was incomplete … and therefore failed to reflect a meeting of the minds as to all material terms." Defs.' Answer, ¶ 21. For the reasons stated above, the PSA sets forth the essential elements of a contract, including "the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *Alligood v. Procter & Gamble Co.*, 72 Ohio App.3d 309, 311 (1st Dist. 1991). Specifically, the PSA identifies (1) the Portfolio properties to be sold, (PSA, Art. 2, Schedule 2.1(A)); (2) the Purchase Price of $75,000,000, (PSA, § 3.1); and (3) the parties to be bound by the agreement, (PSA, pg. 1). The PSA is therefore a binding instrument. Thus, finding this counterclaim to be frivolous and devoid of merit, the Court **DISMISSES** Counterclaim One.

### 2.  Counterclaim Two: Amicus' Breaches of the PSA

In the alternative, the Kacachoses allege that Amicus breached the "conditional PSA." Defs.' Answer, ¶ 30. Under Ohio law, "a cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, *and damages or loss resulting from the breach*." *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41 (emphasis added).

Defendants' counterclaim is deficient as a matter of law because Defendants have not adequately alleged damages or loss resulting therefrom. Defendants maintain they are "are entitled to recoup the deposit of $550,000, escrowed under PSA section 11.2 for buyer default

… [and] are entitled to recover their attorney fees under PSA section 12.9."[7] Defs.' Answer, ¶ 32. This does not suffice to allege damages. "As a general rule, parties are free to enter into contracts that contain provisions which apportion damages in the event of default." *Kurtz v. W. Prop., L.L.C.*, 2011-Ohio-6726, ¶ 26 (10th Dist.). However, such a provision "will be enforced" only "if the provision was reasonable at the time of formation and it bears a *reasonable* (not necessarily exact) relation to *actual* damages." *Lake Ridge Acad. v. Carney*, 66 Ohio St. 3d 376, 382 (1993) (emphasis added) (citing 3 Restatement of the Law 2d, Contracts (1981) 157, Section 356(1)). For Defendants to state a claim, they must plead that the stipulated sum "bears a reasonable proportion to the loss *actually* sustained." *Leugers v. Smallwood*, No. 1-84-50, 1985 WL 7388, at *5 (Ohio Ct. App. Aug. 27, 1985) (emphasis added).

Here, although Defendants request Amicus' escrow deposit of $550,000, they have made no pleading whatsoever that the amount escrowed "bears [any] reasonable relationship to the actual damages [they] sustained." *Id*. In other words, Defendants seek to "penalize" Amicus for their alleged breaches, not to be made whole for the damages they allegedly sustained. *See Boone Coleman Constr., Inc. v. Piketon*, 2016-Ohio-628, ¶ 19 ("Valid and enforceable liquidated-damages provisions are those intended by the parties to give reasonable compensation for damages, but provisions that impose amounts that are 'manifestly inequitable and unrealistic' are deemed unenforceable penalties."). Therefore, finding this counterclaim to be deficient as a matter of law because Defendants do not allege the critical element of damages, the Court **DISMISSES** Counterclaim Two.

---

[7] On August 25, 2025, the Court entered an Order, a proposed version of which was jointly submitted by the Parties, to disburse the escrow proceeds back to Amicus. Doc. 70, PageID 1721.

## IV.     CONCLUSION

For the reasons set forth herein, the Court **GRANTS IN PART, DENIES IN PART** Plaintiff's Motion for Judgment on the Pleadings (Doc. 39); **DENIES** Defendants' Motion for Partial Summary Judgment/Judgment on the Pleadings (Doc. 40); and **DENIES AS MOOT** Plaintiff's Motion to Strike Defendants' Motion for Partial Summary Judgment (Doc. 42).

Within **twenty-one (21) days** of the entry date of this Opinion and Order, the Parties are hereby **ORDERED** to file a joint status report regarding the May 5, 2023 Rule 26(f) Report. Doc. 50. The joint status report must indicate whether the Parties intend to abide by the deadlines as set forth in the Rule 26(f) Report and whether the Parties have engaged in meaningful attempts at settlement now that the instant Motions have been resolved. The Court will determine at a later date if a hearing on damages is necessary.

**IT IS SO ORDERED.**

September 19, 2025

Jeffery P. Hopkins
United States District Judge

48